IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

DARREN WILLIAMS,

Plaintiff,

Civil Action No.
9:09-CV-1258 (NAM/DEP)

v.

BRIAN FISCHER, Commissioner of New York State Department of Correctional Services; LORI MONTROY, Nurse Administrator; MR. PHELIX, Corrections Captain; DONNA PEPIN[1], Nurse; KENNETH SCHWENKE, Corrections Sergeant; LARRY DEUYOUR, Corrections Officer; and STEPHEN TRAVERS, Corrections Officer,

Defendants.

---

APPEARANCES: OF COUNSEL:

FOR PLAINTIFF:

DARREN WILLIAMS, *Pro Se*
04-A-5841
Elmira Correctional Facility
P.O. Box 500
Elmira, NY 14902

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN
New York State Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

ROGER W. KINSEY, ESQ.
Assistant Attorney General

---

[1] The court's records inadvertently list this defendant's name as "Papin". The clerk will therefore be directed to amend the docket sheet to reflect the correct spelling as "Pepin".

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

*Pro se* plaintiff Darren Williams, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. While plaintiff's recitation of the facts upon which his claims are based is relatively succinct, centering upon the allegation that he was assaulted by prison corrections officers and denied due process in an ensuing disciplinary hearing arising out of the incident, his stated legal claims are extensive and varied, alleging deprivation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments as well as violations of various state regulations. In his complaint, plaintiff seeks recovery of compensatory and punitive damages.[2]

In response to plaintiff's complaint defendants have moved seeking its dismissal on a variety of grounds, and additionally a finding that they are

---

[2] Plaintiff's complaint does not specify the amount of compensatory and punitive damages sought from the defendants. *See* Amended Complaint (Dkt. No. 26) at p. 8. In his motion opposition papers, however, plaintiff requests awards of compensatory and punitive damages against the various defendants on a sliding scale basis, ranging in amounts from $150,000 each in compensatory and punitive damages against defendant Pepin down to $2500 in compensatory damages and $2500 in punitive damages against Commissioner Fischer. *See* Plaintiff's Opposition to Defendants' Motion (Dkt. No. 30) at p. 6 of 19.

entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendants' motion be granted in large part, and that plaintiff's claims be pared down to allege the use of excessive force and/or failure to protect him from harm as against defendants Schwenke, Deuyour and Travers, but that all other claims in the action be dismissed.

## I. BACKGROUND[3]

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Amended Complaint (Dkt. No. 26). After coughing up blood, on November 3, 2006 plaintiff was transferred from the Bare Hill Correctional Facility ("Bare Hill") into a tuberculosis ("TB") isolation unit within the Franklin Correctional Facility ("Franklin"), located in Malone, New York, where most of the relevant events occurred. *See id.*

On November 9, 2006, a dispute arose out of plaintiff's request to

[3] In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964). In addressing the issues now raised I have also considered the materials submitted by the plaintiff in opposition to the defendants' motion, Dkt. No. 30, to the extent they are consistent with the allegations set forth in his complaint. *See Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.).

defendant Donna Pepin, a nurse at Franklin, for medical attention to address his complaints of chest pains and shortness of breath. Amended Complaint (Dkt. No. 26) at p. 2. As a result of the dispute, according to Williams, defendant Pepin allowed defendant Kenneth Schwenke, a corrections sergeant, to enter plaintiff's isolation unit, at which point he was assaulted by Schwenke, assisted by Corrections Officers Larry Deuyour and Stephen Travers. *Id.* at pp. 2-5.

As a result of the incident plaintiff was issued a misbehavior report charging him with several prison rule infractions, including assaulting staff members, and was returned to Bare Hill where he was confined within a special housing unit ("SHU"). *Id.* at pp. 2-3; *see also* Williams Aff. (Dkt. No. 30) ¶ 3 and Exh. A. A Tier III hearing was convened to address the charges, with Corrections Captain Phelix serving as a hearing officer.[4] Amended Complaint (Dkt. No. 26) at p. 6; Williams Aff. (Dkt. No. 30) Exh. A. At the close of the hearing plaintiff was found guilty on all counts and

---

[4] The DOCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3. Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

sentenced to thirty-six months of disciplinary SHU confinement, with an additional three-month term imposed in connection with a second misbehavior report authored by defendant Pepin.[5] Amended Complaint (Dkt. No. 26) at p. 6.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on November 10, 2009, and was thereafter granted leave to proceed *in forma pauperis*. Dkt. Nos. 1, 5. Following the defendants' filing of a dismissal motion, Dkt. No. 20, which was later withdrawn, Dkt. No. 24, and my issuance of an order dated March 12, 2010 permitting the plaintiff to amend his complaint, *see* Dkt. No. 25, plaintiff filed a superceding complaint on March 12, 2010. Dkt. No. 26. Named as defendants in plaintiff's amended complaint are Brian Fischer, Commissioner of the DOCS; Lori Montroy, an administrative nurse at Franklin; Mr. Phelix, a corrections captain at the facility; Donna Pepin, a nurse working in the Franklin infirmary; and Corrections Officers Kenneth Schwenke, Larry Deuyour, and Stephen Travers. Plaintiff's complaint, as amended, asserts a single cause of action against each of the named defendants and appears to

---

[5] Plaintiff's thirty-six month sentence was later reduced to eighteen months of SHU disciplinary confinement as a result of plaintiff's internal administrative appeal of the determination. Amended Complaint (Dkt. No. 26) at p. 3.

include claims of deliberate medical indifference; the use of excessive force; the failure to protect plaintiff from the use of force; violation of procedural due process; denial of equal protection; unlawful retaliation; conspiracy; and violation of various state regulations.[6] *See generally id.*

In response to the filing of plaintiff's amended complaint defendants have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss certain of his claims on a variety of grounds.[7] Dkt. No. 27. Plaintiff has since responded in opposition to defendants' motion, *see* Dkt. No. 30, which is now fully briefed and ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. §

---

[6] Plaintiff's third cause of action also references a claimed Sixth Amendment deprivation growing out of the failure of the disciplinary hearing officer to permit Williams to call a witness to testify on his behalf. *See* Complaint (Dkt. No. 1) § 7, Third Cause of Action. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. CONST. AMEND. VI. Since the protections of the Sixth Amendment do not extend to such administrative disciplinary hearings, I have not addressed that portion of plaintiff's third cause of action. *Clyde v. Schoelkopf*, 714 F. Supp. 2d 432, 437 (W.D.N.Y. 2010) ("'[t]he scope of DOCS's obligation in this regard is significantly limited, and ... an inmate's right to assistance in connection with a disciplinary hearing-which arises under the Due Process Clause of the Fourteenth Amendment ... falls far short of the right to counsel that the Sixth Amendment guarantees to criminal defendants.'") (quoting *Loving v. Selsky*, No. 07-CV-6393L, 2009 WL 87452, *2 (W.D.N.Y.2009)).

[7] In their motion, defendants purport to seek dismissal of plaintiff's complaint in its entirety. *See* Defendants' Notice of Motion (Dkt. No. 27); *see also* Defendants' Memorandum (Dkt. No. 27-1) at p. 19. Their motion does not address certain of plaintiff's claims, however, including an apparent claim for an alleged due process violation in association with his disciplinary proceeding and those alleging the use of excessive force and failure to protect him from harm.

636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Dismissal Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S. Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient

facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal*, 129 S. Ct. at 1949. In the wake of *Twombly* and *Iqbal*, the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'" *Log*

*On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted).

B. Deliberate Medical Indifference

While plaintiff's complaint, as amended, makes oblique reference to dissatisfaction with the medical treatment received by him while at Franklin, his first cause of action, asserting a claim against Nurse Pepin – the person most likely to be the focus of such a claim – does not appear to encompass a medical indifference claim. Out of an abundance of caution, defendants have nonetheless moved to dismiss any medical indifference claim deemed to be included within plaintiff's amended complaint. The opposition submitted by plaintiff in response to that motion appears to confirm defendants' speculation that among the claims now being raised is one for deliberate medical indifference.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton

infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).* While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)). To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832, 114 S. Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).[8] Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms,

---

[8] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

"in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir. 2006).

1. Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care . . .", and centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin*, 467 F.3d at 279. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id*. at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is

more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted). In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith*, 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)). Relevant factors

informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

2. Subjective Element

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin*, 467 F.3d at 280 (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S.Ct. 2321, 2325 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-

1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S. Ct. 1970).

Conspicuously lacking from plaintiff's amended complaint are allegations of fact demonstrating the existence of a plausible medical indifference claim. Indeed, plaintiff's complaint fails even to allege that defendant Pepin refused to address his medical complaints of chest pains or shortness of breath, instead stating only that a "discrepancy" with defendant Pepin arose concerning that request. Amended Complaint (Dkt. No. 26) at p. 2. It is well-established, however, that a prisoner's disagreement over the course of treatment rendered by prison medical personnel is not actionable under section 1983. *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970) (citation omitted).

At best, interpreted in a light most favorable to the plaintiff, the amended complaint alleges an isolated incident of failing to address symptoms and is lacking in the information necessary to determine whether plaintiff has plausibly stated a claim that could satisfy both the objective and subjective elements of the governing Eighth Amendment test. Accordingly, I

recommend dismissal of any medical indifference claims deemed present in plaintiff's amended complaint.

C. Personal Involvement

In their motion defendants next seek dismissal of plaintiff's claims against DOCS Commissioner Fischer and Nurse Administrator Lori Montroy, arguing that plaintiff's complaint fails to disclose a sufficient basis to find them personally accountable for the constitutional violations alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). As the Supreme Court recently has noted, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government–official defendant, *through the official's own individual actions, has violated the Constitution." Iqbal*, 129 S.

Ct. at 1948 (emphasis added).

As supervisory DOCS employees, Commissioner Fischer and Nurse Administrator Montroy cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under that statute. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Instead, under established authority within this circuit, culpability on the part of a supervisory official for a civil rights violation can only be established by showing that an individual has engaged in one of the following 1) direct participation in the challenged conduct; 2) after learning of the violation through a report or appeal, failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring.[9] *Colon v. Coughlin,* 58

---

[9] There is considerable debate as to how much the Second Circuit's *Colon* test retains vitality following the Supreme Court's decision in *Iqbal*. *See Sash v. United States*, 674 F. Supp. 2d 531, 5gh42-544 (S.D.N.Y. 2009); *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued vitality of some of the categories set forth in *Colon.*") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010) . While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No.07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir. 2010), (continued...)

F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

Against this backdrop it is clear that the plaintiff has failed to establish a plausible claim against either Commissioner Fischer or Nurse Administrator Montroy. Plaintiff's claims against Commissioner Fischer are based upon his alleged failure to train DOCS employees and the fact that, according to Williams, the Franklin TB isolation unit fails to conform to applicable medical standards. *See* Amended Complaint (Dkt. No. 26) p. 7, ¶ 13 (Seventh Cause of Action). These are precisely the sort of allegations that were deemed insufficient by the Supreme Court in its decision in *Iqbal. See* 129 S. Ct. at 1950-52. In light of this, and the fact that defendant Fischer was not the DOCS Commissioner at the relevant times, I recommend dismissal of plaintiff's claims as against Commissioner Fischer.[10]

Plaintiff's claims against defendant Montroy are only slightly more

---

[9](...continued)
others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, Nos. 09 Civ. 7283 (JSR), 09 Civ. 9952 (JSR), 2010 WL 2428128, at *5 (S.D.N.Y. Jun. 15, 2010); *Qasem v. Toro*, No. 09 Civ. 8361 (SHS), 2010 WL 3156031, at *4 (S.D.N.Y. Aug. 10, 2010).

[10] Noting that Commissioner Fischer was not even in his current position at the relevant times, plaintiff communicated with the court in writing on April 14, 2010 requesting leave to withdraw his claim against that defendant. *See* Dkt. No. 33. That application was denied without prejudice to renewal following disposition of the pending dismissal motion. Dkt. No. 34.

informative regarding her level of involvement. *See* Amended Complaint (Dkt. No. 36) p. 7, ¶ 12 (Sixth Cause of Action). Plaintiff's allegations regarding Montroy's negligence in failing to insure that proper policies and procedures regarding TB isolation were followed at Franklin, like those allegations against Commissioner Fischer, are legally deficient to establish a plausible claim of her involvement in the constitutional deprivations alleged.[11]

Additionally, plaintiff appears to assert a claim against Nurse Administrator Montroy based upon her denial of his request, pursuant to the New York Freedom of Information Law ("FOIL"), N.Y. Pub. Off. Law Art. 6, for documents related to his respiratory isolation. *See* Williams Aff. (Dkt. No. 30) Exh. B. While the precise chronology is less than clear, it appears that by the time that request was made and answered plaintiff's disciplinary hearing was completed; as a result, defendant Montroy's compliance with the FOIL request would not have provided information which was useful to the plaintiff

---

[11] Standing alone, this allegation does not appear to demonstrate defendant Montroy's liability for a constitutional deprivation, not only because it appears, once again, that plaintiff's claim against Montroy is premised upon *respondeat superior*, but also because negligence does not support a section 1983 claim, *see Johnson v. Wigger*, 2009 WL 2424186, at * 8 (N.D.N.Y. 2009) ( "42 U.S.C. § 1983 does not provide remedy for every common law tort. . ..") (citing *Williams v. Pecchio*, 543 F. Supp. 878, 879 (W.D.N.Y. 1982)). It should be noted, moreover, that it appears from the record that Nurse Administrator Montroy did give testimony by speaker phone at plaintiff's hearing and that the plaintiff was allowed to question her during the course of that testimony. *See* Williams Aff. (Dkt. No. 30) Exh. A at p. 12 of 19.

in defending himself during the course of his hearing. In any event, an allegedly improper denial of a FOIL request by an inmate for documents does not give rise to a claim under section 1983. *See Cusamano v. Sobek*, 604 F. Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases) ("A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983.").

In sum, the allegations in plaintiff's complaint regarding the involvement of defendants Fischer and Montroy in the constitutional deprivations are insufficient to establish a plausible constitutional claim under section 1983 against them.

D. *Heck/Balisok*

Defendants next argue that plaintiff's pursuit of procedural due process claims stemming from the disciplinary hearing conducted in November of 2006 is precluded, based upon his failure to invalidate the resulting disciplinary determination before commencing suit.[12] In support of that argument defendants cite the Supreme Court's decision in *Heck v.*

[12] While the table of contents of their memorandum suggests that Point IV is addressed to plaintiff's retaliation claims, in the body of Point IV defendants' argument regarding *Heck* and *Balisok* is instead presented, with only passing reference at the end of the section to retaliation arising out of the issuance of false misbehavior reports. *See* Defendants' Memorandum (Dkt. No. 27-1) at pp. 1, 9-12.

*Humphrey*, 512 U.S. 477, 114 S. Ct. 2364 (1994) and *Edwards v. Balisok*, 520 U.S. 641, 117 S. Ct. 1584 (1997).

In 1997, the Supreme Court issued a decision in *Edwards v. Balisok*, 520 U.S. 641, 117 S. Ct. 1584 (1997), in which it held that a claim for damages for a violation of procedural due process in the context of a prison disciplinary hearing is not cognizable under section 1983 where the nature of the challenge to the procedures followed necessarily implies the invalidity of the judgment and/or punishment imposed, unless the disciplinary disposition has already been reversed through a state administrative or judicial habeas proceeding. *Balisok*, 520 U.S. at 645, 117 S. Ct. at 1588-89. Since that decision was rendered, the Second Circuit has interpreted it to differentiate between those cases involving challenges to disciplinary penalties that only affect the conditions of an inmate's confinement – including disciplinary segregation such as keeplock and solitary confinement – and those resulting in the imposition of sanctions impacting upon an inmate's good-time credits. *Jenkins v. Haubert*, 179 F.3d 19, 22-23 (2d Cir. 1999). Applying *Balisok*, the Second Circuit concluded in *Jenkins* that a plaintiff challenging only the conditions of his or her confinement, where no good time credits have been lost as a result of the disciplinary hearing at issue, need not show as a

threshold matter that the disciplinary hearing decision and sentence were reversed or invalidated. *Id.* at 27. Since the plaintiff in *Jenkins* was not attacking the fact or length of his confinement, either directly or indirectly, it was not necessary for him to invalidate the prison hearing officer's judgment against him prior to bringing a section 1983 claim for damages. *Id.*

Notwithstanding the rule announced in *Balisok* and carried over into the Supreme Court's later decision in *Muhammad v. Close,* 54 U.S. 749,124 S. Ct. 1303 (2004), the Second Circuit has clarified that if, as a prerequisite for maintaining his or her section 1983 action, a prisoner agrees to and can successfully abandon once and for all the portion of his or her challenge directed to the duration of incarceration, then success in the section 1983 action will have no affect on the sanctions that relate to the length of time served in prison and, accordingly, the inmate can proceed with pursuit of a due process claim. *Peralta v. Vasquez*, 467 F.3d 98, 105 (2d Cir. 2006), *cert. denied sub nom*., *Jones v. Peralta*, 551 U.S. 1145, 127 S. Ct. 3006 (2007). Under *Peralta's* limited exception to the rule in *Edwards*, in order to pursue his section 1983 due process claim in this action the plaintiff must therefore abandon – not just at present now but for all time – any claims he may have with respect to the duration of his confinement that arise out of the

proceeding now challenged.[13] *Id.* at 104.

To date, plaintiff has not manifested a willingness to forego a challenge to any sanctions resulting from the hearing determination that potentially affect the duration of his confinement. Unless and until that occurs, his procedural due process claim is barred by the rule enunciated in *Muhammad* and *Edwards*. Accordingly, I recommend that unless plaintiff definitively indicates to the court, by filing objections to this report or otherwise, that he intends to forego all such claims affecting the duration of his confinement, his procedural due process cause of action as set forth in third claim should be dismissed, without prejudice.

D. Eleventh Amendment

Each of the defendants named in plaintiff's amended complaint is employed by the State of New York. Plaintiff's amended complaint is less than precise in stating whether the defendants are sued individually, as employees of the state in their official capacities, or both. At one point the

---

[13] Neither plaintiff's complaint nor his affidavit in opposition to defendants' motion discloses the full extent of the sanctions imposed as a result of the Tier III hearing. Although, as part of the relief requested, plaintiff's amended complaint demands compensatory and punitive damages based upon personal injuries and loss of good time. *See* Amended Complaint (Dkt. No. 26) p. 10. It should be noted, moreover, that in his pleading plaintiff also alleges that as a result of the incident and hearing he was denied parole. *See id.* at p. 6, ¶ 11 (Fifth Cause of Action).

amended complaint does state that plaintiff "seeks relief pursuant to 42 U.S. C. section 1983, from each of the above named Defendant [sic], for damages in their individual capacity, collectively . . .." Amended Complaint (Dkt .No. 26) p. 3, ¶ 6. Additionally, plaintiff's opposition papers, in which he requests compensatory and punitive damages from the individual defendants in varying sums, strongly suggest that the focus of plaintiff's complaint is upon the defendants individually. Nonetheless, once again acting out of an abundance of caution, defendants seek a determination from the court that to the extent they are asserted against the defendants in their official capacities, plaintiff's damage claims should be dismissed.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[14]

---

[14] In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been (continued...)

*Richards v. State of New York Appellate Division, Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-91, 102 S. Ct. 2325, 2328-29 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[15] *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 3105 (1985); *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991).

Since any damage claims against the named defendants in their official capacities would in reality constitute claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.). I therefore recommend this portion of defendants' motion be granted, and that any damage claims considered to have been asserted in plaintiff's complaint against the defendants in their official capacities be dismissed.

---

[14](...continued)
recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County*, 547 U.S. 189, 193, 126 S. Ct. 1689, 1693 (2006).

[15] By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer*, 502 U.S. at 30-31, 112 S. Ct. at 364-65.

E. Plaintiff's Conspiracy Claims

Plaintiff's amended complaint makes passing reference to a "civil conspiracy" in certain of his stated claims. *See* Amended Complaint (Dkt. No. 26) § 7, First, Third, Fifth, and Sixth Causes of Action. Defendants maintain that plaintiff's complaint does not allege sufficient facts to support a plausible claim of conspiracy, and that in any event such a claim would be barred by the intra-agency conspiracy doctrine.

Construed generously, plaintiff's complaint could be deemed to assert a claim of conspiracy to violate his civil rights under 42 U.S.C. § 1983. To sustain a conspiracy claim under § 42 U.S.C. 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights . . . secured by the Constitution or the federal courts." *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) (citations and internal quotation marks omitted). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983. *See Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir.), *cert. denied*, 464 U.S. 857, 104 S. Ct. 177 (1983). Plaintiff's complaint fails to allege facts sufficient to support a showing of an agreement on the part of

two or more of the defendants deprive him of his constitutional rights, and thus fails to state a plausible conspiracy claim under section 1983.

It is possible that plaintiff's conspiracy claim is asserted under 42 U.S.C. § 1985(3), although that statute is nowhere mentioned in his complaint.[16] The requirements associated with that section, however, are no less demanding than those necessary for adequately pleading a conspiracy claim under section 1983. To sustain a cause of action for conspiracy to violate civil rights under section 1985(3), a plaintiff must demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his or her equal protection of the laws, or of equal privileges and immunity secured by law. *United Brotherhood of Carpenters & Joiners, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 834-39, 103 S. Ct. 3352, 3359-61 (1983); *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.

---

[16] That section provides, in pertinent part, that

> [i]f two or more person in any State or Territory conspire. . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws. . . the parties so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

1994); *Gleason v. McBride*, 869 F.2d 688, 694 (2d Cir. 1989); *Patterson v. Cty. of Oneida*, No. 00-CV-1940, 2002 WL 31677033, at *4 (N.D.N.Y. 2002) (Hurd, J.), *aff'd in relevant part*, 375 F.3d 206 (2d Cir. 2004); *Benson v. United States*, 969 F. Supp. 1129, 1135-36 (N.D. Ill. 1997) (citing, *inter alia*, *United Brotherhood*); *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995). A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can in the alternative be evidenced circumstantially, through a showing that the parties had a "'tacit understanding to carry out the prohibited conduct.'" *LeBlanc-Sternberg*, 67 F.3d at 427 (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988)). Nonetheless, in order to properly plead such a claim, a plaintiff must make more than "conclusory, vague, or general allegations of conspiracy." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir.1983) (per curiam); *Williams v. Reilly*, 743 F. Supp. 168, 173 (S.D.N.Y. 1990) ("[u]nsubstantiated, conclusory, vague or general allegations of a conspiracy to deprive constitutional rights are not enough to survive [even] a motion to dismiss"). "[D]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (quoting *Dwares v. City of New York*, 985

F.2d 94, 100 (2d Cir. 1993)).

Aside from the assertion, in purely conclusory terms, that the defendants have conspired among themselves to violate his civil rights, plaintiff's complaint in this case is wholly devoid of specifics in connection with his conspiracy claims. Additionally, plaintiff's complaint lacks any allegation of race-based animus, or his membership in a suspect class as providing motivation for the defendants' conduct. Accordingly, I recommend a finding that plaintiff's conspiracy claims are inadequately set forth in plaintiff's amended complaint.

Even if plaintiff's conspiracy claims were adequately stated in his amended complaint, they would nonetheless be subject to dismissal under the intra-agency conspiracy doctrine, as argued by the defendants in their motion. In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in

such circumstances. *See, e.g., Everson v. New York City Transit Auth.*, 216 F. Supp. 2d 71, 75-76 (E.D.N.Y. 2002); *Griffin-Nolan v. Providence Washington Ins. Co.*, No. 5:05CV1453, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.).

In this instance, plaintiff alleges that the defendants, all employees of DOCS, conspired to deprive him of his civil rights. Since those conspiracy claims are asserted against officers, agents, or employees of the same agency, each acting within the scope of his or her employment, they are precluded by virtue of the intra-corporate conspiracy doctrine. *Little v. City of New York,* 487 F. Supp. 2d 426, 441-42 (S.D.N.Y. 2007) (citations omitted); *Koehl v. Greene*, No. 9:05-CV-582, 2008 WL 4822520, at *12 (N.D.N.Y. Oct. 31, 2008) (Hurd, J. & Peebles, M.J.); *see also Griffin-Nolan,* 2005 WL 146424, at *10-11.

F. New York Correction Law § 24

While not altogether clear, it appears that plaintiff's amended complaint may assert claims against the defendants for violation of state laws and regulations, as well as common law negligence. Defendants maintain that such claims are barred by the immunity afforded under New York Correction Law § 24, and in any event have requested that the court decline to exercise

supplemental jurisdiction over those causes of action pursuant to 28 U.S.C. § 1367.

By statute, New York invests state employees, including correctional workers, with immunity from suits requiring them to personally answer state law claims for damages based on activities falling within the scope of the statute, providing that

> 1. [n]o civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of [the Department of Correctional Services], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.
>
> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of [the Department of Correctional Services] shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sysco,* 119 F.3d 183, 186-87 (2d Cir. 1997).[17] Section 24 thus precludes claims against corrections officers

[17] To be sure, the immunity afforded under section 24 is by no means absolute; actions taken by corrections workers occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that section. The circumstances presented in *Ierardi,* for example, involving a claim of sexual harassment made by a special education teacher employed by the DOCS against a corrections officer assigned to the same facility, serves aptly to illustrate the type of situation in which section 24 would not afford protection. *Ierardi*, 119 F.3d at 188-89.

brought against them in any court in their personal capacities arising out of the discharge of their duties. *Baker v. Couglin*, 77 F.3d 12, 14-15 (2d Cir. 1996).

In *Haywood v. Drown*, ___ U.S. ___, 129 S.Ct. 2108 (2009), the Supreme Court relatively recently held this provision unconstitutional to the extent it precludes inmates from pursuing section1983 actions. In the wake of *Haywood*, one court in this district has observed that "[a] claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim." *May v. Donneli*, 9:06-cv-437, 2009 WL 3049613, at * 5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J. & Treece, M.J.). In that case, because the acts of the corrections officers, which were alleged to have violated New York Correction Law section 610, clearly fell within the scope of their employment, the court found that it lacked jurisdiction to hear such pendent state law claims. *See id.*

In this case, plaintiff's pendent state law claims, alleging violations of the DOCS regulations as well as common law negligence, undeniably arise from actions taken by the defendants in their roles as corrections employees. While plaintiff's complaint may allege constitutional deprivations and actions

exceeding the scope of DOCS employees' authority, these types of claims have consistently been treated as giving rise to immunity from suit for pendent state law claims against corrections officers in their individual capacities, whether in state or federal court. *See, e.g. Baker*, 77 F.3d at 15-16; *Parker v. Fogg*, No. 85-CV-177, 1994 WL 49696, at *9 (N.D.N.Y. Feb. 17, 1994) (McCurn, S.J.); *see also Cepeda v. Coughlin,* 128 A.D.2d 995, 996-97, 513 N.Y.S.2d 528, 530 (3d Dep't 1987) (holding New York Correction Law section 24 applicable to actions against corrections officers for allegedly using excessive force when returning inmates to their cells during a disturbance), *lv. denied*, 70 N.Y.2d 602, 512 N.E.2d 550 (1987). For this reason, I find that plaintiff's state law claims are precluded by section 24, and recommend that they be dismissed.[18]

G. Qualified Immunity

In their motion defendants argue that based upon the allegations contained in plaintiff's complaint, Commissioner Fischer, Nurse Administrator

---

[18] In any event, even if I were to conclude that those state law claims were not precluded, I would recommend that the court decline to exercise pendent jurisdiction of such claims, "pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed." *Stephenson v. Albany County Policymakers*, Civ. No. 6:09-CV-326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug. 14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

Montroy, Nurse Pepin, and Hearing Officer Phelix are entitled to qualified immunity from suit.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the defense, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. ___, 129 S. Ct. 808, 815 (2009) .

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's

qualified immunity claims." *Pearson*, 555 U.S. at ___, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[19] *Kelsey*, 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 430 n.9 (citing *Saucier*).[20] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the . . . prongs of the qualified

---

[19] In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S. Ct. 2151.

[20] In *Okin*, the Second Circuit clarified that the "'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin*, 577 F.3d at 433, n.11 (citation omitted).

immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[21] *Pearson*, 555 U.S. at ___, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey*, 567 F.3d at 61(citing *Pearson*, 129 S. Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs . . . should be addressed in light of the circumstances in the particular case at hand.'" *Okin*, 577 F.3d 430 n.9 (quoting *Pearson*). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.'" *Kelsey*, 567 F.3d at 61 (quoting *Pearson*, 129 S. Ct. at 818).

Here, the constitutional rights at stake were clearly established at the

---

21 Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson*, 555 U.S. at ___, 129 S.Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

relevant times. The question of whether, under the circumstances presented, the defendants reasonably believed that their actions were lawful in light of clearly established law is intimately intertwined with the merits of the case, and is not susceptible to ready disposition on a dismissal motion. Accordingly, I recommend denial of plaintiff's motion for qualified immunity, particularly as it relates to defendants Pepin and Phelix, with leave to renew.

H. Whether to Permit Amendment

This report, if adopted, will result in dismissal of certain of plaintiff's claims. The next issue to be addressed concerns whether the plaintiff should be granted leave to amend his complaint in an effort to restate those dismissal claims.

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). Except as to his claims

against Commissioner Fischer and those against defendants in their official capacities, at this early juncture I am unable to state with complete certainty that, if given the opportunity to amend, plaintiff would nonetheless be unable to assert plausible constitutional claims against the defendants. I therefore recommend that he be granted leave to amend to assert claims, to replace those dismissal of which is herein recommended, as against all defendants, with the exception of Commissioner Fischer and those damage claims asserted against the defendants in their official capacities.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's complaint in this action, though based upon a relatively finite set of circumstances, asserts a broad array of claims against various defendants ranging from the Commissioner of the DOCS down to three corrections officers employed by the agency. Several of plaintiff's claims are not challenged in defendants' motion, including his causes of action alleging retaliation, the use of excessive force, and the merits of his due process claim arising out of the Tier III hearing conducted by defendant Phelix. Of the issues raised by defendants in their motion, I find that certain of their positions are well taken, and that plaintiff's deliberate medical indifference cause of action, his claims against Commissioner Fischer and Nurse

Administrator Montroy, his claims for violation of state law and regulations, his cause of action for negligence, his cause of action for conspiracy, and any damage claims deemed asserted against the defendants in their official capacities, should be dismissed. Additionally, I recommend that plaintiff's due process claim be dismissed unless he states in writing, in his objections to this report, that he is relinquishing all claims affecting the length of his confinement resulting from a Tier III hearing in accordance with the Second Circuit's decision in *Peralta.* Finally, I recommend a finding that the motion to dismiss on the ground of qualified immunity with regard to certain of the defendants be denied, without prejudice to renewal.

Based upon the foregoing it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 27) be GRANTED, in part, and that plaintiff's claims of deliberate medical indifference, all causes of action against defendants Fischer and Montroy, plaintiff's conspiracy claims, all claims arising under state law, regulation and common law, all damage claims against the defendants in their official capacities, and all conspiracy causes of action be dismissed, with leave to replead except with respect to Commissioner and plaintiff's damage claims against the defendants in their official capacity, and additionally that plaintiff's

procedural due process claim be dismissed unless he states to the court in writing that he does not intend to pursue any claims associated with the loss of good time credits and the affect upon the duration of his prison term resulting from the hearing or, alternatively, seeks and obtains a decision vacating the hearing result before pursuing his damage claim under the Fourteenth Amendment; and it is further

ORDERED, that the clerk amend the court's records to correctly reflect defendant Pepin as "Donna Pepin".

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated: February 9, 2011
Syracuse, NY







H

Only the Westlaw citation is currently available.

United States District Court,

W.D. New York.

Shaheeb LOVING, Plaintiff,

v.

Donald SELSKY, Captain Di Angelo, Lt. Gilmore, C.O. Berg, C.O. J. Clark, C.O. R. Mc Jury, Jennifer Infurnari, Sgt. Corcoran, R.N. Danna Smith, Defendants.

No. 07-CV-6393L.

Jan. 12, 2009.

West KeySummary **Prisons 310** **287**

310 Prisons

310II Prisoners and Inmates

310II(H) Proceedings

310k279 Requisites, Course, and Conduct of Proceedings

310k287 k. Counsel or Other Assistance. Most Cited Cases

There were insufficient facts to find that an inmate was denied adequate assistance in preparing for his disciplinary hearing. The inmate was confined in the special housing unit pending a disciplinary hearing after being charged with attempted assault and threats in connection with an incident involving several corrections officers. In preparing for his hearing, the inmate requested that the corrections officers assigned to help him seek statements from witnesses and obtain documents. Although the assisting officers never secured the witness statements, the witnesses did ultimately testify at the hearing and the inmate failed to show how obtaining the witness' statements would have altered the outcome of the hearing.

Shaheeb Loving, Comstock, NY, pro se.

Emil J. Bove , Jr., Office of New York State Attorney General, Rochester, NY, for Defendant.

*DECISION AND ORDER*

DAVID G. LARIMER, District Judge.

***1** Plaintiff, Shaheeb Loving, appearing *pro se,* commenced this action under 42 U.S.C. § 1983. Plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), alleges that his constitutional rights have been violated in a number of respects in connection with certain incidents that occurred in December 2005 and January 2006, while plaintiff was confined at Attica Correctional Facility. Plaintiff has sued nine individual defendants, each of whom was a DOCS employee at the time of the relevant events.

Five of the defendants-Donald Selsky, Michael DiAngelo, Correction Officer ("C.O.") T. Clark, C.O. R. McJury, and Danna Smith-have moved for summary judgment dismissing the claims against them, pursuant to Rule 56 of the Federal Rules of Civil Procedure. A sixth defendant, Jennifer Infurnari, has moved to dismiss plaintiff's claim against her for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6). For the reasons that follow, defendants' motions are granted.

## DISCUSSION

### I. Claims Related to Plaintiff's Tier III Hearing

#### A. Inadequate Assistance

Plaintiff was involved in an incident with several C.O. s on December 29, 2005. As a result, he was issued misbehavior reports charging him with attempted assault, threats, and other violations.

A Tier III hearing on the charges against plaintiff was commenced on January 8, 2006, and completed on January 11, 2006. Defendant DiAngelo, a DOCS captain, was the hearing officer. Defendants Clark and McJury were assigned to assist plaintiff. At the conclusion of the hearing, DiAngelo found plaintiff guilty on all the charges against him, and imposed a sentence of twelve months' confinement in the Special Housing Unit ("SHU") and loss of privileges, and loss of six months of good time.

Plaintiff has asserted three claims related to the Tier III hearing. In one of them, plaintiff alleges that Clark and McJury failed to provide him with adequate assistance in connection with the hearing. Plaintiff alleges that they failed or refused to obtain certain evidence sought by plaintiff or otherwise to help plaintiff defend against the misbehavior charges.

The Second Circuit has held that "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988). In particular, an inmate must be provided some assistance when circumstances hamper the inmate's ability to prepare a defense, such as when the inmate is confined to SHU prior to the hearing. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998); *Eng,* 858 F.2d at 898; *see also Hernandez v. Selsky,* 572 F.Supp.2d 446, 453 (S.D.N.Y.2008) ("the obligation to provide assistance is greater as the inmates' ability to prepare a defense is reduced").

It appears that Loving was confined to SHU immediately following the December 29 incident, and that he remained there from then until the end of the term of confinement imposed upon him by DiAngelo. *See* Def. Ex. N (hearing disposition form indicating that start date of plaintiff's penalty was "12/29/05"). Plaintiff was therefore entitled to *some* assistance in preparing for the Tier III hearing.

***2** How *much* assistance is constitutionally required is another matter. It is clear that the scope of DOCS's obligation in this regard is significantly limited, and that an inmate's right to assistance in connection with a disciplinary hearing-which arises under the Due Process Clause of the Fourteenth Amendment, *see Tate v. Wood,* 963 F.2d 20, 26 (2d Cir.19992) (citing *Eng,* 858 F.2d at 898), falls far short of the right to counsel that the Sixth Amendment guarantees to criminal defendants. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (per curiam).

An inmate in SHU, for example, is entitled to have

someone-either another inmate or a DOCS staff member-to assist him, but the assistant is only required to "perform the investigatory tasks which the inmate, were he able [*i.e.,* were he not confined to SHU], could perform for himself." *Eng,* 858 F.2d at 898. "The assistant is not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel in a prison disciplinary proceeding, assistance to which a prisoner is not entitled." *Silva,* 992 F.2d at 22.

In the case at bar, defendants Clark and McJury were assigned to assist plaintiff from among a list of names that he had selected as requested assistants. Def. Ex. D. Plaintiff alleges in his complaint that on January 2, 2006, Clark came to his cell, but began arguing with plaintiff about plaintiff's requests that Clark interview certain witnesses and obtain certain documents. Complaint at 6 ¶ 6. It is not clear from the complaint what the argument was about, but plaintiff alleges that "Clark left," and that on January 4, McJury came to plaintiff's cell with one of the items that plaintiff had requested, the "Unusual Incident Report" pertaining to the December 29 incident.

