IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DARREN WILLIAMS,

                              Plaintiff,            Civil Action No.
                                                  9:09-CV-1258  (NAM/DEP)

        v.

DONNA PEPIN, Nurse; KENNETH SCHWENKE,
Corrections Sergeant; LARRY DEUYOUR,
Corrections Officer; and STEPHEN TRAVERS,
Corrections Officer, and MR. PHELIX, Corrections
Captain,

                              Defendants.

_____

APPEARANCES:                      OF COUNSEL:

FOR PLAINTIFF:

DARREN WILLIAMS, *Pro Se*
04-A-5841
Marcy Correctional Facility
P.O. Box 3600
Marcy, NY 13403

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN      ROGER W. KINSEY, ESQ.
New York State Attorney General     Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Darren Williams, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights.  Plaintiff's claims, which are centered upon events that occurred in November of 2006 in the prison facility in which he was housed at that time, include alleged deliberate indifference to his medical condition, retaliation, assault, failure to protect, and deprivation of due process.

In response to an amended complaint recently filed by the plaintiff, following earlier motion practice, four of the five named defendants have interposed answers.  Captain Phelix, who is implicated only in connection with plaintiff's procedural due process claim, however, has moved seeking dismissal of that cause of action against him.  In support of his motion defendant Phelix argues that plaintiff's due process claims are foreclosed by an adverse decision in a state court proceeding in which the same due process claims now asserted were raised and decided against him.  For the reasons set forth below, I recommend defendant Phelix's motion be granted.

In addition to the motion brought by defendant Phelix, also pending before the court is an application by the plaintiff for the entry of summary

2

judgment in his favor on all claims.  Because the record discloses the

existence of genuine triable issues of material fact precluding a finding that

no reasonable factfinder could rule in defendants' favor on plaintiff's claims, I

recommend that his motion be denied.

I.      BACKGROUND

        Plaintiff is a prison inmate entrusted to the care and custody of the New

York State Department of Corrections and Community Supervision

("DOCCS").  *See generally* Second Amended Complaint (Dkt. No. 42).

Although previously designated to the Bare Hill Correctional Facility, on

November 3, 2006, after coughing up blood, plaintiff was transferred into a

Tuberculosis ("TB") isolation unit within the Franklin Correctional Facility

("Franklin"), located in Malone, New York.  *See id.*

        In his complaint plaintiff alleges that on or about November 10, 2006,

defendant Donna Pepin, a nurse at Franklin, permitted defendants Kenneth

Schwenke, a corrections sergeant, and corrections officers Larry Deuyour

and Stephen Travers, to enter his cell.  Second Amended Complaint (Dkt.

No. 42) at pp. 3-4.  After the officers gained entry into plaintiff's cell, an

altercation ensued.  *Id.*  As a result of the incident plaintiff was transferred

back to Bare Hill where he was served with a misbehavior report on

3

November 13, 2006 accusing him of violating various prison rules, including by engaging in violent conduct, creating a disturbance, assaulting staff, and refusing to obey a direct order.  *Id.*

A Tier III disciplinary hearing was subsequently held on November 15, 2006 to address those charges, with Corrections Captain Phelix serving as the hearing officer.[1,2]  *Id.*; *see also* Second Amended Complaint (Dkt. No. 42) Exh. D at pp. 49-112.  At the close of the hearing, Williams was found guilty on all counts and was sentenced to a period of thirty-six months of disciplinary special housing unit ("SHU") confinement, with a corresponding loss of packages, commissary, and telephone privileges, and a recommended loss of thirty-six months of good time credits.[3,4]  *Id.,* Exh. D at

---

[1]    The DOCCS conducts three types of inmate disciplinary hearings.  *See* 7 N.Y.C.R.R. § 270.3.  Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the Special Housing Unit ("SHU").  Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

[2]    The moving defendant is identified in the transcript of the November 15, 2006 hearing as Captain Felix.  *See* Amended Complaint (Dkt. No. 42) Exh. D.

[3]    A separate misbehavior report was issued by defendant Pepin on November 9, 2006 charging Williams with creating a disturbance, failing to follow a direct order, interference with staff, and harassment.  *See* Second Amended Complaint (Dkt. No. 42) Exh. C.  While this is not entirely clear, it appears that this second misbehavior report was also addressed in the November 15, 2006 hearing, resulting in a finding of guilt and a

(continued...)

p. 111.

In April 2007, plaintiff commenced a proceeding under New York Civil

Practice Law and Rules ("CPLR") Article 78 requesting annulment of the

hearing officer's disciplinary determination and a corresponding

expungement of references to the matter from his prison records.[5]  *See*

Defendants' Motion (Dkt. No. 44) Exh. A.  The Article 78 proceeding was

transferred to the New York State Supreme Court, Appellate Division, Third

---

[3](...continued)
ninety day period of SHU confinement, to be served consecutively to the thirty-sixth month (later reduced to eighteen month) sentence.   Second Amended Complaint (Dkt. No. 42) ¶ 8.

[4]      According to an earlier amended complaint, which may properly be considered in connection with defendants' dismissal motion, *see Harris v. City of New York*, 186 F.3d 243,249 (2d Cir. 1999), *Hale v. Rao*, No. 9:08-CV-1612, 2009 WL 3698420, at *3 n.8 (N.D.N.Y. Nov. 3, 2009) (Hurd, D.J. and Lowe, M.J.) ("[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint.), plaintiff's thirty-six month SHU sentence was later reduced to eighteen months as a result of an internal administrative appeal of the hearing officer's determination.  *See* Amended Complaint (Dkt. No. 26) at p. 3.

[5]      Although matters outside of the four corners of a plaintiff's complaint, with attachments, ordinarily may not be considered in ruling upon a dismissal motion, the judicial documents and official court records associated with plaintiff's Article 78 proceeding, as publically available documents, are properly considered by the court and entitled to judicial notice in connection with this proceeding. *See* Federal Rules of Evidence 201 and 1005; *see also, Wilson v. Limited Brands, Inc.,* 08 CV 3431, 2009 WL 1069165 at *1 n. 1 (S.D.N.Y. April 17, 2009).   Moreover, it is well established that a district court may rely on matters of public record in deciding whether to dismiss a complaint.  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998)(citations omitted); *see also Anderson v. Coughlin*, 700 F.2d 37, 44 n. 5 (2d Cir. 1983).

Department, which on April 24, 2008 issued a decision dismissing the

petition.  *See Williams v. Selsky,* 58 A.D.3d 1426, 856 N.Y.S.2d 698 (3d

Dep't 2008).  Permission to appeal that determination was denied by the New

York Court of Appeals on September 2, 2008.  *Williams v. Selsky,* 11 N.Y.3d

703, 864 N.Y.S.2d 391 (2008) (Table).

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on November 10, 2009.  Dkt. No. 1.

Though as originally stated plaintiff's claims were considerably more

expansive, following the filing of an earlier dismissal motion, my issuance on

February 9, 2011 of a report and recommendation regarding that motion, Dkt.

No. 7, and the entry of a memorandum decision from Chief District Judge

Norman A. Mordue adopting that report and recommendation on March 8,

2011 (Dkt. No. 39), plaintiff filed a second amended complaint on March 11,

2011, significantly narrowing the issues raised in the action.  Dkt. No. 42.

Named as defendants in plaintiff's second amended complaint are Nurse

Donna Pepin; Corrections Sergeant Kenneth Schwenke; Corrections Officers

Larry Deuyour and Steven Travers; and Corrections Captain Mr. Phelix.  *Id.*

Plaintiff's complaint contains seven causes of action, the last two of which

assert procedural due process claims against defendant Phelix.  *Id.*

On March 22, 2011, defendant Phelix moved seeking dismissal of plaintiff's claims against him.  Dkt. No. 44.  In support of that motion defendant Phelix argues that the issues now raised were presented to and rejected by the New York courts in the context of plaintiff's CPLR Article 78 proceeding, and the determination of the state courts effectively precludes relitigation of those issues in this proceeding.  *Id.*  Plaintiff has since submitted papers in opposition to defendant Phelix's motion.  Dkt. No. 47.

On November 15, 2011, plaintiff moved seeking the entry of summary judgment in his favor on all of the claims set forth in his complaint, as amended.[6]  Dkt. No. 65.  Defendants have since responded in opposition to plaintiff's motion, arguing that the record discloses the existence of triable issues of fact that must be resolved before his substantive claims can be adjudicated.  Dkt. No. 66.

Both of the pending motions are now fully briefed and ripe for determination, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

---

[6]      An earlier summary judgment motion, filed by plaintiff on October 31, 2011, was subsequently withdrawn based upon the fact that it did not include a statement of material facts not in issue as required by Northern District of New York Local Rule 7.1(a)(3) and was therefore defective.  *See* Dkt. Nos. 62, 67.

III.    DISCUSSION

    A.    Standards of Review

        1.    Dismissal Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 129, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S. Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its

8

face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party.  *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.).  However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  *Iqbal*, 129 S. Ct. at 1949.  In the wake of *Twombly* and *Iqbal*, the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'" *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d 435,

441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action.  *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord*, 320 F.3d 346, 350 (2d Cir. 2003) (citation omitted); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.).  In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated.  *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires").

  2. <u>Summary Judgment Standard</u>

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is
warranted when "the pleadings, the discovery and disclosure materials on
file, and any affidavits show that there is no genuine issue as to any material
fact and that the movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.
2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106
S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion
Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for
purposes of this inquiry, if it "might affect the outcome of the suit under the
governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also
Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing
*Anderson*).  A material fact is genuinely in dispute "if the evidence is such
that a reasonable jury could return a verdict for the nonmoving party."
*Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of
demonstrating that there is no genuine dispute of material fact to be decided
with respect to any essential element of the claim in issue; the failure to meet
this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4,
106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial

burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the

verdict").

B.   <u>Sufficiency of Plaintiff's Due Process Claim</u>

Plaintiff's sixth cause of action alleges that he was deprived of a liberty

interest without due process.  Second Amended Complaint (Dkt. No. 42) ¶

15.  The majority of the verbiage comprising that cause of action is devoted

to describing the conditions which Williams has faced at the Upstate

Correctional Facility as a result of his SHU confinement and provides little

elaboration regarding the due process violation claimed.[7]  *Id.*  In the heading

of the sixth cause of action, however, plaintiff alleges that the hearing officer

was biased in the mode of conducting his hearing.  *Id.*  Plaintiff's seventh

cause of action alleges deprivation of his right to call witnesses and present

documentary evidence at his disciplinary hearing, specifically arguing that he

should have been permitted to call Nurse Administrator Montroy as a witness

to testify on his behalf.[8]  *Id.* at ¶ 16.  In his motion, defendant Phelix argues

that these claims are foreclosed based upon the state court's Article 78

---

[7]      Upstate is a maximum security prison comprised exclusively of SHU cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day.  *See Samuels v. Selsky*, No. 01 CIV. 8235, 2002 WL 31040370, at *4 n.11 (S.D.N.Y. Sept. 12, 2002).

[8]      Nurse Administrator Montroy was originally named as a defendant, but was dismissed from the action as a result of my earlier report and recommendation and the decision adopting my recommended findings and plaintiff's apparent decision not to include her in his second amended complaint despite being granted leave to replead.

13

determination.

Both the Full Faith and Credit Clause of the United States Constitution, *see* U.S. Const. art. IV, § 1, and the corresponding Full Faith and Credit statute, 28 U.S.C. § 1738, require that a federal court accord a state court judgment the same preclusive effect which it would merit under the law of the state from which it originated. *See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S. Ct. 892, 896 (1984); *Kremer Chem. Constr. Corp.*, 456 U.S. 461, 466, 102 S. Ct. 1883, 1889-90 (1982); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). This principle applies fully to claims brought pursuant to 42 U.S.C. § 1983. *Migra*, 465 U.S. at 84-85, 104 S. Ct. at 897-98; *Allen v. McCurry*, 449 U.S. 90, 103-04, 101 S. Ct. 411, 419-20 (1980); *Giakoumelos v. Coughlin*, 88 F.3d 56, 59 (2d Cir. 1996). Since the underlying state court determination at issue in this case originated in New York, the law of that state controls in determining the extent of the preclusive effect of which the Article 78 determination in response to Williams' petition is deserving.[9] *Giakoumelos*, 88 F.3d at 59; *see also Marvel*

---

[9]     While the law of New York, rather than federal principles, applies to determine the preclusive effect to be given to the state courts' determinations in response to plaintiff's Article 78 petition, this is a distinction without a difference since, as the Second Circuit has noted, "there is no discernable difference between federal and New York law concerning *res judicata* and collateral estoppel." *Marvel*, 310 F.3d at 286(citing (continued...)

14

*Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002); *LaFleur v. Whitman*, 300 F.3d 256, 271-72 (2d Cir. 2002).

       1.   <u>Claim Preclusion</u>

     As the Second Circuit explained in *Marvel*, claim preclusion, also known as *res judicata*, requires that a final judgment on the merits of an action be given preclusive effect, barring parties as well as those in privity with them from relitigating in a subsequent action a claim which was or could have been raised in the prior suit.  *Marvel*, 310 F.3d at 286-87; *see also Fay v. South Colonie Cent. Sch. Dist.*, 802 F.2d 21, 28 (2d Cir. 1986) (citing, *inter alia*, *Migra*), *overruled on other grounds, Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002).

     In this case it is clear, based upon well-established case authority, that the prior unfavorable Article 78 determination does not serve to foreclose the plaintiff from commencing this subsequent section 1983 civil rights action for damages, since such relief is unavailable in an Article 78 proceeding. *Davidson v. Capuano*, 792 F.2d 275, 278 (2d Cir. 1986); *Allen v. Coughlin*,

---

[9](...continued)
*Pike v. Freeman,* 266 F.3d 78, 90 n.14 (2d Cir. 2001)).

No. 92 Civ. 6137, 1995 WL 117718, at *3 (S.D.N.Y. Mar. 17, 1995).[10]

Accordingly, plaintiff's claims for damages in this section 1983 action are not

barred by *res judicata* based upon decision rendered in the prior Article 78

proceeding, even assuming that all of the requirements for claim preclusion

are otherwise met.

2.    Issue Preclusion

Issue preclusion, a more narrow doctrine often referred to as collateral

estoppel, bars a party that has had a full and fair opportunity to litigate an

issue of fact or law from relitigating the same issue once it has been decided

against that party or its privy.  *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir.

2007); *Marvel*, 310 F.3d at 288-89.  Under New York law, in order for issue

preclusion to apply two elements must be established; first, the issue must

both "actually and necessarily" have been decided in a prior proceeding, and

secondly, the party against whom the doctrine is being urged must have been

afforded a full and fair opportunity to litigate the issue in the first proceeding.

*McKithen*, 481 F.3d at 105; *see also Giakoumelos*, 88 F.3d at 59; *Colon v.*

*Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995).

From a review of plaintiff's petition and the Third Department's

---

[10]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

determination it is clear that the arguments now raised in support of his due

process challenge to the hearing officer's determination were in fact

presented in his Article 78 petition and rejected by the state court.  The third

cause of action set forth in plaintiff's Article 78 petition alleged that the

hearing officer was biased, thereby depriving him of procedural due process.

*See* Defendants' Motion (Dkt. No. 44) Exh. A at p. 16 of 195.  Williams' fourth

cause of action in that proceeding focused upon the denial by the hearing

officer of his request to call Nurse Administrator Montroy as a witness.  *Id.* at

pp. 19-23 of 195.  In addition, the petition was construed by the court to raise

the question of whether the hearing officer's findings were supported by

substantial evidence, and the Third Department concluded that it was.

*Williams v. Selsky*, 50 A.D.2d 1426, 1426-27, 856 N.Y.S. 2d 698 (3d Dep't

2008).  This finding clearly meets, if not surpasses, the modest hurdle of

demonstrating, for due process purposes, that defendant Phelix's disciplinary

determination was supported by some evidence.  *See Superintendent v. Hill*,

472 U.S. 445, 105 S. Ct. 2768 (1985).

The state court also concluded that plaintiff's claim of bias was "neither

substantiated in the record nor was there any indication that the termination

at hand flowed from any purported bias."  *Williams,* 58 A.D.3d at 1427, 856

17

N.Y.S.2d 698 (citations omitted).  Plaintiff's remaining contentions, including

specifically the claim that he was denied the right to present witness

testimony, were addressed and rejected by the state court.  *Id.*  These

findings are entitled to preclusive effect and effectively foreclose plaintiff's

due process arguments now raised in this proceeding.  Accordingly, I

recommend dismissal of plaintiff's sixth and seventh causes of action, and

that all claims against Captain Phelix be dismissed.