At the hearing, DiAngelo asked plaintiff, "now what's the problem with your assistance [sic] here? It says that your witnesses are gonna testify." Hearing Transcript ("Tr.") (Dkt. # 31 Ex. M) at 3. Plaintiff responded that he was "gonna have [his assistants] get witness statements from them." Tr. at 4. DiAngelo then stated that "we'll see if they'll submit them." *Id.* He added, "so other than these statements, there's nothing else that ... you need, correct?," to which plaintiff responded, "Not that I can think of right now." Tr. at 5. DiAngelo then stated that "we'll see if those inmates want to submit statements and then ... we'll have to reconvene at a later date and time." *Id.*

The hearing was then adjourned, and recommenced on January 10, 2006. The two inmate witnesses requested by plaintiff testified outside plaintiff's presence. Tr. at 6-7. DiAngelo states in a declaration that this was done for security reasons because plaintiff was in SHU at the time. Dkt. # 31 ¶ 11.

Plaintiff was then returned to the hearing room, where DiAngelo played the tape of the witnesses' testimony for him. After the tape was played, plaintiff stated that he "want[ed] to object" concerning DiAngelo's "interviewing the witnesses...." Tr. at 8. DiAngelo responded, "I didn't interview them, I just got testimony from," when plaintiff interrupted him, stating, "Yeah, but that's the ... assistant's job to go interview them to get testimony...." *Id.* DiAngelo then asked rhetorically, "Well how am I going to hear the testimony if I don't get it?," and nothing further was said about the matter. *Id.*

***3** Viewing the record in the light most favorable to plaintiff, these facts do not support a § 1983 claim. In general, "[w]hen a prisoner is in SHU, an employee assistant should ... interview witnesses" identified by the inmate. *Shephard v. Coughlin,* No. 91 CIV. 8725(MBM), 1993 WL 77385, at *5 (S.D.N.Y. Mar.16, 1993); *accord LeBron v. Artus,* No. 06-CV-0532, 2008 WL 111194, at *9 (W .D.N.Y. Jan. 9, 2008).

Most of the reported cases finding a due process violation based on a failure to interview witnesses requested by an inmate involve a complete failure to contact the potential witnesses, with the result that they were never called to testify. *See, e.g., Johnson v. Greiner,* No. 03 Civ. 5276, 2007 WL 2844905, at * 14-* 15 (S.D.N.Y. Sept. 28, 2007) (denying summary judgment for defendants where "the record was devoid of any evidence demonstrating that Mack attempted to interview witnesses or gather any of the requested evidence" sought by plaintiff); *Ciaprazi v. Goord,* No. Civ.9:02CV00915, 2005 WL 3531464, at *12 (N.D.N.Y. Dec.22, 2005) (if true, plaintiff's allegation "that he identified certain witnesses critical to his defense, but that his assistant refused to interview those witnesses with an eye toward requesting their testimony during the hearing ... could

establish a due process violation"); *see also* *Holmes v. Grant,* No. 03 Civ. 3426, 2006 WL 851753, at * 10 (S.D.N.Y. Mar. 31, 2006) (if true, plaintiff's allegation that "not only did his assistant not interview witnesses, [but] that his assistant actively pressured and threatened witnesses not to testify [and they did not testify], certainly falls short of the required level of employee assistance and, as such, implies that plaintiff was denied due process").

In part, that probably reflects the principle that, "[t]o establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." *Clark v. Dannheim,* 590 F.Supp.2d 426, 2008 WL 5111056, at *3 (W.D.N.Y. Dec.2, 2008) (citing *Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991)); *see, e.g., Pilgrim v. Luther,* No. 01 Civ. 8995, 2007 WL 233203, at *5 (S.D.N.Y. Jan.24, 2007) ("the alleged failure by Vaughn to perform his duties as an assistant [by interviewing witnesses] amounts to harmless error"); *Gates v. Selsky,* No. 02-CV496, 2005 WL 2136914, at *7 (W.D.N.Y. Sept.2, 2005) (applying harmless-error analysis to inadequate-assistance claim); *Louis v. Ricks,* No. 01 CIV. 9368, 2002 WL 31051633, at *15 (S.D.N.Y. September 13, 2002) (same).

In the case at bar, the two inmate witnesses requested by plaintiff were called, and did testify. Even if it would have been preferable to have obtained statements from them for plaintiff's review prior to the hearing, plaintiff has not shown or explained how the hearing would likely have had a different outcome if that had been done. *Cf. Johnson,* 2007 WL 2844905, at *15 (even applying harmless-error analysis, summary judgment for defendants was not appropriate, based on evidence that, due to failure to provide inmate with assistance, he was not made aware of evidence against him until his disciplinary hearing, by which time his assigned assistant had ceased "assisting" him, and inmate thus "had to fend for himself during the hearing in attempting to understand the nature of the charges against him and determining which witnesses to call," all of which could have affected the outcome of the hearing).

**B. Failure to Hold a Timely Hearing**

***4** Plaintiff also asserts a claim against DiAngelo, based on DiAngelo's alleged failure to comply with DOCS regulations concerning the time within which a Tier III hearing must be held. The regulation in question provides that "[w]here an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said disciplinary hearing or superintendent's hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee." 7 N.Y.C.R.R. § 251-5.1(a).

Here, it appears that the hearing was originally scheduled to commence no later than January 3, 2006, but for various reasons it did not begin until January 8, 2006, ten days after the underlying incident occurred. DiAngelo explains the reasons for the delay in his declaration, Dkt. # 31, including the unavailability of plaintiff's assistant and DiAngelo's work schedule.

The Second Circuit has made clear that the seven-day period established by the regulations is not controlling for purposes of an inmate's due process claim under § 1983. *See* *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990) (rejecting inmate's assertion that "seven-day" rule of § 251-5.1(a), provides the appropriate benchmark for determining what is a "reasonable time" in which to hold a hearing). The court in *Russell* stated that "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Id.* (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). "Those [federal] standards require only that the hearing be held within a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

'reasonable time' and not within any [particular] number of days. 'What is considered a "reasonable time" will depend upon the particular situation being examined.' " *Shell v. Brzezniak,* 365 F.Supp.2d 362, 376 (W.D.N.Y.2005) (nine-day delay in beginning hearing was reasonable). *See also* *Bolanos v. Coughlin,* No. 91 Civ. 5330, 1993 WL 762112, *15 (S.D.N.Y. Oct.15, 1993) (eight-day delay held reasonable); *Donato v. Phillips,* No. 9:04-cv-1160, 2007 WL 168238, at *5 (N.D.N.Y. Jan.18, 2007) ("there can be no due process violation for a hearing that occurs within two weeks of placement in SHU," where "[t]here is no evidence in the record that the days Plaintiff spent in SHU pending the commencement of the hearing imposed an atypical and significant hardship on him") (citing *Sandin v. Connor,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).[FN1]

FN1. Plaintiff also appears to assert a claim against DiAngelo based upon DiAngelo's denial of plaintiff's request to call defendant Selsky as a witness. *See* Complaint ¶¶ 11, 12. This claim is meritless on its face, as there is no indication in the record that Selsky's testimony would or even could have been relevant or material. *See* *LeBron,* 2008 WL 111194, at *12 ("prison officials may deny requested testimony ... where [the testimony would be] irrelevant or unnecessary to the proceeding") (citing *Scott v. Kelly,* 962 F.2d 145, 147 (2d Cir.1992)).

**C. Claim against Selsky**

Plaintiff also asserts a claim against Donald Selsky, the DOCS Director of the Special Housing/Inmate Disciplinary Program, based on his affirmance of DiAngelo's determination. Since there was no underlying constitutional violation, however, this claim must be dismissed as well. *See* *Hernandez v. Tiede,* No. 94-CV-908, 1996 WL 863453, at *7 (W.D.N.Y. May 29, 1996).

**II. Claim against Nurse Smith**

***5** Plaintiff asserts a claim under the Eighth Amendment against Danna Smith, a nurse employed by DOCS, who examined plaintiff shortly after the December 29 incident between plaintiff and the C.O. defendants. Plaintiff alleges that Smith did not adequately examine him to determine the extent and severity of plaintiff's injuries, and that in her written notes, Smith downplayed or minimized the extent of those injuries. Even viewing the record in the light most favorable to plaintiff, I find that there are no genuine issues of fact material to this claim, and that Smith is entitled to judgment as a matter of law.

To show that prison medical treatment was so inadequate as to amount to "cruel and unusual punishment" prohibited by the Eighth Amendment, plaintiff must prove that defendant's actions or omissions amounted to "deliberate indifference to a serious medical need." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To establish such a claim, then, the prisoner must prove (1) the existence of a serious medical need and (2) defendant's deliberate indifference to that need. *Bumpus v. Canfield,* 495 F.Supp.2d 316, 320 (W.D.N.Y.2007).

Plaintiff has failed to present enough evidence to give rise to a genuine issue of fact as to either prong. He may believe that Nurse Smith should have undertaken a more extensive examination than she did, or that her description of his visible injuries was inaccurate, but he has not shown that she acted with a culpable state of mind or that she ignored any serious medical need. *See* *Moore v. Casselberry,* 584 F.Supp.2d 580, 2008 WL 4768831, at *1 (W.D.N.Y.2008) (dismissing § 1983 claim against nurse based on alleged filing of false medical report; "even if the report was incomplete or false, that does not state a federal constitutional violation") (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**III. Claim against Infurnari**

Plaintiff's first cause of action is based upon the alleged assault on plaintiff by the defendant C.O.s on December 29, 2005. In addition to the C.O.s themselves, plaintiff has named Jennifer Infurnari as a defendant on this claim. Infurnari was working at the Attica commissary window at the time of the alleged assault, and it was a verbal exchange between her and plaintiff that led to the C .O.s being called, and, allegedly, assaulting plaintiff. *See* Complaint at 5, ¶¶ 1-3.

This claim must be dismissed. It is clear from the allegations of the complaint that Infurnari did not participate in any way in the alleged assault, nor did she have any duty to intervene. In addition, to the extent that the complaint could be construed as asserting a claim that Infurnari filed a false misbehavior report against plaintiff, that too fails to state a cognizable § 1983 claim. *See Davis v. Castleberry,* 364 F.Supp.2d 319, 323 (W.D.N.Y.2005). In short, there is simply no factual basis in the complaint for any constitutional claim against Infurnari.

**CONCLUSION**

***6** The motion for summary judgment by defendants Selsky, DiAngelo, Clark, McJury and Smith, and to dismiss the claims against defendant Infurnari (Dkt. # 30) is granted, and plaintiff's claims against those defendants are dismissed.

IT IS SO ORDERED.

W.D.N.Y.,2009.

Loving v. Selsky

Slip Copy, 2009 WL 87452 (W.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD, and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage renal disease requiring dialysis, filed § 1983 action against sheriff, nurse practitioner, physician, and medical center, alleging violations of the Eighth Amendment for defendants' failure to provide adequate medical care. Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held that:
(1) there was no evidence that administrative remedy was available to inmate;
(2) prison medical staff's modification of inmate's medication dosage did not constitute deliberate indifference to his medical needs;
(3) prison's failure to provide food with inmate's medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to serious medical needs;
(4) medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs;
(5) genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test precluded summary judgment;
(6) genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition precluded summary judgment;
(7) sheriff was not liable under § 1983; but
(8) genuine issues of material fact precluded summary judgment on § 1983 liability of registered nurse and doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A 2547.1**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)3 Proceedings
170Ak2547 Hearing and Determination
170Ak2547.1 k. In general. Most Cited Cases
Generally, plaintiffs' failure to respond or contest facts set forth by defendants in their statement of facts, submitted in support of summary judgment, constitutes admission of those facts, and facts are accepted as undisputed under local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A 25**

170A Federal Civil Procedure
170AI In General
170AI(B) Rules of Court in General
170AI(B)1 In General
170Ak25 k. Local rules of District Courts. Most Cited Cases
District court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A 2547.1**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)3 Proceedings
170Ak2547 Hearing and Determination
170Ak2547.1 k. In general. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cases
District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[4] Federal Civil Procedure 170A 657.5(1)**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(A) Pleadings in General
170Ak654 Construction
170Ak657.5 Pro Se or Lay Pleadings
170Ak657.5(1) k. In general. Most Cited Cases
Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

**[5] Attorney and Client 45 62**

45 Attorney and Client
45II Retainer and Authority
45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

**Federal Civil Procedure 170A 657.5(1)**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(A) Pleadings in General
170Ak654 Construction
170Ak657.5 Pro Se or Lay Pleadings
170Ak657.5(1) k. In general. Most Cited Cases

**Federal Civil Procedure 170A 2546**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)3 Proceedings
170Ak2542 Evidence
170Ak2546 k. Weight and sufficiency. Most Cited Cases
Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

**[6] Civil Rights 78 1304**

78 Civil Rights
78III Federal Remedies in General
78k1304 k. Nature and elements of civil actions. Most Cited Cases
To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

**[7] Prisons 310 317**

310 Prisons
310II Prisoners and Inmates
310II(H) Proceedings
310k316 Exhaustion of Other Remedies
310k317 k. In general. Most Cited Cases
In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[8] Prisons 310 313**

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

310II Prisoners and Inmates
310II(H) Proceedings
310k307 Actions and Litigation
310k313 k. Trial. Most Cited Cases

Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[9] Civil Rights 78 1319**

78 Civil Rights
78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
78k1319 k. Criminal law enforcement; prisons. Most Cited Cases

Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[10] Sentencing and Punishment 350H 1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Test for determining whether prison official's actions or omissions rise to level of “deliberate indifference” in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[11] Sentencing and Punishment 350H 1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of “culpable intent,” in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

**[12] Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases

Mere fact that an inmate's underlying disease is a “serious medical condition” does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an “objectively serious health risk,” in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[13] Prisons 310 192**

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310 192**

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310 192**

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil rights cases in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

general. Most Cited Cases
Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18] Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19] Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20] Civil Rights 78 1355**

78 Civil Rights
78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1355 k. Vicarious liability and respondeat superior in general; supervisory liability in general. Most Cited Cases
Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21] Civil Rights 78 1358**

78 Civil Rights
78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22] Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[23] Civil Rights 78 1358**

78 Civil Rights
78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24] Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
***347** Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

***348** MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

I. FACTS

[1][2][3] The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.[FN1] They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*also* *Giliani v. GNOC Corp.*, No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See* *Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving ***349** at the NCCC,[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the ***350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.) [FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was ***351** transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was “extremely hurting.” (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder “hurts really bad.” (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 (“Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....”).) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

FN8. Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were “factually intertwined.”

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted***352** an opposition to the motion on August 3 and August 11, 2009.[FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

FN9. Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth., 262 F.3d 412, 414 (2d Cir.2001)* (“And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.”).

FN10. Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.,* 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding *pro se,* the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported ***353** by evidence, are not sufficient to defeat a motion for summary judgment. *Shah v. Kuwait Airways Corp.,* 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." *Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir.2009) (quoting *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo,* 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." ***354***Espinal,* 558 F.3d at 124 (citing *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and *Woodford,* 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to *Woodford,* 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." *Reynoso v. Swezey,* 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); *see also* *Davis v. New York,* 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- *Woodford.* *See, e.g.,* *Reynoso,* 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether *Woodford* has bearing on them."); *Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect *Woodford* has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- *Woodford* case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *see also* *Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." *See* 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,***355** whether city, state or federal." *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also Espinal,* 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." *See Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." *Id.* at 114.

On the record before the Court on this motion, the Court is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.[FN12] Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. *See id.* at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that *Abney,* 380 F.3d 663, was decided before *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- *Woodford.* However, the Court need not decide the applicability of any such nuances to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

> Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the ***356** 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

> [t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

> [d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

> The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

***357** *Hayes,* 84 F.3d at 620 (internal citation omitted); *see also* *Phelps v. Kapnolas,* 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In *Salahuddin v. Goord,* the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

> The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.
>
> Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); *see also* *Jones v. Westchester County Dep't of Corr. Medical Dep't,* 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

> The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware ***358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also* *Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also* *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription***359** of medication for plaintiff's renal disease.

i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See* *Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See* *Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim....”); *Reyes v. Gardener,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( “[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition.”). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. ***360** at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See* *Smith,* 316 F.3d at 188-89 (“Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.”) (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

FN13. Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

FN14. Plaintiff's conclusory testimony that the dosage was “hurting” him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of “itching” and “breaking of bones.” (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 (“Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.”).) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See* *Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged “persistent rash” was not a “serious medical condition”); *see also* *Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at *11 (N.D.N.Y. Oct. 21, 2009) (“[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation.”). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

FN15. In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

FN16. Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall,* 295 Fed.Appx. 102, 103 (8th Cir.2008) (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney,* No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010) ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr.,* No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010) ("[Plaintiff's] claims that Defendants failed ***361** to change or increase his medication and counseling sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher,* No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009) ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange,* 248 Fed.Appx. 232, 237 (2d Cir.2007) ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen,* 205 F.3d 1094, 1097 (8th Cir.2000) ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller,* 2010 WL 597952, at *11 ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.").[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord,* No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009) ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at ***362** the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See* *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also* *Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See* *Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in* *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference ***363** regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. *See* *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994); *see also* *Sereika v. Patel,* 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (*see* Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective. [FN19] (*See, e.g.,* Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (*See* Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (*See* Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s ***364** Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's assertions] do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve [plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

***365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009) ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to ***366** Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna,* 386 F.3d at 437 (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright,* No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna,* 386 F.3d at 437)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.

SO ORDERED.

E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.







Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

***1** Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

III. FACTS [FN4]

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. Fed.R.Civ.P. 56(e); *see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). With this standard in mind, the court now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

***2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id.* at 103,97 S.Ct. at 290 (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety." ' *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Id.*

***3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at *4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at *4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" ' are highly relevant. *Id.* at 702-703 *(citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4)* .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2).* Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

***4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

***5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

***6** WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





C Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York State Department of Correctional Services; Peter J. Lacy, Superintendent at Bare Hill Corr. Facility; Wendell Babbie, Acting Superintendent at Altona Corr. Facility; and John Doe, Corrections Officer at Bare Hill Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Albany, Eric D. Handelman, Esq., Asst. Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

***1** This matter comes before the Court following a Report-Recommendation filed on August 21, 1998 by the Honorable David R. Homer, Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York.

No objections to the Report-Recommendation have been raised. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not clearly erroneous. *See*Fed.R.Civ.P. 72(b), Advisory Committee Notes. Accordingly, the Court adopts the Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is GRANTED; and it is further

ORDERED that the complaint is dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m), and the action is therefore dismissed in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of Correctional Services ("DOCS"), brought this pro se action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that while incarcerated in Bare Hill Correctional Facility ("Bare Hill") and Altona Correctional Facility ("Altona"), defendants violated his rights under the Eighth and Fourteenth Amendments.[FN2] In particular, plaintiff alleges that prison officials maintained overcrowded facilities resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

II. Motion to Dismiss

***2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

***3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare* *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

***4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

IV. Failure to Complete Service

***5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.







Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD, D. Monell, N. Marsh, D. Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D. Russell, Defendants.

No. 9:09-CV-0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

***1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jesse L. Stewart alleges that Defendants, all employees of the Tioga County Jail, violated his constitutional rights by limiting his ability to send legal mail, depriving him of his mattress and bedding during daytime hours, subjecting him to excessive force, denying him medical care after the alleged use of excessive force, and conducting biased disciplinary hearings. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) For the reasons that follow, I recommend that Defendants' motion be granted.

## I. FACTUAL AND PROCEDURAL SUMMARY

This action involves Plaintiff's experiences at Tioga County Jail, where he was incarcerated from August 19, 2008, to January 13, 2009. (Dkt. No. 30-4 at 14:2-11.) The complaint consists almost entirely of copies of grievances and letters that Plaintiff submitted to other individuals and organizations. The “facts” section of the civil complaint form merely directs the reader to “see attached.” As such, the precise contours of Plaintiff's claims are difficult to discern. The documents attached to the complaint show that:

On September 22, 2008, Plaintiff requested a grievance form so that he could complain about the facility's legal mail procedures. (Dkt. No. 1 at 41.) A grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance form so that he could complain about being denied access to the courts. (Dkt. No. 1 at 44.) Sgt. William “spoke with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30-11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night. (Dkt. No. 1 at 10; Dkt. No. 30-11 at 6 ¶¶ 13-15.)

***2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8-9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14-15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30-11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9-10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

***3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46-47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

***4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing [FN1] and requesting that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23-24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

FN1. Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16-17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

***5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards-once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29-30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

***6** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***7** Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30-12 at 10-11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." [FN3] *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30-4 at 9-17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14-15. Plaintiff then ended the deposition. *Id.* at 15:20-22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30-12 at 2-3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007).

***8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30-10 at 8-11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1-2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A)(3-4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5-8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30-11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

FN4. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at *4, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

***9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8-10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23-24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

**C. Eighth Amendment Conditions of Confinement**

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9-10.) Defendants move for summary judgment of this claim. (Dkt. No. 30-12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

**D. Due Process**

1. *Bedding*

***10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30-12 at 5-6.) Defendants are correct.

An individual claiming that he was deprived of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8-10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

***11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the

personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36-3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies *"could* cause a great effect" and *"could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65-66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

***12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30-12 at 11-12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [FN10]

FN6. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN7. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN8. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN9. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN10. The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be ***GRANTED;*** and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

***13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and individual capacity, Dr. Marc Janis, in his official and individual capacity, New York State Department Of Correctional Services, Dr. Lester Wright, in his official and individual capacity, and Dr. J. Pereli, in his official and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary **Civil Rights 78 1358**

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

**Prisons 310 203**

310 Prisons

310II Prisoners and Inmates

310II(D) Health and Medical Care

310k203 k. Reproductive issues. Most Cited Cases

**Sentencing and Punishment 350H 1546**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General

350HVII(H) Conditions of Confinement

350Hk1546 k. Medical care and treatment. Most Cited Cases

A correctional services doctor was not deliberately indifferent to a prisoner's serious medical needs under the Eighth Amendment in connection with the alleged denial of testosterone treatments. The prisoner brought a § 1983 action which alleged that he was denied the treatments which he needed after he developed hypogonadism after an epididymectomy. The doctor not liable for the alleged harm because he was not involved with any denials of the prisoner's treatment and did not create a policy that contributed to the prisoner's alleged harm. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

***OPINION AND ORDER***

SHIRA A. SCHEINDLIN, District Judge.

**I. INTRODUCTION**

***1** Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case [FN1], violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

FN1. The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

**II. BACKGROUND**[FN2]

FN2. For more detailed background, see *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2008 WL 3152963 (S.D.N.Y. Aug. 5, 2008) (*"Bellamy I"* ). Some of the facts recounted here are drawn from the prior opinion.

**A. Facts**

**1. Parties**

Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York.[FN3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws.[FN4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS.[FN5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS.[FN6]

FN3. *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

FN4. *See id.* ¶ 2.

FN5. *See id.* ¶ 3.

FN6. *See id.*

**2. Bellamy's Surgery**

In August 2004, while in DOCS custody at Sing Sing

Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy.[FN7] Bellamy was HIV positive at the time of his surgery.[FN8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol.[FN9] As a result of these conditions, Bellamy was prescribed various medications, including a testosterone patch called "Androderm." [FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

FN7. *See Bellamy I,* 2008 WL 3152963, at *1. An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. *See* Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

FN8. *See* 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

FN9. See *Bellamy I,* 2008 WL 3152963, at *2. These conditions had many side effects, including sexual maladies and dramatic weight loss. *See id.* While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. *See* 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

FN10. *See, e.g.,* Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.

FN11. *See* 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. *See* Moorjani Aff. ¶¶ 4-5.

FN12. *See* Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). *See also* Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

**3. Bellamy's Letters to Wright**

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility. [FN14] Bellamy's third letter to Wright concerned several matters. [FN15] In particular, Bellamy claimed, *first,* that a female officer entered his cell and retrieved his HIV medication, *second,* that an officer

eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

FN13. *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants (“Dawkins Decl.”).

FN14. *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

FN15. *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

FN16. *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses. [FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate. [FN20] The concerns are then investigated and addressed by the regional staff.[FN21]

FN17. *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

FN18. *See id.*

FN19. *See id.* ¶ 13.

FN20. *See id.* ¶ 14.

FN21. *See id.*

***2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

FN22. *See id.* ¶ 15.

FN23. *See id.*

FN24. *See id.*

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**[FN27]

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.[FN28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff." [FN29] Bellamy charges the DOCS because he was in its custody when his claims arose.[FN30] Bellamy specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution." [FN31] A similar claim is lodged against the DOCS.[FN32] Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws.[FN33] Finally, Bellamy seeks compensatory and punitive damages.[FN34]

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive

relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See* *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See* *Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

**III. LEGAL STANDARD**

**A. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [FN35] An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " [FN36] A fact is material when it " 'might affect the outcome of the suit under the governing law.' " [FN37] "It is the movant's burden to show that no genuine factual dispute exists." [FN38]

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248).

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.[FN39] "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

party's case, and on which that party will bear the burden of proof at trial.' " FN40 To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " FN41 and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " FN42 However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " FN43

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

***3** In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.FN44 However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " FN45 Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." FN46

FN44. *See Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," FN47 and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." FN48 However, a pro se plaintiff must still meet the usual requirements of summary judgment .FN49 Thus, a

pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or] her attempt to oppose defendants' motion [for summary judgment] ineffectual." FN50

FN47. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord* *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

FN48. *Burgos,* 14 F.3d at 790.

FN49. *See* *Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

FN50. *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions.FN51 Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to court at all." FN52 Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." FN53 Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules-in order to suffice.FN54 The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." FN55

FN51. *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also* *Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 732, 739 (2001).

FN52. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

FN53. *Id.*

FN54. *See* *Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

FN55. *Porter,* 534 U.S. at 532.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

> when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [FN56]

FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." [FN57] "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " [FN58]

FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

**C. Eleventh Amendment Immunity**

***4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." [FN59] "A state's Eleventh Amendment protection from suit extends to its agencies and departments." [FN60] "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." [FN61] To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." [FN62] State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment.[FN63]

FN59. U.S. Const. amend. XI.

FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

**D. Section 1983**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." FN64 In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.FN65 "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983.' " FN66 Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." FN67

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " FN68 Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." FN69 In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.FN70 However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." FN71 The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." FN72 Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." FN73 For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." FN74

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). *See also Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

***5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." [FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' " [FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. *See Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at

*8 (S.D.N.Y. Mar. 7, 2002) ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " [FN80] "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." [FN81] "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." [FN82] "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." [FN83]

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

**F. Preliminary and Permanent Injunction**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." [FN84] "A preliminary injunction is an extraordinary remedy never awarded as of right." [FN85] "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." [FN86] The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. [FN87]

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). *Accord Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

(citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

FN86. *Mitchell v. New York State Dep't of Corr. Servs.,* No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009) (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

FN87. *See Winter,* 129 S.Ct. at 381.

**IV. DISCUSSION**

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

**A. Exhaustion of Administrative Remedies**

***6** This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." FN88 Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at *5

**B. Eleventh Amendment Immunity**

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

**C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity**

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

evidence that Wright was responsible for making any decisions regarding his testosterone medications.[FN89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability.[FN90]

FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

FN90. *See Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain-indeed Bellamy conceded that Wright was not involved with the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

**D. Preliminary and Permanent Injunction**

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is denied.

***7** *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis. [FN91]

FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs.[FN92] For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment.[FN93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

FN92. While the DOCS itself is immune from section 1983 liability, the following analysis

surrounds the DOCS and its employees generally.

FN93. Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

FN94. *See* Am. Compl., Prayer for Relief ¶ 18.

FN95. *See* *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims."). *See also* *Kshel Realty Corp. v. City of New York,* No. 01 Civ. 9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

United States District Court,

S.D. New York.

Matthew D'OLIMPIO and Michael Kaplan, Plaintiffs,

v.

Louis CRISAFI, in his individual capacity, Brendan Vallely, in his individual capacity, Thomas D'Amicantonio, in his individual capacity, James Giglio, in his individual capacity, Michael Moffett, in his individual capacity, Paul Nadel, in his individual capacity, Jennifer Treacy, in her individual capacity, Kenneth Post, in his individual capacity, and Timothy Dewey, in his individual capacity, Defendants.

Louis Crisafi, Counterclaim-Plaintiff,

v.

Michael Kaplan, Counterclaim-Defendant.

Nos. 09 Civ. 7283(JSR), 09 Civ. 9952(JSR).

June 15, 2010.

**Background:** Arrestee and former narcotics enforcement investigator brought action against another investigator and other narcotics enforcement officials, alleging malicious prosecution, false arrest, unlawful detention, and other constitutional violations against arrestee, and First Amendment retaliation against investigator. Defendant investigator counterclaimed, alleging defamation by plaintiff investigator. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

(1) allegations were sufficient to state a claim of supervisory liability against officials;

(2) law enforcement officers lacked even arguable probable cause to make arrest;

(3) investigator's statements were not protected by First Amendment; and

(4) plaintiff investigator was not liable for defamation.

Motions denied in part and granted in part.

West Headnotes

**[1] Civil Rights 78 ⚷ 1358**

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Arrestee was not required to show discriminatory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

purpose on the part of law enforcement officers in order to establish the personal involvement needed to support the officers' liability on his § 1983 claim alleging that his search, arrest, and prosecution violated the Fourth Amendment. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 1395(6)**

78 Civil Rights

78III Federal Remedies in General

78k1392 Pleading

78k1395 Particular Causes of Action

78k1395(4) Criminal Law Enforcement; Police and Prosecutors

78k1395(6) k. Arrest, search, and detention. Most Cited Cases

Allegations against law enforcement officials were sufficient to state a claim under § 1983 that officials failed to supervise narcotics enforcement investigators; complaint incorporated by reference an investigatory report that described various acts of misconduct by investigator that took place prior to arrestee's arrest, and concluded that there was a lack of appropriate supervision by officials, and arrestee alleged that another investigator complained to official in writing regarding investigator's misconduct prior to arrestee's arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[3] Arrest 35 63.4(2)**

35 Arrest

35II On Criminal Charges

35k63 Officers and Assistants, Arrest Without Warrant

35k63.4 Probable or Reasonable Cause

35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S.C.A. Const.Amend. 4.

**[4] Civil Rights 78 1376(6)**

78 Civil Rights

78III Federal Remedies in General

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(6) k. Sheriffs, police, and other peace officers. Most Cited Cases

In the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78 1358**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Arrestee's allegations were sufficient to state a § 1983 supervisory liability claim against law enforcement officials, arising out of officials' creation of policy allowing narcotics enforcement investigators to initiate criminal charges based on a phone conversation or faxed affidavit, where arrestee alleged that his arrest for possession of a narcotic and criminal impersonation to obtain prescriptions was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of a prescription within a week, which prompted a narcotics enforcement official to call arrestee's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of arrestee's doctor. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[6] Arrest 35 63.4(8)**

35 Arrest

35II On Criminal Charges

35k63 Officers and Assistants, Arrest Without Warrant

35k63.4 Probable or Reasonable Cause

35k63.4(7) Information from Others

35k63.4(8) k. Reliability of informer. Most Cited Cases

Law enforcement officers lacked even arguable probable cause to arrest arrestee for possession of a narcotic and impersonation of a physician based solely on unauthenticated report by physician's staff denying knowledge of arrestee's prescription. U.S.C.A. Const.Amend. 4.

**[7] Constitutional Law 92 1941**

92 Constitutional Law

92XVIII Freedom of Speech, Expression, and Press

92XVIII(P) Public Employees and Officials

92k1941 k. Discipline or reprimand. Most Cited Cases

A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee spoke as a citizen on a matter of public concern; otherwise, the employee's speech is outside the scope of the First Amendment. U.S.C.A. Const.Amend. 1.

**[8] Constitutional Law 92 1955**

92 Constitutional Law

92XVIII Freedom of Speech, Expression, and Press

92XVIII(P) Public Employees and Officials

92k1955 k. Police and other public safety officials. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Municipal Corporations 268 185(1)**

268 Municipal Corporations

268V Officers, Agents, and Employees

268V(B) Municipal Departments and Officers Thereof

268k179 Police

268k185 Suspension and Removal of Policemen

268k185(1) k. Grounds for removal or suspension. Most Cited Cases

Law enforcement officer's complaints to supervisor about fellow officer's behavior, his workplace incident reports, and his complaint to the inspector general, was speech falling within officer's official duties, and thus was not protected under the First Amendment, as required to support employee's retaliation claim; statements were made privately though channels available through officer's employment and were made in a manner that would not be available to a non-public employee citizen, and subject of statements was that other officer was not performing his job properly. U.S.C.A. Const.Amend. 1.

**[9] Libel and Slander 237 28**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k26 Repetition

237k28 k. By others in general. Most Cited Cases

It was simply implausible that narcotics investigator in any legally relevant sense caused the republication of his statements in an investigatory report or newspaper article regarding actions of a fellow investigator, as required to state a claim of defamation under New York law.

**[10] Libel and Slander 237 28**

237 Libel and Slander

237I Words and Acts Actionable, and Liability Therefor

237k26 Repetition

237k28 k. By others in general. Most Cited Cases

Under New York law, a plaintiff may not recover damages from the original author for slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication.

***342** James Brian Lebow, Sr., New York, NY, for Plaintiffs.

Christine Alexandria Rodriguez, Christine A. Rodriguez, Law Office, Ivan B. Rubin, Peter Sangjin Hyun, New York State Office of the Attorney General, New York, NY, for Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

On August 18, 2009, Plaintiff Matthew D'Olimpio brought this action (docket-numbered 09 Civ. 7283) against defendants Louis Crisafi, Brendan Vallely, Thomas D'Amicantonio, James Giglio, Michael Moffett, and Paul Nadel for malicious prosecution, false arrest, unlawful detention, and various other violations of the Constitution and 42 U.S.C. §§ 1983 and 1988. An amended complaint filed on October 29, 2009 joined Michael Kaplan as a plaintiff and added a claim against defendants Nadel, Jennifer Treacy, Kenneth Post, and Timothy Dewey for unconstitutionally retaliating against Kaplan based on his reports of misconduct committed by defendant Crisafi, a fellow investigator employed by the New York State Department of Health's Bureau of Narcotics Enforcement, Metropolitan Area Regional Office ("BNE-MARO"), in violation of the First and Fourteenth Amendments and § 1983.

On December 18, 2009, defendants Giglio, Moffett, and Nadel moved to dismiss all of D'Olimpio's claims against them, and defendants Crisafi, Vallely, and D'Amicantonio moved to dismiss D'Olimpio's malicious prosecution claim. That same day, defendants Nadel, Treacy, Post, and Dewey moved to dismiss Kaplan's claims against them. Meanwhile, on December 3, 2009, Crisafi had filed what was styled as a complaint against Kaplan (docket-numbered 09 Civ. 9952) alleging that Kaplan defamed him through publication of the reports of Crisafi's misconduct discussed in Kaplan's complaint. On the parties' consent, the Court converted Crisafi's complaint into a compulsory counterclaim in the action docket-numbered 09 Civ. 7283 and consolidated the two cases. *See* Transcript, 1/14/10, *Crisafi v. Kaplan,* No. 09 ***343** Civ. 9952. On January 22, 2010, Kaplan moved to dismiss that counterclaim.

By Order dated March 1, 2010 (the "March 1 Order"), the Court granted the motion of Nadel, Treacy, Post, and Dewey to dismiss Kaplan's retaliation claim; granted Kaplan's motion to dismiss Crisafi's defamation counterclaim; and denied all other motions to dismiss.[FN1] The Order also promised that a Memorandum would issue in due course stating the reasons for these rulings. With apologies to counsel for the extended delay, the Court here provides that Memorandum.

FN1. Although the Order did not explicitly so state, all the dismissals were with prejudice (which, as it happens, is also the default position when an order does not state whether a dismissal is or is not with prejudice).

The Court turns first to the motions of defendants Crisafi, Vallely, and D'Amicantonio to dismiss D'Olimpio's malicious prosecution claim, as set forth in the First Amended Complaint ("FAC") filed on October 29, 2009.[FN2] The relevant allegations are as follows:

FN2. The first five causes of action in the FAC are D'Olimpio's claims. The sixth cause of action is Kaplan's claim.