     C.    <u>Plaintiff's Motion for Summary Judgment</u>

In his motion plaintiff seeks the entry of summary judgment in his favor

on all claims, asserting that no reasonable factfinder could conclude that his

constitutional rights to be free from the excessive use of force, unlawful

retaliation, and deprivation of due process were not violated.  Defendants

maintain that plaintiff's motion should be denied based upon his failure to

establish the lack of any genuinely disputed issue of material fact requiring

trial before his claims can be adjudicated.

Among the materials submitted by the plaintiff in support of his motion

is an affidavit given by Williams.  Dkt. No. 65-2.  That affidavit does not

outline his version of the facts.  However, those facts are detailed in plaintiff's

second amended complaint which, because it is sworn under penalty of

18

perjury, is entitled to consideration as the equivalent of an affidavit for purposes of plaintiff's motion for summary judgment.  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *Anderson v. Kooi*, No. 9:07-CV-1257, 2011 WL 1315721, at *6 (N.D.N.Y. Jan. 24, 2011) (citations omitted) (Lowe, M.J.), *report and recommendation adopted*, 2011 WL 1256942 (N.D.N.Y. Apr 01, 2011) (Hurd, J.).

Defendants' motion opposition is likewise not supported by affidavits including, notably, from the individual defendants denying plaintiff's allegations.  Such affidavits, if given, would potentially serve to crystalize any issues of fact associated with plaintiff's motion, particularly if they were to contain denials of plaintiff's allegations, including those regarding the use of excessive force and failure to protect.  Nonetheless, even in the absence of such affidavits I conclude that plaintiff has failed to carry his initial burden of demonstrating the lack of any such material fact requiring trial.

While plaintiff's second amended complaint contains allegations of fact supporting his claims, the exhibits attached to that pleading are equivocal and reflect the existence of conflicting accounts concerning the relevant events.  A transcript of plaintiff's November 15, 2006 disciplinary hearing, for example, includes testimony from the participants in the incident involved

19

flatly contradicting plaintiff's allegations.  *See* Kinsey Aff. (Dkt No. 66-1) Exh.
D.  During the hearing, the hearing officer read into the record written
statements given by Sergeant Schwenke, Corrections Officers Travers, L.
Deuyour, Bushey, and Nurse Pepin concerning the encounter.  *Id.* at pp. 36-
38 of 77.  In addition, testimony was elicited from Nurse Pepin, Sergeant
Schwenke, and Corrections Officers Bushey and Deuyour.[11]  Those
statements and the testimony of those witnesses flatly contradict plaintiff's
version of the relevant events.

That the parties' accounts are squarely in conflict is exemplified by
testimony given at the disciplinary hearing.  Corrections Sergeant Schwenke,
the author of the misbehavior report issued to Williams, testified that on the
day in question he went to the prison infirmary based upon Williams' demand
that he see a sergeant.  Kinsey Aff. (Dkt. No. 66-1) Exh. D at 31 of 77.
According to defendant Schwenke plaintiff was agitated and ultimately
became the aggressor, rushing toward Sergeant Schwenke, pushing him
back, grabbing him around the waist, picking him up off the floor, *id.* at p. 28-
29 of 77.  Sergeant Schwenke was only able to break free from plaintiff's

---

[11]     After having testified initially, Sergeant Schwenke and Corrections Officer
Bushey were recalled, at plaintiff's request.  Upon recall, both confirmed their earlier
testimony.  Kinsey Aff. (Dkt. No. 66-1) at pp. 67-69 and 73-76 of 77.

grasp with the assistance of Corrections Officers Bushey, Deuyour, and Travers. *Id.* at 29. During the course of the incident Williams continued to struggle, causing Sergeant Schwenke to incur scrapes and bruises as well as injuring the other assisting officers. *Id.* at 29-30 of 77.

Officer Deuyour testified that upon responding to the scene of the incident he saw that Sergeant Schwenke was in plaintiff's grasp and consequently entered the room in an effort to free the sergeant. Kinsey Aff. (Dkt. No. 66-1) Exh. D at pp. 48 of 77. The officer testified that once Sergeant Schwenke was freed, officers attempted to place mechanical restraints on the plaintiff, despite his continuing resistence. *Id.* Corrections Officer Bushey also testified, coorborating the version of the events given by Sergeant Schwenke and Corrections Officer Deuyour. Kinsey Aff. (Dkt. No. 66-1) Exh. D at p. 51-56 of 77. The evidence adduced at the hearing resulted in a finding by the hearing officer that during the course of the incident plaintiff engaged in violent conduct, created a disturbance, committed assault on staff, and refused a direct order.

Based upon the record now before the court, I find that plaintiff has failed to shoulder his burden of making an initial showing of the lack of any genuine issues of material fact requiring that a trial be held. Moreover, even

assuming such a required threshold showing was made, I am unable to conclude that no reasonable factfinder could find in defendants' favor in connection with plaintiff's claims.  I therefore recommend that plaintiff's motion for summary judgment be denied.

IV.    SUMMARY AND RECOMMENDATION

Addressing first defendant Phelix's dismissal motion, I conclude that plaintiff's due process claims against him are precluded by state court findings made in connection with Williams' Article 78 proceeding challenging the hearing officer's determination, and therefore recommend dismissal of all claims against that defendant.  Turning to plaintiff's summary judgment motion, I recommend that it be denied, based upon the lack of a showing that there exist no genuine issues of material fact requiring trial and that no reasonable factfinder could find against him in connection with his excessive force, retaliation, and deliberate indifference claims.  It is therefore hereby respectfully

RECOMMENDED that defendant Phelix's motion to dismiss (Dkt. No. 44) be GRANTED and all claims against that defendant be DISMISSED; and it is further

RECOMMENDED that plaintiff's motion for summary judgment (Dkt.

NO. 65) be DENIED and that the case be deemed trial ready with regard to the remaining defendants and causes of action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      December 23, 2011
            Syracuse, NY



Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
John HALE, Plaintiff,
v.
Jadow RAO; J. Ireland; Mack/s/Revell; R. Furnia; J.
Silver; John Doe # 1; John Doe # 2; Jane Doe # 1; Jane
Doe # 2; Jane Doe # 3; and Jane Doe # 4, Defendants.
**No. 9:08-CV-612.**

Nov. 3, 2009.

John Hale, Alden, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Richard Lombardo, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff, John Hale, brought this civil rights action in
March 2008, pursuant to 42 U.S.C. § 1983. By
Report-Recommendation dated September 29, 2009, the
Honorable George H. Lowe, United States Magistrate
Judge, recommended that defendants' motions to dismiss
(Docket No. 27) be granted in part and denied in part as
follows: (1) the motion to dismiss should be granted to the
extent that plaintiff asserts claims for money damages
against defendants in their official capacities; and (2) the
motion should be denied to the extent that defendants
moved to dismiss plaintiff's Eighth Amendment claim
against defendant Rao, and moved to dismiss the
complaint against defendant Rao on the ground of
qualified immunity. The Magistrate Judge further
recommended that the motion to dismiss for failure to

prosecute, or in the alternative for an order compelling
plaintiff's responses (Docket No. 36), be denied. No
objections to the Report-Recommendation have been filed.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Lowe, the
Report-Recommendation is accepted and adopted in all
respects. See 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss (Docket No. 27) is
GRANTED IN PART and DENIED IN PART;

a. The motion to dismiss is GRANTED to the extent
that plaintiff asserts claims for money damages against
defendants in their official capacities; and

b. The motion is DENIED to the extent that
defendants moved to against defendant Rao on the
ground of qualified immunity;

2. Defendants' motion to dismiss for failure to prosecute,
or in the alternative, for an order compelling plaintiff's
responses (Docket No. 36) is DENIED;

3. This matter is referred back to the Magistrate Judge for
any further proceedings.

IT IS SO ORDERED.

### REPORT-RECOMMENDATION AND ORDER

GEORGE H. LOWE, United States Magistrate Judge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

This *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court.

Currently pending is a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c), seeking dismissal of the complaint in its entirety against Defendant Dr. Jadow Rao and against Defendants F. Ireland, R. Furnia, Mack Reyell, J. Silver, and Rao in their official capacities. Dkt. No. 27. Plaintiff opposes the motion. Dkt. Nos. 39, 41.

Also pending is a Motion to Dismiss for Lack of Prosecution pursuant to Fed.R.Civ.P. 41(b) or, in the alternative, for an Order compelling Plaintiff to respond to paragraphs I(A)(1)(b) and (c) of the Court's Mandatory Pretrial Discovery and Scheduling Order. Dkt. No. 36. Plaintiff opposes the motion. Dkt. Nos. 39, 41.

For the reasons discussed below, I recommend that the Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c) be granted, in part, and denied, in part. I also recommend that the Motion to Dismiss for Lack of Prosecution pursuant to Fed.R.Civ.P. 41(b) or, in the alternative, for an Order compelling Plaintiff's responses be denied.

## I. MOTION TO DISMISS PURSUANT TO **FED. R. CIV. P. 12(b)(6)** AND **12(c)**

### A. BACKGROUND

**\*2** Plaintiff John Hale alleges that eleven employees ("Defendants") of the New York State Department of Correctional Services ("DOCS") violated his rights under the Eighth Amendment when (1) in or around May of 2006, Defendants Ireland, Revell, Furnia, and Silver physically assaulted and injured him without provocation at Clinton Correctional Facility ("C.F."), and (2) between May of 2006 and February of 2008, the remaining seven Defendants (Dr. Rao, John Does 1-2, and Jane Does 1-4)

were deliberately indifferent to his resulting serious medical needs at Clinton, Southport, Elmira and Attica C.F.s. Complaint at ¶¶ 16-27.

Plaintiff states that he has exhausted his administrative remedies. Complaint at ¶ 29. Plaintiff has submitted copies of decisions from the Central Office Review Committee of the Inmate Grievance Program. Dkt. No. 5, Exhibits. Plaintiff also included a copy of a decision from the Superintendent of Attica C.F. *Id.*

### B. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2);[FN1] or (2) a challenge to the legal cognizability of the claim.[FN2]

> **FN1.** *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr .S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

> **FN2.** *See Swierkiewicz v. Sorema N.A.,* 534 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12(b)(6)'s requirement of stating a cognizable claim and Rule 8(a)'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN3] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN4] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN5]

FN3. *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v.*

*Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) (citation omitted).

FN4. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

FN5. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

**\*3** It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." FN6 "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"FN7 In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

> FN6. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

> FN7. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.FN8 Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." FN9 Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." FN10 Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.FN11 In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." FN12

> FN8. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering plaintiff's response affidavit on motion to dismiss)). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

> FN9. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

> FN10. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

> FN11. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN12. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN13] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN14] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN15] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[FN16]

FN13. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") (internal quotation marks and citation omitted); *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN14. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P 8] ); *accord,*

*Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN15. *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN16. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

Defendants also move pursuant to Fed.R.Civ.P. 12(c). Rule 12(c) of the Federal Rules of Civil Procedure provides, in pertinent part: "After the pleadings are closed ... any party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). "In deciding a Rule 12(c) motion, [courts] apply the same standard as that applicable to a motion under Rule 12(b)(6)."[FN17]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

FN17. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816 (1994) (citations omitted); *accord, Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 126 (2d Cir.2001) (citations omitted) ("The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim.").

## C. ANALYSIS

### 1. Eighth Amendment

Reading the complaint generously, Plaintiff alleges that he complained to Defendant Rao, Health Services Director at Attica C.F., about his "medical problems," which included (1) the injuries he sustained during the alleged May 2006 incident, such as persistent vomiting of blood and urinating of blood, (2) surgical staples in his stomach, and (3) swollen ribs.[FN18] Complaint at ¶ ¶ 16-27. Plaintiff alleges that in response, Dr. Rao stated that he did not believe Plaintiff's complaints, consistently "denied" Plaintiff's complaints, and called Plaintiff " 'crazy.' " *Id.* at ¶¶ 26, 27. Plaintiff claims that as a result, he has endured pain, suffering, and injuries. *Id.*

FN18. Specifically, Plaintiff states, "It should be noted that *Plaintiff has been complaining about all of the above medical problems* [which include the injuries sustained during the alleged assault, the surgical staples, and swollen ribs] to medical staff here at Attica C.F. *including Defendant Dr. Rao* ... and ever since he was beaten by the Defendant Officers Ireland, Reyell, Furnia, and Silver *he has been throwing up blood and urinating blood yet the Defendants consisting* [sic] *denied his complaints;* resulting in Plaintiff's pain and suffering, and further injuries." Complaint at ¶ 27 (emphasis added).

**\*4** Defendants argue that Plaintiff has made an insufficient showing of an Eighth Amendment claim against Defendant Rao. Dkt. No. 27-2 at pp. 3-6.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Farmer,* 511 U.S. at 834 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corrections,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

medical condition is sufficiently serious." *Id.* A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

**\*5** If the claim is that treatment was provided but was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment claim, the defendant's behavior must be "wanton." Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d 698, 703 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835 (1994)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,*

143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. 825, 835; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703.

Regarding the objective component, the complaint alleges that Defendant Rao provided Plaintiff with inadequate or no medical care after learning of Plaintiff's physical complaints, including persistent vomiting of blood and urinating of blood. Vomiting of blood and urinating of blood are indications of serious medical needs. *See Morgan v. Maass,* No. 94-35834, 1995 WL 759203, at \*2 (9th Cir. Dec. 26, 1995) (finding that vomiting blood constituted a serious medical need); *Kimbrough v. City of Cocoa,* No. 6:05-cv-471, 2006 WL 2860926, at \*3 (M.D.Fla. Oct. 4, 2006) (finding that "[e]ven to a lay person, it is obvious that blood in the urine is an indication of a serious medical need."). Thus, the allegations in the complaint satisfy the objective component.

**\*6** Regarding the subjective component, the complaint alleges that Defendant Rao was aware that Plaintiff had serious medical needs, but consciously and intentionally disregarded or ignored those needs. Dkt. No. 1. Thus, the allegations in the complaint satisfy the subjective component.

Defendants argue that Plaintiff's complaint is conclusory and fails to contain specific allegations of fact indicating

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

a deprivation of rights as against Defendant Rao. Dkt. No. 27-2, at p. 5. The Court disagrees. Plaintiff specifically stated that he informed Defendant Rao about his "medical problems," which included vomiting of blood and urinating of blood, but that Dr. Rao expressed disbelief, consistently "denied" Plaintiff's complaints, and stated that Plaintiff was "crazy." Complaint at ¶ 27. Plaintiff has set forth more than a simple conclusory allegation.

In light of the foregoing, the Court declines to conclude at this stage that Plaintiff has failed to state a claim for deliberate medical indifference against Defendant Rao.[FN19] Accordingly, the motion to dismiss the Eighth Amendment claim against Defendant Rao should be denied.

> FN19. *See Beeks v. Reilly,* No. 07-CV-3865, 2008 WL 3930657, at *7 (E.D.N.Y. Aug. 21, 2008) (citing *Chance,* 143 F.3d at 703-04 (reversing district court's dismissal of medical indifference claim at 12(b)(6) stage because "[w]hether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.... It may be that Chance has no proof whatsoever of this improper motive, and that lack of proof may become apparent at summary judgment. But even if we think it highly unlikely that Chance will be able to prove his allegations, that fact does not justify dismissal for failure to state a claim, for Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations ....") (citations and quotation marks omitted) (other citations omitted); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 559 (S.D.N.Y.2008) (finding that amended complaint plausibly alleged that doctors knew that plaintiff was experiencing extreme pain and loss of mobility, knew that the course of prescribed course of treatment was ineffective, and declined to do anything to attempt to improve plaintiff's situation besides re-submitting MRI request forms) (citing *Harris v. Westchester County Dep't of Corrections,* No. 06 Civ.2011, 2008 WL 953616, at *23 (S.D.N.Y. Apr. 3, 2008) (despite plaintiff's sparse allegations as to defendant's conduct, at the 12(b)(6) stage plaintiff sufficiently alleged facts supporting a plausible claim that defendant

was deliberately indifferent to plaintiff's medical needs)).

**2. Qualified Immunity**

Defendant Rao asserts that he is entitled to dismissal on the ground of qualified immunity. Dkt. No. 27-2 at pp. 6-8.