Sometime before November 16, 2007, D'Olimpio, a resident of Brooklyn, was prescribed Vicodin by his doctor. FAC ¶ 17. He called that prescription into his pharmacy and obtained the Vicodin. *Id.* ¶ 18. D'Olimpio's pharmacy contacted the BNE-MARO after it had not received a hard copy of the prescription from D'Olimpio's doctor within seven days. *Id.* ¶ 19. A MARO official called D'Olimpio's doctor's office and spoke to an unknown individual there, who either stated by phone that he was not aware of D'Olimpio's Vicodin prescription or provided a faxed affidavit purportedly signed by the doctor to that effect. *Id.* ¶ 20. Based on these occurrences, and without any further investigation, MARO investigator Crisafi began planning Crisafi's arrest. *Id.* ¶ 21.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

On or about November 16, 2007, D'Olimpio was exiting his doctor's office in Brooklyn and walking toward his car when Crisafi and defendants Vallely and D'Amicantonio, also MARO investigators, showed D'Olimpio their badges and asked to speak with him. *Id.* ¶¶ 4, 27-28. They asked D'Olimpio his name, where he was coming from, what he was doing at the doctor's office, and whether the car was his. *Id.* ¶ 29. D'Olimpio replied it was his wife's car. *Id.* ¶ 30. Crisafi asked D'Olimpio if they could search him for weapons; D'Olimpio consented to be frisked, but not to a full search. *Id.* ¶¶ 31-32. Crisafi then frisked D'Olimpio, reached into his pockets, and took out his car keys. *Id.* ¶ 33. Crisafi asked D'Olimpio whether he would consent to a search of the car; D'Olimpio refused, but Crisafi nonetheless carried out the search. *Id.* ¶¶ 34-36. During the search, Crisafi found a bag containing a bottle marked for Klonopin but containing both Vicodin and Klonopin pills, all of which were lawfully prescribed to Crisafi and which he carried in one bottle for convenience. *Id.* ¶¶ 37-38. Upon finding the bottle and discovering that there were two types of pills inside, Crisafi handcuffed D'Olimpio and moved him into the police car, without making any effort to find out whether the drugs were legally prescribed. *Id.* ¶¶ 39-40.

While D'Olimpio was being driven to the police precinct and again when he was being escorted to a bathroom prior to questioning, D'Olimpio requested an attorney, but these requests were denied. *Id.* ¶¶ 41-44. Before questioning began, D'Olimpio asked Crisafi to call an ambulance so that he could take the Klonopin that he needed; Crisafi told D'Olimpio to call his wife and ask her to come to the precinct with his medication. *Id.* ¶¶ 46-47. When ***344** D'Olimpio's wife arrived, D'Olimpio was brought into a different room, and his wife was given his possessions. *Id.* ¶ 48. Crisafi then offered D'Olimpio a blue pill, which he took, but D'Olimpio now believes that pill was not a Klonopin pill, as he experienced side effects of confusion and drowsiness after taking it, which he had never felt previously when taking Klonopin. *Id.* ¶ 50. Crisafi began to interrogate D'Olimpio, and at one point threatened to rescind his father's physician license. *Id.* ¶ 51. D'Olimpio at that point again requested an attorney, and Crisafi again denied his request. *Id.* ¶¶ 52-53.

During the interrogation, Crisafi asked D'Olimpio to confess to charges of criminal possession of a controlled substance for possessing the Vicodin and to charges of criminal impersonation for allegedly calling pharmacies and using false information to obtain prescriptions. D'Olimpio, under the influence of the pill, signed a one-page confession presented to him by Crisafi. *Id.* ¶ 54. At Crisafi's request, Vallely signed a form falsely indicating that he had seen Crisafi inform D'Olimpio of his *Miranda* rights. *Id.* ¶ 55. D'Olimpio's forged signature was also added to this "*Miranda* sheet." *Id.* ¶ 56. Crisafi, perhaps with the assistance of Vallely or D'Amicantonio, also wrote a four-page confession and forged D'Olimpio's signature and initials on it. *Id.* ¶ 57. Furthermore, Crisafi, possibly with the assistance of Vallely and D'Amicantonio, drafted an affidavit falsely attesting that D'Olimpio illegally possessed Vicodin and that he impersonated a doctor to obtain his prescriptions. *Id.* ¶ 58.

D'Olimpio was then taken to the Manhattan Detention Center, where he was held for 24 hours prior to being arraigned. *Id.* ¶¶ 59-60. Based on the four-page confession and the affidavit, he was arraigned on the criminal possession and impersonation charges and then released on his own recognizance. *Id.* ¶¶ 61-62. According to the Complaint, D'Olimpio appeared in court about seven times before the charges against him were finally dropped on September 4, 2008. *Id.* ¶ 76.

On the basis of these allegations, D'Olimpio's third cause of action claims that Crisafi, Vallely, and D'Amicantonio maliciously prosecuted D'Olimpio by initiating the criminal charges.[FN3] These defendants moved to dismiss this malicious prosecution claim, primarily on the basis that the charges against D'Olimpio remained pending against him as of the time of their motion, as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

demonstrated by a Court Action Sheet of the Criminal Court, New York County. Decl. of Ivan Rubin, 12/22/09, Ex. 1. Because the favorable termination of the prosecution is a necessary element of a malicious prosecution claim under § 1983, *Green v. Mattingly,* 585 F.3d 97, 103 (2d Cir.2009), the pendency of criminal charges would be fatal to this cause of action.

FN3. In the first, fourth, and fifth causes of action in the FAC, D'Olimpio respectively alleges that Crisafi, Vallely, and D'Amicantonio violated various constitutional rights, falsely arrested him, and unlawfully detained him. No motions to dismiss were filed with respect to these claims.

In his opposition to the motions to dismiss, D'Olimpio asserted that the Assistant District Attorney prosecuting D'Olimpio's criminal case had committed to move orally to dismiss that case at the next court hearing, which was scheduled for February 2, 2010. Based on that representation, this Court granted leave for D'Olimpio to file a Second Amended Complaint ("SAC") following that hearing. The Second Amended Complaint, filed on February 18, 2010, did indeed include the representation that the criminal charges were dismissed on February 2, 2010. SAC ***345** ¶ 110. Since D'Olimpio had now sufficiently alleged the favorable termination of the criminal charges against him, the March 1 Order therefore denied the motions to dismiss D'Olimpio's malicious prosecution claim.FN4

FN4. Defendants also asserted that the malicious prosecution claim should be dismissed because D'Olimpio's allegations failed to demonstrate the element of malice-*i.e.,* that there was "some deliberate act punctuated with awareness of 'conscious falsity' " with respect to the institution of criminal proceedings. *Bradley v. Vill. of Greenwood Lake,* 376 F.Supp.2d 528, 534-35 (S.D.N.Y.2005). But D'Olimpio's allegations regarding the false affidavits and confessions were clearly more than sufficient to plead malice.

Defendants Giglio, Moffett, and Nadel moved to dismiss D'Olimpio's second cause of action, which charged them with various constitutional violations based on their supervisory authority over Crisafi and their involvement with an alleged policy leading to D'Olimpio's false arrest. In this regard, the FAC contains the following allegations with respect to these defendants: At the time of the events alleged, James Giglio was the director of the BNE, and worked in the BNE's office in Troy, New York. *Id.* ¶ 5. Michael Moffett was the BNE's Section Chief with responsibility over BNE investigators, and also worked in the Troy office. *Id.* ¶ 6. Paul Nadel was the BNE's Program Director for the MARO, and worked in the same Manhattan office as Crisafi, Vallely, and D'Amicantonio. *Id.* ¶ 7. All three of these defendants had supervisory authority over Crisafi, Vallely, D'Amicantonio, and Kaplan. *Id.* ¶¶ 5-7.

The FAC further alleges that at the time of Crisafi's arrest, MARO followed the following protocol in order to determine whether a narcotics prescription was legitimate: First, when a patient called in a prescription to a pharmacy, the pharmacy would expect to receive a hard copy of the prescription from the patient's doctor within a week. Second, pharmacies were instructed to contact the MARO if they failed to receive a hard copy by the end of the seven-day period. Third, when the MARO was contacted by a pharmacy because the pharmacy did not receive a hard copy, a MARO officer would call the doctor's office and would either speak with the doctor to inquire whether the prescription was legitimate or would ask the doctor to fax an affidavit stating that the prescription was legitimate. *Id.* ¶ 11. With respect to this last step, MARO had a practice of confirming complaints from doctors by telephone and fax without taking any other steps to verify the doctors' identities. *Id.* ¶ 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The FAC also includes the following allegations regarding the failure of Giglio, Moffett, and Nadel to supervise Crisafi: On March 22, 2007, the *New York Times* published an article detailing the abuse of parking placards by government officials. This article included a photograph of a car belonging to Crisafi. *Id.* ¶ 13. Shortly after the publication of that article, the New York State Inspector General's Office began an investigation of Crisafi, which unearthed evidence of other misconduct. *Id.* ¶ 14. Sometime before November 16, 2007, plaintiff Kaplan, a MARO investigator, sent Nadel a written complaint informing him that Crisafi was violating suspects' Fifth Amendment rights. *Id.* ¶ 15. Nadel took no action in response to this complaint. *Id.* ¶ 16. Kaplan followed up with a series of other complaints, including a report to the Inspector General, which are discussed more fully below in the context of Kaplan's retaliation claim. The Inspector General's investigation culminated in a report issued on December 8, 2008, written by Inspector General Joseph Fisch (the "Fisch Report"), which found that Crisafi committed numerous abuses, including many of those alleged by Kaplan, some of ***346** which were assisted by Vallely and D'Amicantonio. The Fisch Report also found that Giglio and Moffett failed to supervise Crisafi and the MARO office, and noted the fact that Nadel, who was responsible for approving law enforcement operations, was a licensed pharmacist with no previous law enforcement experience. *Id.* ¶¶ 78-79.

Based on the above allegations, Crisafi in his second cause of action asserted § 1983 claims against Giglio, Moffett, and Nadel arising from (1) their creation of a policy allowing MARO personnel to initiate criminal charges based on a phone conversation or faxed affidavit without confirmation of the doctor's identity or that the alleged signature on the affidavit was authentic (the "Policy"); (2) their failure to supervise Crisafi and the MARO; (3) their allowing Nadel, a pharmacist with no prior law enforcement experience, to be the MARO Program Director; and (4) their deliberate indifference to D'Olimpio's rights. *Id.* ¶¶ 122-25.

Defendants attack these claims on several grounds. First, they assert that these claims are based on a broad theory of "supervisory liability" that has been discredited by the Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for showing that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a § 1983 claim. A plaintiff could plead personal involvement by showing any of the following:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Defendants argue that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* therefore rendering D'Olimpio's reliance on some of the *Colon* categories unwarranted.

By way of background, the plaintiff in *Iqbal* brought a " *Bivens* " action against several high-ranking federal officials, including the Attorney General and the Director of the Federal Bureau of Investigation, based on allegations that following the September 11 attacks, the FBI "arrested and detained thousands of Arab and Muslim men" substantially on the basis of their race, religion, or national origin, and that as a result plaintiff was unlawfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

subjected to harsh confinement conditions substantially on these discriminatory bases. 129 S.Ct. at 1951. The Supreme Court, however, held, *inter alia,* that the complaint failed to state a claim for intentional discrimination with respect to the Attorney General or FBI Director, and, as part of that discussion, observed that neither *Bivens* itself (*i.e., Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) nor § 1983 imposes supervisory liability simply on the basis of *respondeat superior;* rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948; *see also id.* at 1949 ("[T]he term 'supervisory liability' is a misnomer.... [E]ach Government official ... is only liable for his or her own misconduct."). The Court went on to note that the required showing of personal involvement "will vary with the ***347** constitutional provision at issue"; as the plaintiff's claim in *Iqbal* was for "invidious discrimination" in violation of the First Amendment and Equal Protection Clause, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 1948. Accordingly, the Court rejected the plaintiff's theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949.

[1] The defendants here note that certain courts in this District have read these passages of *Iqbal* to mean that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ... [t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated." *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* 2009 WL 3321011, at *15 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim Iqbal eliminated."). This Court respectfully disagrees. As *Iqbal* noted, the degree of personal involvement varies depending on the constitutional provision at issue; whereas invidious discrimination claims require a showing of discriminatory purpose, there is no analogous requirement applicable to D'Olimpio's allegations regarding his search, arrest, and prosecution. *See, e.g., Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). *Colon's* bases for liability are not founded on a theory of *respondeat superior,* but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. 58 F.3d at 873 (internal quotation marks omitted). Thus, the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

[2] Apart from this argument based on *Iqbal,* Giglio and Moffett assert that D'Olimpio's claims against them should be dismissed insofar as they allege a failure to supervise the MARO investigators. They maintain that D'Olimpio's allegations in this regard are too conclusory to state a claim. The Court disagrees. The FAC incorporates by reference the Fisch Report, which summarizes an investigation beginning in March 2007, describes various acts of misconduct by Crisafi that took place prior to D'Olimpio's arrest, contains a section headed "Lack of Supervision of Crisafi and MARO," and indeed concludes that there was a "lack of appropriate supervision by [Crisafi's] supervisors at MARO and at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

BNE's headquarters in Troy," where Giglio and Moffett were in charge. Fisch Report, 12/8/08, at 4, 16-17, *available at http:// www. ig. state. ny. us/* ***348** *pd fs/Investigationöf% 20Employee% 20Misconduct% 20at% 20the% 20DOH% 20Bureau% 20of% 20Narcotics% 20Enforcement.pdf* (cited in FAC ¶ 78). These findings by the Inspector General strongly suggest that defendants Giglio and Moffett "fail[ed] to act on information indicating unconstitutional acts were occurring," or were "gross[ly] negligen[t] in failing to supervise ... subordinates who commit ... wrongful acts," or were otherwise deliberately indifferent to suspects' rights, and also demonstrate "an affirmative causal link between the supervisor's inaction and [plaintiff's] injury." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). For the foregoing reasons, the March 1 Order held that the claims against Giglio and Moffett in this respect cannot be dismissed.

Nadel also argued that the claims against him for his failure to supervise Crisafi must be dismissed because there were no specific allegations of Nadel's personal involvement. The FAC does allege, however, that Kaplan complained to Nadel in writing of Crisafi's misconduct prior to D'Olimpio's arrest. FAC ¶ 15. The Fisch Report, although it does not dwell on Nadel's actions, cites Nadel's lack of prior law enforcement experience and describes complaints by MARO investigators that the lack of a Program Director with law enforcement experience allowed Crisafi "to attain an inappropriate degree of power within the office." Fisch Report at 1, 16. Because the Court, in ruling on a motion to dismiss, must "take all facts and draw all inferences in the light most favorable" to the plaintiff, *Gross v. Rell,* 585 F.3d 72, 75 n. 1 (2d Cir.2009), and because, as noted, the FAC incorporates by reference the allegations of the Fisch Report, the Fisch Report's conclusion that there was a general failure to supervise Crisafi must be taken for these purposes to apply to Nadel, Crisafi's immediate supervisor.[FN5] Thus, the March 1 Order denied the motion to dismiss the claim alleging Nadel's failure to supervise.

FN5. Defendants' reply memorandum asserted that contrary to what was pleaded in the FAC, Crisafi was a Senior Investigator at the time of D'Olimpio's arrest and thus did not report to Nadel at that time. In support of this, it cited to the Fisch Report, which mentions that Crisafi was temporarily promoted between 2006 and March 2008. Fisch Report at 16. The Report does not, however, state that Crisafi ceased reporting to Nadel during this period. The FAC alleges that Nadel, as MARO Program Director, had supervisory authority over all MARO investigators. FAC ¶ 7. In light of the allegations in the FAC, and taking all inferences in favor of D'Olimpio, the Court cannot conclude that Nadel lacked supervisory authority over Crisafi during this period. In any event, it is undisputed that Nadel supervised Vallely and D'Amicantonio, who are also alleged to have violated D'Olimpio's constitutional rights.

With respect to those aspects of plaintiff D'Olimpio's second cause of action that relate to the alleged "Policy," that Policy allegedly permitted BNE investigators to rely on unverified telephone communications with, or faxed affidavits from, doctors' offices to satisfy the requirement of probable cause to arrest suspects or initiate criminal charges. While defendants appear to concede that Giglio, Moffett, and Nadel were sufficiently involved with the formation and operation of this Policy to satisfy the personal involvement requirement of § 1983, they argue that the alleged Policy is not unconstitutional, or at the very least, that the doctrine of qualified immunity should bar further proceedings with respect to these allegations.

[3][4] "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is ***349** committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). The probable cause determination is

based on the "totality of the circumstances," and does not readily lend itself to being reduced to a "neat set of legal rules." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (internal quotation marks omitted). Furthermore, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Id.* (internal quotation mark omitted). The Supreme Court has held that tips from informants can provide probable cause to arrest, but only if either the informant or the information in his/her tips has been shown to be reliable or has been sufficiently corroborated. *See* *Illinois v. Gates,* 462 U.S. 213, 242, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven in making a warrantless arrest[,] an officer 'may rely upon information received through an informant, rather than upon his direct observations, *so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.*' " (emphasis added)); *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous call to police reporting that person was carrying a gun lacked indicia of reliability sufficient to satisfy "reasonable suspicion" standard with respect to a police officer's stop-and-frisk search, even though that standard requires a lesser showing than probable cause to arrest); *see also* *United States v. Elmore,* 482 F.3d 172, 179 (2d Cir.2007) ("Even a tip from a completely anonymous informant-though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable-can form the basis of reasonable suspicion or probable cause *if it is sufficiently corroborated.*" (emphasis added) (citation omitted)); *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) ("Information about criminal activity provided by a single complainant can establish probable cause *when that information is sufficiently reliable and corroborated.*" (emphasis added)).

[5] Defendants argue that the Policy provides BNE officers with probable cause (either on the merits or sufficient to entitle them to qualified immunity) because the information provided by the doctors' offices is sufficiently reliable to support a reasonable belief that a crime has been committed. For this proposition, the defendants rely primarily on two out-of-circuit cases, *United States v. Fooladi,* 703 F.2d 180 (5th Cir.1983), and *Edwards v. Cabrera,* 58 F.3d 290 (7th Cir.1995). While these cases do support the proposition that it may be error to discount information provided by disinterested informants absent reason to doubt these informants' veracity, even when their names are not known to the law enforcement officer, these cases do not stand for the proposition that such information alone suffices to establish probable cause. Rather, in *Fooladi,* the probable cause determination was not based solely on information provided by a representative of a glass manufacturer, which the Fifth Circuit held that the trial court had erroneously disregarded. Instead, the arrest was based not only on the employee's tip that the manufacturer had shipped glassware to a purported business address that was in fact the arrestee's personal address, but also on, among other things, the law enforcement agent's personal observation that the arrestee's residence emanated an odor characteristic of methamphetamine manufacturing and that the arrestee left the premises "holding his gloved hands away from his body as if a chemical were on them." 703 F.2d at 181-84. Similarly, in *Edwards,* the Seventh Circuit found that probable cause existed not just because of a tip from a bus ***350** driver, relayed through a dispatcher, that the driver thought he saw several men participate in a drug transaction in a bus station, but also based on the police officer's own personal observations of several men, including the arrestee and his brother, who matched the driver's description standing together outside the bus station; the officer's personal observation that the arrestee's brother was so nervous that he appeared to have urinated on himself; and the officer's subsequent consent search of the brother's garment bag, which yielded a plastic bag appearing to contain marijuana. 58 F.3d at 292.

These cases are thus consistent with the law in this Circuit, as articulated in *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). The plaintiff in *Caldarola,* a New York corrections officer challenged his arrest on charges that he was unlawfully collecting job injury benefits even though he was no longer a New York resident and thus was not qualified to receive such benefits. The arresting officer determined there was probable cause to believe the plaintiff had moved from New York to Connecticut based

on an investigative file containing reports from two private investigation firms that had been hired by the officer's supervisors. The reports themselves contained, among other things, summaries of investigators' personal interviews with the plaintiff's New York neighbors, surveillance tapes showing the plaintiff emerging from a home in Connecticut and dropping his children off at school, a deed and mortgage for a Connecticut home in the plaintiff's name indicating that it was his primary residence, and work attendance records indicating that the plaintiff had a Connecticut telephone number. The Second Circuit held that it was reasonable for the arresting officer to conclude that these private investigative firms hired by his supervisors were reliable and that the investigators' reports provided information corroborating their conclusions. *Id.* at 163-68. Thus, accepting *arguendo* defendants' assertion that *Caldarola* stands for the proposition that information gathered by private investigators can support probable cause even in the absence of personal knowledge by the arresting officer, the decision certainly does not suggest that an unadorned, unverified phone call or fax can, by itself, without further meaningful corroboration, satisfy probable cause or support qualified immunity.

[6] Returning to the allegations in the FAC, D'Olimpio has asserted that, consistent with the Policy, his arrest was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of the prescription within a week, which prompted a MARO official to call D'Olimpio's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of the doctor. None of the above-cited cases suggests that this information originating from an unidentifiable person in a doctor's office can even come close to satisfying probable cause to arrest, absent corroboration or other indicia of reliability. Unlike *Caldarola,* here there is no underlying data providing support for the informant's conclusion. There is no indication that the identity of the informant here could ever be determined. *Cf.* *J.L.,* 529 U.S. at 270, 120 S.Ct. 1375 ("Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " (citation omitted)). There is no suggestion that the MARO investigators had any reason to rely on this particular doctor's office; to the contrary, there are numerous ***351** reasons why a doctor or her staff might inadvertently provide inaccurate information, especially given that the relevant information is not affirmatively provided by a tipper, but rather can be elicited by the investigator from whoever happens to pick up the phone in the doctor's office. Moreover, if the doctor herself were involved in wrongdoing with respect to the prescription of narcotics, she would have an incentive to affirmatively mislead the investigators. In sum, while a report from a doctor or her staff denying knowledge of the prescription might be a reasonable basis for further investigation, it is patently deficient as the sole ground for an arrest.

For the foregoing reasons, under the facts alleged and the clearly established law cited herein, defendants lacked even arguable probable cause to arrest D'Olimpio. Because the circumstances of this arrest were consistent with the Policy (as alleged), and because defendants do not dispute that Giglio, Moffett, and Nadel had personal involvement with the establishment and enforcement of this Policy, the March 1 Order declined to dismiss the second cause of action with respect to these allegations.

The Court turns next to those portions of the FAC that assert claims by plaintiff Kaplan, all of which the defendants moved to dismiss. Kaplan's claim of retaliation for expressing his First Amendment rights (the sixth cause of action in the FAC) is based on the following allegations: Kaplan (as noted) is a MARO investigator. FAC ¶ 3. During at least some of the times covered by the FAC, Crisafi was Kaplan's supervisor. *Id.* ¶ 64. As described above, Kaplan complained to Nadel about Crisafi prior to November 16, 2007, but Nadel took no action. *Id.* ¶¶ 15-16. On or about November 17, 2007, Kaplan again went to Nadel and raised concerns about

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Crisafi: in particular, he stated that Crisafi took prescription narcotics while on duty; that Crisafi would experience facial tics and "zone out"; that Crisafi accidentally discharged his weapon while on duty; that Crisafi lied about his previous job experience; that Crisafi had investigators perform "ill-conceived" and dangerous arrests and searches; that Crisafi was violating suspects' *Miranda* rights; that Crisafi, without authorization, put sirens and lights on his car; and that Crisafi was working outside jobs during work hours. *Id.* ¶ 63. Despite the fact that Kaplan told Nadel that he was afraid of Crisafi and Nadel assured Kaplan that the conversation would be kept confidential, Nadel reported this conversation to Crisafi. *Id.* ¶¶ 63-64. Thereafter, on or about November 20, 2007, Crisafi threatened Kaplan by walking up behind him and saying, "Bang bang, you're dead." *Id.* ¶ 65. At around that same time, Kaplan filed a Workplace Incident Report with the Department of Health's Bureau of Employee Relations detailing these threats and reporting Crisafi's other misconduct, of which he had previously complained to Nadel. *Id.* ¶ 66. In response, Crisafi sabotaged Kaplan's work product on several occasions and began to spread rumors about him, including rumors that Kaplan appeared tired and slept while at the office. *Id.* ¶¶ 67-68. Kaplan then called the Inspector General to report these concerns about Crisafi, and the Inspector General then widened his ongoing investigation of Crisafi to address these issues. *Id.* ¶¶ 69-70. Because, however, the Inspector General's investigation led to interviews with all the MARO inspectors except for Kaplan, Crisafi and Nadel were able to infer that Kaplan was the whistleblower. *Id.* ¶ 71.

Kaplan, after spraining his ankle while on duty, went on workers' compensation leave on or about February 27, 2008. *Id.* ¶ 72. A bullet was shot at Kaplan's house on April 17, 2008, and on April 25, 2008, his house was vandalized. *Id.* ¶¶ 73-74. ***352** On August 12, 2008, after Kaplan was notified that Employee Relations never received his first Workplace Incident Report, Kaplan resubmitted it. *Id.* ¶ 75.

After publication of the Fisch Report, Giglio resigned as the director of the BNE. *Id.* ¶ 81. In December 2008, defendant Jennifer Treacy was appointed Deputy Director of the New York State Department of Health, with supervisory authority over the BNE and the MARO. *Id.* ¶ 82. The Inspector General attempted to persuade Kaplan to return to work, as Crisafi was on leave and would face discipline for his conduct. *Id.* ¶ 83. Kaplan agreed to return to work and received a physician's evaluation that he was fit to return. *Id.* ¶ ¶ 84-86. Nonetheless, Kaplan was required to undergo three additional physical examinations; after reviewing these, the relevant administrator concluded that Kaplan was fit to return, provided the he be closely monitored, specifically for falling asleep at work. *Id.* ¶¶ 87-90. He was scheduled to return to work on April 10, 2009. *Id.* ¶ 91. The FAC alleges that Treacy, who was romantically involved with Giglio, was upset about Giglio's resignation and blamed Kaplan for causing it; therefore, she ordered the acting director of the BNE not to allow Kaplan to return. *Id.* ¶¶ 92-93. On April 9, 2009, Kaplan was told not to return because of a lack of staff, and on April 23, the Department of Health sent him a letter informing him that he was terminated for failing to complete a study to confirm he did not have a sleep disorder. *Id.* ¶ ¶ 94-95. Kaplan filed a grievance and, after a hearing, was allowed to return to work. *Id.* ¶ 96.

In May 2009, defendant Kenneth Post was appointed as director of the BNE, and defendant Timothy Dewey was appointed as BNE Section Chief. *Id.* ¶¶ 97-98. In June 2009, Kaplan returned to work, and was informed that he would only be given a temporary assignment and would not perform fieldwork. *Id.* ¶ 99. After his reinstatement, Kaplan was denied access to a state car and was not given a badge, gun, or firearms training; he was confined to desk duties and menial document review. *Id.* ¶ 100-101. On July 14, 2009, Kaplan met with Dewey to complain about his treatment. *Id.* ¶ 102. D'Olimpio filed his original complaint in the instant action on August 18, 2009. In September 2009, Stephanie Jubic of Employee Relations confiscated the computers of Crisafi, Vallely, D'Amicantonio, and Kaplan-Kaplan believes Jubic downloaded his emails to find grounds to terminate him. *Id.* ¶ 105. On October 8, 2009, Kaplan was placed on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

administrative leave and told not to contact anyone at the BNE. *Id.* ¶ 108. On October 16, Jubic mailed Kaplan a letter stating that he would be interrogated on October 27 and would possibly face discipline. *Id.* ¶ 109. Also on October 16, Kaplan had a grievance hearing to discuss being denied his proper job responsibilities. At this hearing, Post stated that as BNE director, it was in his discretion to decide what duties Kaplan should have. *Id.* ¶ 110.

Based on these facts, Kaplan alleges in that defendants Treacy, Post, Dewey, and Nadel retaliated against him with respect to speech that was protected by the First Amendment. These defendants have moved to dismiss Kaplan's claim on several grounds, including that Kaplan's speech was made pursuant to his official duties and hence is not protected by the First Amendment.

[7] A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee "spoke as a citizen on a matter of public concern"; otherwise, the employee's speech is outside the scope of the First Amendment. *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (internal quotation ***353** mark omitted). In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Though not without reluctance, the Court concludes that this "official duties" exception, as recently elaborated on by the Second Circuit in *Weintraub v. Board of Education,* 593 F.3d 196 (2d Cir.2010), is fatal to Kaplan's retaliation claim.

*Weintraub* made clear that for purposes of determining whether a public employee's speech is protected, a public employee's "official duties" are to be construed broadly. The plaintiff in *Weintraub* was a public school teacher, and the allegedly protected speech consisted of a grievance he filed with his union challenging a school administrator's decision not to discipline a disruptive student. Quoting *Garcetti,* the Court of Appeals stated that the inquiry into whether a public employee speaks pursuant his official duties is "a practical one," and that the employee's duties should not be interpreted narrowly. 593 F.3d at 202 (internal quotation marks omitted). Thus, *Weintraub* held:

> [U]nder the First Amendment, speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer. In particular, we conclude that Weintraub's grievance was "pursuant to" his official duties because it was "part-and-parcel of his concerns" about his ability to "properly execute his duties," as a public school teacher-namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.... Weintraub's speech challenging the school administration's decision to not discipline a student in his class was a "means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching.

*Id.* at 203 (citations omitted). The court went on to note that its conclusion was supported "by the fact that [Weintraub's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." *Id.* Whereas actions like writing a letter to a newspaper or informally discussing politics with co-workers are equally available to government employees and ordinary citizens, "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens." *Id.* at 203-04.

[8] Here, the speech that Kaplan claims is protected falls within Kaplan's official duties as defined by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Weintraub.* In the FAC, Kaplan alleges that the retaliation he allegedly suffered was in response to the following statements: (1) his complaints to Nadel about Crisafi's behavior; (2) his Workplace Incident Reports; and (3) his complaint to the Inspector General. With the possible exception of the latter, each of these statements, as Kaplan concedes, was "made privately though channels available through his employment," and was "made in a manner that would not be available to a non-public employee citizen." Kaplan Supp. Mem., 2/5/10, at 5. Moreover, the common theme of all these statements was that Crisafi was violating suspects' rights and was not performing his job properly, and by implication that Crisafi was interfering with Kaplan's ability to perform his own duties. It is clear that Kaplan's duties as a MARO officer included ensuring that investigations and arrests of narcotics abuses are lawfully conducted. *See, e.g.,* Fisch Report at 2-3 (describing policies and training manuals ***354** applicable to BNE investigators). All of Kaplan's relevant speech was therefore, either directly or indirectly, " 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' " as a BNE investigator. *Weintraub,* 593 F.3d at 203. Just as the speech in *Weintraub* was in furtherance of the teacher's duty to maintain classroom discipline, Kaplan's speech here, which related to ensuring the "safety of citizens" and the "constitutional rights of suspects," Kaplan Supp. Mem. at 5, was made in furtherance of his law enforcement duties as an investigator endowed with the power to arrest. *Cf. Carter v. Inc. Vill. of Ocean Beach,* 693 F.Supp.2d 203, 211 (E.D.N.Y.2010) ( "All of plaintiffs' complaints to their superiors ... related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern [that various acts] affected their ability to perform their job assignments safely and that they were told not to issue summonses to certain individuals and businesses.... Plaintiffs' speech in challenging ... defendants' alleged cover-ups of officer misconduct ... was undertaken in the course of performing one of their core employment responsibilities of enforcing the law and, thus, was speech made pursuant to their official duties."). Accordingly, Kaplan's allegations cannot support a First Amendment retaliation claim.

In addition, the speech contained in Kaplan's Workplace Incident Reports and his complaint to the Inspector General were unprotected by the First Amendment because these statements were required by law. *See* N.Y. Labor Law § 27-b(6)(a) ("Any employee ... who believes that a serious violation of a workplace violence protection program exists or that an imminent danger exists shall bring such matter to the attention of a supervisor in the form of a written notice."); N.Y. Exec. Law § 55(1) ("Every state officer or employee in a covered agency shall report promptly to the state inspector general any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment .... The knowing failure of any officer or employee to so report shall be cause for removal from office or employment or other appropriate penalty.").[FN6] Speech made pursuant to a public employee's legal obligations is not made "as a citizen." [FN7]

FN6. It is these statutory obligations, as well as *Weintraub's* broad definition of speech made in the course of official duties, that distinguish Kaplan's speech from that of the plaintiff in *Freitag v. Ayers,* 468 F.3d 528 (9th Cir.2006). The plaintiff in *Freitag,* a California correctional officer, claimed she was retaliated against after reporting to the California Inspector General that she and other prison guards were being sexually harassed. Although the Ninth Circuit held that the plaintiff "acted as a citizen" in complaining to the Inspector General and in writing letters to a state senator regarding this harassment, the court's holding was based on the fact that "[i]t was certainly not part of [plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly." *Id.* at 545. Under New York law, however, such complaints *are* within the official duties of BNE investigators.

FN7. Because Kaplan's speech was made

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

pursuant to his official duties and thus is not constitutionally protected, the Court need not reach other required elements of a First Amendment retaliation claim, including whether his speech addressed matters of "public concern," *see* *Sousa,* 578 F.3d at 170, and whether the complaint sufficiently alleges a causal connection between the protected speech and the retaliatory acts, *see* *Gorman-Bakos v. Cornell Coop. Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001).

For the foregoing reasons, the March 1 Order denied the sixth cause of action in the FAC, and, as the Court now clarifies, the dismissal was with prejudice because it rests on a legal ground that cannot be ***355** cured by repleading. *Cf.* *Oliver Schs., Inc. v. Foley,* 930 F.2d 248, 252-53 (2d Cir.1991). The Court notes, however, that the dismissal of Kaplan's First Amendment claim brought pursuant to § 1983 does not alter Kaplan's opportunity under applicable New York law to seek protection from the retaliatory acts he alleges. *See* N.Y. Labor Law § 27-b(6)(e) (prohibiting retaliation based on an employee's filing of a report of workplace violence); N.Y. Exec. Law. § 55(1) (providing that employees who report "improper governmental action" to the Inspector General "shall not be subject to dismissal, discipline or other adverse personnel action").

[9] The Court comes finally to Crisafi's counterclaim for defamation, which insinuates that the aforementioned Workplace Incident Reports filed by Kaplan, Kaplan's complaint to the Inspector General, and even Kaplan's allegations in the FAC are defamatory. Crisafi subsequently conceded, however, that the only potentially actionable statements not protected by privilege or barred by the statute of limitations are those that were allegedly republished on December 8, 2008 by the Inspector General and the *New York Times.* Crisafi Mem. Opp. Kaplan's Mot. to Dismiss, 2/5/10, at 4-5. In this respect, the counterclaim, which was filed on December 3, 2009, alleges the following: Kaplan filed Workplace Incident Reports on or about November 20, 2007 and August 12, 2008 reporting various misconduct by Crisafi, and made a complaint to the Inspector General to the same effect on or about November 20, 2007. Crisafi Compl. ¶¶ 15, 17, 20, Exs. C-E. Crisafi alleges, based on information and belief, that Kaplan's report to the Inspector General "prompted an investigation" focused on Crisafi and relating to Kaplan's complaints. *Id.* ¶ 19. Also upon information and belief, Crisafi alleges that a copy of the Fisch Report was provided to Kaplan in advance of its public release. *Id.* ¶ 35. This report was also provided to the *New York Times,* which described this report in an article published on December 8, 2008. *Id.* ¶ 36 & Ex. F. Upon information and belief, Crisafi alleges that Kaplan gave the Fisch Report to the *New York Times. Id.* ¶ 37. The Fisch Report was published on the *New York Times's* and Inspector General's websites, where it remains accessible. *Id.* ¶¶ 39-40. Crisafi alleges that the contents of the *New York Times* article and the Fisch Report reflect false and defamatory statements made by Kaplan, and have caused Crisafi to be vilified and his reputation to suffer. *Id.* ¶¶ 16, 18, 21, 23-33, 41-43. Accordingly, Crisafi asserted two causes of action alleging that Kaplan defamed him. Kaplan then moved to dismiss these counterclaims on the basis that Kaplan is not responsible for the republication of his allegedly defamatory statements by the *New York Times* or the Inspector General.

[10] Under New York law, a plaintiff "may not recover damages from the original author for ... slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 59 (2d Cir.2002). Crisafi argues that a more lenient standard applies, permitting liability based on Kaplan's mere knowledge or reasonable expectation that his allegedly defamatory statements would be republished. *See, e.g.,* *Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963). The Court need not resolve which standard applies: Crisafi's counterclaim is deficient under either test because it fails to "state a claim to relief that is plausible on its face." *Iqbal,* 129 S.Ct. at 1949 (internal quotation marks omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Even accepting as true Crisafi's non-conclusory factual allegations, including ***356** those made only on information and belief, it is simply implausible that Kaplan in any legally relevant sense caused the republication of his statements in the Fisch Report or *New York Times* article. Crisafi alleges that Kaplan's complaint prompted the Inspector General investigation, but this allegation is contradicted by the Fisch Report itself, which indicates that the investigation began after the *New York Times* published an article in March 22, 2007 describing abuses of government-issued parking placards. Fisch Report at 3-4. In any event, even if Kaplan's complaint served to expand the scope the investigation, and included allegations consistent with what the Fisch Report eventually concluded, the Report clearly did more than merely parrot Kaplan's charges. The Report, in a section headed "Methodology," states that the investigation was based on, among other things, interviews with Crisafi himself, other BNE employees, Giglio, and Moffett, as well as other police officers and district attorneys who had interacted with Crisafi. *Id.* at 4. Indeed, the Inspector General is required by statute to "investigate," not merely repeat, allegations of malfeasance. N.Y. Exec. Law § 53. And even if, as alleged, Kaplan acted to bring the Report to the attention of the *New York Times,* the *New York Times* article, which consists entirely of a summary of the Fisch Report, reflects Kaplan's allegations only to the extent that such charges were ratified by the Report itself. *See* Crisafi Compl., Ex. F.