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a prisoner civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68-69 (2d Cir.2004) (citations omitted), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) (citations omitted).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), *cert. denied,* 503 U.S. 962 (1992).[FN20] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169-70 (2d Cir.2007) (citations omitted). [FN21] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).[FN22] As the Supreme Court has explained,

> FN20. *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v.. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

> FN21. *See also Anderson v. Creighton,* 483 U.S. 635, 639 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (citation omitted); *Davis v. Scherer,* 468 U.S. 183, 190 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

> FN22. *See also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

*7 [T]he qualified immunity defense ... provides ample

protection to all but the plainly incompetent or those who knowingly violate the law.

... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.[FN23]

> FN23. *See also Hunter v. Bryant,* 502 U.S. 224, 299 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks and citation omitted].

Here, after liberally reviewing the complaint, accepting all of its allegations as true, and construing them in Plaintiff's favor, the Court declines to conclude that Defendant Rao is entitled to qualified immunity at this stage. As noted, Plaintiff alleges that he informed Dr. Rao of his "medical problems," including persistent vomiting of blood and urinating of blood, but Dr. Rao stated that he did not believe Plaintiff's complaints, consistently denied Plaintiff's complaints, and called Plaintiff " 'crazy,' " which resulted in pain, suffering, and injuries. Complaint at ¶¶ 26-27. Therefore, the motion to dismiss the complaint on the ground of qualified immunity should be denied.[FN24]

> FN24. *See Beeks,* 2008 WL 3930657, at *9 (citing *See McKenna,* 386 F.3d at 437-38 (affirming district court's denial of qualified immunity at motion to dismiss stage on deliberate indifference claim, "[h]owever the matter may stand at the summary judgment stage, or perhaps at trial....") (other citations omitted)).

**3. Eleventh Amendment**

Defendants Ireland, Furnia, Reyell, Silver, and Rao argue

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

that to the extent the complaint seeks damages against them in their official capacities, the claim is barred by the Eleventh Amendment. Dkt. No. 27-2 at pp. 8-9.

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U .S. 139, 142-47, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101-06, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

The Eleventh Amendment bars suits against state officials acting in their official capacities.[FN25] Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3).

FN25. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v.. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages

against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.").

**\*8** Here, each of the represented Defendants has an official position with DOCS. Therefore, any claims for money damages against these Defendants in their officials capacities are barred by the Eleventh Amendment and should be dismissed.

## II. MOTION TO DISMISS FOR LACK OF PROSECUTION, OR IN THE ALTERNATIVE, FOR AN ORDER COMPELLING RESPONSES

Defendants argue that the complaint should be dismissed on the ground that Plaintiff has failed to prosecute this action. Dkt. No. 36. Defendants argue that in the alternative, Plaintiff should be compelled to respond to paragraphs I(A)(1)(b) and (c) of the Court's Mandatory Pretrial Discovery and Scheduling Order. *Id.*

### A. ANALYSIS

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

Rule 41 of the Federal Rules of Civil Procedure provides, "If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed.R.Civ.P. 41(b). As a result, Fed.R.Civ.P. 41(b) may be fairly characterized as providing for two independent grounds for dismissal on motion or on the Court's own initiative: (1) a failure to prosecute the action, and (2) a failure to comply with the procedural rules, or any Order, of the Court. *Id.*

With regard to the first ground for dismissal (a failure to prosecute the action), it is within the trial judge's sound discretion to dismiss for want of prosecution.[FN26] The Second Circuit has identified five factors that it considers when reviewing a district court's order to dismiss an action for failure to prosecute under Rule 41(b):

> FN26. *See Merker v. Rice,* 649 F.2d 171, 173 (2d Cir.1981).

[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard and [5] whether the judge has adequately assessed the efficacy of lesser sanctions.[FN27]

> FN27. *See Shannon v. GE Co.,* 186 F.3d 186, 193 (2d Cir.1999) (affirming Rule 41(b) dismissal of plaintiff's claims by U.S. District Court for Northern District of New York based on plaintiff's failure to prosecute the action) (citation and internal quotation marks omitted).

As a general rule, no single one of these five factors is dispositive.[FN28] However, I note that, with regard to the first factor, Rule 41.2 of the Local Rules of Practice for this Court provides that a "plaintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution." N.D.N.Y. L.R. 41.2(a). In addition, I note that a party's failure to keep the Clerk's Office apprised of his or her current address may also constitute grounds for dismissal under Rule 41(b) of the Federal Rules of Civil Procedure.[FN29]

> FN28. *See Nita v. Conn. Dep't of Env. Protection,* 16 F.3d 482 (2d Cir.1994).

> FN29. *See, e.g., Robinson v. Middaugh,* 95-CV-0836, 1997 WL 567961, at *1 (N.D.N.Y. Sept. 11, 1997) (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41[b] where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change); *see also* N.D.N.Y. L.R. 41.2(b) ( "Failure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending action.").

**1. Address Changes**

As to the first factor (the duration of Plaintiff's "failures") Defendants argue that Plaintiff was transferred to several different facilities, but failed to update the Court and defense counsel of his changes of address. Dkt. No. 36-2, Lombardo Decl., at ¶¶ 4-5, 7-12 & Dkt. Nos. 49, 50. Defendants argue that the action should be dismissed for this reason alone. Dkt. No. 36-8.

**\*9** Plaintiff has failed at times to update the Court and defense counsel as to his address changes. His most recent failure occurred on July 6, 2009 when he was transferred from Green Haven C.F. to Auburn C.F., and subsequently to Wende C.F., where he now remains. Dkt. No. 50-2, Stachowski Decl., at ¶¶ 3-5. Plaintiff failed to update the Court and defense counsel as to these changes. Thus, Plaintiff's failure to provide an updated address has persisted since July 6, 2009 (less than three months). Generally, it appears that durations of this length (i.e., less than four months) are not long enough to warrant dismissal.[FN30]

> FN30. N.D.N.Y. L.R. 41.2(a) ("[P]laintiff's failure to take action for four (4) months shall be presumptive evidence of lack of prosecution.");

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

*Georgiadis v. First Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) (plaintiff had failed to comply with order directing him to answer interrogatories for more than four months).

The Court notes that Plaintiff has been subject to frequent transfers. Since August 7, 2008, Plaintiff was transferred on seven occasions. Dkt. No. 36-3, Loiodice Decl., at ¶¶ 4-11; Dkt. No. 50-2, Stachowski Decl. at ¶¶ 4-5. Three of the transfers occurred within a span of six days. Dkt. No. 36-3, Loiodice Decl., at ¶¶ 7-11.

Moreover, whether Plaintiff was mentally and physically capable of providing written updates of all of his address changes is unclear. Plaintiff noted in his opposition papers that he was diagnosed as suffering from schizophrenia; has "borderline intellectual" functioning; [FN31] and is unable to read or write; therefore Plaintiff's submissions to the Court are written by others. Dkt. No. 39. Plaintiff also stated that at times he has been "prohibited from possessing any type of writing utensil." Dkt. No. 41. Plaintiff further stated that while at Central New York Psychiatric Center, "any legal work whatsoever" was discouraged and "not facilitate[d]." *Id.* In light of the foregoing, I find that the first factor weighs against dismissal of Plaintiff's complaint.

> FN31. Plaintiff submitted copies of medical records indicating that he was diagnosed as suffering from, *inter alia,* schizophrenia, paranoid type; has borderline intellectual functioning; and has an IQ of 71. Dkt. No. 5.

As to the second factor (whether plaintiff had received notice that further delays would result in dismissal), I find that Plaintiff has received notice that his failure to provide his current address may result in dismissal. *See* Dkt. No. 12 at 4 *(Order stating that "Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so will result in the dismissal of this action")* (emphasis in original); N.D.N.Y. L.R. 41.2(b) (stating, "Failure to notify the Court of a change of address in accordance with L.R. 10.1(b) may result in the dismissal of any pending action.") [FN32] As a result, I find that the second factor weighs in favor of dismissal of Plaintiff's

complaint.

> FN32. I note that, to assist *pro se* litigants, the Clerk of the Court for the Northern District of New York has provided to all correctional facilities in New York State copies of the Northern District's Local Rules of Practice and *Pro Se* Manual.

Regarding the third factor (whether defendants are likely to be prejudiced by further delay), I am unable to find, based on the current record, that Defendants are likely to be prejudiced by a delay in the proceedings. While any delay that occurs theoretically impairs the Defendants' memories, the preservation of evidence, and the ability to locate witnesses, [FN33] Defendants have not argued that any delay has occurred due to Plaintiff's failure to update his address. As a result, I find that the third factor weighs against dismissal of Plaintiff's complaint. [FN34]

> FN33. *See, e.g., Georgiadis v. First Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) ("The passage of time always threatens difficulty as memories fade. Given the age of this case, that problem probably is severe already. The additional delay that plaintiff has caused here can only make matters worse.").

> FN34. *See Cruz v. Jackson,* No. 94 Civ. 2600, 1997 WL 45348, at *2 (S.D.N.Y. Feb. 5, 1997) (declining to dismiss action for failure to prosecute or failure to comply with court orders where plaintiff had failed to meet discovery deadlines, and noting that the fact that plaintiff "has been in lock-down and transferred to another facility during the pendency of this action also counsels leniency toward [the plaintiff's] delays") (citing *Jones v. Smith,* 99 F.R.D. 4, 14-15 (M.D.Pa.1983) (granting *pro se* plaintiff final opportunity to comply with orders of court, despite repeated wilful, dilatory and contumacious tactics), *aff'd* 734 F.2d 6 (3d Cir.1984)).

*10 Regarding the fourth factor (striking the balance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard), I find that Plaintiff's right to receive a further chance to be heard in this matter, at this point, outweighs the need to alleviate congestion on the Court's docket. Moreover, Defendants point to no delay caused by Plaintiff's failure to update his address. As a result, I find that the fourth factor weighs against dismissal of Plaintiff's complaint.

With regard to the fifth factor (whether the judge has adequately assessed the efficacy of lesser sanctions), I find that a strong reminder to Plaintiff of his obligation to provide a current address might be effective and is warranted. Plaintiff, who alleges that he suffers from schizophrenia and is unable to read and write, Dkt. No. 39, has been responsive to prior Orders from the Court,[FN35] and has shown an interest in prosecuting this action. *See* Dkt. Nos. 39, 41 (Plaintiff's Opposition Papers). As a result, I find that the fifth factor weighs against dismissal of Plaintiff's complaint.

> FN35. *See* Dkt. Nos. 7-11 (Report-Recommendation and Order; Plaintiff's Inmate Authorization Forms; Application to Proceed *In Forma Pauperis;* and Signed Last Page of Complaint).

Weighing these five factors together, I conclude that they tip the scales against dismissing Plaintiff's complaint (one of the factors weighing in favor of such dismissal and four of the factors weighing against such dismissal).[FN36] Dismissal based on a lack of prosecution is a harsh remedy to be used only in extreme situations. The Court does not currently view the present case to be in such a situation. For these reasons, I recommend that Defendants' Motion to Dismiss based on Plaintiff's failure to provide a current address (Dkt. No. 36) be denied.

> FN36. *Minnette v. Time Warner,* 997 F.2d 1023, 1027 (2d Cir.1993); *see also Jacobs v. County of Westchester,* Dkt. No. 02-0272, 2005 WL 2172254, at * 3 (2d Cir. Sept. 7, 2005) (remanding case to district court to make further factual findings concerning the plaintiff's lack of responsiveness and concerning his confinement

in a prison psychiatric ward where district court dismissed for failure to prosecute).

**2. Responses to Scheduling Order**

Defendants argue that if the Court does not dismiss the complaint for a failure to prosecute, the Court should issue an order requiring Plaintiff to respond to paragraphs I(A)(1)(b) and (c) of the Court's mandatory pretrial discovery and scheduling order dated November 18, 2008 ("Scheduling Order"). Dkt. No. 36-8, Memo. of Law at pp. 3-4.

The Scheduling Order provided, in relevant part, as follows:

**I. Discovery**

**A.** *Documents.* Within sixty (60) days of the date of this order:

**1.** *Plaintiff(s)* shall provide to counsel for defendant(s) copies of all:

**a.** Documents and other materials which plaintiff(s) may use to support the claims in the complaint;

**b.** Correspondence, grievances, grievance appeals, and other documents relating to requests for administrative remedies or the inability or failure to exhaust such remedies; and

**c.** Complaints and petitions filed by plaintiff(s) in any other cases in any court relating to the same issues raised in the complaint in this action or, if such documents are not within the possession of plaintiff(s), plaintiff(s) shall provide to counsel for defendant(s) a list of any such legal proceedings stating the court in which the proceeding was filed, the caption of the case, and the court number.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

**\*11** Dkt. No. 26, at pp. 1-2.

Defendants admit that they received "what purported to be plaintiff's response to paragraph I(A)(1) of the [Scheduling Order]" in a letter to defense counsel from Plaintiff. Dkt. No. 36-2, Lombardo Decl., at ¶ 19 & Dkt. No. 36-6, Ex. C. In that letter, Plaintiff asserted the following:

> Pursuant to paragraph I(A) of the court's mandatory pretrial discovery and scheduling order dated Nov. 18, [20]08[:]

> a. Documents and materials which plaintiff will use to support the claims in this complaint is [sic] the complete Medical Records for the period of June 14, 2006 to present, and current Tier III documents and pictures surrounding the incident which you forwarded to me pursuant to mandatory pretrial discovery, in addition enclosed please find Lab work report of specimen done on plaintiff which will also be use[d].

> Plaintiff has complied with the court's mandatory pretrial discovery and scheduling order pursuant to paragraph I(A) so your office no longer has to seek dismissal of the complaint for failure to prosecute.

Dkt. No. 36-6, Ex. C.

Defendants view this letter as being nonresponsive to paragraphs I(A)(1)(b) and (c). However, regarding paragraph I(A)(1)(b), Plaintiff specifically stated in the above-quoted letter that he "will use the complete medical records for the period of June 14, 2006 to present, and *current Tier III documents and pictures surrounding the incident which you forwarded to me.*" Dkt. No. 36-6, Ex. C at p. 1 (emphasis added). Moreover, Plaintiff stated in his March 23, 2009 letter to defense counsel that he filed grievances while in Attica C.F., but that he was no longer "in possession of those grievances" because his property was lost while he was at Central New York Psychiatric Center. [FN37] Dkt. No. 39 at p. 2. Plaintiff also stated that he has "no money in his account," therefore he has been unable to obtain copies of his grievances, as well as medical records. *Id.* Accordingly, Plaintiff has responded

to paragraph I(A)(1)(b). He stated that he no longer possesses the grievances he filed at Attica C.F.; he is unable to afford copies; and he intends to use the documents that defense counsel sent to him. To the extent that defense counsel is arguing that Plaintiff must provide copies of the same documents defense counsel has already provided Plaintiff, Dkt. No. 36-7, Ex. D at p. 2, this argument is unavailing.

> FN37. Plaintiff also asserts that he no longer has a copy of the complaint in this action. Dkt. No. 41, at ¶ 8. Accordingly, the Clerk will be directed to provide a copy of the complaint to Plaintiff.

Regarding paragraph I(A)(1)(c), Plaintiff stated in his March 23, 2009 opposition letter that "[t]here is no other complaints or petitions filed by plaintiff in any other cases in any other court [sic]." Dkt. No. 39, at p. 2. Plaintiff reiterated this response in a supplemental opposition letter dated March 31, 2009 by stating that "there are no other known complaints, petitions, etc. filed by plaintiff in any other court with regards to the claims raised in [this case]." Dkt. No. 41, [FN38] at ¶ 6. Accordingly, Plaintiff has responded to paragraph I(A)(1)(c).

> FN38. To the extent that Plaintiff is seeking permission to amend his complaint via his supplemental opposition letter, (Dkt. No. 41), Plaintiff's request must be in the form of a motion. *See* N.D.N.Y. Local Rule 7.1.