For these reasons, the Court concluded that there is no basis for holding Kaplan liable for the republication of his allegedly defamatory statements, even if he intended that his allegations be republished in this manner and gave the *New York Times* a copy of the Fisch Report. "The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication." *Van-Go Transp. Co. v. N.Y. City Bd. of Educ.,* 971 F.Supp. 90, 102 (E.D.N.Y.1997) (internal quotation marks omitted). Here, the duty of the Inspector General to investigate complaints prior to publishing a written report, the fact that the Fisch Report was based on numerous sources beyond Kaplan's allegations, and the fact that the *New York Times* article merely summarized the Fisch Report together sever any causal link that might exist between Kaplan's actions and the December 8, 2008 republications. Thus, the March 1 Order dismissed Crisafi's counterclaim with prejudice.[FN8]

FN8. This result is not inconsistent with *Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963), which declared that "[a]nyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication." This broad pronouncement was made in the context of a narrower holding that the defendant, Jack Paar, could be held responsible for the *New York Post's* publication of his statement, made by him to a reporter during an interview, that the plaintiff "lacked certain qualities which would fit him to be a performer desirable to [Paar's] program." *Id.* at 365, 239 N.Y.S.2d 494. The causal link between Kaplan's statements and the findings of the Fisch Report, which were subsequently summarized by the *New York Times,* is obviously much more attenuated than the relationship in *Campo* between Paar's statement to the newspaper reporter during an interview and the reporter's publication of that statement.

For the foregoing reasons, the Court hereby confirms its decisions to dismiss the sixth cause of action (*i.e.,* all of Kaplan's claims) and to dismiss both of Crisafi's counterclaims, all with prejudice, and to otherwise deny the motions to dismiss. The Clerk of the Court is directed to close ***357** the entries numbered 33, 34, 35, 42, and 47 on the docket of case number 09 Civ. 7283 and to close case number 09 Civ. 9952.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

S.D.N.Y.,2010.

D'Olimpio v. Crisafi

718 F.Supp.2d 340

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Gultela QASEM, Plaintiff,

v.

Luis A. TORO; Superintendent of Taconic Correctional Facility Delores Thornton; Deputy Superintendent for Security William Rogers; John Does 1-10, Defendants.

No. 09 Civ. 8361(SHS).

Aug. 10, 2010.

**Background:** Inmate brought a § 1983 suit against corrections officials regarding injuries suffered by the inmate at the hands of a corrections officer alleged to have sexually assaulted the inmate. Superintendent and deputy superintendent for security moved to dismiss claims that they were deliberately indifferent to the inmate's personal safety.

**Holdings:** The District Court, Sidney H. Stein, J., held that:

(1) inmate stated a claim against the movants for Eighth and Fourteenth Amendment violations, and

(2) movants were not entitled to qualified immunity.

Motion denied.

West Headnotes

**[1] Civil Rights 78 1358**

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases

**Constitutional Law 92 4825**

92 Constitutional Law

92XXVII Due Process

92XXVII(H) Criminal Law

92XXVII(H)11 Imprisonment and Incidents Thereof

92k4825 k. Use of Force; Protection from Violence. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Prisons 310 234**

310 Prisons

310II Prisoners and Inmates

310II(E) Place or Mode of Confinement

310k234 k. Duty to Protect; Protective Confinement. Most Cited Cases

**Sentencing and Punishment 350H 1537**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General

350HVII(H) Conditions of Confinement

350Hk1537 k. Protection from Violence. Most Cited Cases

Inmate's allegations against superintendent and deputy superintendent for security in a § 1983 suit, claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, stated a claim for Eighth and Fourteenth Amendment violations; complaint alleged that the officials were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with another official, the investigation and response to complaints of staff misconduct. U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 1335**

78 Civil Rights

78III Federal Remedies in General

78k1334 Persons Liable in General

78k1335 k. In General. Most Cited Cases

Degree of personal involvement required to overcome a motion to dismiss a § 1983 claim for failure to state a claim varies depending on the constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Civil Rights 78 1355**

78 Civil Rights

78III Federal Remedies in General

78k1353 Liability of Public Officials

78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases

Categories set forth in case law as supporting personal liability of supervisors under § 1983 apply as long as they are consistent the requirements applicable to the particular constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983.

**[4] Sentencing and Punishment 350H 1532**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General

350HVII(H) Conditions of Confinement

350Hk1532 k. In General. Most Cited Cases

Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. U.S.C.A. Const.Amend. 8.

**[5] Sentencing and Punishment 350H 1533**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General

350HVII(H) Conditions of Confinement

350Hk1533 k. Deliberate Indifference in General. Most Cited Cases

Official acts with the requisite deliberate indifference for an Eighth Amendment violation when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S.C.A. Const.Amend. 8.

**[6] Civil Rights 78 1376(7)**

78 Civil Rights

78III Federal Remedies in General

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Superintendent and deputy superintendent for security were not entitled to qualified immunity in an inmate's § 1983 suit claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable, if not unintelligible, decisions made with respect to the inmate during the course of an investigation. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 1376(2)**

78 Civil Rights

78III Federal Remedies in General

78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers

78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Individual defendants are shielded from liability for civil damages under § 1983 if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Karen K. Won, Cooley Godward Kronish LLP, William O'Brien, Kronish, Lieb, Weiner & Hellman L.L.P., New York, NY, for Plaintiff.

Thomas Patrick McCloskey, Aliazzo, McCloskey & Gonzalez, LLP, Ozone Park, NY, Julia Hyun-Joo Lee, New York State Department of Law, New York, NY, for Defendants.

*OPINION & ORDER*

SIDNEY H. STEIN, District Judge.

***1** Plaintiff Gultela Qasem brings this action pursuant to 42 U.S.C. § 1983 against defendants Luis Toro, Delores Thornton, William Rogers, and John Does 1-10 in their individual capacities. The lawsuit arises from injuries allegedly suffered by Qasem at the hands of Corrections Officer Luis Toro while Qasem was an inmate under the custody of the New York State Department of Correctional Services ("DOCS") at Taconic Correctional Facility. The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) direct and repeated acts of sexual assault by Toro; (2) Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Defendants Thornton and Rogers have now moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief.

## I. BACKGROUND

The following facts are taken from the complaint and presumed to be true for the purposes of this motion.

A. *Parties*

Plaintiff Gultela Qasem is currently an inmate at the Bedford Hills Correctional Facility. At the time of the acts alleged in the complaint, plaintiff was an inmate at the Taconic Correctional Facility. (Compl. ¶¶ 5, 21.) Defendant Toro-not a party to the present motion-is a DOCS Corrections Officer. At the time of the acts alleged in the complaint, defendant Delores Thornton was the Superintendent of Taconic and defendant Rogers was the Deputy Superintendent for Security of Taconic. (*Id.* ¶¶ 1, 8-9.)

B. *This Action*

Qasem alleges defendants violated her Eighth and Fourteenth Amendment rights under the United States Constitution as they arise out of a repeated pattern of sexual assault and rape committed against her by Toro.

While an inmate at Taconic, Qasem was assigned to work in Building 93 from approximately February 2007 to November 2007, and for most of that time, she also lived there. (*Id.* ¶¶ 21-22.) Qasem alleges that, on or around March 27, 2007, Toro entered her cell during the afternoon "count time" [FN1] and sexually assaulted her by fondling her breasts, vaginal area, and buttocks while also exposing his penis and forcing Qasem to perform oral sex on him. (*Id.* ¶ 23.) Plaintiff alleges that later that evening Toro ordered her to the officers' station where he raped her. (*Id.* ¶ 24.) Toro then told Qasem that he would write up a disciplinary action against her if she told anyone what he had done to her. (*Id.* ¶ 24.)

Qasem alleges that a pattern of sexual assault emerged over the next eight months. Toro allegedly assaulted and raped Qasem in her cell on numerous occasions during the night count time, in the officers' station, in the shower area, and in the recreation room. (*Id.* ¶¶ 25-26.) Throughout these eight months, Qasem alleges that Toro

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

repeatedly threatened to kill her and her family if she reported his actions. As a result, she did not report Toro's conduct. (*Id.* ¶ 27). Plaintiff alleges, however, that other corrections staff facilitated Toro's repeated sexual abuse by condoning Toro or plaintiff being in unauthorized areas and allowing Toro into plaintiff's housing area when he was not assigned there. (*Id.* ¶ 28.)

***2** Although Qasem did not file a report against Toro based on his conduct, others did, and on July 2, 2007, the DOCS Officer of Inspector General ("IG") commenced an investigation into Toro's actions. (*Id.* ¶¶ 31-33.) When interviewed by an IG representative, Qasem denied the allegations because of the prior threats that Toro had made; despite her denials, plaintiff was reassigned to a different building the day after her interview. (*Id.* ¶¶ 33-34.) As the IG continued its investigation, in August 2007 Qasem was transferred back to building 93, which was the building where Toro worked at that time. Plaintiff contends that by causing her to be transferred back to Toro's building, defendants Thornton and Rogers were deliberately indifferent to her safety and allowed Toro to have continued unfettered access to her, which enabled him to continue raping and sexually abusing her. (*Id.* ¶ 38.) Plaintiff alleges that once she returned to building 93 in August 2007, Toro resumed his sexual assaults, including but not limited to raping her and sodomizing her. (*Id.* ¶ 40.)

During this same time period, plaintiff was transferred in and out of the "keeplock" area in building 93. (*Id.* ¶¶ 39-47.) While she was in keeplock, at least one corrections officer delivered a message from Toro to her, while other corrections staff condoned and disregarded the alleged continuing assaults by Toro. (*Id.* ¶¶ 47-48.) In addition to physical, mental, and emotional injuries she suffered from the repeated rapes and sexual abuse, Qasem alleges that in October 2007 she was diagnosed with genital herpes, a sexually transmitted disease, which she believes was transmitted to her by Toro. (*Id.* ¶¶ 61-63.)

Plaintiff alleges that sometime in November 2007, Toro became aware of the IG investigation and started harassing her by asking her what questions the IG representative had asked her and what her responses were. (*Id.* ¶ 45.) Qasem contends that on November 26, 2007, after she was once again raped by Toro, she told him that she was going to report his conduct, and Toro became violent with her-twisting her arm and wrist. (*Id.* ¶ 50.) The next day, plaintiff was transferred out of Taconic and into Bedford. (*Id.* ¶ 51.)

Plaintiff alleges that Thornton and Rogers were deliberately indifferent to her safety and well-being and that despite ample evidence of the assaults, they permitted Toro to have repeated access to her instead of removing either her or Toro from building 93. (*Id.* ¶¶ 55-60.) Plaintiff maintains that Thornton and Rogers were responsible for the inadequate polices and practices that allowed her to be repeatedly raped and assaulted over a number of months, despite the fact that other corrections officers were aware of Toro's misconduct. (*Id.*)

**II. DISCUSSION**

A. *Rule 12(b)(6) Standard*

On a motion to dismiss a claim for relief pursuant to Rule 12(b)(6) a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). A complaint will be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

B. *Supervisory Liability Post-Iqbal*

***3** [1] The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) the direct and repeated acts of sexual assault by Toro; (2) defendant Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Thornton and Rogers respond to the claims against them on several grounds.

First, they assert that Qasem's claims are based on a broad theory of "supervisory liability" that has been discredited by the U.S. Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for alleging that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a section 1983 claim. A plaintiff could plead personal involvement by showing any of the following five courses of conduct:

> (1) the defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Sanders v. N.Y. City Dep't of Corr.,* 07 Civ. 3390, 2009 WL 222161, at *5, 2009 U.S. Dist. LEXIS 7709, at *17-18 (S.D.N.Y. Jan. 30, 2009). Defendants contend that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* thereby rendering Qasem's reliance on *Colon* categories unwarranted.

The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability under *Colon.* As explained in detail in *D'Olimpio v. Crisafi,* No. 09 Civ. 7283, ---F.Supp.2d ----, ---- - ----, 2010 WL 2428128, at *4-6, 2010 U.S. Dist. LEXIS 59563, at *14-18 (S.D.N.Y. June 15, 2010), in the wake of *Iqbal,* certain courts in this district have found that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster," and that "[t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated," because only the first and third categories allege personal involvement sufficiently to permit supervisory liability to be imposed after *Iqbal.* *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at *1-2, 2009 U.S. Dist. LEXIS 54141, at *6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at *15, 2009 U.S. Dist. LEXIS 96952, at *42-43 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim *Iqbal* eliminated."). This Court, as did the Court in *D'Olimpio,* disagrees with this narrow interpretation of *Iqbal.*

***4** [2] As *Iqbal* noted, the degree of personal involvement required to overcome a Rule 12(b)(6) motion varies depending on the constitutional provision alleged to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

have been violated. Invidious discrimination claims require a showing of discriminatory purpose, but there is no analogous requirement applicable to Qasem's allegations of repeated sexual assaults. *See* *Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (citing *Chao v. Ballista,* 630 F.Supp.2d 170, 178 n. 2 (D.Mass.2009)); *see also* *D'Olimpio,* --- F.Supp.2d at ----, 2010 WL 2428128, at *5, 2010 U.S. Dist. LEXIS 59563, at *16. *Colon's* bases for liability are not founded on a theory of respondeat superior, but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. *Id.* at ----, at *5, 2010 U.S. Dist. LEXIS 59563 at *17 (quoting *Colon,* 58 F.3d at 873).

[3] Thus, the five *Colon* categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *Id.*; *see also* *Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

Plaintiff's allegations and inferences, if proven, would entitle her to relief under the Fourteenth Amendment and Eighth Amendments. *See* *Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (sustaining substantive due process claims where state action shocks the conscience); *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.") (quoting *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

C. *Colon Categories*

Second and apart from their argument based on *Iqbal,* Thornton and Rogers assert that plaintiff has adequately alleged neither (1) that they were deliberately indifferent to her rights by failing to act on information that unconstitutional acts were occurring nor (2) that they were responsible for creating or maintaining policies or practices that failed to prevent Qasem from being repeatedly raped and assaulted.

[4][5] The Court finds that plaintiff has alleged sufficient facts that Thornton-the Superintendent of the DOCS facility where plaintiff resided-and Rogers-the Deputy Superintendent for Security at that same facility-were deliberately indifferent to her health and safety and that they were responsible for creating or maintaining policies and practices that failed to prevent plaintiff from being raped and assaulted. The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). "An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

***5** Specifically, the complaint alleges that defendants were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with the IG, the investigation and response to complaints of staff misconduct. Despite an investigation and what plaintiff alleges as substantial evidence of Toro's misconduct known to a variety of individuals (*id.* ¶ 56),

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendants Thornton and Rogers allowed plaintiff to be housed in the building where Toro worked (*id.* ¶ 58); they failed to remove him from guarding Qasem (*id.* ¶ 57); they failed to reassign Qasem to another building (*id.*); they allowed Qasem to be transferred back to the building where Toro worked (*id.* ¶ 58); and they did not increase supervision of Toro despite their knowledge of allegations of Toro's assaults and the IG's investigation of him (*id.* ¶ 59). The complaint also alleges that a number of acts occurred under defendants' supervision that were violations of DOCS rules and regulations (*id.* ¶¶ 28, 47), and that defendants Thornton and Rogers allowed those practices to take place.

Although discovery may ultimately reveal that defendants Thornton and Rogers made every reasonable effort to prevent the alleged sexual abuse, Qasem has alleged sufficient facts to allow the Court "to draw the reasonable inference" that the defendants "are liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.

D. *Qualified Immunity*

[6] Third, Thornton and Rogers claim that qualified immunity requires dismissal of this litigation as to them. So far as the Court can ascertain, defendants contend that they are entitled to immunity principally because Qasem herself initially denied the sexual relationship when asked about it by prison security officers. In their view, her denials by themselves operate as a "reasonable" basis for the decision to place plaintiff back into the building where Toro had unfettered access to her.

[7] Individual defendants are " 'shielded from liability for civil damages' " under 42 U.S.C. § 1983 if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *accord Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir.2007). "A right is clearly established if (1) the law is defined with Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)).

This Court cannot find the defendants immune from suit on this record. It is well established that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation. *See Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir.2000) ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established ... and no reasonable prison guard could possibly have believed otherwise."); *Daskalea v. District of Columbia,* 227 F.3d 433, 440, 343 U.S.App.D.C. 261 (D.C.Cir.2000) (affirming prisoner's Eighth Amendment claim after prison guards sexually assaulted her); *Berryhill v. Schriro,* 137 F.3d 1073, 1076 (8th Cir.1998); *Barney v. Pulsipher,* 143 F.3d 1299, 1310 (10th Cir.1998) ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."). *Cf. Farmer v. Brennan,* 511 U.S. 825, 833-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' ") (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable-if not unintelligible-decisions made with respect to plaintiff during the course of the IG's investigation, the Court cannot say at this stage of the litigation that Thornton and Rogers are entitled to qualified immunity for their alleged actions.

## III. CONCLUSION

***6** Because plaintiff has alleged enough facts to raise

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

a plausible claim to relief against the supervisory officials Thornton and Rogers and they are not entitled to qualified immunity on the basis of the record at this stage of the litigation, the motion by Thornton and Rogers to dismiss the complaint is denied.

FN1. Count time is time during which all activity stops and essentially all inmates are locked into their cells, and corrections staff verify that no inmates are missing. (Compl. ¶ 23 n. 1.)

S.D.N.Y.,2010.

Qasem v. Toro

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

END OF DOCUMENT



C

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Mark JOHNSON, Sr., Plaintiff,

v.

Mr. WIGGER, et al., Defendants.

No. 9:07-CV-0024 (FJS/GHL).

Aug. 5, 2009.

Mark Johnson, Sr., Albany, NY, pro se.

Office of Robert P. Roche, Robert P. Roche, Esq., of Counsel, Albany, NY, for Defendants.

***ORDER***

FREDERICK J. SCULLIN, JR., Senior District Judge.

***1** After carefully considering the entire file in this matter, including Magistrate Judge Lowe's July 10, 2009 Report-Recommendation to which the parties have not filed any objections; Defendants' motion for summary judgment and Plaintiff's claims against Defendants, the Court hereby

**ORDERS** that Magistrate Judge Lowe's July 10, 2009 Report-Recommendation is **ADOPTED IN ITS ENTIRETY** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **DENIED;** and the Court further

**ORDERS** that Plaintiff's federal claims against Defendants are **DISMISSED SUA SPONTE** pursuant to 28 U.S.C. § 1915(e); and the Court further

**ORDERS** that Plaintiff's state-law claims against Defendants are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Mark Johnson, Sr., alleges that Defendants Mr. Wigger (the superintendent of the Albany County Correctional Facility), Albany County Sheriff James Campbell, the County of Albany, Sgt. Kramer, Lt. Edwards, and three John Does violated his constitutional rights by falsely

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

accusing him of sexually assaulting another inmate, subjecting him to excessive force, confining him to the Special Housing Unit ("SHU") for one day, and insulting him. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 24.) For the reasons that follow, I recommend that Defendants' motion be denied but that the Court *sua sponte* dismiss Plaintiff's complaint pursuant to 28 U.S.C. § 1915(e)(2) (B).

**I. FACTUAL AND PROCEDURAL HISTORY**

Plaintiff filed his original complaint on January 8, 2007. (Dkt. No. 1.) Plaintiff alleged that he was accused of raping another inmate at the Albany County Correctional Facility and, as a result, placed in the Special Housing Unit ("SHU"). (Dkt. No. 1 at 4.) Plaintiff was released from the SHU the following day and told that the charges were unfounded. (Dkt. No. 1 at 6.) Plaintiff alleged that he filed a grievance regarding his treatment and suffered retaliation as a result. (Dkt. No. 1 at 6.)

Upon initial review, the Court dismissed the original complaint for three reasons. First, the Court found that Plaintiff had not sufficiently pleaded a due process cause of action based on his one-day SHU confinement because he had not alleged the existence of any atypical and significant hardships. (Dkt. No. 5 at 4.) Second, the Court found that Plaintiff had not stated a cause of action for retaliation because he had alleged only that correctional officers threatened and harassed him, which does not constitute adverse action. (Dkt. No. 5 at 5-6.) Third, the Court found that Plaintiff had not sufficiently alleged that Defendants Wiggins and Campbell were personally involved in any alleged constitutional violations. (Dkt. No. 5 at 6.) The Court granted Plaintiff leave to amend his complaint. (Dkt. No. 5 at 7.)

***2** Plaintiff filed the amended complaint on March 22, 2007. (Dkt. No. 6.) The amended complaint alleges that on November 30, 2006, Plaintiff was falsely accused of sexually assaulting another inmate. Based on this accusation, Plaintiff was escorted to the SHU by an unnamed Correction Officer, two unnamed Sergeants, and Defendant Lt. Edwards. (Dkt. No. 6 at ¶ 13.) Upon arriving at the SHU, Plaintiff was pulled into the SHU by John Doe Correction Officers 1-3, who punched him several times and slammed him against the wall. The officers then ordered Plaintiff to strip, bend over, and spread his buttocks open. The officers placed Plaintiff in mechanical restraints and escorted him barefoot and naked to the SHU tier. When Plaintiff complained that the handcuffs were extremely tight, one Doe tightened the handcuffs and laughed at Plaintiff. (Dkt. No. 6 at ¶ 14.)

Plaintiff alleges that he was released from the SHU the next day. He filed a grievance regarding his treatment. (Dkt. No. 6 at ¶ 14.) On December 4, 2006, Defendant Sgt. Kramer confronted Plaintiff about the grievance, called him a "monkey" several times, and told Plaintiff that no officer would ever apologize to him for the way he was treated. Defendant Lt. Edwards then threw papers across his desk at Plaintiff and ordered him to sign off on the grievance. (Dkt. No. 6 at ¶ 15.)

On December 20, 2006, Plaintiff sent formal complaints to Defendants Wigger and Campbell. Wigger and Campbell did not respond. (Dkt. No. 6 at ¶ 16.)

On April 3, 2007, the Court issued an order directing service of the amended complaint. (Dkt. No. 8.) The Court cautioned Plaintiff that if he did not timely identify the Doe defendants, move for permission to amend the complaint to add them, and serve them with the complaint, "the Court will dismiss his claims against them." (Dkt. No. 8 at 2.) To date, Plaintiff has not identified or served the Does.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**II. PROCEDURAL DEFICIENCIES**

**A. Defendants' Failure to File a Rule 7.1(a)(3) Statement**

Defendants move for summary judgment. As the moving parties, they bear the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after they have met this burden is Plaintiff required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). Federal Rule of Civil Procedure 56 and Local Rule 7 .1(a)(3) provide the procedural guidelines for meeting this initial burden.

Local Rule 7.1(a)(3) requires parties moving for summary judgment to file and serve a Statement of Material Facts. This statement "shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." Facts that are not in the Statement of Material Facts need not be considered. *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 292 (2d Cir.2000). The rule thus puts the onus on the parties to marshal the evidence that supports the motion. *Id.* A district court has no duty to perform an independent review of the record to find proof of either a factual dispute or the lack of a factual dispute. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *accord, Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-72 (N.D.N.Y.2003). "Our District's requirements are not empty formalities. Rules such as L.R. 7.1(a)(3) 'serve to notify the parties of the factual support for their opponent's arguments, but more importantly inform the court of the evidence and arguments in an organized way-thus facilitating its judgment of the necessity for trial.' " *Jackson v. Broome County Correctional Facility,* 194 F.R.D. 436, 437 (N.D.N.Y.2000) (*citing Little v. Cox's Supermarkets,* 71 F.3d 637, 641 (7th Cir.1995)). Local Rule 7.1(a)(3) clearly states that the *"[f]ailure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."* (Emphasis in original.)

***3** Here, Defendants did not file a Statement of Material Facts. As noted above, in the absence of a proper Statement of Material Facts, this Court has no duty to perform an independent review of the record to find proof of either a factual dispute or the lack of a factual dispute. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002). I therefore decline to review the affidavits submitted by Defendants. I will instead treat their motion as an attack on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

**B. Plaintiff's Failure to Respond to the Motion**

Plaintiff did not timely oppose Defendants' motion. On February 6, 2009, I issued an order granting Plaintiff an additional 30 days to respond to the motion and cautioning him that if he did not do so "the Court will entertain Defendants' motion without benefit of Plaintiff's arguments. Plaintiff is not required to respond but if the Court determines that Defendants have met their burden to demonstrate entitlement to the relief requested, the Court may grant Defendants' motion, which ... **WILL RESULT IN DISMISSAL** of his action." (Dkt. No. 27) (Emphasis in original). To date, Plaintiff has not filed any opposition to Defendants' motion.

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3).

Here, Defendants' motion to dismiss is properly filed, Plaintiff has failed to oppose it (despite being warned of the possible consequences of that failure), and Plaintiff has failed to show good cause why his failure to oppose Defendants' motion should not be deemed as consent to the granting of the motion. Therefore, I must determine whether Defendants have met their burden to "demonstrate entitlement to dismissal" under Rule 12(b)(6).[FN1]

FN1. *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1[b][3] is a more limited endeavor than a review of a contested motion to dismiss. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [FN2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [FN3]

FN2. *See, e.g., Ciaprazi v. Goord,* 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

FN3. *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious*" ) [emphasis added; citations omitted]; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M .J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n. 2, 2007 WL 894375 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, at *28-29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

22, 2007) (Kahn, J.).

I find that Defendants have not met this modest burden. Defendants' memorandum of law is a scant three pages long. The first five paragraphs cite no law and discuss evidence submitted via affidavits. As discussed above, I decline to consider these affidavits in light of Defendants' failure to file a Rule 7.1(a)(3) Statement.

The sixth paragraph notes that motions to dismiss may be converted into motions for summary judgment. The seventh paragraph states:

> ***4** Plaintiff enunciates a cause of action in embarrassment, which is not known in the federal lexicon. While the required mechanical restraints (mandatory during transfer) may not have been comfortable, they are a nuisance that goes with the territory, known as jail. Here the movant has shown by affidavits and peripheral sources that the Plaintiff did not-in fact-suffer the loss or diminution of a federally guaranteed Constitutional right.

(Dkt. No. 24-4 at 2-3.)

The eighth paragraph of Defendants' memorandum of law consists entirely of a string cite of cases from the 1940s, with no explanation of how the eight cited cases apply to the case at hand. The relevance of the cited cases is far from clear. The first case, *Boro Hall Corp. v. General Motors Corp.,* 124 F.2d 822 (2d Cir.1942), was an anti-trust action. The second case, *Gallways v. Caldwell,* 120 F.2d 90 (3d Cir.1941), was a stockholder action alleging waste. The third case, *Central Mexico Light & Power v. Munch,* 116 F.2d 85 (2d Cir.1940), was a suit by a corporation to enjoin actions on matured bonds. The fourth case, *National Labor Relations Board v. Montgomery Ward & Co.,* 144 F.2d 528 (D.C.Cir.1944), involved a request for annulment of an order of the National War Labor Board. The fifth case, *Urquhart v. American La Forance Fomite Corp.,* 144 F.2d 542 (D.C.Cir.1944), was a patent action. The sixth case, *Samoro v. United States,* 129 F.2d 594 (2d Cir.1942), was an action to recover taxes collected under the Agricultural Adjustment Act of 1933. The seventh case, *Cohen v. American Window Glass Company,* 126 F.2d 111 (2d Cir.1942), was a shareholder action protesting a merger. The eighth case, *Sperry Products, Inc. v. Assoc. of American Railroads,* 132 F.2d 408 (2d Cir.1942), was a patent action.

The ninth paragraph of Defendants' memorandum of law states that "[f]ederal courts have come to recognize that a jail can be a contentious place but not every touch or every sleight constitutes a tort or deprivation of a civil right that rises to the level of a federal lawsuit. Such is the stuff of embarrassing interludes and chagrin." (Dkt. No. 24-4 at 3.) Defendants conclude that "[f]or all these reasons, the Complaint should be dismissed." *Id.*

Defendants have not directly addressed, with citations to applicable law, any of the issues raised by Plaintiff's complaint. Accordingly, I find that Defendants have not met their modest burden of demonstrating entitlement to the relief they request. Therefore, I recommend that the Court deny Defendants' motion for summary judgment/judgment on the pleadings.

Although I have recommended that the Court deny Defendants' motion for summary judgment/judgment on the pleadings, I have concluded that the complaint is subject to *sua sponte* dismissal for two reasons. First, Plaintiff has failed to name and serve the Doe defendants. Second, the complaint fails to state a claim against any of the named defendants. I will discuss those findings and recommendations below.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

## III. FAILURE TO NAME AND SERVE DOE DEFENDANTS

***5** Regarding the Doe defendants, under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within ***120 days*** after the filing of the complaint. Fed.R.Civ.P. 4(m). This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within ***sixty (60) days*** of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) [emphasis added]. Here, more than 120 days have elapsed since the filing of the complaint and Plaintiff has not named the Doe defendants or served them with the summons and complaint. Plaintiff was cautioned over two years ago that if he did not timely identify the Doe defendants, move for permission to amend the complaint to add them, and serve them with the complaint, "the Court will dismiss his claims against them." (Dkt. No. 8 at 2.) As a result, Plaintiff is in violation of both the Federal Rules of Civil Procedure and the Local Rules of Practice for this Court. I therefore recommend that all claims against John Does 1-3 be dismissed.

## IV. FAILURE TO STATE A CLAIM AGAINST NAMED DEFENDANTS

As noted above, although I have recommended that the Court deny Defendants' motion for summary judgment/judgment on the pleadings, I have concluded that the complaint is subject to *sua sponte* dismissal under 28 U.S.C. section 1915(e)(2)(B) for failure to state a claim on which relief may be granted against the named defendants.

### A. Legal Standard for Dismissal For Failure to State a Claim

Plaintiff is proceeding *in forma pauperis.* (Dkt. No. 5.) 28 U.S.C. section 1915(e) directs that, when a plaintiff proceeds *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that-... (B) the action ... (ii) fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B).

A complaint fails to state a claim on which relief may be granted if it is insufficient under Federal Rule of Civil Procedure 8(a) (2); [FN4] or if it is not legally cognizable.[FN5] Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN6] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN7] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN8]

FN4. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN5. *See* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ( "There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8 [a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

FN6. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also* *Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

FN7. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also* *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN8. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord,* *Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g.,* *Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152,

156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

"[A] complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting* *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

***6** It should also be emphasized that, "[i]n reviewing a complaint for dismissal ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN9] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [FN10] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality. "[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN11] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN12] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN13] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN14]

FN9. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN10. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

FN11. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN12. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN13. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN14. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also* *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See* *Rhodes v. Hoy,* 05-CV-0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07-CV-0166, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00-CV-1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN15] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN16] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN17] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN18]

FN15. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also* *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN16. *See* *Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord,* *Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord,* *Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN17. *See* *McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf.* *Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN18. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

**B. Claims Against the County of Albany**

Plaintiff alleges that the County of Albany "permitted and tolerated a pattern and practice of unreasonable use of force by Correction Officers or Sheriff Deputies of the County of Albany [and has] maintained a system of review of Correction Officers' or Sheriff Deputies' conduct which is so untimely and cursory as to be ineffective and which permits and tolerates the unreasonable and excessive use of force by Correction Officers of the County of Albany." (Dkt. No. 6 at ¶¶ 24-25.)

It is well established that "[a] municipality may not be held liable in a § 1983 action for the conduct of a lower-echelon employee solely on the basis of *respondeat superior."*[FN19] "Rather, to establish municipal liability under § 1983 for unconstitutional acts by a municipality's employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy." [FN20] "Thus, to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to ... prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." [FN21]

FN19. *Powell v. Bucci,* 04-CV-1192, 2005 WL 3244193, at *5 (N.D.N.Y. Nov.30, 2005) (McAvoy, J.); *see also* *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("[A] [municipality] may not be held for the actions of its employees or agents under a theory of *respondeat superior."* ).

FN20. *Powell,* 2005 WL 3244193, at *5; *Monell,* 436 U.S. at 690-691 ("[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."); *Batista,* 702 F.2d at 397 ("[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision."); *Smith v. City of New York,* 290 F.Supp.2d 317, 321 (S.D.N.Y.2003) ("In order to establish the liability of [municipal]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendants in an action under § 1983 for unconstitutional acts by [its] employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy.").

FN21. *Batista,* 702 F.2d at 397, *accord, Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995), *McKeon v. Daley,* 101 F.Supp.2d 79, 92 (N.D.N.Y.2000) (Hurd, J.), *Merriman v. Town of Colonie, NY,* 934 F.Supp. 501, 508 (N.D.N.Y.1996) (Homer, M.J.); *Douglas v. County of Tompkins,* 90-CV-0841, 1995 WL 105993, at *12 (N.D.N.Y. March 2, 1995) (McCurn, J.), *Keyes v. County of Albany,* 594 F.Supp. 1147, 1156 (N.D.N.Y.1984) (Miner, J.).

***7** With regard to the first element (the existence of a policy or custom), a "[p]laintiff may establish the 'policy, custom or practice' requirement by demonstrating: (1) a formal policy officially endorsed by the municipality ...; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question ...; (3) a practice so consistent and widespread that it constitutes a 'custom or usage' sufficient to impute constructive knowledge to the practice of policymaking officials ...; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to 'deliberate indifference' to the rights of those who come in contact with the municipal employees...." FN22

FN22. *Dorsett-Felicelli, Inc.,* 371 F.Supp.2d 183, 194 (N.D.N.Y.2005) (Kahn, J.) (citing three Supreme Court cases for these four ways), *accord, Dunbar v. County of Saratoga,* 358 F.Supp.2d 115, 133-134 (N.D.N.Y.2005) (Munson, J.); *see also Clayton v. City of Kingston,* 44 F.Supp.2d 177, 183 (N.D.N.Y.1999) (McAvoy, J.) (transposing order of second and third ways, and citing five more Supreme Court cases).

"The mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993), *overruled on other grounds Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). A complaint that includes only such conclusory allegations is subject to dismissal under Rule 12(b)(6). *Economic Opportunity Comm'n of Nassau County v. County of Nassau, Inc.,* 47 F.Supp.2d 353, 370-71 (E.D.N.Y.1999). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which can be attributed to a municipal policymaker ." *City of Oklahoma v. Tuttle,* 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

Here, other than alleging the single incident in which Plaintiff was beaten by correction officers, the complaint does not contain any facts plausibly suggesting that the County of Albany has a custom or practice of permitting and tolerating the use of excessive force by correction officers. Therefore, I recommend that the Court dismiss the claim against the County of Albany *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B) with leave to amend.

**C. Claims Against Defendants Wigger and Campbell**

Plaintiff alleges that he sent formal complaints to Defendants Wigger and Campbell regarding the excessive force incident, the threats he received from officers, and the false accusation against him. (Dkt. No. 6 at ¶ 16.) Defendants Wigger and Campbell "never responded." *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN23] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN24] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN25] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN26] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN27]

FN23. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN24. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN25. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN26. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN27. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

***8** A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring." *Rivera v. Goord,* 119 F.Supp.2d 327,344-45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Therefore, I recommend that the Court dismiss Plaintiff's claims against Defendants Wigger and Campbell *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B).

**D. Claims Against Defendant Kramer**

Plaintiff alleges that Defendant Kramer called him a "monkey" and would not apologize. (Dkt. No. 6 at ¶ 15.) "42 U.S.C. § 1983 does not provide a remedy for every common law tort and a suit based on that statute cannot be sustained merely on the basis of verbal abuse." *Williams v. Pecchio,* 543 F.Supp. 878, 879 (W.D.N.Y.1982). "It is well established that mere threatening language and gestures of a custodial officer do not ... amount to constitutional violations." *Alnutt v. Cleary,* 913 F.Supp.

160, 165 (W.D.N.Y.1996) (punctuation omitted). Therefore, I recommend that the Court dismiss Plaintiff's claims against Defendant Kramer *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2) (B).

**E. Claims Against Defendant Edwards**

Plaintiff claims that Defendant Edwards escorted him to the SHU when he was falsely accused of sexually assaulting another inmate. (Dkt. No. 6 at ¶¶ 13.) Plaintiff served one day in the SHU. (Dkt. No. 6 at ¶ 14.) I have construed this as a claim that Defendant Edwards violated Plaintiff's procedural due process rights.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that (1) he was deprived of a liberty interest; (2) without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). The issue, then, is whether Plaintiff's one-day confinement in the SHU imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life."

***9** In the Second Circuit, determining whether a disciplinary confinement in the SHU constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Palmer,* 364 F.3d at 64. Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions [FN28]." *Palmer,* 364 F.3d at 65. Allegations of severe conditions are particularly important for stating a cause of action in cases involving SHU confinements of 30 days or less. *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Arce v. Walker,* 139 F.3d 329 (2d Cir.1998).

FN28. "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004).