**\*12** In light of the foregoing, Defendants' request for an order compelling responses to paragraphs I(A)(1)(b) and (c) of the Scheduling Order should be denied as moot.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c) (Dkt. No. 27) be GRANTED in part and DENIED in part. The motion to dismiss should be granted to the extent that Plaintiff asserts claims for money damages against Defendants in their official capacities. The motion should be denied to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3698420 (N.D.N.Y.)
(Cite as: 2009 WL 3698420 (N.D.N.Y.))

the extent that Defendants moved to dismiss Plaintiff's Eighth Amendment claim against Defendant Rao, and moved to dismiss the complaint against Defendant Rao on the ground of qualified immunity; and it is further

**RECOMMENDED** that the Motion to Dismiss for Failure to Prosecute or in the alternative for an Order compelling Plaintiff's responses (Dkt. No. 36) be DENIED; and it is further

**ORDERED,** *that Plaintiff is required to promptly notify the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so may result in the dismissal of this action;*

**ORDERED,** that the Clerk update Plaintiff's address to reflect that he is currently incarcerated at Wende Correctional Facility; [FN39] and it is further

> **FN39.** Defendants' letter to the Court dated August 21, 2009 indicates that Plaintiff is now incarcerated at Wende C.F. Dkt. No. 50.

**ORDERED,** that the Clerk serve (1) copies of the electronically-available-only opinions cited herein; [FN40] (2) a copy of the Complaint (Dkt. No. 1); and (3) a copy of this Report-Recommendation and Order on Plaintiff.

> **FN40.** Those decisions include *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878 (S.D.N.Y. Nov. 17, 1997); *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119 (E.D.N.Y. Oct. 24, 2002); *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864 (2d Cir. Aug. 12, 2008); *Morgan v. Maass,* No. 94-35834, 1995 WL 759203 (9th Cir. Dec. 26, 1995); *Kimbrough v. City of Cocoa,* No. 6:05-cv-471, 2006 WL 2860926 (M.D.Fla. Oct. 4, 2006); *Beeks v. Reilly,* No. 07-CV-3865, 2008 WL 3930657 (E.D.N.Y. Aug.21, 2008); *Harris v. Westchester County Dep't of Corrections,* No. 06 Civ.2011, 2008 WL 953616 (S.D.N.Y. Apr. 3, 2008); *Robinson v. Middaugh,* 95-CV-0836, 1997 WL

567961 (N.D.N.Y. Sept. 11, 1997); *Cruz v. Jackson,* No. 94 Civ. 2600, 1997 WL 45348 (S.D.N.Y. Feb. 5, 1997); and *Jacobs v. County of Westchester,* Dkt. No. 02-0272, 2005 WL 2172254 (2d Cir. Sept. 7, 2005).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.
Hale v. Rao
Slip Copy, 2009 WL 3698420 (N.D.N.Y.)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Adrella E. WILSON, Plaintiff,
v.
LIMITED BRANDS, INC., et al., Defendants.
No. 08 CV 3431(LAP).

April 17, 2009.
West KeySummary**Administrative Law and
Procedure 15A** ⌖  **501**

15A Administrative Law and Procedure

15AIV Powers and Proceedings of Administrative
Agencies, Officers and Agents
15AIV(D) Hearings and Adjudications
15Ak501 k. Res Judicata. Most Cited Cases
**Civil Rights 78** ⌖  **1711**

78 Civil Rights

78V State and Local Remedies
78k1705 State or Local Administrative Agencies
and Proceedings
78k1711 k. Hearing, Determination, and Relief;
Costs and Fees. Most Cited Cases
**Civil Rights 78** ⌖  **1712**

78 Civil Rights

78V State and Local Remedies
78k1705 State or Local Administrative Agencies
and Proceedings
78k1712 k. Judicial Review and Enforcement of
Administrative Decisions. Most Cited Cases
**Constitutional Law 92** ⌖  **4178**

92 Constitutional Law

92XXVII Due Process
92XXVII(G) Particular Issues and Applications
92XXVII(G)7 Labor, Employment, and Public
Officials
92k4176 Regulation of Employment
92k4178 k. Employment Discrimination
Laws. Most Cited Cases
An Article 78 proceeding that affirmed the New York
State Division of Human Rights' (SDHR) determination
that there was no probable cause that an employer engaged
in unlawful discriminatory practices provided a former
employee with a full and fair opportunity to litigate her
claims, which she asserted in the instant federal action as
well. Thus, SDHR's determination of no probable cause
was entitled to preclusive effect because the SDHR's
procedure for investigating complaints, coupled with
judicial review, comported with due process. That the
employee might have been unaware of an administrative
appeal process was of no import. The employee's failure
to avail herself of the full range of available procedures
did not render those procedures inadequate under the Due
Process Clause. U.S.C.A. Const.Amend. 14; McKinney's
CPLR 7801 et seq.
*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, District Judge.
**\*1** Defendants Victoria Secret Stores, L.L.C. and
Limited Brands, Inc. ("VSS" or "Defendants") move
pursuant to Rule 12(c) for judgment on the pleadings,
arguing that collateral estoppel precludes Plaintiff Adrella
E. Wilson from re-litigating claims she has already
litigated in the State Division of Human Rights ("SDHR")
and through an Article 78 proceeding in Bronx County.
For the reasons set out below, the motion is granted.
The Supreme Court has held that a federal court
"must give to a state-court judgment the same preclusive
effect as would be given that judgment under the law of
the State in which the judgment was rendered." *Migra v.
Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104
S.Ct. 892, 79 L.Ed.2d 56 (1984). In adherence to this rule,
the Court of Appeals has previously held that a "New
York state court affirmation of the [SDHR's] finding of no
probable cause would preclude federal litigation based on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

the same facts." *Yan Yam Koo v. Dep't of Bldgs. of the City of New York,* 218 Fed. Appx. 97, 98 (2007) (Summary Order), affirming *Yan Yam Koo v. NYC Dep't of Bldgs.,* No. 04 Civ. 9628, 2006 WL 963883 (S.D.N.Y. Apr. 12, 2006) (Summary Order). Therefore, a "judgment pursuant to Article 78 may preclude relitigation of issues already decided in that earlier judgment." *LaFleur v. Whitman,* 300 F.3d 256, 272 (2d Cir.2002).

New York law applies collateral estoppel "if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *LaFleur,* 300 F.3d at 271. In *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982), the Supreme Court held that an Article 78 proceeding that affirmed the SDHR's determination of no probable cause was entitled to preclusive effect because the SDHR's procedure for investigating complaints, coupled with judicial review, comported with due process. 456 U.S. at 483-485. *See Hill v. Coca Cola Bottling Co. of New York,* 786 F.2d 550, 552 (2d Cir.1986) ("Since [plaintiff's] administrative proceeding before the state labor department was judicially confirmed in the Article 78 proceeding, we are required by *Kremer* to apply New York's law on collateral estoppel.").

Here, Plaintiff filed a Verified Complaint with the SDHR on April 25, 2005.[FN1] Following the SDHR finding of no probable cause on October 10, 2007 (Ex. I to the Amended Complaint ("Am.Compl.")), Plaintiff commenced an Article 78 proceeding seeking "to overturn [the] decision of the [SDHR] as well as investigate ministerial acts which delayed this case for 31 months." (Verified Petition, attached to the Article 78 Decision.) As noted in the Article 78 Decision, a hearing was held in that proceeding on May 19, 2008 at which both parties presented evidence.

> FN1. The entire administrative record from the SDHR is attached to the June 27, 2008 Decision in *Wilson v. Victoria's Secret, et al* Supreme Court of the State of New York, County of Bronx, Index No. 34095707 (the "Article 78 Decision") which, in turn, is attached as Exhibit

A to Defendants' moving papers. The Court may consider these papers and the documents attached to the Amended Complaint herein on this motion. *See Stewart v. Transp. Workers Union of Greater New York, Local 100,* 561 F.Supp.2d 429, 435-36 (S.D.N.Y.2008) (noting that a district court may rely on matters of public record of which the court may take judicial notice in resolving a Rule 12(c) motion); *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006) (district court may rely on documents incorporated in a complaint on a Rule 12(c) motion).

On June 27, 2008, the State Court determined that "based upon the hearing held on May 19, 2008 and review of the file of the New York State Division of Human Rights the court finds that the determination of respondent of October 10, 2007 was not arbitrary or capricious." Accordingly, the State Court dismissed Plaintiff's Article 78 petition.

**\*2** The Amended Complaint was filed in this Court on July 25, 2008, and this motion followed.

*Same Issues Raised*

Plaintiff claims national origin discrimination in both the SDHR and in her Amended Complaint in this Court. Plaintiff admits that the claims raised in both fora were claims of national origin discrimination raised under Title VII:

Plaintiff "agrees that she filed a Verified Complaint against Victorias Secret [sic] ('VSS') with the New York State Division of Human Rights ('SDHR') ... and agrees that the charge was based on National Origin." *See* Pl. Opposition at 10.[FN2] The charge filed with the SDHR alleged a violation of both state law and Title VII. *See* Pl. Opposition, at 15; Amended Complaint, Exh. I. The SDHR determined that there was "no probable cause to believe that [VSS] has engaged in or is engaging in the unlawful discriminatory practice complained of." *See* Am. Compl., Exh. I.

> FN2. Reference is to Plaintiff's Affirmation in Opposition to Motion dated February 11, 2009.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

Plaintiff "agrees that on December 5, 2007 an Article 78 [proceeding] was filed in the Bronx County New York State Supreme Court ... to overturn the decision of the SDHR." *See* Pl. Opposition at 15. That Court held that "the SDHR actions/determination was not arbitrary and capricious and dismissed the Article 78 petition." *Id.* at 17.

Finally, Plaintiff "agrees that an amended complaint was filed on July 25, 2008 in this [federal] court based on national origin discrimination in violation of Title VII." *Id.* at 19.

More specifically, a comparison of Plaintiff's pleadings in the Article 78 proceeding and in this action confirms that the two claims are based on precisely the same facts and circumstances. For example, in both fora, Plaintiff complains of:

Harassment by management by their cutting her hours and putting false write ups in her personnel files, *compare* letter of 1/3/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 3, l. 9, p. 5, ll. 1-4.

Unfair or "un-American" working conditions, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) with Am. Compl., ¶ 2E, p. 2 l. 8.

Transfer of sales to favored associates, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 3, l. 16.

Management's failure to inform her of late night cab reimbursement policy, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p.4, ll. 8-10.

Management's refusal to grant her time off to attend a funeral, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 6, ll. 1-2.

Retaliation for reporting sexual harassment, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 6, ll. 6-7, ll. 15-16.

Management's insulting remarks, *compare* letter received 10/4/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl ., ¶ 2E, p. 3, l. 9.

**\*3** Retaliation of the April 13, 2005 incident which led to her termination, *compare* letter received 10/4/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 8, l. 1.

The issues raised in the SDHR proceeding were, of course, necessarily decided by the State Court in the Article 78 Decision.

*Full Opportunity to Litigate Had*

A "full and fair opportunity to litigate" means that "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." *Kremer,* 456 U.S. at 481. As noted above, the Supreme Court has clearly stated that an Article 78 proceeding that affirms the SDHR's determination of no probable cause is entitled to preclusive effect because the SDHR's procedure for investigating complaints, coupled with judicial review, comport with due process. *Id.* at 483-485. Thus, the Article 78 proceeding here provided Plaintiff with a full and fair opportunity to litigate her claims. That she might have been unaware of the administrative appeal process, *see* Pl. Op. at 5-6, is of no import. Plaintiff's failure to avail herself of the full range of available procedures does not render those procedures inadequate under the Due Process Clause. *Kremer,* 456 U.S. at 485. ("The fact that Mr. Kremer failed to avail himself of the full procedures provided by state law does not constitute a sign of their inadequacy.")

*Plaintiff's Other Arguments Against Collateral Estoppel Without Merit*

To the extent that Plaintiff suggests that her naming VSS in her SDHR proceeding and Limited Brands in this action somehow avoids the application of collateral estoppel, she is mistaken. Identity of defendants is not required. *See, e.g., LaFleur,* 300 F.3d at 274 (holding that the proper inquiry with respect to collateral estoppel is *"not* whether the respondent-defendants were identical in both cases"); *Republic Gear Co. v. Borg-Warner Corp.,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

381 F.2d 551, 555, n. 1 (2d Cir.1967) (explaining that "collateral estoppel may bar relitigation of an issue even against different defendants," provided that the issue in contention was necessary to the result reached in the prior proceeding); Yan Yam Koo, 218 Fed. Appx. at 99 (holding that the fact "[t]hat the plaintiff did not name the identical parties in the state and federal actions does not disturb our finding of [issue] preclusiveness").

In any event, the party defendants are sufficiently closely related to permit preclusion. Victoria's Secret Stores, L.L.C.-Plaintiff's actual employer (see Am. Compl. at ¶ 11E)-is a wholly-owned subsidiary of Limited Brands Store Operations, Inc., a Delaware corporation that is a wholly-owned subsidiary of Intimate Brands, Inc. Intimate Brands, Inc. is a Delaware corporation that is a wholly-owned subsidiary of LBI, which is also a publicly traded Delaware corporation.[FN3]

> FN3. The Court may take judicial notice of this fact, as this information is attached to the LBI Form 10K that is filed with the Securities and Exchange Commission. Accordingly, it is a matter of public record. See Stewart, 561 F.Supp.2d at 435-36.

Finally, to the extent that Plaintiff argues that she did not raise all her federal causes of action in her Article 78 proceeding, she is nevertheless barred from raising them now pursuant to the doctrine of res judicata.[FN4] Under New York law, the doctrine of res judicata bars a "later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994). Because Plaintiff's claims indisputably arise from the same set of facts, res judicata applies to bar any legal theories she now raises that are different from those raised in the state court proceeding. See Kremer, 456 at 465 n. 3, 481 n. 22 (noting that res judicata has been taken to bar claims arising from the same transaction even if brought under different statutes; also noting that a " 'party cannot escape the requirements of full faith and credit and res judicata by asserting its own failure to raise matters clearly within the scope of a prior proceeding' " (quoting Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n, 455 U.S. 691, 710, 102 S.Ct.

1357, 71 L.Ed.2d 558 (1982))).

> FN4. Although Plaintiff named VSS as the defendant in the state court case and LBI in this case, the identity of the parties is nonetheless the same for purposes of determining res judicata. LBI has a sufficiently close relationship to VSS and both defendants were known to Plaintiff at the time she filed her first lawsuit. See, e.g., Official Publ'ns, Inc. v. Kable News Co., 811 F.Supp. 143, 147 (S.D.N.Y.1993) (holding that the "doctrine of res judiciata also bars litigation of the same causes of action against defendants who were known to plaintiff at the time the first action was filed but were not named where the newly-added defendants have a sufficiently close relationship to the original defendant"); Alpert's Newspaper Delivery Inc. v. The New York Times Co., 876 F.2d 266, 270 (2d Cir.1989) (noting that in determining privity for res judicata purposes, the issue is one of substance rather than the names of the caption of the case). Because LBI is merely a holding company of which VSS is a wholly-owned subsidiary, and the defenses raised by VSS sufficiently represented LBI's interests, VSS and LBI are in privity for res judicata purposes. See G & T Terminal Packaging Co. v. Consol. Rail Corp., 719 F.Supp. 153, 159 (S.D.N.Y.1989) (holding that "[s]ubsidiaries are in privity with their principal for res judiciata purposes when, as here, they sufficiently represent the principal's interests"). Additionally, the same counsel who represented VSS in the prior state court litigation represents LBI and VSS in the current litigation. See Melwani v. Jain, No. 02 Civ. 1224, 2004 WL 1900356, *2 (S.D.N.Y. Aug. 24, 2004) (stating that "the fact that the parties in the prior and current litigation had the same attorney is of singular significance in the privity analysis" (quotation marks omitted)).

*Conclusion*

**\*4** For the reasons set out above, Defendants' motion for judgment on the pleadings [dkt. no. 14] is granted.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

      The Clerk of the Court shall mark this action closed
and all pending motions denied as moot.

      SO ORDERED.

S.D.N.Y.,2009.

Wilson v. Limited Brands, Inc.
Not Reported in F.Supp.2d, 2009 WL 1069165
(S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

**H** Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

*1 Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia*, his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

FN5. While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

FN6. The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against opositions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally-and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> **FN12.** Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> **FN13.** No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> **FN14.** In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

**\*6** Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of
Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e,
which holds in part:

No action shall be brought with respect to prison
conditions under section 1983 of this title, or any other
Federal law, by a prisoner confined in any jail, prison, or
other correctional facility until such administrative
remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a
district court before exhausting all available administrative
remedies, the action must be dismissed. A unanimous
Supreme Court has recently interpreted the term "prison
conditions" expansively, requiring an exhaustion of all
available administrative remedies whether the inmate suit
concerns a general prison condition (i.e., quality of food)
or a discrete incident specific to one prisoner (i.e.,
excessive force). *See* *Porter v. Nussle,* 122 S.Ct. 983
(2002). The Court also held that the exhaustion
requirement applies regardless of whether the
administrative remedies are "plain," "speedy," or
"effective," and also applies when the prisoner "seeks
relief not available in grievance proceedings" such as
monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels
has exhausted all administrative remedies concerning his
due process violations. *See* Defendants' Supplemental
Memorandum of Law and Reply Memorandum of Law in
Further Support of Their Motion to Dismiss ("Reply
Brief"), at 9. Defendants' concession is apparently based
on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following
are not grievable: [...] Media Review, disciplinary
proceedings, inmate property claims (of any amount) and
records review (Freedom of Information Requests,
expunction). However, the policies, rules, and procedures
of any of these programs or procedures may be the subject
of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his
case within the prison facility and later to defendant
Selsky in Albany, who denied it and denied
reconsideration thereof.