Here, Plaintiff has not described the conditions he experienced in the SHU, must less alleged the existence of conditions more severe than normal SHU conditions. Plaintiff might argue that his allegations regarding the use of excessive force by the officers escorting him to the SHU tier suffice. However, allegations of excessive force used *en route* to the SHU do not constitute severe SHU conditions, but rather are evaluated separately as Eighth Amendment claims against the individual officers. *See Rodriguez v. McGinnis,* 1 F.Supp.2d 244 (S.D.N.Y.1998). Here, as discussed above, Plaintiff's claims against the correction officers who allegedly beat him should be dismissed for failure to identify and serve them. Therefore, I recommend that the Court dismiss Plaintiff's claim against Defendant Edwards *sua sponte* pursuant to 28 U.S.C. § 1915(e).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**F. State Court Claims**

Plaintiff alleges that Defendants defamed and slandered him by falsely accusing him of sexually assaulting another inmate. He claims that Defendants' actions violated New York state law. (Dkt. No. 6 at ¶¶ 1, 2, 5, 13.) In light of my recommendation that the Court dismiss Plaintiff's federal claims, I recommend that the Court decline to exercise pendent jurisdiction over Plaintiff's state law claims.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 24) be ***DENIED;*** and it is further

**RECOMMENDED** that the Court dismiss Plaintiff's complaint *sua sponte* pursuant to 28 U.S.C. § 1915(e).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.

Johnson v. Wigger

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.






Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Michael Antonio PATTERSON, Plaintiff,
v.
COUNTY OF ONEIDA, New York; Oneida County Sheriff's Department; Daniel Middaugh, in his individual and official capacity as Sheriff; Peter Paravati, in his individual and official capacity as Undersheriff; William Chapple, in his individual and official capacity as Chief; William Balsamino,[FN1] in his official and individual capacity; John Does, in their individual and official capacity as Employees and Representatives of the County of Oneida; Lieutenant Rende, in his individual and official capacity; and Richard DePhillips, in his individual and official capacity; Defendants.

FN1. This defendant's name correctly spelled is Balsamico. He will be referenced with the correct spelling throughout this Memorandum-Decision and Order.

**No. 5:00-CV-1940.**

Oct. 30, 2002.

African-American correctional officer brought action against county alleging racial discrimination in employment. On county's motion for summary judgment, the District Court, Hurd, J., held that: (1) limitations period for officer to file Equal Employment Opportunity Commission (EEOC) charge began to run at time of his latest alleged unlawful employment practice, which was his termination, and (2) officer failed to set forth any evidence from which inference could be drawn that county intentionally discriminated against Blacks in termination during probation, training, or Sheriff's Emergency Response Team (SERT) participation.

Motion granted.

West Headnotes

**[1] Civil Rights 78 1505(3)**

78 Civil Rights
78IV Remedies Under Federal Employment Discrimination Statutes
78k1503 Administrative Agencies and Proceedings
78k1505 Time for Proceedings; Limitations
78k1505(3) k. Operation; Accrual and Computation. Most Cited Cases
(Formerly 78k342)
Limitations period for African-American police officer to file Equal Employment Opportunity Commission (EEOC) charge under Title VII began to run at time of his latest alleged unlawful employment practice, which was his termination. Civil Rights Act of 1964, § 706(e), as amended, 42 U.S.C.A. § 2000e-5(e).

**[2] Civil Rights 78 1405**

78 Civil Rights
78III Federal Remedies in General
78k1400 Presumptions, Inferences, and Burdens of Proof
78k1405 k. Employment Practices. Most Cited Cases
(Formerly 78k240(2))
African-American police officer failed to set forth any evidence from which inference could be drawn that county intentionally discriminated against Blacks in termination during probation, training, or Sheriff's Emergency Response Team (SERT) participation, in lawsuit claiming equal protection violation; even though officer alleged specific incidents of racial slurs and mace-shaving cream assault by fellow officers, incidents were not reported to someone in supervisory position, and special firearms training was given only to select few officers who were more senior than African-American officer. U.S.C.A.

Const.Amend. 14; 42 U.S.C.A. § 1983.

**[3] Conspiracy 91 7.5(1)**

91 Conspiracy
91I Civil Liability
91I(A) Acts Constituting Conspiracy and Liability Therefor
91k7.5 Conspiracy to Interfere with Civil Rights
91k7.5(1) k. In General. Most Cited Cases

African-American police officer could not maintain civil rights conspiracy claim against county, since he failed to prove that he was deprived of equal protection. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1985(3).

**[4] Civil Rights 78 1126**

78 Civil Rights
78II Employment Practices
78k1124 Public Employment
78k1126 k. Particular Cases. Most Cited Cases
(Formerly 78k146)

African-American police officer could not maintain cause of action against supervisor under § 1986 for allegedly neglecting to prevent deprivation of officer's rights, since officer failed to prove that anyone conspired to deprive him of equal protection in violation of § 1985. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1985(3); 42 U.S.C.A. § 1986.

A.J. Bosman, Utica, NY, for Plaintiff, of counsel.

Gorman, Waszkiewicz, Gorman and Schmitt, Utica, NY, for Defendants, Bartle J. Gorman, of Counsel.

*MEMORANDUM-DECISION AND ORDER*

HURD, J.

I. INTRODUCTION

***1** Plaintiff Michael Antonio Patterson ("Patterson" or "plaintiff") filed the complaint in this matter on December 18, 2000, asserting eleven causes of action pursuant to federal and state law, the gravamen of which is race discrimination in employment. The John Doe defendants were never named and Richard DePhillips was never served. Those defendants who were served answered denying the material allegations of the complaint. The defendants now move for summary judgment dismissing all of plaintiff's claims. Plaintiff opposes. Oral argument was heard on October 18, 2002, in Utica, New York. Decision was reserved.

II. FACTS

Following are the facts, and inferences therefrom, taken in the light most favorable to plaintiff, the nonmovant, as must be done on a motion for summary judgment.

The Oneida County Sheriff's Department ("Sheriff's Department") hired Patterson, an African American, as a correctional officer on February 23, 1998, to work at the Oneida County Jail ("the jail"). He and all new recruits were probationary employees for a period of one year.

Patterson first heard racial slurs in July 1998 while working the "B" block of the jail. He could not specifically identify the speaker or speakers because the door was locked. He did not report this or complain to anyone. He heard racial comments, epithets, and slurs spoken over the jail master control intercom approximately twelve times from October 1998 [FN2] through January 1999. He could not specifically identify the speakers because the master control room that contained the intercom microphone was locked. However, only Sheriff's Department personnel had access to the master control room. Again, he did not report this or complain to anyone.

FN2. There was no intercom in the jail prior to October 1998.

In January 1999 Patterson, while on duty at 1:00 or 2:00 a.m., was jumped by defendants William Balsamico ("Balsamico") and Richard DePhillips ("DePhillips") and

an unknown third man. The three men sprayed mace in his face and covered him with shaving cream. Balsamico then told plaintiff that "Now you're a white boy with an Afro" and made other racial slurs. Plaintiff washed his eyes and returned to duty. Again, plaintiff did not complain or report the incident.

On January 22, 1999, plaintiff received a performance evaluation indicating that he fully met each requirement evaluated. His previous evaluations similarly indicated that he met job requirements. At some point an inmate alleged that Patterson assaulted him. Patterson responded by memorandum on February 3, 1999, that he did not remember any such incident. Defendant Chief Deputy William Chapple ("Chapple") became aware that local police responded to a domestic dispute between plaintiff and a female. Neither plaintiff nor the female were taken into custody by the local police. Chapple also became aware that plaintiff allegedly compromised the identity of an undercover officer working on the drug task force, was fired from his previous employment for refusing to take a drug test, and that he had been involved in dealing drugs. Accordingly, Chapple requested plaintiff's immediate termination for failure to successfully complete his probationary period due to misconduct.

***2** Plaintiff received notice of his termination on February 9, 1999. He had an exit interview with Chapple on March 9, 1999, and a union representative was present. Chapple told Patterson that details regarding the misconduct were confidential and may present a security risk. During the exit interview plaintiff did not mention any racial slurs or the January mace-shaving cream incident. On March 11, 1999, an Oneida County Legislator, Joseph Vescio, wrote a letter at Patterson's behest to defendant Sheriff Daniel Middaugh ("Middaugh") inquiring as to the reason for plaintiff's termination. Middaugh responded by letter that releasing details relating to plaintiff's misconduct would jeopardize the integrity of a sensitive investigation and possibly the safety of police officers. Middaugh suggested that it would be to plaintiff's benefit to have his personnel record reflect that he failed to successfully complete his probationary period, rather than that he was terminated for misconduct.

Patterson filed a Notice of Claim with Oneida County on April 16, 1999, and a Verified Complaint with the Equal Employment Opportunity Commission ("EEOC") on December 2, 1999. The Notice of Claim and the Verified Complaint set forth Patterson's claims based upon Middaugh's letter to Vescio and the racial epithets over the intercom from October 1998 through mid-January 1999. Neither mentions the January mace-shaving cream incident. A right-to-sue letter was sent on September 12, 2000, and received on September 29, 2000. This action followed.

III. DISCUSSION

A. Summary Judgment Standard

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Servs.,* 180 F.3d 426, 436 (2d Cir.1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp. .,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson,* 180 F.3d at 436; *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.,* 477 U.S. at 250; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co.,* 475 U.S. at 587. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248-49; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

B. Analysis

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1. Title VII Claims

***3** [1] Charges filed pursuant to Title VII must be brought within 180 days after the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e). Plaintiff filed his EEOC charge on December 2, 1999. Thus, any unlawful employment practice must have occurred on or after June 6, 1999, in order for the charge to be timely. Here the latest alleged unlawful employment practice was plaintiff's termination on February 9, 1999. Accordingly, plaintiff's Title VII claims must be dismissed. Plaintiff's argument that his termination was within 300 days of the filing of the EEOC charge is unavailing, since the 300-day time limit applies only where, unlike here, a charge is filed with a State or local agency. *See id.*

2. Equal Protection under Sections 1981 and 1983

A claim under section 1981 requires proof that (1) the plaintiff is a member of a racial minority; (2) defendant intended to discriminate on the basis of race, and (3) the discrimination pertained to one of the statutorily enumerated activities. *Mian v. Donaldson, Lufkin & Jenrette Sec.,* 7 F.3d 1085, 1087 (2d Cir.1993)(per curiam). Equal protection under the laws is one of the enumerated activities. 42 U.S.C. § 1981. An equal protection claim pursuant to section 1983 requires a showing of intentional discrimination on the basis of race, national origin, or gender. *Hayden v. County of Nassau,* 180 F.3d 42, 48 (2d Cir.1999). “A touchstone of equal protection is that the government may not subject persons to unequal treatment based on race.” *Id.* at 49. Conclusory allegations are insufficient to establish the essential elements of an equal protection claim. *Mian,* 7 F.3d at 1088.

[2] It is undisputed that Patterson is an African-American, a racial minority. Plaintiff has failed, however, to set forth facts establishing intentional discrimination or unequal treatment based upon race. Patterson failed to report the specific incidents of racial slurs and the mace-shaving cream assault by fellow officers to someone in a supervisory position, such as Chapple, Lieutenant Rende, Paravati, and Middaugh. Because these incidents went unreported they do not demonstrate any intent by the defendants to discriminate against Patterson.

Plaintiff makes conclusory allegations that there is unequal treatment in termination during probation, in the opportunity to take firearms and OC Spray training, and in making application to become a member of the Sheriff's Emergency Response Team (“SERT”).

Plaintiff states that all Blacks are terminated during their probationary period. Plaintiff further discredits defendants' submissions tending to show that both whites and Blacks are terminated during probation. However, plaintiff fails to set forth any facts establishing that Blacks are, in fact, treated differently than whites as far as termination during probation.

Plaintiff further alleges that Blacks are denied an equal opportunity to receive OC Spray and firearms training. However, defendant has shown that Patterson did in fact receiving OC Spray training on October 21, 1998. Additionally, defendants have presented evidence that firearms training was given to only a select few officers and that all of those given firearms training from January 1995 until the present were more senior than plaintiff (in most cases significantly more senior). Chapple testified that one of the minimum requirements to apply for SERT is successful completion of the probationary period. While Patterson failed to meet that minimum requirement, at least two Black officers did apply. One Black applicant was rejected due to excessive absenteeism (acceptable work attendance is another minimum requirement). The second Black applicant was accepted into SERT but injured her ankle during training.

***4** Plaintiff has set forth no evidence or facts from which an inference could be drawn that defendants intentionally discriminated against Blacks in termination during probation, training, or SERT participation. Accordingly, Patterson's equal protection claims must be dismissed.

3. Conspiracy under Sections 1985 and 1986

[3] Section 1985 provides a cause of action for redress when two or more persons conspire to, inter alia, deprive a person or class of persons of equal protection of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

laws. 42 U.S.C. § 1985(3). An essential element of a conspiracy claim is deprivation of the right at issue. *Mian,* 7 F.3d at 1087. Plaintiff failed to establish that there was any genuine issue of material facts relating to his denial of equal protection claim. Accordingly, the conspiracy claim must be dismissed.

[4] Section 1986 provides a cause of action when a person neglects to prevent a deprivation of rights as set forth in section 1985. 42 U.S .C. § 1986. "[A] § 1986 claim must be predicated upon a valid § 1985 claim." *Mian,* 7 F.3d at 1088. Patterson does not have a valid § 1985 claim. Accordingly, his § 1986 claim must be dismissed.

4. Richard DePhillips

DePhillips was never served with the complaint. Thus, any claims against him must be dismissed for lack of personal jurisdiction.

5. State Law Claims

All of Patterson's federal law claims must be dismissed. Therefore, supplemental jurisdiction over his state law claims is declined. *See* 28 U.S.C. § 1367(c)(3).

IV. CONCLUSION

Patterson's Title VII claims must be dismissed as the conduct all occurred more than 180 days prior to the filing of his EEOC charge. Plaintiff has not established any genuine issue of material fact with regard to his equal protection, conspiracy, and failure to prevent a conspiracy claims and they must be dismissed. Personal jurisdiction over DePhillips is lacking and claims against him must be dismissed. Having dismissed all of plaintiff's federal law claims, supplemental jurisdiction over his state law claims is declined.

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED;

2. All federal law claims are DISMISSED;

3. All state law claims are DISMISSED without prejudice.

The Clerk of the Court is directed to enter judgment dismissing the complaint in its entirety.

IT IS SO ORDERED.

N.D.N.Y.,2002.
Patterson v. County of Oneida
Not Reported in F.Supp.2d, 2002 WL 31677033 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Edward P. GRIFFIN-NOLAN, Plaintiff,
v.
PROVIDENCE WASHINGTON INSURANCE COMPANY and Howard Blute, in his Individual Capacity as Manager for the Business Development Executives at Washington Insurance Company, Defendants.
**No. 504CV1453FJSGJD.**

June 20, 2005.

Chamberlain, D'Amanda, Oppenheimer & Greenfield LLP, The Galleries of Syracuse, Syracuse, New York, for Plaintiff, Mairead E. Connor, of counsel.

City of Syracuse Corporation Counsel, Syracuse, New York, for Defendants, David H. Walsh, IV, of counsel.

MEMORANDUM-DECISION AND ORDER

SCULLIN, Chief J.

I. INTRODUCTION

***1** Plaintiff's complaint asserts (1) a 42 U.S.C. § 1983 cause of action for false arrest and denial of First Amendment rights against Defendants City of Syracuse ("City"), Mullen, and Hennessey, alleging that Defendants arrested him for speaking to Defendant officers about their conduct in arresting a third-party; (2) a § 1983 cause of action for false arrest and denial of First Amendment rights against all Defendants, alleging that they arrested him because they believed he might file a complaint of police misconduct; (3) a § 1983 cause of action for failure to train against Defendant City, alleging that Defendant City acted with deliberate indifference in failing to train its officers with respect to what constitutes the crime of obstruction of justice and how to handle the public; (4) a § 1985(3) cause of action against all Defendants for conspiracy to deprive him of the equal protection of the law and of his equal privileges and immunities, alleging that Defendants conspired to so deprive him out of animus for his attempt to prevent them from injuring a third-person on the basis of that third-person's race or color; (5) a common law false arrest claim against all Defendants; (6) a common law false imprisonment claim against Defendants Mullen, Cecile, and City; (7) a common law malicious prosecution claim against all Defendants; (8) a common law libel claim against Defendant Hennessey, alleging that he made false statements in his Complaint Information; and (9) a claim for attorney's fees pursuant to 42 U.S.C. § 1988.

Based upon these claims, Plaintiff seeks (1) declaratory relief with respect to all causes of action, (2) injunctive relief with respect to all causes of action other than those made pursuant to § 1983, (3) compensatory damages, (4) exemplary or punitive damages, and (5) costs, disbursements, and legal fees.

Currently before the Court is Defendants' motion to dismiss Plaintiff's complaint pursuant to Rules 12(b)(5) and 12(b)(6) of the Federal Rules of Civil Procedure.[FN1]

FN1. Defendants' motion to dismiss does not address Plaintiff's claim for attorney's fees pursuant to 42 U.S.C. § 1988.

II. BACKGROUND [FN2]

FN2. Given the procedural posture of this case, the Court assumes the truth of the allegations in Plaintiff's complaint.

On the evening of December 16, 2003, Plaintiff was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

working as a licensed massage therapist at his booth in the Carousel Center mall. *See* Dkt. No. 1 at ¶ 10. Around 8:00 p.m. of that evening, he saw a "Hispanic man of color" ("Paredes") walking toward him and noticed a mall security officer pointing Paredes out to Defendants Hennessey and Mullen. *See id.* at ¶ 11. When Defendant Hennessey tried to stop Paredes by placing his hand on Paredes' chest, Paredes spat on the floor and continued shouting that he was going to kill someone. *See id.* at ¶ 12. Defendant Hennessey then took Paredes behind Plaintiff's booth, told him to show some respect, and smashed his back and head against a concrete pillar. *See id.* at ¶¶ 13-14. Paredes then either pushed or kicked at Defendant Hennessey, at which point they both tumbled and knocked over Plaintiff's booth. *See id.* at ¶¶ 15-16. With Paredes face-down on the floor, Defendant Hennessey placed his knee in Paredes' back and began punching him in the back. *See id.* at ¶¶ 18-19. Defendant Mullen then also placed his knee in Paredes' back and began punching him in the back and sides. *See id.* at ¶ 21. Defendant officers each hit Paredes six or more times after they had subdued him. *See id.* at ¶ 22.

***2** Plaintiff crouched by Defendant officers and told them that they had gone over the top and were out of control. *See id.* at ¶ 24. Defendant Mullen told Plaintiff to get back, and Plaintiff complied. *See id.* at ¶¶ 26-27. After Defendant officers continued to punch Paredes in the back, Plaintiff again told them that they were over the top. *See id.* at ¶¶ 28-29. Defendant Mullen told Plaintiff that, if he did not stop, he would be arrested for Obstructing Governmental Administration. *See id.* at ¶ 30. Plaintiff stopped speaking to Defendant officers, and they pulled Paredes up and led him away. *See id.* at ¶¶ 31-32.

At approximately 9:00 p.m., Defendant Mullen returned to Plaintiff's booth with Defendant Cecile and a mall security guard. *See id.* at ¶ 33. Defendant Cecile told Plaintiff that he understood that Plaintiff had been involved in an incident earlier in the evening and asked Plaintiff to explain what happened. *See id.* at ¶ 34. As soon as Plaintiff began to explain, Defendant Cecile stopped him and asked him whether he understood that he could be arrested. *See id.* at ¶ 35. Defendant Cecile told Plaintiff that, at the time of the incident, it was Defendants Hennessey's and Mullen's call whether to arrest Plaintiff but that, if Plaintiff made a complaint, it would be his call whether to arrest Plaintiff. *See id.* at ¶ 37. After Plaintiff said that he was not sure how the complaint procedure worked, Defendant Cecile showed Plaintiff the patch on his shoulder and said, " 'It's right here with me, right now." ' *See id.* at ¶¶ 38-39. Plaintiff told Defendant Cecile that he did not think that this was the only way to file a complaint. *See id.* at ¶ 40. Defendant Cecile then told Plaintiff that, if he filed a complaint, Defendant Cecile would take him down. *See id.* at ¶ 41. Next, Defendant Cecile told Defendant Mullen, " 'He's not happy. We're going to get a complaint. Take him in,' or words to that effect." *See id.* at ¶ 42. When Plaintiff said that he had things at his booth that he could not leave unsecured, Defendant Cecile told him that he should have thought of that before. *See id.* at ¶ 44. Upon Defendant Cecile's direction, Defendant Mullen arrested Plaintiff for Obstructing Governmental Administration by giving him an appearance ticket. *See id.* at ¶¶ 45-46.

That same night, Defendant Hennessey submitted a complaint information affidavit in support of Plaintiff's arrest. *See id.* at ¶ 47. The affidavit contained a number of statements that were false and that Defendant Hennessey knew to be false when he made them. *See id.* at ¶¶ 48-49. Plaintiff's counsel filed a motion to dismiss the information for insufficiency. *See id.* at ¶ 51. On January 10, 2004, the Syracuse City Court dismissed the information in its entirety. *See id.* at ¶ 52.[FN3] In or about November 2004, Carousel Center management informed Plaintiff that he could not set up his booth during the holiday season because it was concerned about potential negative publicity arising from these incidents. *See id.* at ¶ 53.

> FN3. It appears to the Court that this dismissal actually occurred on January 14, 2004, and was made pursuant to New York Criminal Practice Law § 170.40. *See* Dkt. No. 9 at Pt. 5.

***3** Plaintiff filed the instant action on December 15, 2004. *See* Dkt. No. 1.

III. DISCUSSION

A. Defendants' motion to dismiss for insufficient service of process pursuant to Rule 12(b)(5) of the Federal Rules

of Civil Procedure

Defendants argue that the Court lacks personal jurisdiction over them because Plaintiff failed to serve them with summonses. The docket sheet contains four affidavits of service that indicate that each Defendant was served with the summons and the complaint sometime between January 12, 2005, and January 26, 2005. *See* Dkt. Nos. 5-8. Perhaps these affidavits are mistaken; Plaintiff's counsel has filed an affidavit stating that Plaintiff personally served summonses and complaints for all Defendants upon Defendants' counsel on February 8, 2005, one day after Defendants filed their motion to dismiss. *See* Dkt. Nos. 9, 14 at ¶ 4. Since Defendants do not address insufficiency of service of process in their reply memorandum of law, the Court presumes that they were served summonses and are abandoning their motion to dismiss pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure. Regardless, both Local Rule 7.1(a)(2) and common sense dictate that a motion to dismiss for a failure to serve summonses requires a supporting affidavit, which Defendants have not provided. *See* L.R. 7.1(a)(2). Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's complaint pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure.

B. Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

*1. Standard of review*

In considering a motion to dismiss for failure to state a claim, the court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See* *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). Hence, dismissal is appropriate only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994) (quotation omitted).

*2. Defendant City's liability for Plaintiff's § 1983 claims*

A municipality may only be held liable under § 1983 when its policies or customs result in a plaintiff's constitutional injury. *See* *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 694 (1978). The existence of a policy or custom may be inferred when a plaintiff presents evidence that a " 'municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction...." ' *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir.1998) (quotation and footnote omitted). Contrary to some earlier Second Circuit cases, there is no heightened pleading requirement for claims of municipal liability. *See* *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 167-68 (1993) (rejecting contention that "plaintiff must do more than plead a single instance of misconduct" to state a claim for municipal liability); *contra* *Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993) (citation omitted). As the Supreme Court noted, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Leatherman,* 507 U.S. at 168-69.

***4** Plaintiff's complaint alleges that Defendant City has a policy or custom of threatening those who verbally challenge, or indicate the desire to file a complaint about, police misconduct with Obstructing Governmental Administration and that Defendant City has shown deliberate indifference in failing to train its police officers in how to handle the public while making arrests and failing to train its officers about what constitutes the crime of Obstructing Governmental Administration. *See* Dkt. No. 1 at ¶¶ 55, 64, 71-73. Plaintiff's allegations of municipal liability are directly related to his allegation of personal injury and, if shown to be true according to the evidence, might support a determination of municipal liability. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's § 1983 claims against Defendant City for failure to adequately plead municipal liability.

*3. Plaintiff's § 1983 and common law false arrest and false imprisonment claims*

*a. elements of false arrest and false imprisonment*

"The elements of false arrest ... under § 1983 are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

'substantially the same' as the elements under New York law." *Boyd v. City of N.Y.,* 336 F.3d 72, 75 (2d Cir.2003) (quotation omitted). The elements of false arrest and false imprisonment claims are identical: " '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." ' *See* *Curry v. City of Syracuse,* 316 F.3d 324, 335 (2d Cir.2003) (quotation omitted).

The central dispute between the parties is whether the issuance of an appearance ticket constitutes the requisite confinement.

*b. common law false arrest and false imprisonment*

Every New York case of which the Court is aware that has considered whether the issuance of an appearance ticket constitutes confinement has held that the issuance of an appearance ticket, in and of itself, does not constitute confinement for purposes of a common law false arrest or false imprisonment claim. *See* *Du Chateau v. Metro-North Commuter R.R. Co.,* 253 A.D.2d 128, 129, 132 (1st Dep't 1999) (citations omitted) (police officer escorted plaintiff from train, talked to him, and issued an appearance ticket); *Kramer v. Herrera,* 176 A.D.2d 1241, 1241 (4th Dep't 1991) (citations omitted); *Pozzanghera v. Anderson,* 136 A.D.2d 912, 913 (4th Dep't 1988) ("Plaintiff's sole contention is that he was detained by the service of an appearance ticket. This did not restrict plaintiff's freedom and, therefore, does not form a basis for his wrongful arrest claim." (citation omitted)); *Pritchett v. State,* 61 A.D.2d 1110, 1110 (3d Dep't 1978); *cf.* *Reinhart v. Jakubowski,* 239 A.D.2d 765, 766 (3d Dep't 1997) (issuance of criminal summons requiring court appearance insufficient to support false arrest claim); *Vill. of Ellenville v. Searles,* 235 A.D.2d 692, 693 (3d Dep't 1997) (brief traffic stop in order to serve process did not constitute requisite confinement) (citations omitted).

***5** Plaintiff contends, however, that his complaint alleges more than the mere issuance of an appearance ticket. Conduct that accompanies the issuance of an appearance ticket certainly can constitute confinement for purposes of a false arrest or false imprisonment claim. *See* *Wiggins v. Metro-North Commuter R.R. Co.,* 228 A.D.2d 198, 198 (1st Dep't 1996) (police escorted plaintiff off train, questioned him in a railroad police facility, and issued an appearance ticket). Unfortunately, Plaintiff does not specify which of his allegations he believes show that Defendants confined him. The relevant allegations are:

33. Approximately one hour later, at about 9:00 p.m., Officer Mullen returned to Plaintiff's booth with [Sergeant Cecile] and a mall security guard.

34. Sergeant Cecile told Plaintiff that he understood he had been involved in an incident earlier and asked the Plaintiff what happened.

35. As the Plaintiff began to tell him, Sergeant Cecile interrupted Plaintiff and asked if Plaintiff understood that he could be arrested.

36. Plaintiff was quite surprised at this statement as he had complied with Officer Mullen's directive and had not interfered with Paredes' arrest or done anything unlawful.

37. Sergeant Cecile said that right then it was the officer's call, but if they were going to receive a complaint from the Plaintiff, it would be his call whether to arrest Plaintiff.

38. Plaintiff said that he was not sure how the complaint procedure worked.

39. Sergeant Cecile showed Plaintiff the patch on his shoulder and said, "It's right here with me, right now."

40. Plaintiff said that he did not think that was the only way to file a complaint.

41. Sergeant Cecile then told Plaintiff, "I'll tell you right now if you're filing a complaint, I'm taking you down," or words to that effect.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

42. Sergeant Cecile told Officer Mullen, "He's not happy. We're going to get a complaint. Take him in," or words to that effect.

43. Plaintiff explained that he had expensive things in his booth that he could not leave unsecured.

44. Sergeant Cecile told Plaintiff that he should have thought of that before.

45. Sergeant Cecile told Officer Mullen to give Plaintiff an appearance ticket, which Officer Mullen did.

*See* Dkt. No. 1 at ¶¶ 33-45. Although Plaintiff alleges that Defendant Cecile threatened to arrest him, the mere threat to arrest does not constitute confinement. *See Blumenfield v. Harris,* 3 A.D.2d 219, 220 (1st Dep't 1957) (citations omitted), *aff'd* 3 N.Y.2d 905 (1957).[FN4]

FN4. In articulating his first cause of action, Plaintiff alleges that "[i]n the course of arresting Plaintiff, plaintiff was not free to leave and was confined against his will at the Carousel Center." *See* Dkt. No. 1 at ¶ 58. However, in light of the more specific allegations that Plaintiff made in his statement of facts, this allegation is too vague and conclusory to support a reasonable inference that Defendants confined him.

Accepting all of Plaintiff's allegations as true and drawing every reasonable inference from them, the Court does not find that he has alleged that Defendants took any actions that would constitute confinement for purposes of a common law false arrest or false imprisonment claim. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's common law false arrest and false imprisonment claims for failure to state a claim.

*c. § 1983 false arrest*

***6** The question of whether the issuance of an appearance ticket constitutes confinement for purposes of § 1983 is not so clear. Defendants rely upon *Angel v. Kasson,* 581 F.Supp. 170, 177-78 (N.D.N.Y.1983) ("[I]t [is] well settled that the issuance of such tickets under the provisions of N.Y.Crim. Proc. Law § 150.10 does not constitute an arrest." (citation and footnote omitted)). Plaintiff, on the other hand, relies upon *Dorman v. Castro,* 214 F.Supp.2d 299 (E.D.N.Y.2002), which states that,

> [a]lthough this is a close case, the Court finds that Plaintiffs were subject to a "seizure" under the Fourth Amendment. Plaintiffs claim that their liberty was restrained because "at the point when the Plaintiffs were informed that they were being issued a Summons" they "were not free to leave until the Plaintiffs had the Summons in hand."

*Id.* at 308 (quotation omitted). *Dorman* goes on to note that "district courts in this circuit that have analyzed *Murphy [v. Lynn,* 118 F.3d 938 (2d Cir.1997) ], however, have held that the mere issuance of an appearance ticket, without any restraint on travel, is a sufficient restraint of liberty to constitute a 'seizure' under the Fourth Amendment." *Id.* (citing *Kirk v. Metropolitan Trans. Auth.,* No. 99 CV 3787, 2001 WL 258605, *15 (S.D.N.Y. Mar. 14, 2001); *Kirton v. Hassel,* No. 96 CV 1371, 1998 WL 146701, *6 (E.D.N.Y. Mar. 25, 1998); *Sassower v. City of White Plains,* 992 F.Supp. 652, 656 (S.D.N.Y.1998)) (other citation omitted).[FN5]

FN5. Contrary to *Dorman'* s statement, two of the supporting cases it cites do not involve appearance tickets and the third, *Kirk,* involves a desk appearance ticket that the defendant issued after the plaintiff had been arrested and detained. *Kirk,* 2001 WL 258605, *2-*4.

*Dorman* and all the supporting cases that it cites rely upon *Murphy. Murphy,* applying *Albright v. Oliver,* 510 U.S. 266 (1994), held that, in order for a plaintiff to establish a § 1983 malicious prosecution claim, he "must show ... that the initiation or pendency of judicial proceedings" resulted in a Fourth Amendment "seizure." *Murphy,* 118 F.3d at 944. The court went on to hold that "[t]he liberty deprivations regulated by the Fourth Amendment are not limited to physical detention." *Id.* at 945. Finally, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

court, relying upon Justice Ginsburg's solitary concurrence in *Albright,* held that

> while a state has the undoubted authority, in connection with a criminal proceeding, to restrict a properly accused citizen's constitutional right to travel outside of the state as a condition of his pretrial release, and *may order him to make periodic appearances,* such conditions are appropriately viewed as seizures within the meaning of the Fourth Amendment.

*Id.* at 946 (emphasis added).

Like *Murphy,* all three of the supporting cases that *Dorman* cites concern malicious prosecution claims. There is certainly considerable similarity between the analysis of a § 1983 malicious prosecution claim and a § 1983 false arrest claim; both arise out of the Fourth Amendment's protection against unreasonable seizures. However, *Murphy* does not expressly address false arrest claims. Furthermore, there is reason to constrain the application of *Murphy* to the precise issues it addresses. Judge Jacobs, dissenting in *Murphy,* after noting the majority's reliance upon Justice Ginsburg's solitary concurrence, pointed out that "[a] probable cause determination is required only for 'those suspects who suffer restraints on liberty *other* than the condition that they appear for trial." ' *Id.* at 953, 955 (quoting *Gerstein [v. Pugh],* 420 U.S. [103,] 125 n. 26, 95 S.Ct. [854,] 869 n. 26 [ (1975) ] (Judge Jacobs' emphasis)) (footnote omitted). In *Sassower,* Judge Lowe noted the novelty of the *Murphy* holding and quoted Judge Jacobs' statement that " 'strange is the majority's holding that [plaintiff] was seized within the meaning of the Fourth Amendment because he was required to appear in court." ' *Sassower,* 992 F.Supp. at 655, 656 (quotation omitted).

***7** Although in the context of a malicious prosecution claim *Murphy* would be controlling, given the tenuousness of its reasoning, the Court holds that the issuance of an appearance ticket does not, in and of itself, constitute confinement for purposes of a § 1983 false arrest or false imprisonment claim. Furthermore, since the circumstances surrounding the issuance of the appearance ticket in this case do not present any alternative forms of the restraint of Plaintiff's liberty, the Court grants Defendants' motion to dismiss Plaintiff's § 1983 false arrest claims for failure to state a claim.

*4. Plaintiff's § 1983 First Amendment claims*

Second Circuit First Amendment retaliation case law is, to put it mildly, confusing. There are at least three formulations of the elements of a First Amendment retaliation claim. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) ((1) protected speech or conduct, (2) the defendant's adverse action against the plaintiff, and (3) " 'a causal connection between the protected speech and the adverse action" ' (quotation omitted)); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 91 (2d Cir.2002) ((1) conduct that the First Amendment protects that (2) prompts or substantially causes the defendant's action (citations omitted)); *Curley v. Vill. of Suffern,* 268 F.3d 65, 73 (2d Cir.2001) ((1) protected speech or conduct that (2) motivates or substantially causes the defendant's action, which action (3) effectively chills the plaintiff's exercise of his First Amendment right (citation omitted)).

In an attempt to make sense of this case law, one approach is to distinguish cases according to broad types. The great majority of First Amendment retaliation cases arise in the prisoner and public employee contexts. Less typical are those cases, like the one currently before the Court, in which a private citizen alleges that state actors took some action against him in retaliation for his exercise of his First Amendment rights. Unfortunately, even in this subset of cases, there is disagreement about the elements of the claim. The most recent case in this subset to set forth the elements of a First Amendment retaliation claim is *Dougherty.* In that case, the plaintiff alleged that the defendants had revoked a previously issued building permit in retaliation for his exercise of his First Amendment rights. Although the court indicated that there may have been additional protected speech, it specifically noted the plaintiff's allegation that the permit revocation occurred soon after the defendants' receipt of his opposition papers to their motion to dismiss an action that he had filed in relation to an earlier denial of a permit. *See Dougherty,* 282 F.3d at 91-92. The court held that the circumstances that the plaintiff alleged gave rise to a sufficient inference of a causal relationship between his protected conduct and the defendants' action to withstand a motion to dismiss. *See id.* at 92.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

***8** The next most recent case in the subset of private citizen plaintiffs is *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98 (2d Cir.2001). *Garcia* involved a student who claimed that the defendants dismissed him from medical school in retaliation for his exercise of his First Amendment rights. The court followed the same formulation of the elements of a First Amendment retaliation claim as did *Gill* but concluded that the plaintiff's assertions did not satisfy the third element of that formulation. *See* *id.* at 106-07 (quotation and other citation omitted).

After *Garcia,* the next most recent case in this subset is *Curley.* The facts of that case are more analogous to those of the instant action than are those of either *Dougherty* or *Garcia.* The plaintiff in *Curley* alleged that the defendants arrested him in retaliation for comments that he had made while campaigning for municipal office about a police cover-up and failure to discipline. *See* *Curley,* 268 F.3d at 72-73. The court found that the defendants were entitled to summary judgment on the plaintiff's First Amendment retaliation claim because the existence of probable cause to arrest him negated the second element of such a claim and because the fact that the plaintiff continued his campaign and later campaigned for another municipal office negated the third, “chilling,” element of the claim. *See* *id.* at 73.

*Curley* is distinguishable from *Dougherty* and *Garcia.* All the Second Circuit cases that the Court has found involving a private citizen plaintiff who alleges that the defendant arrested him in retaliation for his exercise of his First Amendment rights have articulated the same formulation of the elements of a First Amendment retaliation claim as did *Curley.* *See Kerman v. City of N.Y.,* 261 F.3d 229, 241-42 (2d Cir.2001) (citation omitted); *Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir.1998) (citations omitted). Although it might be difficult to explain the distinction between private citizen arrestee plaintiff cases and the other private citizen plaintiff cases, the distinction is present in the case law. Therefore, the Court will follow the *Curley* formulation of the elements of a First Amendment retaliation claim.[FN6]

FN6. The only Second Circuit case that Plaintiff cites in support of his First Amendment retaliation claims is *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994). *Gagliardi* applies the same formulation of the elements of the claim as does *Dougherty.* *See* *id.* at 194 (quotation and other citations omitted). However, *Gagliardi,* like *Dougherty,* is a private citizen zoning dispute case rather than a private citizen arrestee case.