Defendants argue, however, that "if a claim is incidental
to a disciplinary determination [...] the fact that the
disciplinary charge itself has been appealed does not
excuse the failure to file a grievance." Reply Brief, at 9.
Defendants thus seek to sever the alleged due process
violations (for which Samuels has exhausted all
administrative remedies) from several closely related
claims-Samuels' claims protesting the confiscation of his
papers, his transfer to the special housing unit, and DOCS
policy regarding the Five Percent Nation of Gods and
Earths (for which defendants argue Samuels has failed to
exhaust all administrative remedies). *See* Reply Brief, at
9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious
material is a matter separate from the underlying
disciplinary hearing. While Samuels directly appealed his
disciplinary adjudication, he concedes that he did not
bring any complaint to the inmate grievance program. *See*
Complaint, at 1. Defendants argue that Samuels' claim
alleging the confiscation of religious material must
therefore be dismissed because he failed to exhaust
administrative remedies. *See* Reply Brief, at 9-10.
Defendants represent that confiscation of religious
documents from a cell is a grievable matter. The Court
notes, however, that in similar cases inmates have been
told that such confiscations are not grievable. *See, e.g.,*
*Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS
7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed
an inmate grievance protesting confiscation of religious
material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion
regarding exactly which documents were confiscated.
Samuels has sought these documents numerous times;
defendants have not made the documents available to him
or to the Court. Initially, defendants stated that "Plaintiff
specifically alleges in his compliant that the defendants
confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled "Awake." Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia,* punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly,* 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002), is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at \*21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at \*15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.](#) The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.](#) There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See [Flanagan,](#)* [2002 WL 122921, at \*2](#). The transfer to a special housing unit potentially implicates due process concerns. *See, e.g., [Tookes v. Artuz,](#)* [00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002)](#) (noting that in the Second Circuit, confinement in a special

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at *22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker*'s ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Walker,* at *21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at *21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at *21.

> FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at *22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at *3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

**2. Whether Samuels Received the Process Due Him**

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be

Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

**a. Witnesses**

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

**b. Confidential Informant**

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility.'" *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient evidence.

**c. Assistance Provided by the Employee Assistant**

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See Ayers v. Ryan, 152 F.3d 77, 80-81 (2d Cir.1998).* Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward, 458 F.Supp. 624, 627 (S.D.N.Y.1978).*

**d. Actions of the Hearing Officer**

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

**e. Timeliness of the Hearing**

*14 Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a).* In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord, 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000)* (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

**f. Notice**

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord, 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997).* While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

**C. Retaliation**

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

**FN22.** Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1995 WL 117718 (S.D.N.Y.)

(Cite as: 1995 WL 117718 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Jimmie Lee ALLEN, Plaintiff,

v.

Thomas A. COUGHLIN III; Donald Selsky; Jose Pico; Charles J. Scully; Wallace Oldham; C. Artuz; M. Haubert; S. Phillips; and Kim Thornton; Jointly, Severally, and Individually, Respectively, Defendants.

No. 92 Civ. 6137 (MGC).

Mar. 17, 1995.

Jimmie Lee Allen, plaintiff pro se.

G. Oliver Koppell, Atty. Gen. of the State of N.Y. by Charles F. Sanders, Asst. Atty. Gen., New York City, for defendants.

MEMORANDUM OPINION AND ORDER

CEDARBAUM, District Judge.

**\*1** Plaintiff, an inmate at the Attica Correctional Facility, sues under 42 U.S.C. § 1983 on the claim that defendants deprived him of due process of law by withholding documents relevant to his defense in a rehearing of disciplinary charges against him, by sentencing him to time served without giving him notice as to the possible range of sanctions, and by not completing the rehearing in a timely manner. Plaintiff also sues under 42 U.S.C. § 1983 to recover a fine that he alleges was imposed in violation of the *ex post facto* clause of the Constitution. Defendants have moved to amend their answer to add the affirmative defenses of *res judicata* and collateral estoppel and to dismiss the complaint or, in the alternative, for summary judgment. For the reasons discussed below, defendants' motion is granted in part and denied in part.

*Background*

Plaintiff brought an Article 78 proceeding in the New York State Supreme Court to challenge a prison disciplinary determination that he had violated four of the regulations of the New York Department of Correctional Services ("DOCS"). The Article 78 court granted DOCS' application to annul the hearing and remand the matter for a new hearing. (Decision/Order of N.Y.Sup.Ct., Dutchess Cty., Benson, A.J., Index No. 4216/91, dated March 13, 1992) After a rehearing, all charges against plaintiff were dismissed except one, for which plaintiff was sentenced to the time he had already served in the Special Housing Unit as a result of the earlier determination. Because of the determination at the rehearing, a $5.00 mandatory disciplinary surcharge was imposed on plaintiff pursuant to a regulation that had gone into effect after the conclusion of the first hearing. *See* N.Y.Comp.Codes R. & Regs. tit. 7, § 254.7(b) (1994).

Plaintiff filed an administrative appeal, which was denied on July 1, 1992. Plaintiff then brought another Article 78 proceeding in the New York State Supreme Court, which was dismissed. (Decision and Order, N.Y.Sup.Ct., Dutchess Cty., Index No. 5115/92, Hillery,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 117718 (S.D.N.Y.)

(Cite as: 1995 WL 117718 (S.D.N.Y.))

A.J., dated June 28, 1993)

Plaintiff filed this action in July of 1992. Defendants moved to dismiss the complaint pursuant to Rule 12(b)(6). That motion was denied on October 4, 1993. Defendants now move to amend their answer to add *res judicata* and collateral estoppel as affirmative defenses and to dismiss the complaint or, in the alternative, for summary judgment.

*Discussion*

*I. Motion to Amend Answer*

As a preliminary matter, it is necessary to decide whether defendants should be permitted to amend their answer to add the affirmative defenses of *res judicata* and collateral estoppel. Although defendants have styled this motion as one to "amend their answer," they cannot point to an answer to amend. Defendants have not filed an answer with the court. They assert that they served an answer upon plaintiff, but he denies ever having received an answer. Defendants have not candidly admitted this deficiency, but, in a reply brief, they refer to their motion as one "to amend or file their answer."

**\*2** If defendants are not permitted to file an answer, they will be in default. Therefore, it is appropriate to look to the standard for setting aside an entry of default to decide whether defendants should be permitted to file an untimely answer. *See In re Roth, 172 B.R. 777 (Bankr.S.D.N.Y.1994)* (where debtor sought to file answer more than one year after filing complaint and creditor refused to consent to late filing and sought default judgment, court applied standard of Rule 55(c) for setting aside entry of default, although no entry of default had yet been made); *see also John v. Sotheby's, Inc., 141 F.R.D. 29, 35 (S.D.N.Y.1992)* ("The filing of a late answer is analogous to a motion to vacate a default.").

In determining whether to relieve a party of a default under Rule 55(c), courts must consider three factors: (1) whether the default was willful; (2) whether setting it aside would prejudice the adversary; and (3) whether a meritorious defense is presented. *Meehan v. Snow, 652 F.2d 274, 277 (2d Cir.1981)*. "Defaults are not favored, particularly when the case presents issues of fact, and doubts are to be resolved in favor of trial on the merits." *Id.* (citing *Klapprott v. United States, 335 U.S. 601 (1949)*).

There is no evidence that defendants' failure to file an answer was willful. Although defendants make no effort to explain why they did not file an answer within the period prescribed by Rule 12(a), their conduct during the course of the litigation demonstrates a good faith intent to litigate the action. Defendants and plaintiff submitted a joint pre-trial order to the court on February 23, 1994, in which defendants stated their intention to assert the *res judicata* and collateral estoppel affirmative defenses. *See In re Roth, 172 B.R. at 781* (pro se debtor who failed to file answer more than one year after filing of complaint held to have demonstrated "his intent to fulfill his obligations as a litigant" where he had appeared at depositions and corresponded with plaintiff's counsel during that period).

Plaintiff will not be unfairly prejudiced by the addition of these defenses. Plaintiff will not need additional discovery. Moreover, for more than a year, plaintiff has had notice that defendants intended to assert these defenses.

Finally, as discussed below, defendants' *res judicata* defense is meritorious with respect to some of plaintiff's claims, and collateral estoppel is a meritorious defense to other claims. Thus, an examination of the applicable factors shows that defendants should be permitted to file their answer.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 117718 (S.D.N.Y.)

(Cite as: 1995 WL 117718 (S.D.N.Y.))

*II. Res Judicata and Collateral Estoppel Defenses*

Since defendants are permitted to assert the *res judicata* and collateral estoppel defenses, I turn to defendants' motion for summary judgment on those grounds. A federal court must give the same preclusive effect to a state judgment as would be given in the state where it was rendered. *Migra v. Warren City School District Bd. of Educ.,* 465 U.S. 75, 81 (1984); *see also* 28 U.S.C. § 1738. Therefore, I look to the law of New York to determine the preclusive effect of plaintiff's second Article 78 proceeding.

**\*3** Under the doctrine of *res judicata,* when a court renders a final judgment on the merits, the parties are precluded from relitigating the claims that were or could have been raised in that action. *Fay v. South Colonie Central School Dist.,* 802 F.2d 21, 28 (2d Cir.1986). New York applies a "transactional approach" to *res judicata,* that is, claims that arise out of the same "factual grouping" that formed the basis for the prior judgment are considered to be part of the same claim and will be barred even if they are based upon different legal theories or seek additional relief. *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986); *Cepeda v. Coughlin,* 785 F.Supp. 385, 387 (S.D.N.Y.1992). However, a prior factual determination does not bar another action arising from the same claims if the forum which issued the judgment does not have the power to award the full relief sought in the action. *See Davidson,* 792 F.2d at 278-80; *Cepeda,* 785 F.Supp. at 388 n. 1. Since damages may only be awarded under Article 78 when they are "incidental to the primary relief sought," N.Y.Civ.Prac.L. & R. § 7806, courts have held that damage claims under Section 1983 are not barred by prior Article 78 judgments. *See Davidson,* 792 F.2d at 278-80; *Natale v. Koehler,* No. 89 Civ. 6566 (PNL), 1991 WL 130192 (S.D.N.Y. July 9, 1991). Therefore, although plaintiff's claims for relief other than damages [FN1] are barred under the doctrine of *res judicata,* plaintiff's damage claims are not barred.

Defendants argue that *Davidson* does not prevent the application of *res judicata* in this case because the plaintiff in *Davidson* had prevailed in the Article 78 proceeding unlike the plaintiff in this case whose Article 78 claims were denied. The Second Circuit has rejected such a distinction. *Davis v. Halpern,* 813 F.2d 37, 39 n. 2 (2d Cir.1987).

Although plaintiff's claims for damages are not barred by *res judicata,* they are barred by collateral estoppel. Collateral estoppel precludes a party from relitigating an issue when (1) the identical issue was necessarily decided in another action; and (2) there was a full and fair opportunity to litigate the issue in the other action. *Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.) (citing *Halyalkar v. Board of Regents,* 72 N.Y.2d 261, 266, 527 N.E.2d 1222, 1224, 532 N.Y.S.2d 85, 87 (1988)), cert. denied, 498 U.S. 951 (1990).

With one exception, the issues that must be decided to determine whether plaintiff is entitled to damages in this action are identical to those decided in the Article 78 proceeding. In the Article 78 proceeding, plaintiff made the following claims of deprivation of due process that he also asserts in this action: (1) that he was denied access to documents necessary to his defense at the disciplinary hearing; (2) that he was not given notice of the range of sanctions that could be imposed as a result of the rehearing; and (3) that the hearing was untimely. The state court considered these issues and found that plaintiff "failed to demonstrate any grounds sufficient ... to support any allegation that the determination under review was ... in violation of law." (Decision and Order, N.Y.Sup.Ct., Dutchess Cty., Index No. 5115/92, Hillery, A.J., dated June 28, 1993) Therefore, these issues were necessarily decided in the Article 78 proceeding.

**\*4** The party opposing issue preclusion bears the

Not Reported in F.Supp., 1995 WL 117718 (S.D.N.Y.)

(Cite as: 1995 WL 117718 (S.D.N.Y.))

burden of establishing that he was not afforded a full and fair opportunity to litigate the issue in the other proceeding. *See* *Kirkland v. City of Peekskill,* 828 F.2d 104, 108 (2d Cir.1987). Plaintiff has not suggested that he did not have a fair opportunity to present the issues in this action to the Article 78 court.

Plaintiff does raise one claim in this action which he did not assert in the Article 78 proceeding: that he was forced to pay a fine in the amount of $5.00 because a revision of a regulation was applied to him retroactively in violation of the *ex post facto* clause of the Constitution. Since that claim was not raised in any Article 78 proceeding, the doctrine of collateral estoppel does not preclude plaintiff from litigating that issue in this action.

Although defendants have also argued that the complaint fails to state a claim, they have not addressed whether plaintiff's allegations regarding the violation of the *ex post facto* clause state a claim. Defendants also have failed to address the issue of whether the *ex post facto* claim could have been brought in the Article 78 proceeding, and, therefore, would be barred by *res judicata.* Until these issues are addressed, defendants' motion to dismiss the *ex post facto* claim must be denied.

*Conclusion*

For the foregoing reasons, defendants' motion is granted with respect to all claims except plaintiff's claim regarding violation of the *ex post facto* clause.

SO ORDERED.

FN1. Plaintiff's claims for relief other than for money damages are (1) for a declaratory

judgment that defendants violated his rights; (2) that his record be expunged; and (3) that his "prior status" be restored.

S.D.N.Y.,1995.

Allen v. Coughlin

Not Reported in F.Supp., 1995 WL 117718 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 1315721 (N.D.N.Y.)

(Cite as: 2011 WL 1315721 (N.D.N.Y.))

---

H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James ANDERSON, Plaintiff,
v.
Doctor KOOI, Auburn Correctional Facility; Lester
Wright, Chief Medical Officer, Auburn Correctional
Facility; Ms. Collette, Assistant Medical Officer,
Auburn Correctional Facility; Michael Pettigrass,
Auburn Correctional Facility, Defendants.
No. 9:07–cv–1257 (DNH/GHL).

Jan. 24, 2011.
James Anderson, Coxsackie, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, C. Harris Dague, Esq., of Counsel, Albany,
NY, for Defendants.

### REPORT–RECOMMENDATION and ORDER

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action,
commenced pursuant to 42 U.S.C. § 1983, has been
referred to me for Report and Recommendation by the
Honorable David N. Hurd, United States District Judge,
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).
Plaintiff James Anderson alleges that Defendant Pang
Kooi provided inadequate medical care to Plaintiff, and
that such care amounted to deliberate indifference to
Plaintiff's serious medical needs. (Dkt. No. 8.) Plaintiff
further alleges that Defendants Lester Wright and Holly
Collette were deliberately indifferent by failing to rectify
the alleged constitutional violations after learning of them.
*Id.* Finally, Plaintiff accuses Defendant Michael Pettigrass
of medical indifference and defamation by including
certain statements on Plaintiff's disciplinary and quarterly
reports. *Id.* Currently pending before the Court is
Defendants' Motion for Summary Judgment pursuant to
Federal Rule of Civil Procedure 56(b). (Dkt. No. 39.)

Plaintiff has not filed a response. For the reasons that
follow, I recommend that Defendants' motion be granted
in part and denied in part.