The only challenge [FN7] that Defendants currently make to Plaintiff's First Amendment retaliation claims is that he fails to allege that they prevented him from filing a compliant, i.e., he fails to allege that Defendants' actions effectively chilled him from exercising his First Amendment rights. However, this challenge reads Plaintiff's claims too narrowly. Two distinct forms of speech are at issue in Plaintiff's first two causes of action. Plaintiff's first cause of action alleges that he verbally complained about Defendants' actions during the course of their arrest of Paredes. From Plaintiff's second cause of action, it may be reasonably inferred that he also desired to file a formal complaint about Defendants' actions after the arrest incident. With respect to the second cause of action, Plaintiff has not alleged that Defendants' actions effectively chilled him from filing a complaint. Therefore, Plaintiff's second cause of action fails to state a First Amendment claim. Accordingly, the Court grants Defendants' motion to dismiss the First Amendment claims in Plaintiff's second cause of action for failure to state a claim.

FN7. It is possible that Plaintiff's conduct in criticizing Defendants' actions during the course of their arrest of Paredes may not be protected activity. If the allegations in Defendant Hennessey's affidavit in support of the complaint information are true, Defendants likely had probable cause to arrest Plaintiff for Obstructing Governmental Administration and, thus, their threat to arrest him on that charge was privileged. *See* Dkt. No. 1 at ¶ 48. However, since Defendants have not raised the issue of whether Plaintiff's conduct was privileged, and the Court must accept the allegations in Plaintiff's complaint as true, the Court cannot address this issue at this time.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

***9** However, with respect to Plaintiff's first cause of action, the Court finds that it may reasonably infer from the complaint that Defendants' conduct effectively chilled Plaintiff's speech. The relevant allegations are:

> 24. Plaintiff then crouched down and told the officers that they were "over the top" and that they were "out of control" or words to that effect.
>
> 25. Plaintiff did this because the police officers were brutalizing Paredes.
>
> 26. Officer Mullen told Claimant to get back.
>
> 27. Claimant complied by stepping back.
>
> 28. Officers Mullen and Hennessey then continued to punch Paredes on the back after Paredes was subdued.
>
> 29. Plaintiff told the officers again that they were "over the top" or words to that effect.
>
> 30. Officer Mullen then told the Plaintiff that if he didn't stop, he would be arrested for Obstructing Governmental Administration.
>
> 31. Plaintiff stopped speaking to the officers.

*See* Dkt. No. 1 at ¶¶ 24-31. Accordingly, since Plaintiff has sufficiently alleged that Defendants' (or at least Defendant Mullen's) actions effectively chilled his exercise of his First Amendment rights, the Court denies Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his first cause of action for failure to state a claim.

*5. Plaintiff's § 1985(3) claims*

Defendants have asserted three bases for the dismissal of Plaintiff's § 1985(3) claims. First, they argue that Plaintiff, as a white person, lacks standing to assert a § 1985(3) claim. Second, they contend that Defendants, as agents or employees of a corporate entity, by definition, may not conspire with one another. Finally, they assert that Plaintiff's factual allegations are insufficient to state a conspiracy claim.

*i. standing*

Despite the age and extensive use of § 1985(3), case law contains little discussion of the question of who has standing to assert a claim under that statute.[FN8] However, the Court finds that the case law provides sufficient guidance to answer the question currently before it: whether a non-minority person who alleges that he was injured by a conspiracy that aimed to deprive minority persons of the equal protection of the law has standing to assert a § 1985(3) claim.

> FN8. The parties have cited conflicting precedents, none of which are binding on this Court. Defendants cite two cases for the proposition that a plaintiff asserting a § 1985(3) claim must himself be a member of a class that the statute protects: *Puglisi v. Underhill Park Taxpayer Ass'n,* 947 F.Supp. 673, 692 (S.D.N.Y.1996) (citations omitted); *McLoughlin v. Altman,* No. 92 Civ. 8106, 1993 WL 362407, *6 (S.D.N.Y. Sept. 13, 1993) (citation omitted). Although *McLoughlin* cites *Griffin v. Breckinridge,* [403 U.S. 88, 102,] 91 S.Ct. 1790, 1798 (1971), for the proposition that "a claimant must show, among other things, that she belonged to the type of class that is protected by that statute," *McLoughlin,* 1993 WL 362407, at *6, it does not appear that *Griffin* stands for such a proposition. Likewise, although *Puglisi* discusses several other cases, when it holds "that plaintiff cannot bring this § 1985(3) claim because ... plaintiff is not a member of the class protected by the statute nor a member of the race triggering the alleged racial discrimination[,]" *McLoughlin* is the only case that the court cited that supports this holding. *Puglisi,* 947 F.Supp. at 692.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The cases upon which Plaintiff relies are also suspect. He contends that a white person who has sought to vindicate the rights of members of a racial minority and against whom the defendants conspire has standing to assert a § 1985(3) claim. He cites three primary cases to support this proposition: *Maynard v. City of San Jose,* 37 F.3d 1396, 1403-04 (9th Cir.1994) (citations and footnote omitted); *Pisello v. Town of Brookhaven,* 933 F.Supp. 202, 216 (E.D.N.Y.1996) (citing *Maynard* ); *Bryant v. Polston,* No. IP 00-1064-C-T/G, 2000 WL 1670938, *7 (S.D.Ind. Nov. 2, 2000) (citing *Maynard* ). In *Maynard,* the Ninth Circuit sought to apply the law of that circuit which provided that "[p]laintiffs have standing under Section 1985 only if they can show they are members of a class that the government has determined 'require[s] and warrant[s] special federal assistance in protecting their civil rights." ' *Maynard,* 37 F.3d at 1403 (quotations and other citation omitted). The court reasoned that, because Title VII "grants special protection to whites who are denied association with members of other groups because of an employer's discriminatory practices" and "to all employees-regardless of race-who are subjected to retaliation for assisting in the investigation of discriminatory employment practices," such persons may have standing to assert a § 1985(3) claim. *Id.* (citation omitted). The plaintiff in *Maynard* had alleged that his employer and other defendants had retaliated against him for complaining about discriminatory hiring practices. *See id.* at 1399-1400. Since it does not appear that the Second Circuit has articulated a general statement of the requirement for standing under § 1985(3), the Court does not find *Maynard* persuasive.

The Supreme Court has discussed the statute's purpose: "[t]he predominant purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters. The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views towards the Negro." *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott,* 463 U .S. 825, 836 (1983). This statutory purpose implies that, if a white person who sought to vindicate the rights of members of a racial minority were injured by a conspiracy that aimed to deny members of that racial minority of the equal protection of the laws, he would have standing to assert a § 1985(3) claim.

***10** At least two Courts of Appeals have expressly held that a plaintiff asserting a § 1985(3) claim need not himself be a member of a class that the statute protects. *See* *Cutting v. Muzzey,* 724 F.2d 259, 260 (1st Cir.1984) (holding that a non-Italian had standing to assert a § 1985(3) claim against members of a town planning board who allegedly conspired to deprive Italians of access to housing); *Novotny v. Great Am. Fed. Sav. & Loan Ass'n,* 584 F.2d 1235, 1244 (3d Cir.1978) (*en banc* ) ("[M]embers of a conspiracy to deprive women of equal rights are liable under § 1985(3) to persons who are injured in furtherance of the object of the conspiracy, whether male or female."), *vacated on other grounds,* 442 U.S. 366 (1979).[FN9] Although the Second Circuit has not addressed whether a white person may have standing to assert a § 1985(3), the Court finds that, in light of the discussion in *Scott,* the holdings of *Cutting* and *Novotny* are persuasive. Therefore, the Court concludes that the fact that Plaintiff is white does not, in and of itself, bar him from asserting a § 1985(3) claim. Consequently, since Plaintiff has alleged that a conspiracy whose object was to deprive the constitutional rights of a member of a racial minority injured Plaintiff while he was seeking to vindicate those rights, the Court finds that he has adequately alleged standing for his 42 U.S.C. § 1985(3) claim.

FN9. The Supreme Court vacated *Novotny* because the plaintiff in that case alleged that the conspiracy that injured him had the goal of depriving women of their Title VII rights. The Court held that, because allowing a plaintiff to base a § 1985(3) cause of action upon rights that Title VII created would circumvent the procedural requirement that Congress had built into Title VII, "deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3)." *Novotny,* 442 U.S. at 378. Since the Fourth Amendment creates the rights of Paredes of which Plaintiff alleges Defendants conspired to deprive him, the Court's holding

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

does not bar Plaintiff's action.

*ii. intra-corporate conspiracy doctrine*

" 'Under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together[ ]" ' while acting within the scope of their employment. *Nassau County Employee "L" v. County of Nassau,* 345 F.Supp.2d 293, 304 (E.D.N.Y.2004) (quotations and other citations omitted); *see* *Crudele v. City of N.Y. Police Dep't,* No. 97 Civ. 6687, 2004 WL 1161174, *5 (S.D.N.Y. May 24, 2004) (citations omitted). Although courts first applied this doctrine to cases involving public corporations, they have subsequently held that the doctrine is applicable to municipal entities and their officers, agents, and employees. *See* *County of Nassau,* 345 F.Supp.2d at 304 (citation omitted); *Cameron v. Church,* 253 F.Supp.2d 611, 623 (S.D.N.Y.2003) (quotation omitted). "However, '[a]n exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." ' *County of Nassau,* 345 F.Supp.2d at 304-05 (quotation omitted); *see* *Stoner v. N.Y. City Ballet Co.,* No. 99 Civ. 0196, 2002 WL 523270, *9 (S.D.N.Y. Apr. 8, 2002) (quotation and other citation omitted).

Individual Defendants are officers of Defendant City. *See* Dkt. No. 1 at ¶¶ 7-9. Plaintiff's allegation that at the time that individual Defendants "conspired to violate Plaintiff's civil rights and committed acts in furtherance of such conspiracy, they were acting as police officers for the City of Syracuse[ ]" is presumably an admission that individual Defendants were acting within the scope of their employment. *See* Dkt. No. 1 at ¶ 79.

***11** Nonetheless, Plaintiff contends that the personal interest exception applies. "[T]hat exception applies where 'a plaintiff adequately alleges that each defendant possessed an independent, personal conspiratorial purpose." ' *Everson v. N.Y. City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (quotation and other citation omitted); *see* *Salgado v. City of N.Y.,* No. 00 Civ. 3667, 2001 WL 290051, *9 (S.D.N.Y. Mar. 26, 2001). Plaintiff has not alleged that individual Defendants had a personal interest in their alleged conspiracy. *See* Dkt. No. 1 at ¶¶ 77-83. In his motion papers, Plaintiff concedes that he "does not allege Defendants' personal stake in their bias against Plaintiff or Paredes...." *See* Dkt. No. 15 at 14. However, he contends that he has "allege[d] sufficient facts to infer that the Defendants were motivated by personal gain in silencing Plaintiff about what he witnessed concerning their brutality and/or misconduct in subduing and arresting Paredes and preventing Plaintiff from filing a complaint about such misconduct." *See id.* at 14-15 (citations omitted). He further argues that "the complaint alleges sufficient facts to infer that Defendants' employment opportunities and interest in not answering a complaint about their misconduct was Defendants' personal stake or interest in participating in the conspiracy." *See id.* at 15. However, since Defendant City arguably has the same general interest, Plaintiff's allegations do not give rise to a reasonable inference that individual Defendants' interests in the alleged conspiracy were distinct from those of Defendant City.

Accordingly, since the intra-corporate conspiracy doctrine applies, the Court grants Defendants' motion to dismiss Plaintiff's § 1985(3) claims for failure to state a claim.[FN10]

> FN10. Since the Court concludes that the intra-corporate conspiracy doctrine applies, it will not address Defendants' alternative argument that Plaintiff's factual allegations are insufficient to state a conspiracy claim.

*6. Plaintiff's common law malicious prosecution claims*

> In order to recover for malicious prosecution, a plaintiff must establish four elements: that a criminal proceeding was commenced; that it was terminated in favor of the accused; that it lacked probable cause; and that the proceeding was brought out of actual malice.

*Cantalino v. Danner,* 96 N.Y.2d 391, 394-95 (2001) (citations omitted). Defendants argue that a dismissal in the interest of justice of an accusatory instrument pursuant to New York Criminal Practice Law § 170.40 cannot constitute a favorable termination. However, Defendants only cite pre-*Cantalino* case law to support their argument. *Cantalino* directly addressed "whether the dismissal of criminal charges against plaintiff in the interest of justice constituted a termination in her

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

favor." *Id.* at 395. It expressly rejected "a per se rule that a dismissal in the interest of justice can never constitute a favorable termination," and held that

the question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused. A case-specific rule is particularly appropriate for dismissals in the interest of justice, since the trial court is required to state on the record its reasons for dismissing the criminal charges....

***12** *Id.* at 396 (internal citation omitted). Unfortunately, in this case, the state court did not state on the record its reasons for dismissing the charges. *See* Dkt. No. 9 at 2. Furthermore, even if the state court had stated its reasons on the record, that record is not part of Plaintiff's pleadings. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's common law malicious prosecution claims for failure to state a claim.

*7. Plaintiff's common law libel claim*

Defendants argue (1) that Plaintiff has failed to comply with New York Civil Practice Law and Rules § 3016(a)'s requirement that a complaint asserting a claim for libel or slander set forth the particular words complained of and (2) that, if the Court dismisses all of Plaintiff's federal claims, it should decline to exercise jurisdiction over his state claims.

Since federal law governs the procedural issues in this case, " 'the mode of pleading defamation is governed by Rule 8, Fed.R.Civ.P.' " *Kelly v. Schmidberger,* 806 F.2d 44, 46 (2d Cir.1986) (quotation omitted). Therefore, the heightened pleading requirement of New York Civil Practice Law and Rules § 3016(a) does not apply to this action. *See* *Silverman v. City of N.Y.,* No. 98-CV-6277, 2001 WL 218943, *8 (E.D.N.Y. Feb. 2, 2001) (quotation and other citation omitted). The allegations of libel in Plaintiff's complaint satisfy Rule 8's requirements of "a short and plain statement of the claim" and "simple, concise, and direct" allegations. Fed.R.Civ.P. 8(a), (e)(1); *see* Dkt. No. 1 at ¶¶ 47-49, 94-96. Furthermore, the Court has not dismissed all of Plaintiff's federal claims. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's libel claim for failure to state a claim.

## IV. CONCLUSION

After carefully considering the file in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Defendants' motion to dismiss Plaintiff's complaint for insufficient service of process is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 claims against Defendant City of Syracuse for failure to sufficiently allege municipal liability is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's common law false arrest and false imprisonment claims for failure to state a claim is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 false arrest claims for failure to state a claim is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his second cause of action is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his first cause of action for failure to state a claim is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1985(3) claims for failure to state a claim is GRANTED; and the Court further

***13** ORDERS that Defendants' motion to dismiss

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff's common law malicious prosecution claims for failure to state a claim is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's common libel claim for failure to state a claim is DENIED.

IT IS SO ORDERED.[FN11]

FN11. The following claims of Plaintiff remain in this action: (1) § 1983 claims for denial of First Amendment rights against Defendants City, Mullen, and Hennessey, alleging that these Defendants arrested him for speaking to Defendant officers about their conduct in arresting a third-party; (2) § 1983 claims for failure to train against Defendant City; (3) common law malicious prosecution claims against all Defendants; (4) a common law libel claim against Defendant Hennessey; and (5) a claim for attorney's fees pursuant to 42 U.S.C. § 1988.

N.D.N.Y.,2005.
Griffin-Nolan v. Providence Wash. Ins. Co.
Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Edward KOEHL, Plaintiff,

v.

Gary GREENE, Superintendent; Jay Kellman, Facility Rabbi; Bruce Parker, Correction Officer; C. Lacroix, Correction Sergeant; R.W. Potter, Deputy Superintendent; Greg Lyons, Cook; and James Pagano, Defendants.

No. 9:05-CV-582.

Oct. 31, 2008.

Edward Koehl, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Charles J. Quackenbush, Esq., James B. McGowan, Esq., Asst. Attorneys General, of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

***1** Plaintiff, Edward Koehl, brought this civil rights action pursuant to 42 U.S.C. § 1983. In a Report Recommendation dated September 18, 2008, the Honorable David E. Peebles, United States Magistrate Judge, recommended that defendants' motion for summary judgment (Docket No. 99) be granted, and that plaintiff's complaint be dismissed in its entirety. The plaintiff has filed timely objections to the Report Recommendation.

Based upon a de novo review of the portions of the Report-Recommendation to which the plaintiff has objected, the Report-Recommendation is accepted and adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED;

2. Plaintiff's complaint is DISMISSED in its entirety; and

3. The Clerk is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Edward Koehl, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 claiming deprivation of his civil rights. In his complaint plaintiff asserts an array of claims centered upon his efforts, beginning in or about April of 2003, to convert to Judaism and a delay in processing that request and, correspondingly, in permitting him to attend congregate Jewish religious services, celebrate religious holidays, and receive meals consistent with a kosher diet. Plaintiff also asserts that various of the defendants have verbally harassed and directed derogatory comments toward him, based upon his new-found religion, and that prison officials, responding to the many grievances filed by him to address the situation, failed to conduct proper investigations and remediate the constitutional violations. Plaintiff's complaint seeks injunctive relief, as well as awards of compensatory and punitive damages.

Currently pending before the court is a motion filed by the defendants seeking the entry of summary judgment dismissing plaintiff's claims on a variety of grounds. In their motion, *inter alia,* defendants assert that no reasonable factfinder could conclude that plaintiff's First Amendment religious exercise rights were violated, that plaintiff's claims concerning the issuance of false misbehavior reports and verbal harassment are not cognizable, and that plaintiff's conspiracy claims are precluded by the intra-corporate conspiracy doctrine, additionally asserting their entitlement to qualified immunity. Based upon a careful review of the evidence now before the court, I recommend that defendants' motion be granted.

I. *BACKGROUND1*[FN1]

FN1. In light of the procedural posture of the case, the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See* *Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted).

Plaintiff is a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"); while he is currently confined elsewhere, at the times relevant to his claims in this action Koehl was designated to the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York.[FN2] *See generally* Complaint (Dkt. No. 1).

FN2. Plaintiff was transferred out of Great Meadow on or about March 26, 2007, and is currently housed in the Clinton Correctional Facility. *See* Dkt. Nos. 83, 84.

***2** The events giving rise to a majority of plaintiff's claims were set in motion in April of 2003, when plaintiff initiated efforts to convert to the Jewish faith. Complaint (Dkt. No. 1) ¶ 1. After not having received an acceptable response to that request from defendant J. Kellman, the designated Rabbi at Great Meadow, plaintiff went to the Catholic Chaplin at the facility in August of 2003 to make arrangements for the change in religious preference. *Id.* ¶ 2.

According to the defendants, religious matters such as conversion requests are generally left to prison chaplain staff, with minimum input from security personnel. Greene

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Decl. (Dkt. No. 99-3) ¶ 7. Defendants attribute the delay in Rabbi Kellman acting on Koehl's conversion request to the cleric's practice of interviewing inmates to determine the level of their sincerity in converting to the Jewish religion, and the fact that those interviews were conducted only once each month.[FN3] *Id.* ¶ 6.

FN3. It appears from materials now before the court that Rabbi Kellman's procedures did not conform to DOCS policy, which provides for self designation by inmates of their religious preferences subject to certain limitations and restrictions as to when and how often such designations may be made. *See* DOCS Directive No. 4202; *see also* Greene Decl. (Dkt. No. 9903) Exh. C. Such violations of state regulation, however, do not in and of themselves arise to a level sufficient to support a civil rights claim under 42 U.S.C. § 1983. *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985).

Hand-in-hand with his request to convert to the Jewish faith, plaintiff undertook efforts to receive kosher meals, also beginning on or about August 13, 2003. Complaint (Dkt. No. 1) ¶¶ 3-7. Subsequent inquiries by Koehl regarding the status of that request were met with verbal harassment and derogatory epithets on the part of various DOCS employees, including Corrections Sergeant C. Lacroix, Corrections Officer Bruce Parker, and facility cook Greg Lyons.[FN4] Complaint (Dkt. No. 1) ¶ 3. Plaintiff was approved for a kosher diet on August 21, 2003. Complaint (Dkt. No. 1) ¶ 7.

FN4. The evidence in the record regarding this portion of plaintiff's claim is sharply conflicting. In his opposition to defendants' motion, plaintiff has submitted statements from various inmates tending to substantiate his allegations regarding the offensive statements on the part of prison officials. *See* Plaintiff's Opposition (Dkt. No. 105-2) Exhibits at pp. 6-8; *see also* Plaintiff's Opposition (Dkt. No. 105-3) Exhibits at pp. 3, 5, 7, 9-11. The three defendants implicated, by contrast, have submitted sworn statements in which they deny their use of such language toward the plaintiff. Lyons Decl. (Dkt. No. 99-5) ¶ 3; Parker Decl. (Dkt. No. 99-7) ¶ 2; Lacroix Decl. (Dkt. No. 99-4) ¶ 2.

Plaintiff asserts that corrections officials also ignored his repeated requests in August, September and October, 2003 that he be permitted to attend Jewish religious services, including those held to celebrate Rosh Hashanah and the Sukkoth holiday. Complaint (Dkt. No. 1) ¶¶ 8-14 and Exhs. 2, 4. Once Koehl was interviewed by Rabbi Kellman on October 30, 2003, he was thereafter added to the call out list in order to permit him to attend Jewish services. [FN5] *Id.* ¶ 32.

FN5. According to an interdepartmental communication dated January 21, 2004, the requirement of call out to attend Jewish services has been eliminated at Great Meadow. Greene Decl. (Dkt. No. 99-3) Exh. D. Notwithstanding the elimination of this call out requirement, among plaintiff's claims is his contention that he was not placed on a call out list to attend Jewish Purim services held on March 4, 2004. *See* Complaint (Dkt. No. 1) ¶ 46.

Among the events triggering plaintiff's claims was the issuance by Defendant Lacroix of a misbehavior report to the plaintiff on October 14, 2003, accusing him of various prison disciplinary rule infractions, including soliciting goods (Rule 103.20), theft (Rule 116.10) and violating mess hall serving policies (Rule 124.16). Complaint (Dkt. No. 1) ¶ 15; Greene Decl. (Dkt. No. 99-3) Exh. E. Those disciplinary charges arose from an incident occurring in the Great Meadow mess hall, when it was discovered that plaintiff was in possession of a hamburger, located inside

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of his food bag, that was not served as part of his special, cold alternative diet. *Id.; see also* Lacroix Decl. (Dkt. No. 99-4) ¶ 4. At a Tier I I hearing convened on October 17, 2003 by Corrections Lieutenant Eastman to address those charges, plaintiff admitted having violated mess hall policies, but denied the remaining two accusations against him.[FN6] Greene Decl. (Dkt. No. 99-3) Exh. E. Following that hearing plaintiff was found guilty of the mess hall violation charge but acquitted of the remaining two, and a penalty which was limited to loss of recreation privileges for a period of seven days was imposed. *Id.* That hearing officer's determination was later upheld on appeal by the superintendent's designee, Deputy Superintendent Carpenter, apparently based upon plaintiff's admission of guilt with respect to the charge for which he was convicted. Greene Decl. (Dkt. No. 99-3) ¶ 8 and Exh. E.

FN6. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See* *Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

***3** While the majority of plaintiff's claims surround his efforts at securing the requisite approval for conversion and a kosher diet, as well as the misbehavior report issued in October 2003, his complaint also addresses various other matters. Plaintiff further asserts that in January of 2005 defendants Lyons and Pagano verbally harassed him, making pointed and abusive reference to his religious beliefs. Complaint (Dkt. No. 1) ¶¶ 52-53. Plaintiff additionally alleges that on January 13, 2005 he was issued a false misbehavior report by defendant Lyons, related to the requirement that he sign a written acknowledgment of receipt of his kosher meals. *Id.* ¶ 54. That misbehavior report related to DOCS Directive No. 4310, which provides that inmates receiving cold alternative diets must daily attend every meal, and sign an acknowledgment receipt of each meal. Pagano Decl. (Dkt. No. 99-6) ¶ 7 and Exh. A. The misbehavior report alleged that on January 13, 2005, during a period when he was receiving a cold alternative diet, plaintiff did not appear for breakfast but when attending lunch on that day, signed for having received both breakfast and lunch, in violation of the governing policy.[FN7] Lyons Decl. (Dkt. No. 99-5) ¶¶ 6-7 and Exh. A. In light of this violation and the fact that plaintiff had been warned on other occasions concerning compliance with the meal attendance policies, plaintiff was removed from the cold alternative diet on January 13, 2005, but later reinstated effective January 21, 2005. Pagano Decl. (Dkt. No. 99-6) ¶¶ 9-13.

FN7. Despite apparently admitting during an ensuing hearing that he did in fact attempt to sign for a breakfast which he did not attend, *see* Lyons Decl. (Dkt. No. 99-5) ¶ 10 and Exh. C, plaintiff now alleges in his complaint that the misbehavior report issued was "false". *See* Complaint (Dkt. No. 1) ¶ 54.

The balance of plaintiff's claims, as set forth in his complaint, concern the many grievances filed by him in complaining of various prison conditions and matters set forth in this complaint. Plaintiff's complaint identifies seven grievances filed to address various matters now raised. The first of those, grievance no. 34934-03, was filed on August 13, 2003 to challenge the refusal of religious officials to honor Koehl's request for conversion. Complaint (Dkt. No. 1) ¶ 4. Following Rabbi Kellman's failure to respond to plaintiff's allegations during the course of the investigation, Superintendent Greene submitted a response advising plaintiff that he was listed as Jewish, but failing to respond to the allegations that he was being denied ongoing access to religious services. *Id.* ¶¶ 5, 10-11. On appeal to the DOCS Central Office Review Committee (the "CORC"), Superintendent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Greene's decision was upheld. *Id.* ¶¶ 13, 25.

Plaintiff filed a second grievance, no. 35021-03, on September 29, 2003, also addressing the failure of Rabbi Kellman and Superintendent Greene to accommodate his religious beliefs. Complaint (Dkt. No. 1) ¶ 12. Upon refusal of both the Inmate Grievance Review Committee ("IGRC") and Superintendent Greene to respond to that grievance within the required timeframe, plaintiff appealed the matter to the CORC.[FN8] *Id.* ¶¶ 17, 29. On December 9, 2003 plaintiff received a decision from the CORC denying the relief requested in his second grievance. *Id.* ¶ 37.

FN8. Following that appeal plaintiff received Superintendent Greene's decision in connection with grievance no. 35021-03 on November 4, 2003. Complaint (Dkt. No. 1) ¶ 32. Plaintiff lodged an objection to that response, arguing that it was untimely. *Id.* ¶ 33.

***4** A third grievance, no. 35069-03, was submitted by Koehl on October 15, 2003, claiming that he should not have been held responsible for the hamburger discovered in his lunch bag on the previous day. Complaint (Dkt. No. 1) ¶ 16. While the IGRC initially rendered a decision in plaintiff's favor regarding that grievance on October 24, 2003, Superintendent Greene issued a decision denying the grievance on November 1, 2003. *Id.* ¶¶ 27, 30. Superintendent Greene's decision was upheld on appeal to the CORC by decision issued on December 9, 2003. *Id.* ¶ 36.

On January 13, 2004 plaintiff filed grievance no. 35469-04, complaining of harassment received from defendant Lyons allegedly on the basis of plaintiff's religious beliefs. Complaint (Dkt. No. 1) ¶ 38. That grievance was transferred by the IGRC to Superintendent Greene who, following an investigation, issued a decision on February 13, 2004 denying it. *Id.* ¶¶ 39-41. That determination was upheld by the CORC on February 13, 2004. *Id.* ¶ 42.

Plaintiff's fifth relevant grievance, no. 35669-04, was filed on February 16, 2004 complaining of prison mess hall practices, and in particular contending that Jewish inmates were forced to violate their sincerely held religious beliefs as a result of the Kosher diet at the facility. Complaint (Dkt. No. 1) ¶ 43. On March 22, 2004, after Koehl complained to the CORC and Commissioner Goord regarding the delay in processing that grievance, Superintendent Greene issued a decision denying the relief requested. *Id.* ¶¶ 47-49. That determination was upheld by the CORC on April 24, 2004. *Id.* at ¶ 51.

On January 13, 2005 plaintiff filed grievance no. 37637-05, complaining of harassment by defendant Lyons extending over a period of more than a year. Complaint (Dkt. No. 1) ¶ 55 and Exh. 8. That grievance was assigned to defendant Potter for investigation, resulting in the submission on January 24, 2005 of a report which, plaintiff maintains, was fabricated and based upon perjured statements. *Id.* ¶¶ 59, 62. The report from defendant Potter was appealed to the CORC, which denied the grievance basing its decision on the Potter report. *Id.* ¶ 64.

The seventh and final grievance specifically identified in plaintiff's complaint, no. 37674-05, was filed on January 18, 2005, complaining of his removal from his prescribed religious kosher diet. Complaint (Dkt. No. 1) ¶ 58 and Exh. 10. That grievance resulted in a decision from both the IGRC, and later defendant Greene and the CORC, finding that plaintiff had in fact been impermissibly removed from the list of those receiving a religious diet and ordering his reinstatement. *Id.* ¶¶ 63, 65.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff alleges that during the course of investigating and deciding his various grievances the defendants and other prison officials failed to properly investigate and decide those matters.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 12, 2005. Dkt. No. 1. Plaintiff's complaint asserts various claims, grouped into two denominated causes of action, alleging deprivation of his First Amendment right to freely exercise his chosen religion; violation of The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.*; unlawful retaliation; deprivation of due process; harassment; cruel and unusual punishment; and conspiracy. Named as defendants in the action are Great Meadow Superintendent Gary Greene; Jay Kellman, the Rabbi assigned to the facility; Deputy Superintendent R.W. Potter; Corrections Sergeant S. Lacroix; Corrections Officer Bruce Parker; Facility Cook Greg Lyons; and James Pagano, whose position at Great Meadow is designated by the plaintiff as "CFFA2." Complaint (Dkt. No. 1) ¶ 3. Following the joinder of issue, Dkt. Nos. 32, 41, and a somewhat tortured procedural history which has included, *inter alia,* the denial of a motion by the plaintiff for preliminary injunction, Dkt. No. 43, an interim appeal, later dismissed by the United States Court of Appeals for the Second Circuit, Dkt. Nos. 50, 79, a mandamus petition, also filed by the plaintiff with that court, Dkt. No. 94, and the completion of discovery, on October 26, 2007, defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 99. In their motion, defendants argue that 1) plaintiff's claims of verbal harassment are not actionable; 2) any request by Koehl for the entry of injunctive relief is moot, based upon his transfer out of Great Meadow; 3) plaintiff's claim of conspiracy is barred by the intracorporate conspiracy doctrine; 4) plaintiff's claim of retaliation is lacking in merit; 5) plaintiff's claim against the defendants alleging interference with his right to exercise his chosen religion fails to state an actionable constitutional violation; 6) plaintiff is precluded from recovering compensatory damages, based upon his failure to allege and prove the existence of physical injury; and 7) in any event, defendants are entitled to qualified immunity. *Id.* Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 105, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).[FN9] *See also* Fed.R.Civ.P. 72(b).

FN9. By letter dated February 6, 2008 defendants' counsel urged the court to reject plaintiff's summary judgment response as both insufficient and untimely. Dkt. No. 103. In light of the circumstances detailed in plaintiff's response to that letter, *see* Dkt. No. 107, and in deference to his *pro se* status, I have nonetheless considered his submissions in opposition to defendants' motion. *See, e.g., Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006).

III. *DISCUSSION*

A. *Summary Judgment Standard*

***5** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Insurance Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if "it might affect the outcome of the suit under governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys,* 426 F.3d at 553 (citing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see* *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Insurance,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright,* 132 F.3d at 137-38. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also* *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

B. *Religious Interference*

The centerpiece of plaintiff's complaint is his claim that through their actions, perhaps better characterized as inaction, prison officials at Great Meadow interfered with his First Amendment right to freely exercise his religion of choice. That claim encompasses both the delay in answering his request for conversion to the Jewish faith and the resulting denial of his opportunity to participate in congregate services and religious observances, as well as the corresponding delay in arranging for him to receive prison meals consistent with his religious beliefs. The religious exercise claim also extends to the brief withholding in January of 2005 of plaintiff's cold alternative diet, based upon his violation of prison mess hall policies.

***6** The First Amendment to the United States Constitution guarantees a right to the free exercise of religion.[FN10] U.S. Const. amend. I; *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 2020 (2005). As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974)). Thus, for example, under accepted free exercise jurisprudence inmates are guaranteed the right to participate in congregate religious services under most circumstances. *See, e.g.,* *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (citing cases).

FN10. That amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

The right of prison inmates to exercise their religious beliefs, however, is neither absolute nor unbridled, but

instead is subject to valid penological concerns, including those relating to institutional security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987); *Salahuddin,* 993 F.2d at 308. A determination of whether the refusal to permit attendance at a religious service, for example, has abridged an inmate's constitutional rights hinges upon the balancing of the inmate's First Amendment free exercise right against institutional needs of officials tasked with the increasingly daunting task of operating prison facilities; that determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372 (1990).

Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, an inmate's diet and participation in religious meals. *McEachin v.. McGuinnis,* 357 F.3d 197, 204-05 (2d Cir.2004); *Ford,* 352 F.3d at 597. Ordinarily the Eighth Amendment establishes as a constitutional minimum the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials otherwise retain considerable discretion in determining dietary constituents. *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001). This requirement, however, is augmented by the First Amendment's free exercise clause, which is broad enough to include an inmate's "clearly established" right "to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597; *see also* *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin,* 357 F.3d at 203. As one might imagine, a free exercise claim arising from such a denial often brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests on the other. *See* *Benjamin,* 905 F.2d at 574.

***7** Examination of plaintiff's free exercise claim entails application of a three-part, burden shifting framework. *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988). A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes his or her sincerely held religious beliefs.[FN11] *Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006); *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y.Mar.30, 2007). Importantly, in evaluating this factor the court must be wary of "question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigant's interpretations of those creeds[,]" *McEachin,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148-49 (1989)), and instead may only consider whether the particular plaintiff holds a belief which is religious in nature. *Ford,* 352 F.3d at 590; *King,* 2007 WL 1017102, at *4. Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny.[FN12] *Salahuddin,* 467 F.3d at 474-75; *Livingston v. Griffen,* No. 04-CV-00607, 2007 WL 1500382, at *15 (W.D.N.Y.May 21, 2007). In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley,* 482 U .S. 78, 107 S.Ct. 2254 (1987). *See* *Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995); *Livingston,* 2007 WL 1500382, at *15.

FN11. Noting in its decision in *Ford v. McGinnis* a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, the Second Circuit declined to resolve the issue, instead assuming continued applicability of the substantial burden test. 352 F.3d 582, 592-93 (2d Cir.2003). Recent cases from this and other courts suggest that the Second Circuit resolved this split in its decision

in *Salahuddin v. Goord,* 467 F.3d 263 (2d Cir.2006) by subscribing to the substantial burden test. *See, e.g., Livingston v. Griffin,* No. 9:04-CV-00607, 2007 WL 1500382, at *15 (N.D.N.Y. May 21, 2007) (Singleton, J.); *King v. Bennett,* No. 02-CV-349, 2007 WL1017102, at *4 (W.D.N.Y.Mar.30, 2007). While harboring some doubt that the Second Circuit has in fact laid the matter to rest, I find it unnecessary to take a stance regarding the issue.

FN12. While this framework is particularly well-suited for analysis of an agency wide or facility policy or practice affecting inmates generally, it applies with equal force to individual decisions such as that involved in this case, which impacts only a single inmate. *Salahuddin,* 467 F.3d at 274 n. 4.

Under *Turner,* the court must determine "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective." *Thornburgh v. Abbott,* 490 U.S. 401, 414, 109 S.Ct. 1874, 1882 (1989). The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question. *Id.* at 417, 109 S.Ct. at 1884. Lastly, the court must examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id.* at 418, 109 S.Ct. 1884. Decisions rendered since *Turner* have clarified that when applying this test, a court should examine "the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Smith v. Nuttal,* No. 04-CV-0200, 2007 WL837111, at *5 (W.D.N.Y.Mar.14, 2007) (citing *Salahuddin,* 467 F.3d at 274).