### I. BACKGROUND

#### A. Summary of Plaintiff's Complaint

Plaintiff is currently confined at Coxsackie
Correctional Facility ("Coxsackie"). (Dkt. No. 8 at 1.) The
events giving rise to this action occurred during his
confinement at Auburn Correctional Facility ("Auburn").
*Id.* at 2. Plaintiff suffers from ankylosing spondylitis [FN1]
and other arthritic conditions that cause severe pain. *Id.* at
2. Defendant Kooi is a physician at Auburn and the
facility's health services director, Defendant Wright is the
Chief Medical Officer for the New York State Department
of Correctional Services ("DOCS"), Defendant Collette is
a Regional Health Administrator for DOCS, and
Defendant Pettigrass is a Correction Counselor at Auburn.
(Dkt. No. 39–2 ¶ 3.)

> FN1. Ankylosing spondylitis (also known as
> Marie–Strumpell Disease) is a "form of
> rheumatoid arthritis that affects the spine ...
> producing pain and stiffness as a result of
> inflammation of the ... joints." *McArthur v.
> Comm'r of Soc. Sec.,* No. 3:06–CV–860
> (LEK/DRH), 2008 WL 4866049, at \*4 n. 5
> (N.D.N.Y. Nov. 7, 2008) (citation omitted).

#### 1. Claims Against Defendant Kooi

Plaintiff was transferred from Green Haven
Correctional Facility ("Green Haven") to Auburn on
September 3, 2004. (Dkt. No. 8 at 2.) From September 3
to September 7, Plaintiff was held in the infirmary and
kept in an "extremely cold room," which exacerbated his
condition. *Id.* at 3. Upon admission to the infirmary,
Plaintiff told a nurse that, in addition to vitamins, he
required twenty milligrams of OxyContin twice a day to
treat his illnesses. *Id.*

On September 7, Plaintiff was released from the
infirmary. *Id.* Upon his release, Defendant Kooi ceased the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1315721 (N.D.N.Y.)

(Cite as: 2011 WL 1315721 (N.D.N.Y.))

OxyContin treatment without providing a detoxification program even though Defendant Kooi knew that Plaintiff had been dependant on opiates for the past five to six years. *Id.* In place of OxyContin, Defendant Kooi prescribed Motrin. *Id.*

Six days later, on September 13, Plaintiff requested OxyContin, Ensure, vitamins, and pads for his Transactional Electrical Nerve Stimulation ("TENS") Unit.[FN2] *Id.* at 4. Defendant Kooi then canceled a medical appointment that a nurse had made for Plaintiff. *Id.* Four days later, Plaintiff saw another nurse to tell her about his upcoming appearance before Auburn's programming committee. *Id.* at 4. Plaintiff expected the nurse to inform Defendant Kooi about the upcoming committee appearance. *Id.* Defendant Kooi, rather than providing medication, placed Plaintiff on "medically unemployed status." *Id.*

> FN2. A TENS Unit "is a pocket size, portable, battery-operated device that sends electrical impulses to certain parts of the body to block pain signals. The electrical currents produced ... can prevent pain messages from being transmitted to the brain and may raise the level of endorphins (natural pain killers produced by the brain)." *Verhow v. Astrue,* No. 08–CV–6423–CJS, 2009 U.S. Dist. LEXIS 100836, at *25 n. 5, 2009 WL 3671665, at *8 n. 5 (W.D.N.Y. Oct. 29, 2009)

**\*2** On September 20, Plaintiff had his first appointment with Defendant Kooi. *Id.* at 5. He requested OxyContin, multivitamins, Ensure, and TENS treatment pads because he was suffering from pain, Hepatitis C, and weight loss. *Id.* Defendant Kooi denied these requests even though Plaintiff said that those treatments had helped in treating his conditions in the past. *Id.* Plaintiff claims that when Defendant Kooi denied the treatment, Defendant Kooi said that Plaintiff "ran track for F.D.R. high school," which was over forty years ago, and that Plaintiff "could or did run" for one hour. *Id.*

Plaintiff was examined by medical staff once again on September 24. *Id.* at 5. Plaintiff complained of paralysis in the extremities and severe muscle spasms. *Id.* He also stated that he had not received Trilisate (a painkiller) from the pharmacy even though Trilisate was supposed to have been ordered. *Id.* After receiving Trilisate, Plaintiff complained of adverse side effects, including nausea, dizziness, and vomiting. *Id.* at 6. He also stated that he had sciatica and that the pain had extended into his neck and hip. *Id.* Plaintiff requested a second opinion but Defendant Kooi had canceled Plaintiff's appointment with another physician. *Id.* at 6.

On October 6 and 14, Plaintiff repeated his complaint that Trilisate was bothering his stomach, and he renewed his requests for Ensure and OxyContin. *Id.* at 6. Defendant Kooi personally examined Plaintiff on October 21. *Id.* at 6. At this examination, Defendant Kooi refused to review the X-ray requisition form. *Id.* He also changed Plaintiff's height and weight on the ambulatory record. *Id.* Defendant Kooi smirked and made sarcastic remarks while instructing Plaintiff to complete exercises on a piece of paper. *Id.* Plaintiff made an appointment to see a physical therapist, and also requested a neurologist, Ensure, and a Hepatitis C profile. *Id.* Although Defendant Kooi told Plaintiff that he would receive Percocet, Plaintiff did not receive the drug. *Id.*

Complaining of pain and given no medication, Plaintiff saw a nurse on October 27. *Id.* at 7. Defendant Kooi examined Plaintiff the next day. *Id.* at 7. Plaintiff complained of back pain and withdrawal symptoms. *Id.* Defendant Kooi noted that Plaintiff coached a boxing team during his confinement at Green Haven Correctional Facility. *Id.* Plaintiff questioned the necessity of this notation because he used strong pain medication while he was a coach. *Id.*

On November 17, Dr. Scarpilla told Plaintiff that he needed to strengthen his back and that Plaintiff should receive a medical call out. *Id.* at 7. On November 26, Plaintiff was seen by a nurse who noted that Plaintiff's appointment with a doctor could not be found on the computer system. *Id.* This appointment was made by Defendant Kooi. *Id.* After reviewing Plaintiff's M.R.I., the nurse also sent a note to someone named Bobby instructing Bobby to schedule an appointment for Plaintiff in the orthopedic clinic as soon as possible. *Id.* Also on November 26, Defendant Kooi examined Plaintiff and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1315721 (N.D.N.Y.)

(Cite as: 2011 WL 1315721 (N.D.N.Y.))

acknowledged the recommendation of Dr. Scarpilla that Plaintiff needed level four medication. *Id.*

**\*3** At a December 2 sick call, a nurse noted that Plaintiff was placed on Defendant Kooi's sick call list on November 12 but that appointment could not be found on the computer system. *Id.* Defendant Kooi, the only official with the authority to cancel call outs, had a long history of canceling call outs. *Id.*

Defendant Kooi examined Plaintiff again on December 9 and noted the need for another hepatitis profile. *Id.* Plaintiff had provided blood about twice a week since September 20. *Id.* Plaintiff, however, did not receive the results even though the results were available. *Id.*

On December 13, Mr. Comber, a physician's assistant, examined Plaintiff. *Id.* After reviewing Plaintiff's X-ray acquisition sheet, Mr. Comber described Plaintiff's spine as "mush." *Id.* Plaintiff told Mr. Comber that Ultram was not controlling the pain, and Mr. Comber was "incredulous" that Plaintiff had not received narcotics. *Id.*

Nine days later, Defendant Kooi examined Plaintiff and acknowledged that Plaintiff had a "degenerate Soinal Disorder." *Id.* Defendant Kooi also said that the Hepatitis C profile had yet to be completed. *Id.* Plaintiff requested Percocet, Morphine, or OxyContin. *Id.* Defendant Kooi told Plaintiff that he would be "called to a medication call out" but that call out did not occur. *Id.* Against Plaintiff's wishes, Defendant Kooi then attempted to admit Plaintiff to the infirmary. *Id.* Plaintiff objected because "bed rest" is the "last thing that someone with arthritis spine needs." *Id.*

Plaintiff made another request for pain relief on January 24. *Id.* One week later, Defendant Kooi told Plaintiff that the current "treatment" was not working, and Defendant Kooi placed Plaintiff on "medically unemployed" status. *Id.* at 9. In a February 8 examination, Defendant Kooi stated that Plaintiff could participate in only half of the educational programs and could not participate in work programs. *Id.*

On February 28, Dr. Gracefo became Plaintiff's

physician. *Id.* Plaintiff had made the request for this change in a January 5 grievance to the prison's grievance committee. *Id.* Dr. Gracefo replaced the Feldene and Flexeril with Ultram, a different painkiller. *Id.* at 10. He also ordered a liver profile and different blood pressure medication, and he made different shower arrangements for Plaintiff so that he could avoid the cold while going to take a shower. *Id.* Defendant Kooi continued to refuse to prescribe narcotics leading to an argument between Defendant Kooi and Dr. Gracefo. *Id.* Defendant Kooi and Dr. Gracefo had repeatedly argued over Plaintiff's treatment, including Plaintiff's request for narcotics, Ensure, herbal teas, and vitamins. *Id.* at 11.

On January 4, 2006, Plaintiff was admitted to the infirmary after a hernia operation. *Id.* at 10. Four days later, Defendant Kooi discontinued the percocet treatment that Plaintiff had been given following the operation. *Id.* Defendant Kooi also reduced the Ultram treatment from 100 milligrams twice a day to 50 milligrams twice a day, which Plaintiff claimed was inadequate to treat his pain. *Id.* On January 27, Defendant Kooi resumed Plaintiff's treatment with Feldene and Flexerin despite knowing that Plaintiff was allergic to such treatment. *Id.*

**\*4** Finally, in addition to suffering from severe pain associated with ankylosing spondylitis, Plaintiff claims that he suffered mental anguish due to the conflicting reports about his hepatitis status. *Id.* at 20.

2. *Claims Against Defendants Wright and Collette*

Plaintiff's family members contacted Defendant Wright on September 16, 2004, requesting that Defendant Wright investigate the alleged medical indifference. *Id.* at 13. Defendant Wright responded that Plaintiff would have to submit medical release forms before any investigation could begin. *Id.* On September 22, Plaintiff contacted Defendant Wright regarding Defendant Kooi's treatment, and on September 24 Plaintiff submitted the medical release forms. *Id.* Defendant Wright, however, did not take any further action even after further requests to do so by Plaintiff's family members. *Id.*

Plaintiff contacted Defendant Collette on September 22. *Id.* Defendant Collette was "assigned the task of investigating" the alleged medical indifference. *Id.* at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1315721 (N.D.N.Y.)

(Cite as: 2011 WL 1315721 (N.D.N.Y.))

13–14. Defendant Collette "alluded that she [would go] to Auburn personally, and ... see to it that [Plaintiff would] receive [ ] proper treatment." *Id.* at 13. Defendant Collette failed to take these actions. *Id.* Finally, Plaintiff's brother and Defendant Collette had maintained regular phone conversations for several months regarding Plaintiff's medical treatment. *Id.* at 14.

### 3. *Claims Against Defendant Pettigrass*

Defendant Pettigrass started serving as Plaintiff's guidance counselor in September 2004. *Id.* at 14. Defendant Pettigrass allegedly inserted two-year old misbehavior incidents into Plaintiff's quarterly reports. *Id.* The insertion of these incidents into the quarterly reports prevented Plaintiff from being transferred, including any transfers to medical facilities. *Id.*

Plaintiff also alleges that Defendant Pettigrass entered the following onto Plaintiff's quarterly reports: "pay particular attention to charges 101. 10, 101. 11, 101.20, 101.21, 101.22." *Id.* Those charges are for sexual misconduct. *Id.* Plaintiff argues that this act of defamation endangered his life because the "penal environment is ever hungry and thirsty for gossip, innuendo and rumors." *Id.*

### B. Summary of Grounds in Support of Defendants' Motion

Defendants argue that (1) the Eleventh Amendment bars Plaintiff's claims against them in their official capacities; (2) Plaintiff cannot prevail on his Eighth Amendment inadequate medical care claim because Plaintiff received adequate medical care and it was Plaintiff who refused the treatment that Defendants provided; (3) Defendants Wright and Collette are not liable for the failure to intervene because Defendants' medical indifference claim is without merit; (4) Plaintiff does not allege sufficient personal involvement on the part of Defendant Wright; (5) Plaintiff's defamation claim against Defendant Pettigrass is based on a faulty premise; and (6) Defendants are entitled to qualified immunity. (Dkt. No. 39–3.)

### II. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

**\*5** Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006).

The nonmoving party must do more than "rest upon the mere allegations ... of his pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact [FN3] exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN3. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

When a plaintiff fails to respond to a defendants' motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the defendants' motion, and (2) assure itself that, based on the *undisputed* material facts in the record, the law indeed warrants judgment for the defendants. See *id.; Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001); N.D.N.Y. L.R. 7.1(b)(3).

Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts (its "Rule 7.1 Statement"), the facts as set forth in the Rule 7.1 Statement will be accepted as true to the extent that (1)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1315721 (N.D.N.Y.)

(Cite as: 2011 WL 1315721 (N.D.N.Y.))

those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram, Co.,* 373 F.3d 241, 243 (2d Cir.2004); *Champion,* 76 F.3d at 486; N.D.N.Y. L.R. 7.1(a)(3);

Similarly, where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law, the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. Implied in this standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se. See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002). This is because even *pro se* plaintiffs must obey the Court's procedural rules.[FN4] For example, this Court has consistently enforced Local Rule 7.1(a)(3)—and its predecessor, Local Rule 7.1(f)—by deeming facts set forth in a moving party's statement to have been admitted where the opposing party has failed to properly respond to that statement-even where the opposing party was proceeding *pro se* in a civil rights case.[FN5] Here, however, in an abundance of caution, I have independently reviewed the entire record.

FN4. *See McNeil v. United States,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that the procedural rules in ordinary civil rights litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Edwards v. I.N.S.,* 59 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.") (citations omitted).

FN5. *See, e.g., DeMar v. Car–Freshner Corp.,* 49 F.Supp.2d 84, 86 n. 1 (N.D.N.Y.1999) (*pro se* civil rights case); *Costello v. Norton,* No. 96–CV–1634, 1998 U.S. Dist. LEXIS 16755, at *1 n. 1, 1998 WL 743710, at *1 n. 2 (N.D.N.Y. Oct. 21, 1998) (*pro se* civil rights case); *Squair v. O'Brien & Gere Eng'rs, Inc.,* No. 96–CV–1812, 1998 U.S. Dist. LEXIS 22114, at *2 n. 2, 1998 WL 566773, at *1 n. 2. (N.D.N.Y. Aug. 31, 1998) (*pro se* civil rights case); *see also Monahan v. N.Y. City Dep't of Corrs.,* 214 F.2d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1.(a)(3), in *pro se* civil rights case).

**\*6** Where, as here, the Court chooses to conduct such an independent review of the record on an unopposed motion for summary judgment, any verified complaint filed by plaintiff should be treated as an affidavit. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") (citations omitted). To be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based on "personal knowledge." Fed.R.Civ.P. 56(e) ("A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."). An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. *Patterson,* 375 F.3d at 219; *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970).

In this case, Plaintiff's Amended Complaint includes a "declar[ation] under penalty of perjury that the [facts alleged in the complaint are] true and correct." (Dkt. No. 8 at 34.) Further, Plaintiff's Amended Complaint does not allege any matters "upon information and belief." Thus, Plaintiff's declaration "was the equivalent of an oath that

Slip Copy, 2011 WL 1315721 (N.D.N.Y.)

(Cite as: 2011 WL 1315721 (N.D.N.Y.))

would be given with respect to an affidavit." *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001). As such, the Amended Complaint is a verified complaint and should be treated as an affidavit. *Colon,* 58 F.3d at 872.

While the Court will treat Plaintiff's Amended Complaint as an affidavit, such an affidavit (or verified complaint) must still comply with [the] characteristics of a verified complaint) must still comply still comply with Rule 56(e). For example, such an affidavit (or verified complaint) must not be conclusory. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set out specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219; *Applegate,* 425 F.2d at 97. An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general. *See Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1999) ( "Statements, [like those made in affidavits, deposition testimony, or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") (citations omitted). However, even where an affidavit (or verified complaint) is non-conclusory, it may be insufficient to create a factual issue where it possesses the following two characteristics: (1) it constitutes almost the sole or exclusive basis for a disputed issue of fact in the case (or, expressed differently, it is largely unsubstantiated by any other direct evidence); and (2) it is so lacking in credibility that, even after drawing all inferences in the light most favorable to the nonmovant, no reasonable jury could find for the non-movant because the testimony is complete and/or replete with inconsistencies and improbabilities. *See Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005); *Argus, Inc. v. Eastman Kodak Co.,* 804 F.2d 38, 42–46 (2d Cir.1986); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612–15 (S.D.N.Y.2004).