In addition to asserting a claim under the First Amendment, plaintiff also includes a cause of action under the RLUIPA. That Act provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution .... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person-1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

***8** 42 U.S.C. § 2000cc-1(a). Under the RLU IPA, a governmental agency may not "impose a substantial burden" on religious exercise of prison inmates, *inter alia,* absent a showing that "that the burden furthers a compelling governmental interest by the least restrictive means." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006) (citing 42 U.S.C. § 2000cc-1(a); the principles which inform the analysis of plaintiff's free exercise claim, while similar to those applicable to plaintiff's potential RLUIPA cause of action, are not entirely co-extensive, as the two claims are analyzed under somewhat different frameworks. *Salahuddin,* 467 F .3d at 274.

1. *Rabbi Kellman*

Plaintiff's complaint does not clearly delineate which of the defendants are implicated in the various claims asserted. At Great Meadow, decisions regarding whether an inmate should be permitted to convert to any particular religion are entrusted to the chaplin staff. Greene Decl. (Dkt. No. 99-3) ¶ 7. In their motion, defendants apparently claim that for this reason, plaintiff's First Amendment and RLUIPA claims are only asserted against Rabbi Kellman. Accordingly, while they argue that defendant Kellman cannot be held accountable under section 1983 since he is not a state actor, they do not address the merits of plaintiff's religious deprivation claims.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Conspicuously absent from defendants' motion is an affidavit from Rabbi Kellman indicating the nature of his affiliation with the DOCS and outlining his duties and responsibilities as the Rabbi designated to Great Meadow. The record discloses that in keeping with his self-imposed practice, before signing off on plaintiff's conversion request Rabbi Kellman desired to interview the plaintiff to determine the sincerity of his beliefs and whether, consistent with the doctrinal principles associated with the faith, he would permit the desired conversion.[FN13]

FN13. As a general rule, under accepted dogma a person is considered of the "Jewish" faith only if born to a Jewish mother or formally converted by a Rabbi. See *Tripp v. Donovan,* No. 97 CIV. 4579, 1998 WL 338090, at *3 n. 2 (S.D.N.Y. June 24, 1998) (citing Solomon Ganzfried, *Code of Jewish Law* (Hyman E. Goldin Trans., Hebrew Publishing Co.1963)).

Undeniably, in performing his duties at Great Meadow defendant Kellman is an employee or agent of the DOCS. *See Montano v. Hedgepeth,* 120 F.3d 844, 846 n. 3 (8th Cir.1997). This fact alone, however, does not necessarily mean that his conduct implicates state action. *Id.* at 848-49. To the extent that, when ruling upon plaintiff's request for conversion, Rabbi Kellman "was acting as a cleric enforcing religious dogma[,]", however, he cannot be considered to have been acting under color of state law for purposes of liability under 42 U.S.C. § 1983. *Tripp v. Donovan,* No. 97 Civ. 4579, 1998 WL 338090, at *3 (S.D.N.Y. June 24, 1998); *Montano,* 120 F.3d at 850. I therefore recommend dismissal of plaintiff's religious deprivation claims against defendant Kellman as a matter of law.

2. *Remaining Defendants*

Liberally construed, plaintiff's complaint expands his religious deprivation claims beyond Rabbi Kellman to also extend to Superintendent Greene and others at the Great Meadow. While the argument is not limited to plaintiff's religious claims, defendants, maintaining that their actions toward the plaintiff were reasonable under the circumstances, invoke qualified immunity from suit.

***9** Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007); *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007). The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162-63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

> [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Qualified immunity analysis involves a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter it must first be determined whether, based upon the facts alleged, plaintiff has facially established a constitutional violation. *Id.; Gilles v. Repicky,* 511 F.3d 239, 243-44 (2d Cir.2007). If the answer to this inquiry is in the affirmative, the court must then turn its focus to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002). Finally, if the plaintiff had a clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

The right of an inmate to the practice of religion without substantially undue burden was clearly established at the relevant times in this action. *See Salahuddin,* 467 F.3d at 275-76. The question remains to whether, despite this fact, it was objectively reasonable for the defendants to believe that their actions did not violate plaintiff's rights under those provisions. In this instance I recommend a finding, as a matter of law, that it was. It appears clear from the record that any delay in permitting the plaintiff to attend Jewish congregate religious services and to provide him with a kosher diet stems from deference to Rabbi Kellman's determination regarding Koehl's request for conversion. Under these circumstances I recommend that plaintiff's religious deprivation claims against remaining defendants be dismissed on the basis of qualified immunity .[FN14] *Johnson v. Guiffere,* No. 9:04-CV-57, 2007 WL 3046703 (N.D.N.Y. Oct. 17, 2007); *but see Ford v. McGinnis,* 352 F.3d 582, 597-98 (2d Cir.2003) (holding that reliance upon advice of religious authorities is not always "objectively reasonable.").

FN14. As was previously discussed, plaintiff's religious deprivation claims extend to include the denial over a period of a week of a cold alternative diet based upon his failure to comply with mess hall directives. Because that deprivation was related to legitimate penological concerns, and did not amount to a substantial burden on plaintiff's religious exercise, it does not support a claim of religious interference under either the First Amendment or the RLUIPA. *See Salahuddin,* 467 F.3d at 374-75.

C. *Harassment*

***10** Much of plaintiff's complaint is focused upon verbal harassment which he received at the hands of various of the defendants. Among the allegations in support of this claim is his contention that expletives with derogatory, religious overtones were directed toward him by prison officials during the course of his confinement. Defendants seek dismissal of plaintiff's verbal harassment claims as implicating conduct which is not actionable under 42 U.S.C. § 1983.

Undeniably plaintiff's allegations, if substantiated, reveal conduct which is both offensive and should not be tolerated in a workplace or prison setting. Nonetheless, it is well established that such conduct, absent more, does not suffice to establish a constitutional deprivation. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam). Accordingly, I recommend that the portion of defendants' motion attacking plaintiff's harassment claims based upon legal insufficiency be granted, and those claims dismissed.

D. *False Misbehavior Reports*

Also included among plaintiff's claims are those related to the issuance of false misbehavior reports. Arguing both that the claims are unsubstantiated, particularly in view of plaintiff's admission of certain of the violations set forth in those misbehavior reports, and that in any event such allegations do not rise to a level of constitutional significance, defendants seek their dismissal.

Standing alone, the mere allegation that a false misbehavior report has been filed against an inmate does not implicate constitutional conduct. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988)). The further assertion that the false misbehavior report has been prompted by retaliatory animus and relates to an inmate having engaged in protected activity, however, can suffice to state a claim for unlawful retaliation. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). Under these circumstances I recommend that's plaintiff's claims related to the issuance of false misbehavior reports, as distinct from his contention that he has been unlawfully retaliated against for engaging in protected activity, be dismissed as a matter of law.

E. *Retaliation*

Plaintiff asserts that the issuance by certain defendants of false misbehavior reports against him is directly attributable to retaliatory animus based upon his having lodged complaints and grievances regarding defendants' actions toward him. Noting the ease with which such claims are stated by prison inmates, defendants seek dismissal of this cause of action as well.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco,* 854 F.2d at 588-90. As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care ." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (same).

***11** In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case-specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any

protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

It should also be noted that personal involvement of a named defendant in any alleged constitutional deprivation is a prerequisite to an award of damages against that individual under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See* *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). As is true of other types of claims, this principle applies to causes of action claiming unlawful retaliation. *See* *Abascal v. Hilton,* No. 04-CV-1401, 2008 WL 268366, at *10 (N.D.N.Y. Jan. 30, 2008) (Kahn, D.J. and Lowe, M.J.).

As District Judge David N. Hurd recognized in his decision in *Barclay v. New York,* 477 F.Supp.2d 546 (N.D.N.Y.2007), in cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay,* 477 F.Supp.2d at 558. More than conclusory allegations are required to survive a summary judgment motion; the "types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted).

***12** I have scoured the record now before the court in an effort to find proof from which a reasonable factfinder could conclude that the issuance to plaintiff of allegedly misbehavior reports was motivated by his filing of various grievances complaining of the actions of prison officials. Despite that survey I have been unable to locate, nor has plaintiff cited, any evidence which would tend to establish the requisite nexus. In any event defendants have established, particularly in view of plaintiff's admissions of violations associated with both the October 2003 misbehavior report and that issued in February of 2004, that the charges contained within them were not lacking in merit, and even absent any potential retaliatory motivation they would have taken the same actions against the plaintiff, thus satisfying their burden under *Mount Healthy* to establish independent grounds for the issuance of those misbehavior reports now attributed to retaliatory animus. Accordingly, I recommend dismissal of all claims arising out of the issuance of misbehavior reports to the plaintiff.

F. *Conspiracy*

Plaintiff's complaint also alleges, in conclusory fashion bereft of supporting details, a claim of conspiracy. Defendants similarly seek dismissal of this cause of action.

To sustain a conspiracy claim under § 42 U.S.C.1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights ... secured by the Constitution or the federal courts." *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995) (citations and internal quotation marks omitted). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983. *See* *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.), *cert. denied,* 464 U.S. 857, 104 S.Ct. 177 (1983).

Neither plaintiff's complaint nor the record before the court provides the identity of the parties to the alleged conspiracy, a showing of agreement or a "meeting of the minds", or any details as to the time and place of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

conspiracy or its objective. Such deficiencies are fatal to plaintiff's conspiracy claim. *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999). Because plaintiff has asserted claims of conspiracy in only vague and conclusory terms, and has failed to come forward, in the face of defendants' summary judgment motion, with evidence to support such a conspiracy claim, I recommend its dismissal as a matter of law. *See* *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1399 (1991); *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987).

As a separate and independent basis for dismissing that claim, defendants assert that it is legally precluded because all of the alleged co-conspirators are DOCS affiliates. In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances. *See, e.g.,* *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75-76 (E.D.N.Y.2002); *Griffin-Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at *10-11 (N .D.N.Y. June 20, 2005) (Scullin, C.J.). Since plaintiff's conspiracy claim in this action is asserted against various DOCS agents or employees, each acting within the scope of his or her employment, it is precluded by virtue of the intra-corporate conspiracy doctrine. *Little v. City of New York,* 487 F.Supp.2d 426, 441-42 (S.D.N.Y.2007) (citations omitted).

IV. *SUMMARY AND RECOMMENDATION*

***13** While plaintiff's complaint contains assorted constitutional and federal statutory claims, those which appear to be potentially supported by the record are lacking in merit. Because plaintiff's religious deprivation claims implicate the delay of Rabbi Kellman in approving his request for conversion in order to insure that the controlling doctrinal requirements of the Jewish faith were met, and in that respect Rabbi Kellman was not engaged in state action, plaintiff's religious deprivation claims are subject to dismissal as a matter of law. To the extent that plaintiff's religious deprivation claims extend beyond Rabbi Kellman to the remaining defendants, those parties are entitled to qualified immunity based upon the court's finding that as a matter of law it was reasonable for the defendants to defer the decision regarding conversion to Rabbi Kellman, based upon the implication of religious dogma.

Plaintiff's claims alleging the issuance of false misbehavior reports and verbal harassment are insufficient to support a claim under section 1983. While the issuance of a false misbehavior report may support a claim of retaliation, in this instance the record is lacking in any evidence to link those reports to protected activity, and in any event defendants have sustained their burden of demonstrating that even but for any potential retaliatory animus those misbehavior reports would nonetheless have been issued. Turning to plaintiff's conspiracy claim, I find that it is subject to dismissal based both upon his failure to plead and prove the existence of a conspiracy and independently on the ground of the intra-corporate conspiracy doctrine.

Accordingly, I recommend that defendants' motion be granted and plaintiff's complaint be dismissed, and find it unnecessary to additionally address the issues of mootness, based upon plaintiff's transfer out of Great Meadow, in connection with his request for injunctive relief, as well as the allegation that he is not entitled to recover compensatory damages.[FN15] Accordingly, it is hereby

FN15. Plaintiff's complaint also alleges the deprivation of due process. Discerning no basis

from plaintiff's complaint to conclude that he has been denied a cognizable liberty interest sufficient to trigger the procedural process requirements of the Fourteenth Amendment, *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.1999), I have not addressed this claim and assume that his due process cause of action is instead lodged as a substantive due process denial associated with his religious exercise claims.

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 99) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2008.

Koehl v. Greene

Not Reported in F.Supp.2d, 2008 WL 4822520 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Charles MAY, Plaintiff,

v.

Superintendent DONNELI; Donaldson, Grievance Coordinator; Dep. Stern; Imam Ahmed; Officer Matthew; Deacon Bashaw; and James Jones, Administration Sergeant, Defendants.

Civil Action No. 9:06-cv-437 (GLS/RFT).

Sept. 18, 2009.

West KeySummary**Civil Rights 78** **1463**

78 Civil Rights

78III Federal Remedies in General

78k1458 Monetary Relief in General

78k1463 k. Mental Suffering, Emotional Distress, Humiliation, or Embarrassment. Most Cited Cases

A prisoner who did not suffer a physical injury was not entitled to compensatory damages for mental or emotional suffering for his § 1983 claim under the Religious Land Use and Institutionalized Persons Act (PLRA). The prisoner's alleged loss of weight and possible increase in blood pressure was insufficient to constitute a physical injury under the PLRA. The prisoner alleged that his First Amendment rights were violated when he was denied the opportunity to eat blessed food for seven days with his fellow Nation of Islam members during the Holy Month of Ramadan. Prison Litigation Reform Act of 1995, § 101(e), 42 U.S.C.A. § 1997e(e).

Charles May, Ray Brook, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, David L. Cochran, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

***ORDER***

GARY L. SHARPE, District Judge.

***1** The above-captioned matter comes to this court following a Report-Recommendation by Magistrate Judge Randolph F. Treece, duly filed August 25, 2009. Following ten days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report-Recommendation for clear error, it is hereby

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ORDERED, that the Report-Recommendation of Magistrate Judge Randolph Treece filed August 25, 2009 is ACCEPTED in its entirety for the reasons state therein, and it is further

ORDERED, that the defendants' motion for partial summary judgment (Docket No. 57) is GRANTED in part and DENIED in part, and it is further

ORDERED, that the Clerk of the court serve a copy of this order upon the parties in accordance with this court's local rules.

IT IS SO ORDERED.

***REPORT-RECOMMENDATION AND ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Charles May brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that his First Amendment rights were violated when he was denied the opportunity to eat blessed food for seven days with his fellow Nation of Islam members during the Holy Month of Ramadan. Dkt. No. 51, Am. Compl. at ¶ 1. In addition, Plaintiff asserts claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, and New York State Corrections Law § 610. *Id.* at ¶ 37. Defendants move for Partial Summary Judgment, to which Plaintiff filed a Response in Opposition. Dkt. Nos. 57-58. Defendants contend that Plaintiff is (1) barred from bringing an action for mental or emotional injury under 42 U.S.C. § 1983 because he failed to allege the required showing of physical injury pursuant to 42 U.S.C. § 1997e(e); and (2) estopped from bringing a pendent state law claim pursuant to N.Y. CORR. LAWW § 24. Dkt. No. 57-5, Defs.' Mem. of Law at pp. 2-4. For the reasons that follow, it is recommended that the Defendants' Motion be **GRANTED in part** and **DENIED in part.**

## I. BACKGROUND

The following material facts are not, for purposes of this Motion, in dispute. Plaintiff alleges that in August 2005, approximately one month prior to the Islamic celebration of Ramadan, he was signed up as a member of the Nation of Islam in order to allow him to participate in Ramadan related activities. Dkt. No. 58, Pl.'s 7.1 Statement at p. 2. According to Plaintiff, during the Holy Month of Ramadan, Muslims are unable to eat during mess hall hours because they are required to fast during that time; the fast is then broken at night by eating blessed food. Am. Compl. at ¶ 16.[FN1] On October 5, 2005, Plaintiff fasted and then ate blessed food with his fellow Nation of Islam members. *Id.* at ¶ 13. Plaintiff alleges that on October 6, 2005, he was informed by Defendant Sergeant Jones, in the presence of Defendant Corrections Officer ("C.O.") Mathew, that the administration had him listed as a Sunni Muslim and he would therefore have to eat with them until the administration straightened things out. *Id.* Though Plaintiff was willing to eat with the Sunni Muslims temporarily, he alleges that when he attempted to enter the Masjid [FN2] on October 6th, he was denied access by C.O. Mathew because he was not on the list. *Id.* at ¶ 35. Plaintiff alleges that Defendant Sergeant Jones maliciously failed to put him on the Sunni Muslim list. *Id.* at ¶ 34. Ultimately, Plaintiff was unable to eat with either Muslim sect for seven days until October 13, 2005, when he was permitted to eat with the Sunni Muslims. *Id.* at ¶ 19. During those seven days, Plaintiff observed the fasting strictures of Ramadan, but was unable to properly break his fast, thus resulting in a seven day fast. After informing Defendant Superintendent Donneli of the matter, Plaintiff was immediately placed with the Nation of Islam on October 18, 2005. *Id.* at ¶ 20.

FN1. Though Plaintiff submitted a "Material Fact" statement in accordance with N.D.N.Y.L.R. 7.1 (Dkt. No. 57), his statement is presented in an argumentative manner and does

not clearly lay out all of his factual allegations. Therefore, the Court relies primarily on Plaintiff's Amended Complaint to discern his factual allegations.

FN2. A Masjid is a Muslim place of worship, commonly referred to in English as a Mosque.

***2** Though Plaintiff refrained from eating for seven days, he alleges no physical injury other than that he "lost a few pounds," was feeling lightheaded because of a possible increase in blood pressure, and suffered mental and emotional distress. Dkt. No. 58, Pl.'s Resp. in Opp'n to Defs.' Mot. (hereinafter "Pl.'s Resp.") at p. 2. In fact, Plaintiff stated candidly during his deposition that he did not suffer any physical injury. Dkt. No. 57-4, David L. Cochran, Esq., Affirm., dated Oct. 15, 2008, Ex. A, Pl.'s Dep., dated Jan. 22, 2008 (hereinafter "Pl.'s Dep.") at p. 2.

Plaintiff alleges a second violation of his constitutional right to freely exercise his religion when Defendants denied him the opportunity to have family visits during the Muslim festival of Eid-Ul-Adha. Am. Compl. at ¶ 22.

As a result of the aforementioned factual allegations Plaintiff claims he suffered emotional, mental, and physical distress, and seeks both compensatory and punitive damages for his alleged injuries. *Id.* at ¶¶ 22, 25 & 26.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In order for an issue of material fact to exist, it must relate to a disputed matter that "might affect the outcome of the suit," and the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On a motion for summary judgment, the moving party bears the initial burden to demonstrate that there is no genuine issue as to any material fact, and therefore, they are entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and allege specific facts that present a genuine issue for trial. FED. R. CIV. P. 56(e). To that end, the non-movant cannot rest on "mere allegations or denials." *Id.*

When evaluating a motion for summary judgment, the court will draw all inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, when a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (cited in *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995)). Nevertheless, a party's "bald assertion," unsupported by evidence, is insufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Physical Injury Requirement

***3** The Prison Litigation Reform Act of 1995 ("PLRA"), codified in part at 42 U.S.C. § 1997e(e), states

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." The purpose of this physical injury requirement is to discourage frivolous suits commenced by inmates. *See* *Cox v. Malone,* 199 F.Supp.2d 135, 139-140 (S.D.N.Y.2002) ("Section 1997e(e) [ ... ] is a *substantive* limitation on the type of actions that can be brought by prisoners. Its purpose is to weed out frivolous claims where only emotional injuries are alleged.") (emphasis in original). The Second Circuit Court of Appeals has held that the PLRA applies to alleged constitutional violations brought under 42 U.S.C. § 1983. *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002).

In this case, the only physical injury that Plaintiff states he suffered was a loss of a few pounds and a possible increase in blood pressure. Pl.'s Resp. at p. 2. Furthermore, Plaintiff did not allege these injuries in his Amended Complaint, but rather, only after Defendants raised the PLRA defense in their Motion for Partial Summary Judgment. Prior to Defendants' Motion, Plaintiff stated at his deposition that he did not suffer any physical injury. Pl.'s Dep. at p. 2. Even assuming, *arguendo,* that Plaintiff had properly alleged a physical injury in his Amended Complaint, his allegations do not constitute physical injury for purposes of the PLRA.

Section 1997e(e) provides no definition of "physical injury." *Liner v. Goord,* 196 F.3d 132, 135 (2d Cir.1999). However, courts have held that in order to constitute a physical injury under 1997e(e), an injury must be more than *de minimis,* but need not be significant. *Id.* (citing *Siglar v. Hightower,* 112 F.3d 191, 193 (5th Cir.1997)); *Warren v. Westchester County Jail,* 106 F.Supp.2d 559, 570 (S.D.N.Y.2000) (citing *Siglar* ).

The issue is therefore whether Plaintiff's loss of a few pounds amounts to more than a *de minimis* injury for purposes of the PLRA. In short, it appears this question is answered in the negative. Loss of weight is generally not considered to be a physical injury for purposes of the PLRA, especially the loss of only a few pounds. *See* *Dawes v. Walker,* 1998 WL 59454, at *1 n. 1 (N.D.N.Y. Feb.9, 1998) ("It appears unlikely that lost weight is a physical injury within the meaning of Section 1997e(e)."); *see also* *Porter v. Coombe,* 1999 WL 587896, at *8 (S.D.N.Y. Aug.4, 1999) (plaintiff's loss of twenty-five pounds did not constitute a physical injury); *accord* *Pearson v. Welborn,* 471 F.3d 732, 744 (7th Cir.2006) (plaintiff's loss of fifty pounds did not constitute a physical injury). Similarly, Plaintiff's alleged increase in blood pressure does not amount to physical injury. *See* *Jones v. H.H.C. Inc.,* 2003 WL 1960045, at *5 (S.D.N.Y. Apr.8, 2003); *accord* *Davis v. District of Columbia,* 158 F.3d 1342, 1349 (D.C.Cir.1998) (articulating that § 1997e(e) precludes reliance on somatic manifestations of emotional distress). Thus, Plaintiff has not alleged a sufficient physical injury pursuant to the PLRA.

***4** Although Plaintiff has not met his burden on the physical injury requirement of the PLRA, his failure to do so is not completely dispositive of his underlying constitutional claim. "The failure of prisoners to plead or establish a compensable actual injury in a § 1983 constitutional tort claim [ ... ] only precludes the recovery of compensatory damages, but does not lead to the dismissal of the underlying claim." *Dawes v. Walker,* 239 F.3d 489, 496 (2d Cir.2001). Plaintiff may still be entitled to injunctive or declaratory relief for a violation of his constitutional rights. *Thompson v. Carter,* 284 F.3d 411, 416-418 (2d Cir.2002). A plaintiff is not required to show physical injury in order to recover nominal damages, punitive damages, or declaratory relief. *Gill v. Hoadley,* 2007 WL 1341468, at *4 (N.D.N.Y. May 4, 2007). In fact, it is error for courts not to award nominal damages in § 1983 actions when a constitutional violation has been established. *See* *Robinson v. Cattaraugus,* 147 F.3d 153, 162 (2d Cir.1998).

In the instant case, Plaintiff has requested punitive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

damages. Am. Compl. at ¶ 26. Defendants do not challenge the merits of Plaintiff's underlying constitutional claim, therefore that issue is not before this Court. Due to Plaintiff's inability to demonstrate a physical injury under 1997e(e), compensatory damages for mental or emotional suffering are barred for his § 1983 claim, but it remains to be decided if Plaintiff is entitled to nominal damages, punitive damages, or declaratory relief.

**C. Plaintiff's Pendent State Law Claim**

Plaintiff also brings a pendent state law claim pursuant to N.Y. CORR. LAWW § 610, which guarantees inmates "the free exercise and enjoyment of religious profession and worship" while incarcerated. Am. Compl. at ¶ 37. A federal court exercising pendent jurisdiction must apply state law. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1996). "Thus, if state law does not recognize a plaintiff's right to bring an action in state court, a federal court, exercising pendent jurisdiction, sitting as a state court, must follow the state law limitation on jurisdiction." *Livingston v. Griffin,* 2007 WL 2437433, at *2 (N.D.N.Y. Aug.22, 2007) (citing *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996)).

Defendants argue that this claim is barred by N.Y. CORR. LAWW § 24, which reads:

> 1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.
>
> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

***5** Thus, § 24 precludes "the assertion of claims against corrections officers [in their personal capacities] in any court, including the federal courts," by designating the New York State Court of Claims as the only available venue to bring a claim for damages arising out the acts committed by corrections officers within the scope of their employment. *Baker v. Coughlin,* 77 F.3d at 14-15. And, because the Court of Claims is a court of limited jurisdiction, hearing only claims against New York State and no other individual or entity, § 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties. N.Y. CT. CLMS. LAW § 9.

After the parties submitted their respective briefs on this Motion, the Supreme Court held in *Haywood v. Drown,* --- U.S. ----, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009) that § 24, when used to relegate to the Court of Claims civil rights actions brought pursuant to 42 U.S.C. § 1983, is inconsistent with the Supremacy Clause, U.S. Const. Art. VI, cl. 2, and therefore, unconstitutional. The *Haywood* Court held that New York State, having created courts of general jurisdiction that routinely hear § 1983 actions against all types of state actors, "is not at liberty to shut the courthouse door to federal claims [against corrections officers] that it considers at odds with its local policy." *Id.* at 2117. The Supreme Court found such selective treatment of § 1983 claims brought against corrections officers to be "contrary to Congress' judgment that *all* persons who violate federal rights while acting under color of state law shall be held liable for damages," and therefore, in violation of the Supremacy Clause. *Id.* at 2115 (emphasis in original).

In this case, Plaintiff has brought a state law claim

pursuant to N.Y. CORR. LAWW § 610. Although the *Haywood* decision found § 24 to be in violation of the Supremacy Clause, it did so only with respect to claims brought under § 1983, a federal statute. A claim brought pursuant to a state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear this pendent state law claim.

Even after *Haywood,* a New York state court (other than the Court of Claims) would not have jurisdiction to hear Plaintiff's pendent claim pursuant to § 24 because Plaintiff has alleged acts that clearly fall within the scope of the Defendants' employment duties as corrections officers. Therefore, this Court does not have jurisdiction to hear this pendent state law claim brought pursuant to N.Y. CORR. LAWW § 610, and it is recommended that such claim be **dismissed.** *Baker v. Coughlin,* 77 F.3d at 14-16; *see also, e.g., Cancel v. Mazzuca,* 205 F.Supp.2d 128, 139 (S.D.N.Y.2002) (dismissing plaintiff's pendent state law claims pursuant to § 24).

**III. CONCLUSION**

For the reasons stated therein, it is hereby

***6 RECOMMENDED,** that the Defendants' Motion for Partial Summary Judgment (Dkt. No. 57) be **GRANTED in part and DENIED in part;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.* ., 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2009.

May v. Donneli

Slip Copy, 2009 WL 3049613 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Maurice PARKER, Plaintiff,

v.

Superintendent Walter FOGG, Correction Officers Dennis Schoonmaker, Ernest Benevento & Correction Sergeant Longtin, Defendants.

No. 85-CV-177.

Feb. 17, 1994.

James M. Kerrigan, Ithaca, NY, for plaintiff.

Robert Abrams, Atty. Gen. for the State of New York, Albany, NY (David B. Roberts, Asst. Atty. Gen., of counsel), for defendants.

MEMORANDUM-DECISION AND ORDER

McCURN, Senior District Judge.

***1** While incarcerated plaintiff *pro se,* Maurice Parker, filed the present lawsuit.[FN1] This civil rights action, brought pursuant to 42 U.S.C. § 1983, is predicated upon allegations that plaintiff's Eighth and Fourteenth Amendment rights under the United States Constitution were violated, as well as his rights under Article I, §§ 5 and 6 of the New York State Constitution,[FN2] during an altercation which took place on October 12, 1983, at Coxsackie Correctional Facility ("Coxsackie" or "the facility"), a maximum security prison. Besides those alleged constitutional deprivations, plaintiff asserts three pendent state law claims: (1) intentional infliction of emotional distress, (2) assault and battery, and (3) violations of New York Corrections Law § 137(5) [FN3] and 7 N.Y.C.R.R. §§ 250.2(g) and 251.2.[FN4] In his complaint plaintiff seeks a declaratory judgment "that defendants have violated [his] constitutional rights as protected by the Eighth and Fourteenth Amendments to the United States Constitution;...." Complaint at 5. He also seeks compensatory damages of $250,000 and punitive damages of $250,000, as well as reasonable costs and expenses, including attorney's fees. *Id.*

Named as defendants in the complaint are Walter Fogg, the Superintendent at Coxsackie at the time of the alleged incident,[FN5] Correction Officers ("C.O.") Dennis Schoonmaker and Ernest J. Benevento, and Sergeant James Longtin.[FN6] On January 18 and 19, 1994 this matter was tried before the court without a jury. In accordance with Fed.R.Civ.P. 52(a), following constitutes the court's findings of fact and conclusions of law in this regard.

*I. FINDINGS OF FACT*

To fully appreciate the relatively brief encounter between plaintiff Parker and the defendants on the evening of October 12, 1983, it is necessary to briefly examine the background against which that incident occurred. There is evidence in the record, in the form of "Inmate Misbehavior Reports," showing that plaintiff had been verbally harassing C.O. Judy Wood prior to October 12, 1983. *See* Defendants' exhs. E and F. Even though plaintiff did not remember the incidents described in those

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

reports, he did remember having some differences with C.O. Wood. Defendants suggest that those differences arose out of the fact that C.O. Wood is a woman and at the time was a "Block Officer," which apparently was quite rare in the early 1980's. Plaintiff disagrees explaining that his differences with Wood occurred because she accused him of being a ringleader or instigator, provoking others to engage in disturbances. In any event, it is against this history of animosity between plaintiff Parker and Wood (which most surely did exist, for whatever reason) that the incident which is the subject of this litigation occurred.

Plaintiff's version of the events of October 12, 1983 is as follows. That evening he was keeplocked [FN7] in his cell. When the other inmates returned from evening recreation there were problems with the "lock in" [FN8] because the inmates thought that the C.O.s were bringing the inmates back to the cells ten minutes early. Plaintiff testified that the inmates were behaving in a raucous manner, with continued screaming even after being locked in for the night. During this time plaintiff claims to have been writing letters.

***2** Then, between 9:15 and 9:40 p.m., the door to plaintiff's cell was opened and he saw the defendants standing there. Plaintiff states that at that time he was wearing pajamas with no pockets and his slippers. When he tried to put on his boots, Schoonmaker, whom plaintiff believes had a baton, ordered him not to. In response to plaintiff's inquiry as to what was going on, Schoonmaker told him to, "Shut up," in no uncertain terms. Upon leaving the cell, plaintiff testified that he was not pat frisked, but that he was only escorted by the defendants to the center room. Apparently that room is so called because it is located between two sets of cell blocks. *See* Defendants' exh. A.

As they proceeded down the corridor, plaintiff admits to talking loudly and continuing to question defendants as to where he was being taken. He did that because he was the only one not locked in and he wanted his fellow inmates to know that he was being taken away by the defendants. Plaintiff was then placed in the corner of the center room, making it difficult for him to be seen or heard by other inmates in the surrounding cells. *See* Defendants' exh. A. At this time plaintiff's hands were behind his back, as they had been since he left the cell, and pressed against the wall. C.O.s Benevento and Schoonmaker flanked plaintiff, and by plaintiff's estimation Sergeant Longtin was behind the C.O.s, about two and a half feet from plaintiff.

Plaintiff further testified that it was only about three seconds from the time he was placed in the corner until Schoonmaker first hit him-either with an open right hand or a fist, plaintiff is not sure which. Prior to being struck, plaintiff testified that Schoonmaker was basically telling him that he had a big mouth and that he was a troublemaker. Trying to avoid getting hit, the plaintiff ducked. Plaintiff then claims that after that initial strike by Schoonmaker, both Benevento and Schoonmaker beat him up a little. Schoonmaker then hit plaintiff a second time with a right fist to plaintiff's temple, causing plaintiff's head to hit the wall and he began to bleed. Plaintiff testified that he was ducking and trying to protect himself after Schoonmaker struck him the first time. In fact, the plaintiff went so far as to demonstrate for the court the crouching position he assumed, with his hands covering his face, when the altercation started. Thus, because by his own admission plaintiff was protecting his face and head and in so doing obstructing his own vision, the court simply cannot credit plaintiff's testimony that C.O. Benevento struck or kicked plaintiff. Perhaps plaintiff was kicked or hit by more than one of the defendants, but the fact remains that he could not reasonably testify to that because at that point, he could not see what was happening.

In any event, after this plaintiff claims that Benevento subdued him with a stick and no more punches were thrown. Plaintiff also claims that he was kicked in the groin, but again there is no credible testimony as to which

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendant, if any, engaged in that conduct. Moreover, the medical records do not corroborate plaintiff's statement that he sustained injuries to the groin area as a result of this incident.

***3** The medical report contained in the "Unusual Incident Report" reveals that plaintiff sustained a cut measuring approximately 1 and 1/8 inches long on the outer area of his right eyebrow. Defendants' exh. B and H at 5. The facility nurse applied butterfly bandages. *Id.* The next day plaintiff was seen by a doctor who administered sutures. Defendants' exh. H at 5. Plaintiff received somewhere between four and six sutures.[FN9] The sutures were removed eleven days later. Defendants' exh. H. Photos of plaintiff taken eight days after the incident show that his right eye was still quite swollen, with significant bruising around it. Defendants' exh. I and plaintiff's exhs. 3A and 3B.[FN10] To this day, plaintiff still has a small scar (about one and a half inches long) above his right eyebrow, visible from approximately five feet away.

In addition to the scar, plaintiff claims that in the months after the incident he had a lot of headaches and vision problems, as well as pain in the groin area. Even today plaintiff claims that he continues to suffer from headaches, although he could not testify to the frequency of the same. Significantly, however, there is no mention in any of plaintiff's medical records, which are a part of the trial record, of headaches or vision problems. If plaintiff had, as he testified, a number of headaches in the two weeks immediately following the incident, surely that would be noted in his medical records from that time.

Likewise, even though plaintiff claimed at trial that he also sustained injury to his groin area, there is no mention of that in either the medical portion of the "Unusual Incident Report" or in his medical records for the date of the incident, or the visits immediately following that. In fact, there is no mention in the medical records of any such problem until nearly six weeks after the incident. Defendants' exh. H. In addition, when plaintiff again saw the doctor on November 28, 1983, he mentioned that problems with "bloody ejaculate" were intermittent for the past two months "and also 1 yr. [year] ago." *Id.* Following treatment for prostate difficulties, by plaintiff's own admission, this problem subsided. Thus, insofar as plaintiff's injuries are concerned, the court finds that plaintiff did sustain a laceration to the area above his right eyebrow, which required sutures and resulted in a small permanent scar.

The court will not attribute plaintiff's other complaints of headaches, vision problems and pain and discomfort in the groin area to this incident, however, because those problems are not substantiated in plaintiff's medical records during the weeks immediately following the incident. Furthermore, the fact that headaches can be so easily feigned is another reason for not attributing that particular symptom to the October 12, 1983 incident, especially where these supposed headaches are not mentioned anywhere in plaintiff's medical records.

Not surprisingly, defendants' version of events is at odds with that offered by plaintiff. The defendants claim that earlier in the evening of October 12, 1983, plaintiff had again been verbally harassing C.O. Wood. Sergeant Longtin claims that he first became aware of this when he received a call from C.O. Wood at approximately 7:50 p.m. In response to that call, Sergeant Longtin testified that he went to plaintiff's cell to work out the problem by talking with plaintiff. According to Longtin he and plaintiff agreed to "forgive and forget" the whole matter. Sometime later, while he was making his rounds in another part of the facility, Longtin received a second call from C.O. Wood, again complaining about plaintiff Parker. This time she advised Longtin that the keeplocked inmates, including Parker, were creating a disturbance. Wood also expressed concern that plaintiff had indicated that when the nurse and another C.O. made their usual nightly rounds at 10:00 p.m., the inmates, led by plaintiff, planned to "break on" them, or, in other words, create a disturbance. Defendants' exh. G. Longtin advised Wood

that he would be up shortly after finishing his rounds.

***4** The Sergeant did not come alone, though, as he had earlier. This time he was accompanied by defendants, Benevento and Schoonmaker. Sergeant Longtin testified that Schoonmaker was called to accompany him because that was part of his job. At the time, Schoonmaker had the official sounding title of "Evening Shift Assembly Desk Escort Officer," which in Schoonmaker's own words meant that he was a "gopher," or as Longtin described it, a "go-getter." Longtin testified that he did not know why Benevento was also called upon to accompany the Sergeant, but he hypothesized that perhaps Benevento was working overtime that night. The Sergeant further testified that it was customary for one Sergeant to be accompanied by two Corrections Officers in a situation such as this, where they anticipated moving an inmate, as they did Parker.

When the three defendants arrived at plaintiff's cell, prior to giving the signal for the door to be opened, Sergeant Longtin testified that he informed plaintiff that he was being taken to the center room so that they could talk to him. Schoonmaker then ordered plaintiff Parker to put on his pants and plaintiff did that. After exiting the cell, Schoonmaker pat frisked plaintiff and he found contraband-namely a blade from a Bic brand razor measuring approximately 1 1/2 inches by 3/8 inches. Defendants' exh. D and D1. Despite finding that contraband, the three defendants proceeded to escort plaintiff to the center room. Later that night, Schoonmaker wrote up an Inmate Misbehavior Report pertaining to both the contraband and the altercation; but no action was taken with respect to the contraband at the time it was found. Defendants' exh. D.