### III. ANALYSIS

#### A. Claims Against Defendants in Their Official Capacities

**\*7** Plaintiff has brought suit against Defendants in their individual capacities and in their capacities as DOCS employees. (Dkt. No. 8 at 26–28.) Defendants move to dismiss the official-capacity claims, arguing that any claims for damages against them in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 39–3 at

8.) While the text of the Eleventh Amendment bars only suits against a state by a citizen of another state, the Supreme Court has "repeatedly held" that the principle of sovereign immunity bars a citizen from bringing a suit against his or her own state in federal court. *See Tenn. Student Assistance Corp. v. Hood,* 541 U.S. 440, 446 (2004); *Idaho v. Coeur D'Alene Tribe,* 521 U.S. 261, 267 (1997); *Hans v. Louisiana,* 134 U.S. 1, 10–21 (1890); *see also* U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."). State immunity extends not only to the states but also to state agencies and to state officers who act on behalf of the state. *See* Puerto Rico Aqueduct & Sewer Auth. v. Metcalf, 506 U.S. 139, 142–47 (1993).

The Eleventh Amendment bars suits for damages against state officials acting in their official capacities. *See* Will v. Mich. Dep't of State Police, 491 U.S. 58, 71; *see also Yin Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the official capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities.").

All DOCS employees are state officials for the purposes of the Eleventh Amendment. *See Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *see also Tolliver v. N.Y. State Corr. Officers,* No. 99 Civ. 9555, 2000 U.S. Dist. LEXIS 11531, at \*7, 2000 WL 1154311, at \*2 (S.D.N.Y. Aug. 14, 2000). Therefore, I recommend that the Court dismiss the claims for damages against Defendants in their official capacities.

#### B. Personal Involvement

Defendant Wright argues that he was not personally involved in any alleged unconstitutional conduct. (Dkt.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1315721 (N.D.N.Y.)

(Cite as: 2011 WL 1315721 (N.D.N.Y.))

No. 39–3 at 12–14.). A defendant's personal involvement "in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). To prevail, the plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Where a defendant is a supervisory official a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e. under the doctrine of *respondeat superior* ) is insufficient to show his personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

**\*8** Supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [FN6]

> [FN6.] The Supreme Court's decision in *Ashcroft v. Iqbal,* ––– U.S. –––, 129 S.Ct. 1937 (2009), arguably casts in doubt the continued vitality of some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531 (S.D.N.Y.2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

Plaintiff alleges that Defendant Wright failed to remedy Defendant's Kooi's medical indifference after learning of the alleged violation from letters sent by Plaintiff and Plaintiff's family. (Dkt. No. 8 at 13; Dkt. No. 39–13 at 53–54.) Defendant Wright then assigned Defendant Collette to investigate Plaintiff's allegations. (Dkt. No. 8 at 14.)

Without more, even construing the facts in the light most favorable to Plaintiff, Plaintiff has failed to allege, let alone establish, any factual basis upon which a jury could reasonably conclude personal involvement by Defendant Wright. First, the "mere receipt of letters from an inmate by a [supervisory official] regarding a medical claim is insufficient to constitute personal liability." *Gonzales v. Wright,* No. 9:06–CV–1424 (JMH), 2010 U . S. Dist. LEXIS 15953, at \*28, 2010 WL 681323, at \* 10 (N.D.N.Y. Feb. 22, 2010) (citations omitted); *see also Booker v. Doe,* No. 9:06–CV–73 (GLS), 2008 U.S. Dist. LEXIS 76413, at \*22, 2008 WL 4527601, at \*7 (N.D.N.Y. Sept. 30, 2008) ("It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement."). Second, a supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *see also Wright v. Genovese,* 694 F.Supp.2d 137, 161 (N.D.N.Y.2010) (Baxter, Mag. J.). Finally, Defendant Wright's actions in telling Plaintiff's family members that Plaintiff would need to sign medical release forms is not enough to subject Defendant Wright to personal liability. *See Joyner v. Greiner,* 195 F.Supp.2d 500, 506–07 (S.D.N.Y.2002) (holding that prison doctor's response to plaintiff's letter does not demonstrate personal involvement); *Ramsey v. Coughlin,* 1 F.Supp.2d 198, 204 (W.D.N.Y.1998) (holding that plaintiff's claim that supervisor responded to his letters is insufficient to establish personal involvement). [FN7]

> [FN7.] It should be noted that some courts have held that personal liability may lie where a "supervisor's 'involvement went beyond merely the receipt of complaint letters,' to 'responding, explaining the treatment and defending the institution.' " *Woods v. Goord,* No. 01 Civ. 3255(SAS), 2002 U.S. Dist LEXIS 7157, at \*27–31, 2002 WL 731691, at \*7–9 (S.D.N.Y. Apr. 23, 2002) (internal citations omitted); *see also Rashid v. Hussain,* No. 95–Civ. 676, 1997 U.S. Dist. LEXIS 16132, at \*9–10, 1997 WL 642549, at \*3 (N.D.N.Y. Oct. 15, 1997).

As such, I recommend granting Defendant Wright summary judgment on this ground.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1315721 (N.D.N.Y.)

(Cite as: 2011 WL 1315721 (N.D.N.Y.))

## C. Medical Indifference

As a threshold matter, the Court rejects Defendants' contention that Plaintiff's medical indifference claim is based solely on the refusal to prescribe the narcotics that Plaintiff requested. (Dkt. No. 39–3 at 1.) In addition to issues regarding treatment of Plaintiff's pain, Plaintiff has also raised allegations of deliberate indifference in regard to his weight loss. (Dkt. No. 8 at 22.)

1. *Defendant Kooi*

**\*9** Plaintiff alleges that Defendant Kooi's refusal to prescribe narcotics and nutritional supplements amounted to deliberate indifference of Plaintiff's serious medical needs in violation of the Eighth Amendment. (Dkt. No. 1.)

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Id* . (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27 (1984)).

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (citations omitted), *accord, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03. This "inquiry must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185.

For the purposes of their motion, Defendants do not challenge Plaintiff's assertion that ankylosing spondylitis is a serious medical condition. (Dkt. No. 39–3 at 9.) Instead, they argue that Plaintiff has failed to allege that Defendants acted with deliberate indifference. *Id.*

**\*10** Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Farmer v. Brennan,* 511 U.S. at 835). To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U .S. at 835; *Ross v. Giambruno,* 112 F.3d 505 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1315721 (N.D.N.Y.)

(Cite as: 2011 WL 1315721 (N.D.N.Y.))

Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith,* 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan. *Chance,* 143 F.3d at 703. As such, in a summary judgment motion, the critical question is whether a reasonable jury could conclude that Defendants "knew of and disregarded an excessive risk to [Plaintiff's] health and safety and that [Defendants were] both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." *Caiozzo,* 581 F.3d at 72 (internal quotation marks and alterations omitted).

In this case, Plaintiff has failed to establish that Defendant Kooi acted with deliberate indifference in treating Plaintiff's pain. Throughout the six-month period in question, Defendant Kooi examined Plaintiff on at least eight separate occasions. (Dkt. No. 39–4 ¶ 26; Dkt. No. 39–5 at 5, 7–8, 10–13.) The ambulatory health record also shows that medical staff examined Plaintiff on approximately sixty separate occasions between August 2004 and May 2006. (Dkt. No. 39–5.) Plaintiff also received a number of different pain relievers and muscle relaxants, including Trilisate, Ibuprofen, Feldene, Flexeril, Ultram, and Alamag. (Dkt.Nos.8, 39–4, 39–5.) In addition to medication, Plaintiff was granted use of the TENS Unit to help alleviate his pain. *Id.* Rather than showing a "conscious disregard" to Plaintiff's serious medical needs, the record demonstrates that medical staff adequately responded to Plaintiff's complaints. (Dkt. No. 39–5.) Even if the prescribed treatments were not successful in alleviating Plaintiff's pain, it cannot be said that Defendant Kooi acted with deliberate indifference. *See Williams v. Koenigsmann,* No. 03 Civ. 5267(SAS), 2004 U.S. Dist. LEXIS 2346, at *18–19, 2004 WL 315279, at *6 (S.D.N.Y. Feb. 18, 2004).

**\*11** Although the record contains several instances where Plaintiff disagreed with Defendant Kooi's judgment, "[d]ifferences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs." *Wright,* 694 F.Supp.2d at 160 (citing cases); *see also Chance,* 143 F.3d at 703 ("mere disagreement over proper treatment does not create a constitutional claim"). "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703. Defendant Kooi was also entitled to his own medical judgment regarding Plaintiff's addiction to narcotics. *See Wright,* 694 F.Supp.2d at 160 ("concern about prescribing narcotic pain medication, on which inmates with possible substance abuse issues could become dependent, may inform a medical judgement about what drug to prescribe"). Here, Defendant Kooi, who had been a doctor with DOCS for over twenty years, believed that Plaintiff had addiction issues. (Dkt. No. 39–4 ¶ 21.) His medical judgment is further bolstered by Plaintiff's own admission that he had been addicted to percocet for at least three and a half years. (Dkt. No. 39–13 at 35–37.) Moreover, even if other doctors, as Plaintiff argues, disagreed with Defendant Kooi's prescribed treatment, Defendant Kooi is entitled to his own medical judgment and the mere fact that he disagreed with other medical professionals is insufficient to show deliberate indifference even if Defendant Kooi's judgment was misguided or negligent. *See Ortiz v. Makram,* No. 96 Civ. 3285, 2000 U.S. LEXIS 18428, at *34, 2000 WL 1876667, at *10 (S.D.N.Y. Dec. 21, 2000).

The Amended Complaint also contains allegations of three medical call-outs or appointments, including one with a specialist, that Defendant Kooi canceled. (Dkt. No. 8 at 4, 6–7.) Although these cancellations may show negligence or medical malpractice, they do not rise to the level of an Eighth Amendment violation as a "delay in medical treatment does not necessarily invoke the Eighth Amendment." *Morrison v. Mamis,* No. 08 Civ. 4302(PAC) (AJP), 2008 U.S. Dist. LEXIS 106416, at *25 n. 19, 2008 WL 5451639, at *7 n. 19 (S.D.N.Y. Dec. 18, 2008) (Peck, Mag. J.). Delayed treatment amounts to deliberate indifference when "officials deliberately

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1315721 (N.D.N.Y.)

(Cite as: 2011 WL 1315721 (N.D.N.Y.))

delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Id.* (citing *Demata v. New York State Corr. Dep't of Health Servs.,* No. 99–0066, 198 F.3d 233 (table), (published in full-text format at 1999 U.S.App. LEXIS 22955, at *5, 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999)). Here, any delay in treatment does not rise to the level of deliberate indifference. In fact, after each cancellation, Plaintiff was subsequently examined by medical personnel within a short period of time. For example, Plaintiff was seen by medical personnel on September 17, just four days after a cancellation on September 13. (Dkt. No. 8 at 4.) Likewise, Plaintiff was examined by a nurse on October 6 following a call-out cancellation on September 30. *Id.* at 6. And after a purported cancellation on December 2, Plaintiff was examined by Defendant Kooi on December 9. *Id.* at 7. Further, not providing Plaintiff with the second medical opinion that he requested does not amount to an Eight Amendment violation. *See Tafari v. Stein,* No. 01CV0841, 2009 U.S. Dist. LEXIS 10256, at *26, 2009 WL 331378, at *7 (W.D.N.Y. Feb. 11, 2009) (Scott, Mag. J.) ("The Constitution does not require that an inmate receive a particular course of treatment, or that an inmate see a requested specialist.") (citing *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir.1997); *Davis v. Hall,* 992 F.2d 151, 153 (8th Cir.1993)); *Scott v. Laux,* No. 07–CV–936, 2008 WL 4371778, at *4 (N.D.N.Y. Sept. 18, 2008) ("[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim.").

*12 Plaintiff also accuses Defendant Kooi of continuing the Feldene and Flexeril treatment even though Defendant Kooi knew that Plaintiff had adverse side effects, which Plaintiff characterizes as an allergy, to those medications. (Dkt. No. 8 at 11.) This accusation, while not addressed by Defendant Kooi, is conclusory and lacks any supporting evidence. *See Bickerstaff,* 196 F.3d at 452. For example, there is no indication that Plaintiff's side effects or allergic reactions amounted to a serious medical condition. In fact, it is unknown how any adverse affects manifested themselves. Without more, it cannot be said that Defendant Kooi's actions amounted to deliberate indifference. *See Bryant v. Wright,* No. 09 Civ.

2456(GBD) (GWG), 2010 U.S. Dist. LEXIS 96539, at *24, 2010 WL 3629443, at *8 (S.D.N.Y. Aug. 31, 2010) ("The mere fact that the generic medication has 'side effects,' ... is certainly insufficient to state a deliberate indifference claim ....") (Gorenstein, Mag. J.).

Finally, Plaintiff's refusal of the prescribed treatment further negates allegations of deliberate indifference. *See Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 U.S. Dist. LEXIS 124737, at *28, 2010 WL 4905240, at *10 (N.D.N.Y. Sept. 29, 2010) (Lowe, Mag. J.) (citing *Rivera v. Goord,* 253 F.Supp.2d 735, 756 (S.D.N.Y.2003)). On October 24, 2004, Plaintiff signed a Refusal of Medical Examination and/or Treatment Form stating: "I refuse to stay in the infirmary. The doctor has released me and I realize that I cannot be monitored as closely in population as I could if I stayed but I still wish to leave." (Dkt. No. 39–7.) This refusal occurred after Defendant Kooi had examined Plaintiff on October 21. (Dkt. No. 8 at 7.) On December 22, after requesting morphine and Percocet from Defendant Kooi, Plaintiff refused admission to the medical unit for bed rest and observation. (Dkt. No. 39–5 at 12.) Plaintiff also started physical therapy on December 8 but Plaintiff failed to appear for three of the five sessions that were scheduled during the time relevant to this suit. (Dkt. No. 39–6.) While Plaintiff might have refused the prescribed treatment because he disagreed with them, prisoners are not afforded the medical treatment of their choice. *Chance,* 143 F.3d at 703. Thus, Plaintiff's refusal of the prescribed treatment negates his claim of deliberate indifference.

Accordingly, I recommend that Defendant Kooi be granted summary judgment to the extent that Plaintiff's deliberate indifference claim is based on treatment for pain.[FN8]

> FN8. Interspersed throughout the Second Amended Complaint are allegations regarding conflicting reports on Plaintiff's hepatitis status. Although unaddressed by Defendants, the allegations do not state a deliberate indifference claim. In fact, it is unclear if Plaintiff even has hepatitis. A printout of a medical report indicates that Plaintiff tested negative for Hepatitis C but

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1315721 (N.D.N.Y.)

(Cite as: 2011 WL 1315721 (N.D.N.Y.))

appearing right next to that typed-text are the handwritten words "Hep C" accompanied with a positive symbol. (Dkt. No. 8–1 at 57.) Moreover, Plaintiff argues that he tested positive for Hepatitis C in 2001 but that he did not learn of it until 2004. There are no allegations, however, that Defendants were deliberately indifferent in treating this condition. Even if Plaintiff had Hepatitis C there are no indications that any delay in diagnosis or treatment endangered Plaintiff. *See Gonzalez v. Coughlin,* Nos. 9:94CV1119, 9:97CV3202008, U.S. Dist. LEXIS 45076, at *20–21, 2008 WL 2385948, at *7 (N.D.N.Y. June 9, 2008) (finding no deliberate indifference to inmate's serious medical needs where "four years after [inmate] first tested positive for Hepatitis C and three years after he learned of his diagnosis, plaintiff did not require treatment due to the slow progression of his disease"). Plaintiff also argues that Defendant Kooi ignored Plaintiff's potential liver damage (as a result of the alleged hepatitis) when prescribing painkillers but there are no indications that Plaintiff suffered any adverse affects as Plaintiff indicates that his liver test results between September 2004 and June 2006 "were deemed 'good-excellent.' " (Dkt. No. 8 at 21.) Finally, the Amended Complaint also contains discussions regarding Plaintiff's hypertension. The record, however, is devoid of any allegations that Defendants acted with deliberate indifference in treating Plaintiff's high blood pressure.