Upon entering the center room, plaintiff was ordered to stand in the corner and he did that. At that point, while directly in front of the plaintiff, Sergeant Longtin claims that he began talking to him, again questioning plaintiff about the alleged harassment and his supposed plan to instigate a disturbance on the block later that evening. Before he could finish, plaintiff began yelling. Schoonmaker told the plaintiff to stop yelling and to show a little more respect for the Sergeant, or words to that effect. According to the defendants, that prompted plaintiff to respond by removing his hands from his pockets, where he had been instructed to keep them, and to swing at Schoonmaker with a closed fist. Schoonmaker claims that in self-defense he responded by striking plaintiff on the left side of his head, causing plaintiff's head to hit the wall. Schoonmaker and Benevento then turned the plaintiff around, and both applied "bar hammer locks" to plaintiff's arms. Defendants' exh. B. Longtin issued handcuffs to Schoonmaker who handcuffed the plaintiff. After being escorted to the infirmary, plaintiff was seen by a facility nurse and then placed in another cell area.

Ascertaining exactly what happened on the evening of October 12, 1983 at Coxsackie is not easy because, admittedly, there are discrepancies, in varying degrees of significance, in the testimony of each of the witnesses, all of whom are parties to this action.[FN11] In addition to the discrepancies, the court's task of deciding the "facts" of this case is made even more difficult because it appears that all of the witnesses embellished their testimony to some extent. Difficulty in ascertaining where the "truth" lies here is also compounded by the fact that this incident occurred over ten years ago; and thus, understandably, the independent recollection of each party was significantly impaired. Nevertheless, after considering all of the evidence, and after having the opportunity to judge the credibility of the witnesses, the court concludes that plaintiff's version of events more closely resembles what happened between plaintiff and defendants on the evening of October 12, 1983 than does the defendants' version, and the matter will be decided based predominately upon that view of events.

***5** There are two primary reasons that the court is willing, for the most part, to accept plaintiff's version of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

events. First, the court is greatly troubled by the fact that once contraband was found on the plaintiff, the defendants did not proceed to immediately write him up or focus upon that undisputed violation of prison policy. It is incredible to the court that after finding that contraband on the plaintiff, who according to the Sergeant, had already been reprimanded earlier that same evening for verbal assaults, the defendants' agenda remained to take plaintiff down the hall and talk to him about Wood's claim that he planned to instigate another disturbance later that night. Given the sequence of events, the court finds it perplexing that once the contraband was found, the defendants did not simply remove plaintiff from his cell block, especially when they were supposedly concerned about him causing a disturbance there later on that night. If that remained defendants' concern, it seems only logical that once they found the contraband, in combination with plaintiff's earlier difficulties with C.O. Wood and her fear about the possibility of plaintiff instigating another cell block disturbance, the defendants would have taken immediate action to segregate plaintiff. Or, at the very least, they would have taken some action more severe then just taking plaintiff down the hall to discuss matters with him. After all, as defendants themselves emphasized at trial, Coxsackie is a maximum security prison and plaintiff had a history of behavior problems, including problems with C.O. Wood-the very same C.O. who complained about him the night of October 12, 1983. Had defendants segregated plaintiff, any fear about his causing another disturbance would have been alleviated.

The court finds the defendants' description of what happened on the night of October 12, 1983 suspect for a second reason. As all the parties testified, although not in precisely this way, plaintiff, a 19 year old, 160 pound unarmed inmate, and familiar with prison mores having already served part of his sentence, was surrounded and literally cornered, by three guards whose combined weight was, conservatively, 500 pounds. Regardless of whether or not the defendants had batons,[FN12] it is implausible to the court that in this situation plaintiff would have "thrown the first punch," [FN13] "in an effort to 'get in his licks,' " [FN14] as the defendants steadfastly maintain. It is far more likely, in the court's opinion, that defendants were agitated by plaintiff Parker's ongoing insolence, as documented in the Inmate Misbehavior Reports of C.O. Woods, and which apparently continued earlier that evening. And thus they, or at least defendant Schoonmaker, made the decision to take some action beyond just talking to the plaintiff.

II. CONCLUSIONS OF LAW

*A. Eighth Amendment-Excessive Force*

Given the proliferation of inmate instituted lawsuits over the years, [FN15] it is not surprising that the law is fairly well circumscribed, with respect to Eighth Amendment excessive force claims. Recently, Chief Judge McAvoy of this District had occasion to set forth the legal principles governing such claims. *See* *Richardson v. VanDusen,* 833 F.Supp. 146 (N.D.N.Y.1993); *see also* *Boyd v. Selmver,* 842 F.Supp. 52, 55-56 (N.D.N.Y.1994). Set forth in those decisions is a thorough and accurate recitation of the relevant legal principles, which closely follows that set forth by other courts in this Circuit when faced with Eighth Amendment excessive force claims.[FN16] Consequently, the court sees no need to restate what has already been so well put by a number of courts; instead the court will quote liberally from Judge McAvoy's recent published decision in *Richardson*.

***6** The Eighth Amendment protects prisoners from "cruel and unusual punishment." *See* *Wilson v. Seiter,* 501 U.S. 294, ----, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102-05, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976). However, it is "the unnecessary and wanton infliction of pain", *Estelle v. Gamble,* 429 U.S. at 103, 97 S.Ct. at 290, and not simply the "ordinary lack of due care for the prisoner's interests or safety" *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), which the Eighth Amendment prohibits.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

To prevail in this civil rights action grounded in the Eighth Amendment, the plaintiff must show that the defendants used such excessive force to subdue him that the force could fairly be characterized as the "unnecessary and wanton infliction of pain." *See* *Hendricks v. Coughlin,* 942 F.2d 109, 113 (2nd Cir.1991). What is necessary to establish an "unnecessary and wanton infliction of pain" varies according to the nature of the constitutional violation. *Whitley v. Albers,* 475 U.S. at 320, 106 S.Ct. at 1084. "Wantonness does not have a fixed meaning but must be determined with 'due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged.' " *Wilson v. Seiter,* 501 U.S. at ----, 111 S.Ct. at 2326 (1991) (quoting *Whitley v. Albers,* 475 U.S. at 320, 106 S.Ct. at 1084). In this manner, the court must consider the "wantonness" element within the context of the situation in which the underlying force occurred. *Id.* What may amount to the "unreasonable and wanton infliction of pain" is determined by the constraints facing the state official. As the *Whitley* court stated:

Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Id.* at 321-322, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom.* *John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

The Supreme Court has recently re-affirmed use of the *Whitley* test in situations such as the one now before the court. *See* *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). In *Hudson,* the Court stated that "whenever prison officials stand accused of using excessive force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley:* whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*

***7** Applying the *Whitley/Hudson* test, the Second Circuit recently stated:

To determine whether the defendants acted maliciously, a jury should consider the following factors: the extent of the plaintiff's injuries; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response. Id. (citing *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085). If an evaluation of these factors leads the jury to conclude that the defendants acted maliciously, wantonness has been established. And an Eighth Amendment violation has occurred. If, on the other hand, reflection upon these factors leads the jury to find that the defendants acted in a good-faith effort to maintain and restore discipline, no constitutional violation has occurred because the subjective component of the claim has not been satisfied.

*Romano v. Howarth,* 998 F.2d 101 (2d Cir.1993).

*Id.* at 151-52.

*1. Defendant Schoonmaker*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Convinced that defendant Schoonmaker delivered the first blow, the court must now consider whether, under the circumstances, that conduct amounted to a deprivation of plaintiff Parker's constitutional rights such that liability should be imposed under section 1983. When the facts of this case are analyzed in light of the *Romano* factors, the court is compelled to conclude that Schoonmaker's unprovoked attack on plaintiff, albeit brief, renders him liable under section 1983. Although plaintiff's injuries were not extensive, that does not militate against a finding of excessive force violative of the Eighth Amendment. *See Hudson,* 112 S.Ct. at 1000 (use of excessive physical force against an inmate may constitute cruel and unusual punishment even though the inmate does not suffer serious injury). In addition, crediting plaintiff's testimony that Schoonmaker struck him first, there is absolutely nothing in the record demonstrating that Schoonmaker needed to apply force when plaintiff, a 19 year old, 160 pound unarmed inmate, was in a corner virtually surrounded by three prison guards who together substantially outweighed him. Again, accepting plaintiff's version of events, as just explained, Schoonmaker could not reasonably perceive plaintiff as a threat to Schoonmaker's well being. Lastly, Schoonmaker made no effort to temper his response to plaintiff's supposed disrespect; after verbally attacking plaintiff, Schoonmaker just hauled off and struck him. Based on all of the foregoing, the court finds that the force applied by defendant Schoonmaker was not done "in a good faith effort to maintain or restore discipline[,]" but rather was done "maliciously and sadistically to cause harm." *See id.* at 999. Consequently, plaintiff has shown to the court's satisfaction that Dennis Schoonmaker violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishments.

*2. Defendant Longtin*

***8** The legal analysis set forth above, and particularly those factors enumerated in *Romano,* are not necessarily applicable with respect to the other two defendants however. More specifically, as to Sergeant Longtin, because the court does not credit plaintiff's testimony that he was attacked by any defendant other than Schoonmaker, obviously Longtin cannot be held liable on the same basis as Schoonmaker-as a direct participant in the attack. At the time of the incident, along with the other Sergeant on duty during that shift, by his own admission Sergeant Longtin was the second highest ranking prison official on duty then. (The highest ranking on duty official was a Lieutenant.) As such, Sergeant Longtin stands in a different position legally from that of the other two defendants. And because of that status, the fact that Longtin himself did not actually strike the plaintiff, does not necessarily extricate him from a finding of liability under § 1983.

A defendant's liability for a constitutional deprivation under 42 U.S.C. § 1983 may arise in several different ways, as the Second Circuit has recognized.

The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

*Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991) (quoting *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (citations omitted)); *see also Van Pelt v. Finn,* No. 92 Civ. 2977, 1993 U.S.Dist. LEXIS 15951, at * 19 (S.D.N.Y. filed Nov. 12, 1993) (same); and *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (quoting *Duchesne v. Sugarman,* 566 F.2d 817, 830 (2d Cir.1977)) ("Supervisory officials cannot be held liable under § 1983 solely for the acts of others; 'there must be some showing of personal responsibility.' "). In the present case there is simply no proof that Longtin participated in striking plaintiff; that he created a policy or custom under which this attack was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

allowed to take place; or that he allowed a policy or custom of unprovoked attacks on inmates to continue. Thus, of the types of personal involvement just described, the only category into which Sergeant Longtin could possibly be placed would be as a supervisor who was grossly negligent in managing a subordinate-C.O. Schoonmaker.

Sergeant Longtin cannot be found liable on that basis, however, because this was a single incident which happened in a matter of seconds. Therefore, even though he was acting in a supervisory capacity at the time plaintiff's constitutional rights were violated, Sergeant Longtin still cannot be held liable because he is no different than any other non-supervisory prison official who does not act because there is no reasonable opportunity to intercede. As defense counsel correctly pointed out, this case is no different than *O'Neill v. Krzeminiski,* 839 F.2d 8 (2d Cir.1988), where the Court held that there was "insufficient evidence to permit a jury reasonably to conclude that [an officer's] failure to intercede was a proximate cause of the beating [,]" where "the three blows were struck in such rapid succession that [the officer] had no realistic opportunity to a prevent them." *Id.* at 11. Just as in *O'Neill,* the blows by Schoonmaker were over and done with so quickly here that Sergeant Longtin "had no realistic opportunity to attempt to prevent them." *Id. see also* *Gaudreault v. Municipality of Salem, Mass.,* 923 F.2d 203, 207 n. 3 (1st Cir.1990), *cert. denied,* 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 1991) (no "realistic opportunity" for a police officer to prevent an attack in a police station booking room where it was over in a matter of seconds). Thus, while generally a corrections officer such as Longtin bears "an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers [,]" Sergeant Longtin was excused from that duty because there was no "realistic opportunity" to prevent this attack which was over in a matter of seconds. *See id.*

*3. Defendant Benevento*

***9** Similarly, there is no basis for finding liability under section 1983 as against C.O. Benevento. Not only was C.O. Benevento not in a supervisory position at the time of the incident, but just like Sergeant Longtin, he too did not have a reasonable opportunity to intercede. Therefore the legal analysis set forth above with respect to Sergeant Longtin applies with equal force to C.O. Benevento. Thus there is no basis for a finding that defendant Benevento violated plaintiff's rights under the Eighth Amendment.

*B. Fourteenth Amendment-Due Process*

Given the complete lack of proof at trial on any due process claim other than one based upon Schoonmaker's unprovoked attacked on plaintiff Parker,[FN17] the court assumes that plaintiff has abandoned all other aspects of this claim. In other words, the court finds that defendant Schoonmaker is also liable under § 1983 for violating plaintiff's due process rights when Schoonmaker struck plaintiff in the head, but the other two defendants are not liable in any way for violating plaintiff's due process rights.

*C. Pendent State Law Claims*

Before turning to a consideration of plaintiff's pendent state law claims, the court notes that although this case has been pending for nearly nine years, it was not until defendants' opening statement at trial that a statute of limitations defense was raised. Having failed to assert that affirmative defense in their answer, however, the defendants are deemed to have waived it. *See* *Litton Indus. v. Lehman Bros. Kuhn Loeb Inc.,* 967 F.2d 742, 752 (2d Cir.1992). In light of that waiver, the court need not address the defendants' untimely statute of limitations argument.

During their opening statement, defendants raised a

second procedural point with respect to plaintiff's pendent claims and that is that those claims are barred by § 24 of the New York State Corrections Law. That statute expressly states, in relevant part:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department [of corrections], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y.Correc.Law §§ 24(1) and 24(2) (McKinney 1987) (emphasis added). Relying upon that statute, defendants argue that because a state court would lack jurisdiction thereunder to decide plaintiff's pendent state claims, then so too would this court lack jurisdiction over those claims.[FN18] Case law construing section 24 is not plentiful. The few federal cases discussing that statute do make clear, though, that "a New York State inmate is foreclosed in New York State court- ...-from a private damage action against prison employees in their personal capacity for damages arising out of acts or failures to act taken within the scope of employment and in the discharge of duty." *Selby v. Ribeiro,* No. 78 Civ. 1281-CSH, slip op. at 3 (S.D.N.Y. Jan. 9, 1980) (citing *Ray v. Fritz,* 468 F.2d 586, 587 n. 2 (2d Cir.1972)) (emphasis added); *see also Boyd, supra,* slip op. at *13-*14; and *Brown v. Coughlin,* 758 F.Supp. 876, 886 (S.D.N.Y.1991). Thus, the court agrees that § 24 bars plaintiff's pendent tort claims.[FN19]

*D. Damages*

***10** Having determined that defendant Schoonmaker is liable to plaintiff for violating his Eighth and Fourteenth Amendment rights, the only remaining question for the court is the amount of damages to be awarded. In that regard, the court notes its disagreement with defendants that plaintiff Parker should only be entitled to recover nominal damages. An award of nominal damages is proper "[a]bsent a showing of causation and actual injury." *Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993) (emphasis added) (citing, *inter alia, Carey v. Piphus,* 435 U.S. 247, 263, 266-67, 98 S.Ct. 1042, 1052, 1054, 55 L.Ed.2d 252 (1978)). As fully set forth herein, the plaintiff has made the requisite showing of causation and actual injury, at least with respect to the injury he sustained to his head. Thus, something more than a nominal damage award is mandated here.

After reviewing the medical records, listening to all of the testimony, and having an opportunity to observe the permanent scar near plaintiff's right eyebrow, which although not disfiguring, does remain visible today-some nine years later, the court is convinced that plaintiff is entitled to damages totalling $2,500.00. An award of that amount will, in the court's opinion, adequately compensate plaintiff for the actual injury he sustained, as well as for his pain and suffering.

An award of punitive damages is not, however, justified on the present record. In *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the Supreme Court set forth the standard for assessing punitive damages in § 1983 actions. The Court held that punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* at 56, 103 S.Ct. at 1640. The *Smith* Court further "observed that though entitlement to compensatory damages is automatic upon a finding that the plaintiff's rights have been violated, an award of punitive damages is discretionary, reflecting a 'moral

judgment,' and that the threshold of proof need not be different." *Vasbinder v. Ambach,* 926 F.2d 1333, 1342 (2d Cir.1991) (quoting *Smith,* 461 U.S. at 52, 52-55, 103 S.Ct. at 1638, 1638-40). The Supreme Court has also explained that the purpose of punitive damages "is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Community School District v. Stachura,* 477 U.S. 299, 306 n. 9, 106 S.Ct. 2537, 2542 n. 9, 91 L.Ed.2d 249 (1986); *see also In re Air Disaster at Lockerbie, Scotland,* 928 F.2d 1267, 1272 (2d Cir.), *cert. denied,* 502 U.S. 920, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991) (reviewing history of punitive damages).

Keeping these general principles in mind, the court cannot find that punitive damages are warranted based upon the record before it. There is simply nothing in the record showing that defendant Schoonmaker acted recklessly or with "callous indifference" to plaintiff Parker's rights. Although defendant Schoonmaker violated plaintiff's constitutional rights, in the court's view his conduct was not sufficiently egregious to justify an award of punitive damages.

*E. Attorney's Fees*

***11** In light of the foregoing, plaintiff's counsel has thirty (30) days from the date of entry of this memorandum-decision and order in which to file his application for attorney's fees. Counsel is reminded that such application must be submitted in a form consistent with the requirements for the same in this Circuit. Defendant Schoonmaker will then have fifteen (15) days in which to file any objections thereto. If no objections are filed by the end of that time, the court will award attorney's fees in the full amount sought by plaintiff's counsel. Having said all this, the court strongly urges both counsel to resolve the attorney's fees matter without further court intervention. If that is not possible, however, the above time frame applies.

*III. CONCLUSION*

For the violation of his Eighth and Fourteenth Amendment rights, plaintiff Maurice Parker is awarded compensatory damages of $2,500.00 against defendant Dennis Schoonmaker. Plaintiff Parker is also entitled to a declaratory judgment that defendant Dennis Schoonmaker violated his Eighth and Fourteenth Amendment as fully explained herein. Plaintiff Parker is not, however, entitled to recover on any other aspect of this action.

Accordingly, the Clerk of the Court is directed to enter judgment on behalf of the plaintiff in the total amount of $2,500.00 as against defendant Dennis Schoonmaker. The Clerk of the Court is further directed to enter judgment dismissing the plaintiff's claims as against defendants Ernest Benevento and James Longtin, and dismissing plaintiff's state law claims as against all defendants.

IT IS SO ORDERED.

FN1. Although plaintiff initially proceeded *pro se,* by order dated July 19, 1989 Magistrate Judge Gustave DiBianco appointed attorney David Damico to represent the plaintiff. Docket Entry # 24. When Mr. Damico asked to be relieved as counsel because it was a hardship for him to travel to the prison where plaintiff was incarcerated, the Magistrate Judge granted that request. Docket Entry # 26. He then appointed attorney James Kerrigan to represent plaintiff on a *pro bono* basis. Docket Entry # 27. The court acknowledges its gratitude to Mr. Kerrigan's for his willingness to accept this *pro bono* assignment.

FN2. As does the Eighth Amendment of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

United States Constitution, section 5 of the New York State Constitution contains a prohibition against "cruel and unusual punishments," and presumably it is that provision upon which plaintiff is relying, although the same is not specified in his complaint. *See* N.Y. Const. art. I, § 5 (McKinney 1982). Section 6 of the State Constitution is likewise similar to the Fourteenth Amendment of the United States Constitution in that in contains, *inter alia,* a due process clause. *See* N.Y. Const. art. I, § 6 (McKinney 1982). And once again, although not indicated in his complaint, it is apparently that provision of section 6 upon which plaintiff relies in this action.

FN3. Although not identified in his complaint, plaintiff is apparently relying upon the first part of this statute, which states:

> No inmate in the care or custody of the department [of corrections] shall be subjected to degrading treatment, and no officer or other employee of the department shall inflict any blows whatever upon any inmate, unless in self defense, or to suppress a revolt or insurrection.

> N.Y.Correct. § 137(5) (McKinney 1987). This statute is not as one-sided as a reading of the just quoted passage might suggest. Section 137(5) goes on to provide:

> When any inmate, or group of inmates, shall offer violence to any person, or do or attempt to do any injury to property, or attempt to escape, or resist or disobey any lawful direction, the officers and employees shall use all suitable means to defend themselves, to maintain order, to enforce observation of discipline, to secure the persons of the offenders and to prevent any such attempt or escape.

> *Id.*

FN4. Section 250.2(g) of the New York Code of Rules and Regulations plainly states: "Corporal punishment is absolutely forbidden for any purpose and under all circumstances." 7 N.Y.C.R.R. § 250.2(g). Section 251-1.2 of the Code, contained in the section entitled "Initial Actions in Cases of Inmate Misbehavior," basically describes the circumstances under which it may be appropriate for physical force to be used in connection with an inmate who has misbehaved.

FN5. Just prior to trial, plaintiff moved to voluntarily discontinue this action as against Superintendent Fogg, and the court granted that motion. Docket Entry # 41.

FN6. The court observes that the complaint is silent as to which capacity-individual or official-the defendants are being sued. This is not an uncommon deficiency in a case such as this. *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 252 (2d Cir.1991) (quoting *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985) (quoting in turn *Brandon v. Holt,* 469 U.S. 464, 469, 105 S.Ct. 873, 876, 88 L.Ed.2d 878 (1985)) (" 'In many cases,' a complaint against public officials 'will not clearly specify whether officials are sued personally, in their official capacity, or both,' and only" [t]he course of proceedings' ... will

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

indicate the nature of the liability imposed.' "). Furthermore, in part because the defendants never filed any motions in this case, the issue of the capacity in which the defendants are being sued was never fully explored. The court will assume, however, that plaintiff Parker is suing the defendants in both their individual and official capacities.

It is true that in their answer defendants asserted a qualified immunity defense, which applies, if at all, only insofar as they are being sued in their personal or individual capacities. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529-530 (2d Cir.1993). Presumably if defendants believed that they were also being sued in their official capacity, they would have included an Eleventh Amendment immunity defense in their answer. *See id.* at 529 (citations omitted) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."). Nonetheless, given the following comment by the Second Circuit, except as explained below, the court will not presume, as defendants seemingly did, that they are being sued only in their personal capacities.

[A] plaintiff who has not clearly identified in her complaint the capacity in which the defendant is sued should not have the complaint automatically construed as focusing on one capacity to the exclusion of the other. By the same token, a party who is unclear in argument as to the capacity in which the defendant can be pursued should not lightly be deemed to have withdrawn a claim that was expressly stated. When the party's defense of her stated claim bespeaks a doctrinal confusion, the court should not presume that there has been abandonment but should instead give her the opportunity either to abandon the claim or to pursue it with a corrected understanding as to what proof will be required to establish it.

*Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.1993).

Having given plaintiff some leeway on this pleading issue, consistent with the relevant case law, the court will not read plaintiff's complaint as asserting a claim for monetary damages against the defendants in their official capacities, however, because such claim obviously would be barred by the Eleventh Amendment. *Gan,* 996 F.2d at 529. Thus, the court will construe plaintiff's complaint as seeking monetary damages against defendants in their personal or individual capacities only. The court will construe the complaint as seeking declaratory relief against defendants in both their personal and official capacities, however. (It is undisputed that a claim for declaratory relief is not barred by the Eleventh Amendment. *See Berman Enterprises, Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.1993)).

FN7. Keeplock is a means of administrative confinement. As plaintiff explains it, an inmate is keeplocked in his cell because of certain misbehavior. While keeplocked, an inmate must spend nearly the entire day in the cell, including taking meals there.

FN8. Sergeant Longtin testified that at 10:00 p.m. all the inmates are locked in their cells for

the night and a head count is taken.

FN9. Plaintiff testified that he received six sutures, and the medical records are ambiguous. The one entry pertaining to the number of sutures appears to read four, but it is followed by and entry which is illegible. Defendants' exh. H at 5. This discrepancy, if it even exists, in the court's view, is inconsequential.

FN10. The court takes umbrage at the suggestion by plaintiff that the original photographs were "hidden away in the court's files for years [,]" implying an element of deceit on the part of the court or defense counsel. First of all, those photographs were provided by Prisoner's Legal Services of New York, which was at least nominally representing plaintiff at the time. *See* Docket Entry # 46 (Court Exhibit # 1). Second, the court file in this action is a matter of public record. Therefore, at any time prior to the trial plaintiff's counsel was free to review it. Indeed, the court would be surprised to learn if that was not done shortly after the appointment of plaintiff's current counsel. Thus, any suggestion that either the court or defense counsel were secreting these photographs is patently absurd.

FN11. In defendants' post-trial submission, they suggest that the plaintiff's testimony is inherently suspect because, among other reasons, he is a party to this action. While that may be true, obviously the same can also be said of the defendants, and thus the court is not willing to discredit the testimony of any witness here simply because he is a party to this action.

As an additional basis for challenging plaintiff's testimony, defendants assert that he should be disbelieved simply because he is a convicted felon. The court declines to accept that view. Automatically discounting the testimony of a plaintiff-inmate would mean that he or she would never prevail in a case such as this. Certainly the Supreme Court did not intend such a harsh result when it stated, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84. 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). An obvious and dangerous ramification of the view suggested by defendants is that plaintiff-inmates would be deprived of all their constitutional rights solely by virtue of their status as inmates. Such a cynical view flies in the face of the Supreme Court's clear pronouncement in *Turner.*

FN12. The testimony conflicts on this point.

FN13. Letter of David B. Roberts to Court (Jan. 24, 1994) at 1.

FN14. *Id.* at 3.

FN15. *See* Report of the Federal Courts Study Committee-Part II, April 2, 1990 at 49; *see also* N.Y.Correc.Law § 137, Practice Commentary thereto at 137 ("Claims that unnecessary force was used against inmates by corrections officers have formed the basis for numerous lawsuits alleging a violation of the 8th Amendment."). In this District alone, inmate instituted cases, with the vast majority being brought under 42 U.S.C. § 1983, represented 34.3% of the total civil caseload for 1993. *See* Northern District of New

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

York, 1993 Annual Report, *Pro Se* Staff Attorney's Office.

FN16. *See, e.g., Candelaria v. Coughlin,* 787 F.Supp. 368, 374 (S.D.N.Y.), *aff'd without published opinion,* 979 F.2d 845 (2d Cir.1992); *Gabai v. Jacoby,* 800 F.Supp. 1149, 1154-55 (S.D.N.Y.1992) (Grubin, Mag. J.), *Report-Recommendation Adopted in its Entirety,* No. 91 Civ. 2605 (S.D.N.Y. Sept. 9, 1992).

FN17. Besides forming the basis for an Eighth Amendment violation, an unprovoked attack such as the one which occurred in this case may also be the basis for a violation of an inmate's due process rights. *See Wilson v. White,* 656 F.Supp. 877, 879 (S.D.N.Y.1987) ("An attack on a prison inmate ... which is not part of an attempt to maintain or restore discipline violates the inmate's due process right to be free from unprovoked attack."); and *Vargas v. Correa,* 416 F.Supp. 266, 268-69 (S.D.N.Y.1976) (court held that an unprovoked assault upon an inmate constituted a violation of his due process rights).

FN18. Defendants also failed to raise this defense in their answer. Nevertheless, defendants are not deemed to have waived it because, as Fed.R.Civ.P. 12(h)(3) plainly states, "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3) (emphasis added); *see also Tongkook America, Inc. v. Shipton Sportswear Company,* 14 F.3d 781, 783 (2d Cir. Jan. 26, 1994) (citations omitted) ("The fact that [defendant] did not raise the defense of lack of subject-matter jurisdiction in its answer is not determinative, since subject-matter jurisdiction cannot be waived and the issue can be raised at any time in the course of the litigation.").

FN19. One thing is clear from the complaint and that is that plaintiff is seeking only monetary damages with respect to the pendent tort claims. His claim for declaratory relief is, as mentioned earlier, limited to the claims arising out of the alleged constitutional deprivations. *See supra* at 3.

N.D.N.Y.,1994.

Parker v. Fogg

Not Reported in F.Supp., 1994 WL 49696 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.







H

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

David STEPHENSON, Plaintiff,

v.

ALBANY COUNTY POLICYMAKERS, et al., Defendants.

Civ. No. 6:09-CV-326 (LEK/RFT).

Aug. 14, 2009.

David Stephenson, Marcy, NY, pro se.

***REPORT-RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

***1** The Clerk has sent to the Court a civil rights Complaint (Dkt. No. 1), Motion to Proceed *In Forma Pauperis* (IFP) (Dkt. No. 2), Motion for Joinder of Claims (Dkt. No. 3), and a Motion to Appoint Counsel and Conduct Discovery (Dkt. No. 6), filed by *pro se* Plaintiff David Stephenson, who is currently incarcerated at Marcy Correctional Facility.[FN1] In his *pro se* Complaint, Stephenson alleges civil rights violations based upon, *inter alia,* malicious prosecution, abuse of process, conspiracy, fraud, invasion of privacy, and attorney malpractice. For a more complete statement of Plaintiff's claims, reference is made to the Complaint.

FN1. In 2006, Stephenson filed a civil rights action in this Court, pursuant to 42 U.S.C. § 1983, *Stephenson v. Herrick,* Civ. No. 1:06-CV-1466 (GLS/DRH), which was dismissed by the Court, *sua sponte,* for failure to state a claim upon which relief could be granted. Stephenson's Petition for a Writ of *Habeas Corpus,* pursuant to 28 U.S.C. § 2254, is also pending in this Court, *Stephenson v. Superintendent,* Civ. No. 9:08-CV-1243 (LEK/RFT).

## I. DISCUSSION

### A. Application to Proceed *In Forma Pauperis*

Plaintiff has submitted an *In Forma Pauperis* Application. The Prison Litigation Reform Act (PLRA), codified in part at 28 U.S .C. § 1915(b), provides that an inmate who seeks *in forma pauperis* status is required to pay over a period of time the full amount of the filing fee provided for in 28 U.S.C. § 1914(a), which is currently $350.00 for most civil actions. After reviewing Plaintiff's Application, we find that he may properly proceed *in forma pauperis.*

### B. Allegations Contained in the Complaint

Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed *in forma pauperis,* "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Thus, it is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed further with his action.

Moreover, under 28 U.S.C. § 1915A, a court must, as soon as practicable, *sua sponte* review "a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employees of a governmental agency" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. §§ 1915A(a) & (b); *see also* *Carr v. Dvorin,* 171 F.3d 115, 116 (2d Cir.1999) (*per curiam* ).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which "establishes a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.,* 885 F.Supp. 537, 573 (S.D.N.Y.1995) (quoting *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990) & 42 U.S.C. § 1983)); *see also* *Myers v. Wollowitz,* 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that " § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). In this action, Plaintiff seeks to hold Defendants liable for various alleged constitutional violations, including, but not limited to:

***2** • conspiracy claims against all Defendants;

• claims for malicious prosecution and abuse of process against Defendants Mark Haskins, New York State Bureau of Narcotics, P. David Soares, Albany County District Attorney, and Christopher Baynes, Albany County Assistant District Attorney;

• claims of "undue influence and fraud" against Defendants Haskins, Albany County Task Force, and Albany County Prosecutors;

• claims of "common law fraud" and attorney malpractice against Defendant F. Stanton Ackerman, his court appointed attorney;

• invasion of privacy claims against Defendants Haskins, Andrew Zostant, Town of Colonie Police Detective, Steven Heider, Town of Colonie Police Superintendent, and other members of the Albany County Task Force for interfering with Plaintiff's expectation of privacy and private communications without probable cause; and

• what appears to be a *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691 (1978), claim against Albany County for various policies and customs.

*See generally* Compl.

The initial impediment to Plaintiff's pursuit of this action is aptly summarized in Plaintiff's Complaint: "The Plaintiff has a pending Federal Habeas Corpus Petition in the Northern District of New York Federal Court, Case No. 9:08-CV-1243. **This 1983 action and complaint is intended to supplement that Petition, as these claims for money damages are relevant to the same set of**

**facts."** Compl. at ¶ 17 (emphasis added). Indeed, as Plaintiff overtly admits, this entire § 1983 action (including state claims for malpractice and fraud) relates to events leading up to and including his guilty plea and sentence in Albany County Court in 2006.[FN2] The Supreme Court has held that

FN2. A similar *fait accompli* vanquished Stephenson's prior attempt to sue various individuals in this Court, *Stephenson v. Herrick, et al.,* Civ. No. 1:06-CV-1466 (GLS/DRH). Upon information and belief, the core events giving rise to Stephenson's prior § 1983 action are the same events giving rise to the current action. That prior civil rights action was dismissed in light of *Heck v. Humphrey,* 512 U.S. 477 (1994). *See Stephenson v. Herrick, et al.,* Civ. No. 1:06-CV-1466, Dkt. No. 9, Decision and Order, dated Mar. 8, 2007.

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994).

Plaintiff's claims in this action are barred because he has failed to show that his conviction or sentence has been overturned. *See Duamutef v. Morris,* 956 F.Supp. 1112, 1115-18 (S.D.N.Y.1997) (dismissing § 1983 claims of malicious prosecution, false arrest, perjury, retaliation, and civil rights conspiracy under *Heck* where the plaintiff's underlying conviction had not been overturned). Because all of Plaintiff's claims relate to events that gave rise to Plaintiff's conviction and the sentence he is currently serving, many of which are currently interposed in his pending *Habeas Corpus* Petition, [FN3] this action is barred under *Heck* and we recommend dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) and (ii) as it lacks an arguable basis in law. We note that this recommendation is limited to all § 1983 claims asserted by Plaintiff. Plaintiff has also inserted some state law claims sounding in fraud and attorney malpractice. It is not clear whether Plaintiff intended to assert these claims in support of his § 1983 claims, or if he intended them to stand on their own, thereby invoking the Court's pendent jurisdiction to entertain state law claims. To the extent they are part and parcel of the § 1983 claims, then they too suffer the same infirmity and are barred by *Heck.* To the extent, however, that they are purely state law claims, in light of this Court's recommendation of dismissal of the federal claims, we would recommend the Court not exercise pendent jurisdiction of such state law claims, pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline to exercise supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed. 28 U.S.C. § 1367(c)(3).

FN3. Stephenson raises the following grounds, *inter alia,* in support of his *Habeas* Petition:

> 1) he was denied equal protection and due process in state court when he was denied, *inter alia,* a grand jury and was subjected to an insufficient accusatory process and was victim of an illegal search and seizure;

> 2) he was a victim of selective prosecution and "Mode of Proceedings error"; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

3) his guilty plea was unknowing and unintelligent due to ineffective assistance of counsel.

*Stephenson v. Superintendent,* Civ. No. 9:08-CV-1243 (LEK/RFT), Dkt. No. 1, Pet.

**C. Other Pending Motions**

***3** Presently pending in this matter are Plaintiff's Motions for Joinder of Claims, Appointment of Counsel, and to Conduct Discovery. In light of the Court's recommendation of full dismissal, we find it unnecessary at this juncture to adjudicate such claims. Should the District Judge assigned to this matter accept this recommendation, such Motions would be automatically terminated upon the closing of this case. If, however, the recommendation is not accepted, the Clerk shall forward this file to the undersigned for consideration of these Motions.

**WHEREFORE,** it is hereby

**ORDERED,** that Plaintiff's *In Forma Pauperis* Application (Dkt. No. 2) is **granted;** and it is further

**RECOMMENDED,** that pursuant to the Court's review under 28 U.S .C. § 1915 and § 1915A, Plaintiff's entire Complaint be should be **dismissed** as barred by *Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994), and the Court should decline to exercise pendent jurisdiction over any purported state claims pursuant to 28 U.S.C. § 1367(c)(3); and it is further

**ORDERED,** that in the event the District Court does not adopt the above recommendation, the entire file be returned to the undersigned for consideration of Plaintiff's other Motions (Dkt. Nos. 3 & 6); and it is further

**ORDERED,** that the Clerk serve a copy of this Report-Recommendation and Order on Plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

***DECISION AND ORDER***

LAWRENCE E. KAHN, District Judge.

This matter comes before the Court following a Report-Recommendation filed on August 14, 2009 by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 7). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff David Stephenson, which were filed on August 24, 2009. Objections (Dkt. No. 8).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings

or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

***4** Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 7) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that pursuant to the Court's review under 28 U.S.C. § 1915 and § 1915A, Plaintiff's entire Complaint is **DISMISSED WITHOUT PREJUDICE,** pending the outcome of Plaintiff's pending habeas petition; and accordingly all other pending Motions in this case (Dkt. Nos. 3 and 6) should be **DENIED** and **DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2009.

Stephenson v. Albany County Policymakers

Slip Copy, 2009 WL 2922805 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.