Plaintiff has also alleged that Defendant Kooi's failure to provide nutritional supplements, including multivitamins, Ensure, and herbal teas caused a dramatic weight loss of approximately thirty pounds or one-fifth of Plaintiff's body weight. (Dkt. No. 8 at 5, 22.) While weight loss alone may not constitute a serious medical condition, rapid weight loss or weight loss coupled with other conditions may present a serious medical condition. *See, e.g* ., *Kaminsky v. Rosenblum,* 929 F.2d 922, 924 (2d Cir.1991) (high blood pressure, diabetes, angina, gout and an enlarged spleen held to be serious medical needs, particularly in light of prisoner's extreme weight loss).

Because this issue remains unaddressed by Defendants and because it is unclear from the record whether this weight loss occurred rapidly or whether it was exacerbated by the ankylosing spondylitis, I find that a genuine issue of fact remains on whether the weight loss is a serious medical condition. Moreover, it is unclear if Defendant Kooi or other medical staff treated Plaintiff's weight loss at all. Plaintiff has alleged that Defendant Kooi changed Plaintiff's weight on the ambulatory record from 123 pounds to 137.5 pounds. (Dkt. No. 8 at 6.) In light of Defendant Kooi's failure to respond to this accusation or provide any discussion on this issue, I find that a genuine issue of material fact exists as to whether Defendant Kooi was deliberately indifferent to a potentially serious medical need.

**\*13** Therefore, I recommend that Defendant Kooi be denied summary judgment to the extent that the Amended Complaint alleges deliberate indifference based on rapid weight loss and the failure to provide nutritional supplements.

2. *Defendant Collette*

Plaintiff further alleges that Defendant Collette was deliberately indifferent to his serious medical needs by failing to rectify the alleged unconstitutional conduct after conducting an investigation. (Dkt. No. 8 at 13.) Defendant Collette might have exhibited deliberate indifference had she failed to act on information indicating that Defendant Kooi was violating Plaintiff's constitutional rights. *See Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d at 323–24). As I discussed above, however, the record does not show that constitutional violations were occurring with regard to treatment for Plaintiff's pain. Thus, Defendant Collette's intervention was not required. As such, I recommend that Defendant Collette be granted summary judgment to the extent that it is based on the treatment for Plaintiff's pain.

However, as I also discussed in the section immediately above, I find that genuine issues of material facts exists as to whether the deprivation of nutritional supplements and herbal teas violated the Eighth Amendment. In light of that finding, I recommend denying Defendant Collette summary judgment to the extent that the Amended Complaint is based on that issue.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1315721 (N.D.N.Y.)

(Cite as: 2011 WL 1315721 (N.D.N.Y.))

3. *Defendant Pettigrass*

Plaintiff alleges that he could not receive proper medical care because the two-year old misbehavior incidents that Defendant Pettigrass noted on Plaintiff's records prevented transfers to medical facilities. (Dkt. No. 8 at 15.) Although Defendant Pettigrass has not addressed this argument, Plaintiff's allegation does not support a claim of medical indifference as it is too conclusory and lacks any supporting evidence. *See Bickerstaff,* 196 F.3d at 452. Neither the Amended Complaint nor the record contain any factual allegations (or disputes) that Plaintiff did in fact receive inadequate medical care as a result of the misbehavior reports.

As such, Defendant Pettigrass should be granted summary judgment on the medical indifference claim.

**D. Defamation**

Plaintiff also accuses Defendant Pettigrass of defamation by falsely accusing Plaintiff of sexual misconduct. (Dkt. 8 at 15–16.) Generally, a state defamation action by government officials "cannot be converted into a federal action for loss of liberty under the Due Process Clause of the Fourteenth Amendment." *Patterson v. City of Utica,* 370 F.3d 322, 328 (2d Cir.2004); *see also Paul v. Davis,* 424 U.S. 693, 709 (1976). "Section 1983 requires that the alleged conduct violate a constitutionally safeguarded right." *Venable v. Goord,* No. 03 Civ. 4434(RMB), 2004 U.S. Dist. LEXIS 18275, at *13, 2004 WL 2033069, at *5 (S.D.N.Y. Sept. 7, 2004) (citing *Savage v. Snow,* 575 F.Supp. 828, 837 (S .D.N.Y.1983)). Thus, Plaintiff has failed to allege a section 1983 violation.

**\*14** "In the absence of original federal jurisdiction, the decision of whether to exercise jurisdiction over pendent state law claims is within the court's discretion." *Butler v. LaBarge,* No. 9:09–cv–1106 (GLS/DRH), 2010 U.S. Dist. LEXIS 104701, at *9, 2010 WL 3907258, at *3 (N.D.N.Y. Sept. 30, 2010) (citing *Kolari v. New York–Presbyterian Hosp.,* 455 F.3d 118, 121–22 (2d Cir.2006)). When all federal claims are eliminated before trial, the balance of factors in deciding whether to exercise jurisdiction over remaining state law claims leans toward dismissal. *See Kolari,* 455 F.3d at 122. But a court may choose to exercise jurisdiction if a state law claim raises an important question of federal policy. *See id.* at 122–23. Here, Plaintiff has failed to establish a federal claim or an important issue of federal policy. Thus, in light of my recommendation that the Court dismiss Plaintiff's federal claim against Defendant Pettigrass, I recommend that the Court decline to exercise pendent jurisdiction over Plaintiff's state law claim of defamation.

**E. Qualified Immunity**

Defendants also argue that they are entitled to qualified immunity. (Dkt. No. 39–3 at 16.) The affirmative defense of qualified immunity "shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997)).

A qualified immunity inquiry in prisoner civil rights cases generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004) (citations omitted); *accord, Higazy v. Templeton,* 505 F.3d 161, 169 n. 8 (2d Cir.2007) (citations omitted). The right to be free from deliberate indifference to serious medical needs is a clearly established constitutional right. *LaBounty v. Coughlin,* 137 F.3d 68, 74 (2d Cir.1998) (citing *Estelle,* 429 U.S. at 104). Whether particular acts are objectively reasonable, however, is a highly fact-specific inquiry. *See Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). Thus, the defense is unavailable and summary judgment is inappropriate where "the objective reasonableness of defendants' actions turns on disputed questions of fact." *Id.* at 927. To establish the qualified immunity defense, defendants "must show that it was 'objectively reasonable' ... for them to believe that they had not acted with the requisite deliberate indifference." *McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004) (quoting *Ford v. McGinnis,* 352 F.3d 582, 597 (2d Cir.2003)).

As I discussed above, a reasonable jury could conclude that Defendant Kooi acted with deliberate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1315721 (N.D.N.Y.)

(Cite as: 2011 WL 1315721 (N.D.N.Y.))

indifference in failing to provide Plaintiff with the nutritional supplements. Likewise, a reasonable jury could also conclude that Defendant Collette acted with deliberate indifference in failing to correct the constitutional violation after learning of it. Thus, a jury could conclude that their actions were not objectively reasonable. Accordingly, I recommend that Defendants Kooi's and Collette's motion for summary judgment on qualified immunity grounds be denied.

**\*15 ACCORDINGLY,** it is

**RECOMMENDED** that the Defendants' motion for summary judgment (Dkt. No. 43) be **GRANTED IN PART** and **DENIED IN PART,** and it is further

**ORDERED** that the clerk provide copies of *Demata v. New York State Corr. Dep't of Health Servs.,* No. 99–0066, 198 F.3d 233 (table), (published in full-text format at 1999 U.S.App. LEXIS 22955, at \*1, 1999 WL 753142, at \*1 (2d Cir. Sept. 17, 1999); *Gonzales v. Wright,* No. 9:06–CV–1424 (JMH), 2010 U.S. Dist. LEXIS 15953, at \*1, 2010 WL 681323, at \*1 (N.D.N.Y. Feb. 22, 2010); *Bryant v. Wright,* No. 09 Civ. 2456(GBD) (GWG), 2010 U.S. Dist. LEXIS 96539, at \*1, 2010 WL 3629443, at \*1 (S.D.N.Y. Aug. 31, 2010); *Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 U.S. Dist. LEXIS 124737, at \*1, 2010 WL 4905240, at \*1 (N.D.N.Y. Sept. 29, 2010); *Butler v. LaBarge,* No. 9:09–cv–1106 (GLS/DRH), 2010 U .S. Dist. LEXIS 104701, at \*1, 2010 WL 3907258, at \*1 (N.D.N.Y. Sept. 30, 2010); *Tafari v. Stein,* No. 01CV0841, 2009 U.S. Dist. LEXIS 10256, at \*1, 2009 WL 331378, at \*1 (W.D.N.Y. Feb. 11, 2009); *Verhow v. Astrue,* No. 08–CV–6423–CJS, 2009 U.S. Dist. LEXIS 100836, at \*1, 2009 WL 3671665, at \*1 (W.D.N.Y. Oct. 29, 2009); *Gonzalez v. Coughlin,* Nos. 9:94CV1119, 9:97CV3202008, U.S. Dist. LEXIS 45076, at \*1, 2008 WL 2385948, at \*1 (N.D.N.Y. June 9, 2008); *Scott v. Laux,* No. 07–CV–936, 2008 WL 4371778, at \*1 (N.D.N.Y. Sept. 18, 2008); *Booker v. Doe,* No. 9:06–CV–73 (GLS), 2008 U.S. Dist. LEXIS 76413, at \*1, 2008 WL 4527601, at \*1 (N.D.N.Y. Sept. 30, 2008); *McArthur v. Comm'r of Soc. Sec.,* No. 3:06–CV–860 (LEK/DRH), 2008 WL 4866049, at \*1 (N.D.N.Y. Nov. 7, 2008); *Morrison v. Mamis,* No. 08 Civ. 4302(PAC) (AJP), 2008 U.S. Dist. LEXIS 106416, at \*1,

2008 WL 5451639, at \*1 (S.D.N.Y. Dec. 18, 2008); *Williams v. Koenigsmann,* No. 03 Civ. 5267(SAS), 2004 U.S. Dist. LEXIS 2346, at \* 1, 2004 WL 315279, at \*1 (S.D.N.Y. Feb. 18, 2004); *Venable v. Goord,* No. 03 Civ. 4434(RMB), 2004 U.S. Dist. LEXIS 18275, at \*1, 2004 WL 2033069, at \*1 (S.D.N.Y. Sept. 7, 2004); *Tolliver v. N.Y. State Corr. Officers,* No. 99 Civ. 9555, 2000 U.S. Dist. LEXIS 11531, at \*1, 2000 WL 1154311, at \*1 (S.D.N.Y. Aug. 14, 2000); *Ortiz v. Makram,* No. 96 Civ. 3285, 2000 U.S. Dist. LEXIS 18428, at \*1, 2000 WL 1876667, at \*1 (S.D.N.Y. Dec. 21, 2000); *Woods v. Goord,* No. 01 Civ. 3255(SAS), 2002 U.S. Dist. LEXIS 7157, at \*1, 2002 WL 731691, at \*1 (S.D.N.Y. Apr. 23, 2002); *Squair v. O'Brien & Gere Eng'rs, Inc.,* No. 96–CV–1812, 1998 U.S. Dist. LEXIS 22114, at \*1, 1998 WL 566773, at \*1 (N.D.N.Y. Aug. 31, 1998); *Costello v. Norton,* No. 96–CV–1634, 1998 U.S. Dist. LEXIS 16755, at \*1, 1998 WL 743710, at \*1 (N.D.N.Y. Oct. 21, 1998); *Rashid v. Hussain,* No. 95–Civ. 676, 1997 U.S. Dist. LEXIS 16132, at \*1 1997 WL 642549, at \*1 (N.D.N.Y. Oct. 15, 1997), in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2011.

Anderson v. Kooi
Slip Copy, 2011 WL 1315721 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 1256942 (N.D.N.Y.)

(Cite as: 2011 WL 1256942 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James ANDERSON, Plaintiff,
v.
Doctor KOOI, Auburn Correctional Facility; Lester
Wright; Ms. Collette, Assistant Medical Officer; and
Michael Pettigrass, Counselor, Auburn Correctional,
Defendants.
No. 9:07–CV–1257.

April 1, 2011.
James Anderson, Coxsackie, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, C. Harris Dague, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.
    **\*1** Plaintiff, James Anderson, commenced this civil
rights action in December 2007, pursuant to 42 U.S.C. §
1983. By Report–Recommendation dated January 24,
2011, the Honorable George H. Lowe, United States
Magistrate Judge, recommended that the defendants'
motion for summary judgment (Docket No. 43) be granted
in part, and denied in part. The defendants have filed
objections to the report-recommendation.
    Based upon a de novo review of the entire file,
including the portions of the Report–Recommendation to
which defendants have objected, and the recommendations
of Magistrate Judge Lowe, the Report–Recommendation
is accepted and adopted in all respects. See 28 U.S.C.
636(b)(1).

    Accordingly, it is

    ORDERED that

    1. Defendants' motion for summary judgment (Docket
No. 43) is GRANTED in part and DENIED in part as
follows:

    a. All claims for damages against the defendants in their
official capacities are DISMISSED;

    b. Defendants Kooi and Collette are GRANTED
summary judgment to the extent that plaintiff's
deliberate indifference claim is based on treatment for
pain;

    c. Defendants Kooi and Collette are DENIED summary
judgment to the extent that the amended complaint
alleges deliberate indifference based on rapid weight
loss and the failure to provide nutritional supplements;

    d. Defendant Wright's summary judgment motion is
GRANTED, and all claims against him are
DISMISSED;

    e. Defendant Pettigrass' summary judgment motion is
GRANTED, and all federal claims against him are
DISMISSED;

    f. Jurisdiction over plaintiff's state law claim of
defamation is DECLINED and is DISMISSED without
prejudice;

    g. Defendant Kooi's and Collette's motion for summary
judgment on qualified immunity grounds is DENIED;
and

    2. The Clerk is directed to return the file to the
Magistrate Judge for further scheduling and/or pretrial
procedures.

    IT IS SO ORDERED.

N.D.N.Y.,2011.

Anderson v. Kooi
Slip Copy, 2011 WL 1256942 (N.D.N.Y.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1256942 (N.D.N.Y.)

(Cite as: 2011 WL 1256942 (N.D.N.Y.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1256942 (N.D.N.Y.)

(Cite as: 2011 WL 1256942 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James ANDERSON, Plaintiff,
v.
Doctor KOOI, Auburn Correctional Facility; Lester
Wright; Ms. Collette, Assistant Medical Officer; and
Michael Pettigrass, Counselor, Auburn Correctional,
Defendants.
No. 9:07–CV–1257.

April 1, 2011.

James Anderson, Coxsackie, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, C. Harris Dague, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff, James Anderson, commenced this civil
rights action in December 2007, pursuant to 42 U.S.C. §
1983. By Report–Recommendation dated January 24,
2011, the Honorable George H. Lowe, United States
Magistrate Judge, recommended that the defendants'
motion for summary judgment (Docket No. 43) be granted
in part, and denied in part. The defendants have filed
objections to the report-recommendation.

Based upon a de novo review of the entire file,
including the portions of the Report–Recommendation to
which defendants have objected, and the recommendations
of Magistrate Judge Lowe, the Report–Recommendation
is accepted and adopted in all respects. See 28 U.S.C.
636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment (Docket
No. 43) is GRANTED in part and DENIED in part as
follows:

a. All claims for damages against the defendants in their
official capacities are DISMISSED;

b. Defendants Kooi and Collette are GRANTED
summary judgment to the extent that plaintiff's
deliberate indifference claim is based on treatment for
pain;

c. Defendants Kooi and Collette are DENIED summary
judgment to the extent that the amended complaint
alleges deliberate indifference based on rapid weight
loss and the failure to provide nutritional supplements;

d. Defendant Wright's summary judgment motion is
GRANTED, and all claims against him are
DISMISSED;

e. Defendant Pettigrass' summary judgment motion is
GRANTED, and all federal claims against him are
DISMISSED;

f. Jurisdiction over plaintiff's state law claim of
defamation is DECLINED and is DISMISSED without
prejudice;

g. Defendant Kooi's and Collette's motion for summary
judgment on qualified immunity grounds is DENIED;
and

2. The Clerk is directed to return the file to the
Magistrate Judge for further scheduling and/or pretrial
procedures.

IT IS SO ORDERED.

N.D.N.Y.,2011.

Anderson v. Kooi
Slip Copy, 2011 WL 1256942 (N.D.N.Y.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1256942 (N.D.N.Y.)

(Cite as: 2011 WL 1256942 (N.D.N.Y.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.